| | |
|---|---|
| STATES OF NEW YORK, CONNECTICUT, NEW JERSEY, RHODE ISLAND and WASHINGTON, and COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA, | |
| Plaintiffs, | 18-CV-06471 (ER) (SDA) |
| v. | FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| UNITED STATES DEPARTMENT OF JUSTICE; and JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States, | |
| Defendants. | |

## INTRODUCTION

1.     In our federal system, States have primary responsibility for the design of law enforcement policies to keep our communities safe and promote trust between law enforcement agencies and the residents they serve. The Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program is a mandatory formula grant that Congress created to provide States with a reliable source of funding to promote public safety while maximizing their discretion to tailor their law enforcement efforts to local needs. Congress has appropriated hundreds of millions of dollars in annual grant funds to that end. Contrary to this congressional intent, however, the United States Department of Justice ("DOJ") has now decided to coerce States and localities into enforcing the federal government's civil immigration priorities by conditioning Byrne JAG funding on compliance with immigration-related conditions that have nothing to do with the program's purpose. Plaintiffs—the States of New York, Connecticut, New Jersey, Rhode Island,

and Washington and the Commonwealths of Massachusetts and Virginia ("the States")—challenge these unconstitutional and illegal conditions, and seek declaratory and injunctive relief to protect their ability to pursue their own law enforcement prerogatives in the manner that best achieves the safety and security of their communities.

2.      The Byrne JAG program is the primary source of federal criminal justice funding for States and localities and is designed to "give state and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). Byrne JAG funds have been used to support a diverse array of programs tailored to local law enforcement needs, including initiatives to combat gun violence, reduce violent crime, provide substance abuse services, support diversion and re-entry programs, improve criminal records systems, fight organized crime, prevent sexual abuse, and fund domestic violence legal advocacy.

3.      On July 25, 2017, DOJ announced that it was imposing three immigration-related conditions on Fiscal Year ("FY") 2017 Byrne JAG funds. The conditions require States and localities to (1) provide access to their correctional facilities for federal immigration enforcement agents (the "access condition"); (2) provide advance notice—i.e., as early as practicable upon request—to federal immigration authorities before an individual's scheduled release from custody (the "notice condition"); and (3) accept various conditions relating to 8 U.S.C. § 1373, which prohibits States and localities from restricting their officials from communicating with federal immigration authorities "regarding the citizenship or immigration status, lawful or unlawful, of any individual" (collectively, the "Section 1373 conditions").  In addition, States are required to monitor their subgrantees to ensure their compliance with the notice and access conditions, and report to DOJ if they believe that a subgrantee has violated Section 1373.

4.      On July 20, 2018, DOJ released the FY 2018 Byrne JAG award solicitation (the "FY 2018 State Solicitation"). In the FY 2018 State Solicitation, DOJ seeks to impose new immigration-related conditions in addition to those that DOJ imposed on FY 2017 grantees. Any recipient that accepts the FY 2018 award will also need to certify that it does not or will not: violate 8 U.S.C. § 1644, another federal statute prohibiting restrictions on sharing information about an individual's immigration status with federal authorities; violate, aid or abet violation of 8 U.S.C. § 1324(a), which prohibits the knowing or reckless concealment or harboring of aliens; impede federal authorities in their arrest or removal of aliens as authorized by 8 U.S.C. §§ 1226(a) and (c), and 8 U.S.C. § 1231(a)(4); impede federal immigration agents in their interrogation of individuals as authorized by 8 U.S.C. § 1357(a)(1); and impede reporting by the Attorney General of the United States of the number of individuals without lawful status incarcerated in Federal and State prisons for having committed felonies and all efforts to ensure their prompt removal pursuant to 8 U.S.C. §§ 1366(1) and (3). *See* FY 2018 State Solicitation at 37, 40-45.

5.      DOJ's decision to impose these sweeping conditions on Byrne JAG grantees represents an unlawful, *ultra vires* attempt to force States and localities to forsake their own policy judgments and aid in federal civil immigration enforcement. Nothing in the Byrne JAG statute "grant[s] the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for their failure to comply with those conditions." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018).

6.      DOJ has thus forced the States into an untenable position: accept unlawful and unconstitutional conditions that diminish our sovereign ability to set our own law enforcement

priorities and protect our communities, or forfeit Byrne JAG funding, thus undermining the vital programs that such funding supports.

7.      Accordingly, the States file this action seeking a declaratory judgment that the immigration-related conditions DOJ seeks to impose on both FY 2017 and FY 2018 Byrne JAG funds are unlawful, and a permanent injunction enjoining DOJ from imposing these conditions on any Byrne JAG applicant in order to receive the funds.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

9.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of New York is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the Southern District of New York.

## PARTIES

10.      Plaintiff the State of New York, represented by and through its Attorney General, Barbara D. Underwood, is a sovereign state in the United States of America. The Attorney General is New York State's chief law enforcement officer, and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.

11.      Plaintiff the State of Connecticut, represented by and through its Attorney General, George Jepsen, is a sovereign state in the United States of America.

12.      Plaintiff the Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Attorney General Maura Healey, who is the

chief law enforcement officer of Massachusetts. The Massachusetts Executive Office of Public Safety and Security ("EOPSS") is the state agency responsible for applying for, obtaining, and disbursing funds to subgrantees under the Byrne-JAG program.

13. Plaintiff the State of New Jersey, represented by and through its Attorney General, Gurbir S. Grewal, is a sovereign state in the United States of America. As the State's Attorney General, Grewal is the head of the New Jersey Department of Law and Public Safety, N.J. Stat. Ann. § 52:17B-2. The mission of the Department of Law and Public Safety is to protect the safety, security, and quality of life of the people of New Jersey through an integrated and coordinated structure of law enforcement and regulatory agencies. The Department of Law and Public Safety is also the agency responsible for applying for, obtaining, and disbursing funds to subgrantees under Byrne JAG.

14. Plaintiff the State of Rhode Island, represented by and through its Attorney General, Peter F. Kilmartin, is a sovereign state in the United States of America.

15. Plaintiff the Commonwealth of Virginia, represented by and through its Attorney General, Mark Herring, is a sovereign state in the United States of America.

16. Plaintiff the State of Washington, represented by and through its Attorney General, Robert W. Ferguson, is a sovereign state in the United States of America. The Washington State Attorney General is the chief legal advisor to the State. The Attorney General's powers and duties include acting in federal court on matters of public concern.

17. The States are aggrieved by Defendants' actions and have standing to bring this action.

18. Defendant United States Department of Justice ("DOJ") is an agency of the United States government and has responsibility for implementing the Byrne JAG program.

19.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and is the federal official in charge of the U.S. Department of Justice. The Attorney General is sued in his official capacity.

## ALLEGATIONS

## I.     The Byrne JAG Program

20.     The Byrne JAG program has its origins in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title I, 82 Stat. 197, which created the first block grants for States and localities to use for law enforcement and criminal justice programs.[1] Recognizing that "crime is essentially a local problem that must be dealt with by State and local governments," 82 Stat. at 197, Congress designed the grant to provide a reliable funding stream that States and localities could use in accordance with State and local law enforcement policies.[2]

21.     To ensure federal deference to local priorities, the 1968 Act prohibited federal agencies and executive branch officials from using law enforcement grants to "exercise any direction, supervision, or control over any police force or any other law enforcement agency of any State or any political subdivision thereof." *Id.* § 518(a), 82 Stat. at 208. Although Congress has repeatedly modified the structure and terms of the law enforcement grants authorized under Title I of the 1968 Act, the prohibition originally set forth in § 518 of the 1968 Act remains in

---

[1] *See* Justice System Improvement Act of 1979, Pub. L. No. 96-157, 93 Stat. 1167, 1179 (amending Title I of the 1968 Act and reauthorizing law enforcement block grants to States and local governments); Justice Assistance Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, 2077-85 (same); Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, pt. E, 102 Stat. 4181, 4329 (amending Title I of the 1968 Act and creating a formula law-enforcement grant); Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006) (amending Title I of the 1968 Act and creating the modern Byrne JAG program).

[2] *See, e.g.*, S. Rep. No. 90-1097, at 2 (1968) (stating that Congress sought to encourage States and localities to adopt programs "based upon their evaluation of State and local problems of law enforcement"); *see also Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (reviewing the legislative history of the 1968 Act and concluding that "[t]he dominant concern of Congress apparently was to guard against any tendency towards federalization of local police and law enforcement agencies").

effect with virtually no modification, and is now codified in the same chapter of the U.S. Code as Byrne JAG. *See* 34 U.S.C. § 10228(a). The full text of Section 10228(a) provides: "Nothing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." *Id.*

22.     Congress codified the modern Byrne JAG program in 2006.[3] 34 U.S.C. §§ 10151–58. The Byrne JAG program is administered by DOJ through its Office of Justice Programs. Like its predecessors, Byrne JAG aims to "give state and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). To that end, the Byrne JAG statute gives recipients substantial discretion to use funds for eight "broad purposes," *id.*, including law enforcement, crime prevention and education, and drug treatment, 34 U.S.C. § 10152(a)(1).

23.     DOJ is required by law to issue grants "in accordance with the formula" set forth in the Byrne JAG statute. *Id.* Specifically, "[o]f the total amount appropriated" by Congress, the U.S. Attorney General "shall, except as provided in paragraph (2), allocate" fifty percent of the funds based on each State's population and fifty percent based on each State's crime rate. *Id.* § 10156(a)(1). The exception in paragraph (2) provides that each State must receive at least one-quarter of one percent of the funds appropriated by Congress for a given year, regardless of what the formula would otherwise dictate. *Id.* § 10156(a)(2).

---

[3] The program is named after a former New York City police officer who was killed in the line of duty. *See About Officer Byrne*, https://goo.gl/pLm8JM. Congress appropriated for the program—which consolidated the existing Byrne formula program with another law enforcement block grant program—in an appropriations act passed on December 8, 2004. *See* P.L. 108-447, 118 Stat. 2809, 2863 (Dec. 8, 2004). Thus, although the program was not codified until 2006, some states began receiving awards under the program in FY 2005.

24.     Of the money allocated to each State, sixty percent of the funding "shall be for direct grants to States," *id.* § 10156(b)(1), and forty percent "shall be for grants" directly to localities (compared within a State based on crime rate), *id.* § 10156(b)(2), (d). Each State is required to allocate a portion of its award to localities within the State. *See id.*, § 10156(c)(2). Thus, some localities are both direct grant recipients and subgrantees of the States.

25.     Unlike *discretionary* grant programs, which agencies award on a competitive basis, "formula grants … are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865 F.2d, 1084 1088 (9th Cir. 1989). Thus, if a grantee satisfies the statutory requirements, it is entitled to receive what the formula dictates.

26.     Under the Byrne JAG statute, States and local governments are entitled to their share of the formula allocation as long as they use the funds to further one or more of the eight broadly defined goals, *see* 34 U.S.C. § 10152(a)(1)(A)-(H), and their applications contain a series of statutorily prescribed certifications and attestations, *see id.* § 10153(a).

27.     States and localities are required to submit an application to receive Byrne JAG funds each fiscal year. *See* 34 U.S.C. § 10153(a). The application must include the following items, among others: a certification that program funds will not be used to supplant state or local funds, *id.* § 10153(a)(1); an assurance that the application was made available for comment by the public, and by neighborhood or community-based organizations, *id.* § 10153(a)(3); an assurance that the applicant will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," *id.* § 10153(a)(4); and a certification that programs to be funded meet the requirements of the Byrne JAG statute, that all the information in the application is correct, that there has been appropriate coordination with affected agencies,

and that "the applicant will comply with all provisions of this part and all other applicable Federal laws," *id.* § 10153(a)(5).

28.     The Byrne JAG statute does not include any provision expressly authorizing DOJ to impose conditions on Byrne JAG funding.

## II.     The States' Use of Byrne JAG Funding

29.     For nearly fifty years, the States and local subgrantees have used grant funds under Byrne JAG and its predecessor grant programs to support a broad array of critical law enforcement programs tailored to local needs.

30.     The States have received Byrne JAG awards every year since the program was created.

### A.     New York

31.     The State of New York has used Byrne JAG funding for a variety of purposes, including to support a multi-county program to combat gun violence, improve criminal records systems, enhance the services of forensic laboratories, and support prosecution and defense services.[4]

32.     New York's subgrantees also have used Byrne JAG funding for varied and successful programs. For example, the Buffalo Veterans Treatment Court used a Byrne JAG award of $86,147 to divert 100 veterans from the prison system and provide them with "health, education, and employment resources and services which have been critical to the 're-adjustment challenge' these combat veterans have faced upon returning home."[5] The Council of Thought and Action

---

[4] *See New York State's Application for Byrne JAG Program Funds—FFY 2016*, at 4-9 (June 30, 2016), *at* https://goo.gl/3WsuWr.

[5] Success Story Details: Buffalo Veterans Treatment Court, U.S. Department of Justice Bureau of Justice Assistance, https://www.bja.gov/SuccessStoryDetail.aspx?ssid=11.

Youth in Suffolk County received $10,000 in Byrne JAG funding to support the initiative's outreach workers, who identify and engage at-risk youth and young adults between the ages of 13 and 24 years, assess their needs, and provide them with guidance and mentoring.[6]

33.    On June 26, 2018, New York was notified that it received a Byrne JAG award for FY 2017 in the amount of $8,879,161.[7]

34.    For the FY 2017 grant cycle, New York plans to use its Byrne JAG funding to support a number of criminal justice, law enforcement, and drug treatment priorities. In particular, New York plans to use FY 2017 Byrne JAG funding to:

   a.    cover 50% of the cost of the purchase and installation of Livescan fingerprint technology equipment at local law enforcement agencies to facilitate the timely receipt of fingerprint search results when an individual is arrested;

   b.    expand a demonstration project that uses Byrne JAG to fund staff positions at police and prosecutorial agencies that are focused on investigating and prosecuting non-fatal shooting cases;

   c.    provide annual subgrants to district attorney and public defender offices in numerous counties to enhance the quality and effectiveness of prosecution and defense services, including efforts to combat illegal gun trafficking and improve defense services for individuals processed through specialty courts, such as domestic violence courts, veterans courts, and drug courts;

   d.    support the creation of a New York State Criminal Justice Research Consortium to

---

[6] Success Story Details: Council of Thought and Action (COTA) Youth, U.S. Department of Justice Bureau of Justice Assistance, https://www.bja.gov/SuccessStoryDetail.aspx?ssid=97.

[7] *See* N.Y. FY 2017 Byrne JAG Award, Ex. A.

connect criminal justice practitioners to academic researchers to expand the use of evidence-based practices;

e.  support New York's SNUG[8] street outreach program, a gun violence prevention initiative active in eleven jurisdictions throughout the State that have had elevated levels of shooting incidents;

f.  partially or fully fund twenty-nine staff positions at the New York State Office of Information Technology dedicated to maintaining critical public information technology systems and platforms such as the State's fingerprint identification system and criminal history database;

g.  purchase and install video equipment for recording custodial interrogations at local law enforcement agencies; and

h.  cover roughly one-half of the costs of approximately thirty crime analyst positions at four Crime Analysis Centers that serve the Buffalo, Rochester, Syracuse, and Albany regions.

35.   In addition to these planned programs, New York plans to provide FY 2017 Byrne JAG funding to subgrantees to support a variety of criminal justice and drug treatment programs. A broad range of local and State government subgrantees benefit from these funds, including police agencies, prosecutors, and social services agencies.

36.   New York's 2017-18 enacted state budget included $10 million in appropriation authority to support state and local projects funded from the state's FY2017 Byrne JAG award. These funds were reappropriated in the 2018-19 enacted state budget.

---

[8]"Guns" spelled backwards.

37.     New York's deadline to accept the Byrne JAG award is August 10, 2018.[9]

**B.     Connecticut**

38.     Connecticut typically distributes most of its funds to its subgrantees, including various state agencies and local jurisdictions. Most of the state-level funds are committed to state agency projects focused on enhancing components of the criminal justice system, while most subgrants to local jurisdictions are dedicated to local law enforcement functions, with a priority given to projects focusing on narcotics, violent crime reduction, technology improvements and equipment.

39.     On June 26, 2018, Connecticut was notified that it received a Byrne JAG award for FY 2017 in the amount of $1,711,049.[10]

40.     If Connecticut accepts the FY 2017 JAG grant, it intends to disburse most of the money to various state agencies and local jurisdictions to assist in their law enforcement and criminal justice programs, including funding for stipends for local police to ensure their continued participation in and support of Connecticut's Statewide Narcotic Task Force, substance abuse treatment services and other re-entry services in Connecticut prisons and communities, and the State's opioid intervention project for local police departments, the purpose of which is to reduce opioid-related deaths and reduce opioid-related crime and incarceration.

41.     Connecticut's deadline to accept the Byrne JAG award is August 10, 2018.

**C.     Massachusetts**

42.     Massachusetts has spent or will spend funds received from its Byrne JAG award to create or support various law enforcement programs and initiatives, such as programs that provide

---

[9] The parties have entered into a stipulation (ECF 29) extending the Byrne JAG award acceptance deadline during the pendency of this litigation pursuant to the terms set forth therein.

[10] *See* Conn. FY 2017 Byrne JAG Award, Ex. B.

wrap-around services to high-risk youth, including through faith-based and community-based efforts; programs aimed at reducing heroin and other opioid use through prevention, intervention, treatment, interdiction, and system readiness; collaborative projects that promote efforts of local agencies to provide and ensure comprehensive reintegration programs for juvenile and adult offenders reentering the community; and projects that promote the collaboration of law enforcement, the courts, and local victim service agencies in responding to domestic violence and sexual assault incidents.

43.     The various subgrantees of EOPSS have spent or will spend funds received from Massachusetts' Byrne JAG award to create or support various law enforcement programs and initiatives, such as hiring case managers with expertise in substance abuse and counseling to serve as a liaison between law enforcement and the treatment centers where individuals are referred for care; increasing community outreach in high-risk areas; implementing training and early intervention tools for at-risk youth; and implementing data and analysis to drive strategies to reduce crime and improve operational effectiveness.

44.     On June 26, 2018, Massachusetts was notified that it received a Byrne JAG award for FY 2017 in the amount of $3,453,006.[11]

45.     Massachusetts has planned on using its FY 2017 Byrne JAG award to fund programs focused on reducing gun, gang, and youth violence; evidence-based reentry programs to reduce recidivism; programs targeting domestic violence and sexual assault offenders; efforts geared toward combating heroin, opioids, and other illegal drugs; and collaborative prosecution and prevention programs.

46.     Massachusetts' deadline to accept the Byrne JAG award for FY 2017 is August 10,

---

[11] *See* Mass. FY 2017 Byrne JAG Award, Ex. C.

2018.

###### D. New Jersey

47.    New Jersey has spent Byrne JAG funds that it received in FY 2014 through 2016 to create or support various law enforcement programs and initiatives, such as the State's Multi-Jurisdictional Gangs, Organized Crime and Narcotics Task Force, the Statewide Gun Violence Reduction Initiative, the Atlantic City Organized Crime Task Force, the Prosecutor Supervision Training Initiative, building a password recovery server that helps investigators access devices that may contain evidence of a crime, and supporting the integration and enhancement of New Jersey's statewide criminal justice information sharing networks.

48.    Subgrantees of the New Jersey Department of Law and Public Safety spent Byrne JAG funds that they received in FY 2014 through 2016 to create or support various law enforcement programs, such as the Body-Worn Cameras Initiative which helps municipal law enforcement agencies acquire body-worn cameras,  and county Multi-Jurisdictional Gangs, Guns, and Narcotics Task Forces.  In addition, past Byrne JAG awards have funded the implementation of Megan's Law requirements by county prosecutor's offices, a study analyzing the effectiveness of New Jersey's inmate Re-entry Initiatives, and updating inmate videoconferencing equipment.

49.    The New Jersey legislature anticipated receiving, and accounted for, the Byrne JAG award for FY 2017 as a "federal resource" when it passed the State's most recent appropriations act.

50.    On June 26, 2018, New Jersey was notified that it received a Byrne JAG award for FY 2017 in the amount of $4,047,274.[12]

---

[12] *See* N.J. FY 2017 Byrne JAG Award, Ex. D.

51.     The Division of Criminal Justice of the New Jersey Department of Law and Public Safety has planned on using the FY 2017 grant to fund the following: the Multi-Jurisdictional Gangs, Organized Crime and Narcotics Task Force, which is responsible for investigating and prosecuting members of criminal gang organizations, gun traffickers, and gun trafficking organizations whose operations transcend county jurisdictions or operate across state lines into, or out of, New Jersey; the Division's Megan's Law Coordinator, who is responsible for the coordination and oversight of all of the agencies responsible for implementing Megan's Law; and the Prosecutor Supervision Training Initiative, which ensures the availability of cost-free, high-quality training to State, county, and municipal law enforcement officers engaged in the investigation of gangs, drugs, and related violent criminal activity.

52.     The Division of State Police of New Jersey's Department of Law and Public Safety plans to use the FY 2017 monies to fund the Organized Crime, Gangs, and Narcotics Task Force, which is responsible for spearheading New Jersey's ongoing war on drugs and gangs with strategic initiatives derived from intelligence-led policing efforts. The Division also plans to fund the State Police's Ballistics Unit, which routinely serves agencies throughout the State by providing expert advice on firearms-related evidence, preparing reports, offering courtroom testimony, providing lectures, and entering and correlating images in the National Integrated Ballistic Information Network.

53.     New Jersey's deadline to accept the Byrne JAG award is August 10, 2018.

**D.     Rhode Island**

54.     Rhode Island distributes funds it receives from the Byrne JAG program to various state agencies and local entities. These funds support law enforcement-related activities by, among other entities, the Rhode Island State Police, the Rhode Island Department of Corrections, as well

as local municipal governments. Past funding has supported victim services, family services, and juvenile-at-risk programs.

55.     On June 26, 2018, Rhode Island was notified that it received a Byrne JAG award for FY 2017 in the amount of $767,114.00.[13]

56.     If Rhode Island accepts the FY 2017 Byrne JAG award, it intends to disburse the money to various state agencies and local municipal entities to aid in their law enforcement and criminal justice programs. Recipients will include the Rhode Island Public Defenders Office, to represent indigent defendants; the Domestic Violence Unit, to augment other federal and state funds to partially support efforts to enter data from police arrest report forms and disseminate various domestic violence/child molestation reports to state, municipal, and private non-profit victim service agencies; the Rhode Island Attorney General, to provide a prosecutor for cases accepted into the Drug Court program; and the Department of Children, Youth and Families, to continue job training for at-risk youths.

57.     Rhode Island's deadline to accept the Byrne JAG award is August 10, 2018.

**D.      Virginia**

58.     The Commonwealth of Virginia has used Byrne JAG funding to cover the administrative costs that support the salaries of critical staff in various divisions within the Virginia Department of Criminal Justice Services (VA-DCJS), including its Division of Law Enforcement, and to supplement essential staffing needs within the VA-DCJS Director's Criminal Justice Research Center.

59.     In recent years, Virginia's subgrantees have used Byrne JAG funding to support various local law enforcement programs and initiatives, including crime reduction and prevention

---

[13] *See* R.I. FY 2017 Byrne JAG Award, Ex. E.

efforts, initiatives to upgrade law enforcement equipment, initiatives to support specialized law enforcement training, and the use of body cameras and life-saving naloxone.

60.     On June 26, 2018, DOJ notified Virginia that it had been awarded $3,353,534 in Byrne JAG monies for FY 2017.[14]

61.     Virginia intends to use its FY 2017 Byrne JAG funding to make subgrants to localities and to continue funding to various law enforcement agencies and criminal justice partners. Virginia also plans to use Byrne JAG funds to continue to support the critical staffing and administrative needs at the VA-DCJS.

62.     Virginia, through its state budget process, has also set aside funding to support long-term and ongoing law enforcement projects in anticipation of receiving FY 2017 Byrne JAG monies.

63.     Virginia's deadline for accepting its FY 2017 Byrne JAG allocation is August 10, 2018.

**E.     Washington**

64.     Washington has used Byrne JAG funding to support a number of criminal justice and law enforcement programs, including narcotics task forces, drug courts, and youth intervention programs. Washington also has used this funding to support high-impact offender prosecution and tribal law enforcement efforts, and to improve its state criminal history records. In addition, Byrne JAG funding has supported domestic violence legal advocacy and efforts to combat sexual abuse. Funds also have been directed to mitigate the gang threat in prisons and to support the Governor's

---

[14] *See* Va. FY 2017 Byrne JAG Award, Ex. F.

Council on Substance Abuse.

65. Washington's subgrantees have used Byrne JAG funding for varied law enforcement purposes, including training, staffing, travel, equipment, professional services, and facilities, among others. These funds have been vital in Washington's attempts to combat criminal organizations.

66. On June 26, 2018, DOJ notified Washington that it had been awarded $3,277,891 in Byrne JAG monies for FY 2017.[15]

67. Washington intends to use its FY 2017 Byrne JAG award to support multi-jurisdictional drug and gang task forces.

68. The chief law enforcement agencies of Washington State are the county sheriffs. Multi-jurisdictional task forces are an important tool in combating drug trafficking and gang violence. Drug trafficking, and the violence associated with this activity, is nearly impossible to address on a jurisdiction-by-jurisdiction basis, as drug trafficking organizations often operate at a level above the capacity of most local jurisdictions to adequately investigate and prosecute. These criminal organizations operate across city, county, and state boundaries, and therefore law enforcement cannot adequately investigate, disrupt, or dismantle these organizations when only a portion of their operation is targeted by local law enforcement.

69. Funding from the Byrne JAG program both encourages local agencies to participate in regional task forces, and helps local law enforcement agencies to offset costs associated with combatting drug trafficking and gang violence.

70. Washington has budgeted in anticipation of its receipt of the FY 2017 Byrne JAG award. Because these funds are distributed statewide, any delay or failure in receiving grant

---

[15] *See* Wash. FY 2017 Byrne JAG Award, Ex. G.

funding will negatively impact both Washington State as well as the numerous cities and counties in Washington that depend on this grant funding to combat crime and maintain public safety.

71.     Washington's deadline for accepting its Byrne JAG allocation is August 10, 2018.

### III.     DOJ's FY 2017 Immigration-Related Byrne JAG Conditions

72.     On January 25, 2017, President Trump issued Executive Order 13768. Section 9(a) of the order threatened to deny federal grant funding to all so-called "sanctuary jurisdictions." That section was permanently enjoined by a federal district court because it violated numerous provisions of the United States Constitution.[16]

73.     DOJ subsequently sought to achieve a similar goal by imposing three immigration-related conditions on FY 2017 Byrne JAG funds.[17] On July 25, 2017, DOJ announced that it would impose these conditions and provided a one-page "Backgrounder" and a press release, neither of which explained how or why DOJ decided to impose these immigration-related conditions, how the conditions would advance the interests of the Byrne JAG program, or what alternatives DOJ had considered.

74.     On August 24, 2017, one day before State applications for FY 2017 Byrne JAG funds were due, DOJ published a sample final award document containing the three immigration-related conditions and stated that identical conditions would be imposed on other applicants.

75.     The access condition requires all State and local grantees and State subgrantees to have a statute, rule, regulation, policy or practice designed to ensure that, upon request, federal

---

[16] *County of Santa Clara v. Trump*, 267 F. Supp. 3d 1201 (N.D. Cal. 2017) (permanent injunction).

[17] *See* Press Release, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Programs (July 25, 2017), *available at* https://goo.gl/VH5wGU; Backgrounder on Grant Requirements (July 25, 2017), *available at* https://goo.gl/ZLgXMC; Byrne JAG FY2017 State Solicitation, *available at* https://www.bja.gov/funding/JAGstate17.pdf

agents may access any state or state-contracted or local or local-contracted correctional facility to question suspected aliens about their right to be, or remain, in the United States.

76. The notice condition requires all State and local grantees and State subgrantees to have a statute, rule, regulation, policy or practice designed to ensure that State and local officers will respond as soon as practicable to any formal written request from the Department of Homeland Security to a correctional facility seeking advance notice of a particular alien's scheduled release date and time.

77. In addition, States are required to monitor all of their subgrantees to ensure they are complying with the notice and access conditions.

78. The States also must accept various conditions related to 8 U.S.C. § 1373, which prohibits States and localities from restricting their officials from communicating with federal immigration authorities "regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a).[18] The Section 1373 conditions will require States to:

- Comply with Section 1373 throughout the duration of the award;

- Diligently monitor the compliance of all subgrantees with Section 1373; and

- Notify DOJ in writing if the State becomes aware of "credible evidence" that any subgrantee has violated Section 1373.

79. DOJ also requires three certifications from the States. The first, which must be by the State's Chief Executive, i.e., the Governor, attests to the State's compliance with Section 1373 and the other grant conditions. The second, which must be by the State's Chief Legal Officer,

---

[18] *See also* 8 U.S.C. § 1373(b) ("Notwithstanding any other provision of Federal, state, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending information to, or requesting or receiving such information from, the Immigration and Naturalization Service. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity.").

certifies the State's compliance with Section 1373 and that the Legal Officer understands that subgrantees must also comply with Section 1373. The third certification requires the State employee who signs the grant award to certify the State's compliance with all other grant conditions. Each certification carries the risk of personal criminal prosecution, civil penalties, and administrative remedies.

80.     A number of jurisdictions have brought lawsuits challenging DOJ's legal authority to impose one or more of the immigration-related conditions on Byrne JAG funding. All courts to have considered the question to date have held that DOJ likely or definitely lacks authority to impose these conditions.

81.     The City of Chicago sued on August 7, 2017, challenging the notice and access conditions and seeking a declaration that it complies with Section 1373.[19] On September 15, 2017, a federal court in Chicago issued a nationwide preliminary injunction that prohibited DOJ from imposing the notice and access conditions on any Byrne JAG applicant.[20] Rather than disburse the Byrne JAG awards without these conditions, DOJ instead decided to effectively suspend the program by withholding all further FY 2017 grant awards until the injunction was narrowed or there was a final decision on the merits in the Chicago action.

82.     On April 19, 2018, the Seventh Circuit unanimously affirmed the Chicago district court's nationwide preliminary injunction on the notice and access conditions and its ruling that DOJ likely lacks authority to impose those two conditions.[21]

---

[19] Compl., *City of Chicago v. Sessions*, No. 17-cv-05720, 264 F. Supp. 3d 933 (N.D. Ill. Aug. 7, 2017), ECF No. 1.

[20] *City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017).

[21] *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018).

83.     On June 26, 2018, the Seventh Circuit issued a partial stayed of the nationwide preliminary injunction previously issued by the district court in Chicago, limiting the effect of the injunction to Chicago. The Seventh Circuit also granted *en banc* review solely on the question of the propriety of the nationwide scope of the injunction.[22] The Seventh Circuit will hear argument *en banc* in September 2018 on that limited issue. DOJ did not challenge the Seventh Circuit's ruling that DOJ likely lacks authority to impose the notice and access conditions.

84.     While the Chicago lawsuit was pending in the district court, the State of California and City of San Francisco filed lawsuits challenging the notice, access, and Section 1373 conditions.[23] On March 5, 2018, a California district court denied DOJ's motion to dismiss both the California and San Francisco lawsuits, holding that those jurisdictions had stated plausible claims that the challenged conditions were unlawful.[24]

85.     Shortly after the lawsuits in California were filed, the City of Philadelphia filed its own lawsuit.[25] On June 6, 2018, the district court in Philadelphia permanently enjoined DOJ from imposing the three conditions on Philadelphia and ordered DOJ to immediately disburse the Byrne JAG funds to Philadelphia.[26]

86.     On June 26, 2018, just hours after the Seventh Circuit issued its decision limiting

---

[22] *City of Chicago v. Sessions*, 17-2991 (7th Cir. June 4, 2018), Doc. No. 128 (granting en banc review on scope of preliminary injunction); Order, *Chicago v. Sessions*, 17-2991 (7th Cir. June 26, 2018), Doc. No. 134 (granting partial stay of injunction as to geographic areas beyond the City of Chicago).

[23] Compl., *California ex rel. Becerra v. Sessions* ("*California*"), No. 17-cv-4701, (N.D. Cal. Aug. 14, 2017), ECF No. 1; Compl., *City of San Francisco v. Sessions*, No. 17-cv-4642 (N.D. Cal. Aug. 11, 2017), ECF No. 1.

[24] Order Denying Mot. to Dismiss, *California*, No. 17-cv-4701 (Mar. 5, 2018), ECF No. 2018; Order Denying Mot. to Dismiss, *City of San Francisco v. Sessions*, No. 17-cv-4642 (N.D. Cal. Mar. 5, 2018), ECF No. 78. The district court denied California's request for a preliminary injunction enjoining DOJ from enforcing the Section 1373 condition on the State and its subdivisions, finding that the record was insufficient at the motion to dismiss stage to enjoin the Section 1373 condition. *See* Order Denying Am. Mot. for Prelim. Inj. at 26-27, *California*, No. 17-cv-4701 (N.D. Cal. Mar. 5, 2018), ECF No. 89.

[25] Compl., *City of Philadelphia v. Sessions*, No. 17-cv-03894, (E.D. Pa. Aug. 30, 2017), ECF No. 1.

[26] *City of Philadelphia v. Sessions*, --- F. Supp. 3d. ---, 2018 WL 2725503, at *40-45 (E.D. Pa. 2018).

the injunction to Chicago, DOJ issued grant award letters to the States giving the States 45 days to decide whether to accept the awards with the new immigration-related conditions.

87.     On July 27, 2018, after those letters were issued and Plaintiff States filed the complaint in this case, the district court in the Chicago lawsuit ruled that DOJ lacked the statutory authority to impose the notice and access conditions, and that Section 1373 is unconstitutional because that statute seeks to commandeer State and local governments in violation of the Tenth Amendment. The district court entered a permanent nationwide injunction barring DOJ's enforcement of all three conditions, but immediately stayed the injunction to limit its effect to Chicago pending the Seventh Circuit's en banc consideration of the nationwide scope of the preliminary injunction.[27]

## IV.     DOJ's FY 2018 Immigration-Related Byrne JAG Conditions

88.     Two days after the complaint in this action was filed, on July 20, 2018, DOJ released the FY 2018 State Solicitation, which includes additional immigration-related conditions for FY 2018 Byrne JAG funds on top of those imposed on FY 2017 funding.

89.     According to the FY 2018 State Solicitation, when applying for the FY 2018 Byrne JAG funding, each State must answer the following questions:

- Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?

- Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?

FY 2018 State Solicitation at 27-28.

90.     If the answer to either question is yes, the applicant must provide a copy of each

---

[27] Mem. Opinion & Order, *City of Chicago v. Sessions*, No. 17 C 5720, 2018 WL 3608564, at *5-11 (N.D. Ill. July 27, 2018).

law or policy, describe each practice, and explain how the law, policy, or practice complies with Section 1373. *Id.* States also must collect this information from all of their subgrantees. *Id.*

91.     The FY 2018 State Solicitation also requires each recipient to certify that it does not or will not:

- Violate 8 U.S.C. § 1644, which prohibits certain restrictions on sharing information relating to immigration status;

- Violate, "aid or abet any violation of 8 U.S.C. § 1324(a)," which prohibits the knowing or reckless concealment or harboring of aliens;

- "[I]mpede the exercise of the authority of the federal government under 8 U.S.C. § 1226(a) & (c), . . . and 8 U.S.C. § 1231(a)(4)," which grants certain powers concerning the arrest or removal of aliens;

- "[I]mpede the exercise by DHS agents . . . of their authority under 8 U.S.C. § 1357(a)(1) to 'interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States'"; and

- Impede congressional reporting by the Attorney General of the United States of the number of individuals without lawful status incarcerated in Federal and State prisons for having committed felonies and efforts to ensure their prompt removal pursuant to 8 U.S.C. § 1366(1) and (3).

*See* FY 2018 State Solicitation at 37, 40-45.

92.     At the time of applying for Byrne JAG funding, the State's Chief Executive, i.e., the Governor, must also attest to the State's compliance with Sections 1373 and 1644, as well with 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1357(a), and 1366(1) & (3).[28] The State's Chief Legal Officer must separately certify the State's compliance with the same as well as 8 U.S.C. § 1324(a) at the time of application.[29] The State employee who signs the grant award also must certify the

---

[28] Though DOJ requires this and all other immigration-related conditions for FY 2018 Byrne JAG funds to be certified at the time of the application in order to consider a State's Byrne JAG funding application complete, OJP will not deny an application for FY2018 for failure to submit these certifications by the application deadline; instead, a state will not be able to access the awards until it submits these certfications and assurances. FY 2018 State Solicitation at 1, 27-28, 40-41.

[29] FY 2018 State Solicitation at 1, 27, 42-45.

State's compliance with all award conditions, including all statutes referenced in the Chief Legal Officer's certification.[30]

93.     Each certification carries the risk of personal criminal prosecution, civil penalties, and administrative remedies.

94.     States will be required to obtain from their subgrantees similar certifications. FY 2018 State Solicitation at 24. Those certifications have yet to be released. *See* https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm ("Forms for completion by applicants are listed below. Associated forms for required certifications from prospective subrecipients also will be posted on this webpage, at or about the time OJP makes awards under the pertinent program.").

95.     DOJ's position now seems to be that 8 U.S.C. §§ 1226, 1231, 1324, 1357, and 1366 are "applicable laws" within the meaning of the Byrne JAG statute. Moreover, it is using several of these immigration statutes as a vehicle to provide *post hoc* statutory authority for the notice and access conditions—conditions that every court to date has held DOJ lacks the statutory authority to impose. For example, the FY 2018 State Solicitation suggests that noncompliance with the notice condition would impede the authority of the federal government to arrest, detain, and remove "aliens" under 8 U.S.C. § 1226(a) & (c), and 8 U.S.C. § 1231(a)(4), as well as to report on such actions under 8 U.S.C. § 1366(1) and (3). Likewise, the solicitation suggests that noncompliance with the access condition would impede the authority of the federal government to interrogate those it suspects of being in the country unlawfully pursuant to 8 U.S.C. § 1357(a)(1) or constitute a violation under 8 U.S.C. § 1324(a) for any person harboring or attempting to conceal an alien despite the fact that this statute relies on a definition of person, 8 U.S.C. § 1101(b)(3), that

---

[30] FY 2018 State Solicitation at 35-37.

does not encompass States or local governments. *See* FY 2018 State Solicitation at 37.

96.     By their terms, none of these statutes applies to state or local government actions.

97.     The deadline for submitting an application for Byrne JAG funding for FY 2018 is August 22, 2018. All Plaintiffs intend to apply for said funds.

## V.     All of the Immigration-Related Conditions Are Unlawful.

98.     All of the immigration-related conditions are unlawful for a number of reasons.

99.     First, DOJ has no statutory authorization to impose the conditions. An "agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Here, nothing in the statute's text, structure, purpose, or history suggests that Congress granted DOJ authority to prescribe generally applicable substantive conditions like the immigration-related conditions at issue here. *See City of Chicago*, 888 F.3d at 285-87; *City of Philadelphia*, --- F. Supp. 3d ---, 2018 WL 2725503, at *25.

100.     The fact that Congress designed Byrne JAG as a formula grant provides further confirmation that DOJ lacks discretion to impose these substantive conditions. Formula grants leave no discretion to the administering agency: if a grantee satisfies the statutory requirements, it is entitled to the grant amount that the formula dictates. *See, e.g.*, *City of Los Angeles*, 865 F.2d at 1088.[31]  Accordingly, DOJ's imposition of the new conditions is *ultra vires* for purposes of the Administrative Procedure Act.

101.     Second, because Congress did not authorize DOJ to impose conditions on Byrne JAG, DOJ's actions here violate the Separation of Powers between Congress and the Executive. The Executive Branch may not arrogate to itself the powers that the Constitution reserves to Congress, as it has attempted to do here. The Executive has no authority to amend or cancel an

---

[31] *See also* Paul G. Dembling & Malcolm S. Mason, *Essentials of Grant Law Practice* § 5.03, 33-35 (1991).

appropriation that Congress has duly enacted. Nor can executive officials choose to spend less than the full amount of funding that Congress has authorized under a statute.

102.   Third, the immigration-related conditions violate 34 U.S.C. § 10228(a), which is codified in the same chapter of the U.S. Code as the Byrne JAG statute and provides that "[n]othing in this title or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." This language has been carried forward in every law enforcement grant since the Omnibus Crime Control and Safe Streets Act of 1968—a predecessor to the Byrne JAG program and the first federal block grant program for State and local law enforcement.[32] The legislative history of Section 10228 makes clear that Congress intended to incorporate anti-commandeering principles into the grant context to prevent executive officials from using a grant like Byrne JAG to interfere with state and local law enforcement policy.[33]

103.   All of the immigration-related conditions violate Section 10228(a) because they compel States to act as enforcement arms of federal immigration authorities by, for example, requiring States to monitor and report to DOJ whether all of the States' subgrantees comply with Section 1373.

104.   DOJ's requirement that States certify compliance with the additional immigration-

---

[32] *See* Omnibus Crime Control and Safe Street Act of 1968, Pub. L. No. 90-351, § 518(a), 82 Stat. 197, 208 (1968); *see generally* John K. Hudzik, *Federal Aid to Criminal Justice: Rhetoric, Results, Lessons* 1-68 (1984) (describing the origins of the Safe Streets Act).

[33] *See, e.g.*, *Amendments to Title I (LEAA) of the Omnibus Crime Control and Safe Streets Act: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Comm. of the Judiciary*, 94th Cong. 407-08 (1975) (statement of Richard W. Velde, Administrator of the LEAA) ("It is disturbing that it should even be suggested that LEAA ought to undertake to redirect the efforts of state and local law enforcement agencies . . . . The Congress has continuously emphasized that law enforcement is, and must remain, essentially a state and local responsibility. Section 518(a) of the Safe Streets Act is the embodiment of this appropriate philosophy.").

related statutes listed in the FY 2018 State Solicitation particularly runs afoul of Section 10228(a)'s prohibition on law enforcement commandeering because the statutes at issue do not even regulate actions by State or local goverments. *Compare* 8 U.S.C. § 1373 (prohibiting Federal, State and local government agencies from restricting information-sharing about immigration or citizenship status with federal immigration authorities) *with* 8 U.S.C. § 1644 (prohibiting State and local government agencies from being restricted in information-sharing about an individual's immigration status with federal immigration authorities) and 8 U.S.C. § 1226(a) & (c) as well as 8 U.S.C. § 1231(a)(4) (granting certain powers to the Attorney General of the United States with respect to the arrest and detention of aliens) *and* 8 U.S.C. § 1324(a) (prohibiting any person from the knowing or reckless concealment or harboring of aliens) *and* 8 U.S.C. § 1357(a)(1) (authorizing federal immigration officers to interrogate any alien or any person believed to be an alien) *and* 8 U.S.C. § 1366(1) and (3) (requiring the Attorney General of the United States to report, to the Committees on the Judiciary of the House of Representatives and of the Senate, the number of individuals without lawful status incarcerated in Federal and State prisons for having committed felonies and all efforts to ensure their prompt removal). DOJ's attempt to bootstrap compliance with the notice and access conditions into these statutes similarly violates Section 10228(a)'s anti-commandeering principle.

105.    The Section 1373 conditions are invalid because Section 1373 is unconstitutional. *See South Dakota v. Dole*, 483 U.S. 203, 210-211 (1987) (federal government cannot impose unconstitutional conditions). In *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018), the Supreme Court held that Congress runs afoul of the anti-commandeering principles of the Tenth Amendment when it "unequivocally dictates what a state legislature may and may not do." Section 1373 violates this rule because it directly prohibits States and localities enacting laws, rules, or

policies that "prohibit or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Nationalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). *See, e.g.*, *City of Philadelphia*, --- F. Supp. 3d. ---, 2018 WL 2725503, at *32-33 (citing *Murphy* and holding that 8 U.S.C. § 1373 violates the Tenth Amendment); Mem. Opinion & Order, *City of Chicago v. Sessions*, No. 17 C 5720, 2018 WL 3608564, at *5-11 (N.D. Ill. July 27, 2018).

106.    Just as Section 1373 violates the Tenth Amendment by seeking to unequivocally dictate what the States may and may not do, so too does the newly-added Section 1644 condition, which, like Section 1373, prohibits restrictions on sharing information about an individual's immigration status with federal authorities. The Tenth Amendment prohibits the federal government from requiring states and localities to govern according to Congress's instructions and from commanding localities to administer or enforce a federal regulatory program. This anti-commandeering principle applies to situations in which Congress compels a state to enact, or prohibits a state from enacting legislation. *Murphy*, 138 S. Ct. at 1478.

107.    Finally, the conditions are arbitrary and capricious because DOJ imposed them without any explanation, reasoning, or opportunity for exchange with state or local governments regarding the likely impact of the conditions on state and local efforts to promote public safety.

## VI.    The States Are Harmed by DOJ's Imposition of the Immigration-Related Conditions On Byrne JAG funding.

108.    The immigration-related conditions imposed by DOJ upon applicants for FY 2017 and FY 2018 Byrne JAG funding threaten the States and their localities with serious, immediate, and irreparable harm.

109.    In our federal system, the States and localities have primary responsibility for the design of law-enforcement policies to keep their residents safe. *See, e.g.*, *United States v.*

*Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power . . . reposed in the States[] than the suppression of violent crime and vindication of its victims.").

110.     Recognizing that the States possess the primary authority for maintaining public safety, Congress designed the Byrne JAG program to maximize the discretion of States and their localities to decide how to best use these funds to advance their law enforcement priorities and make their communities safer. The immigration-related conditions constrain the very choices that Congress sought to safeguard.

111.     DOJ's actions place the States in an untenable position. If the States do not acquiesce to the conditions, they will forfeit tens of millions of dollars in law enforcement funding, potentially compromising the critical law enforcement and criminal justice programs those funds support.

112.     If they accept these conditions, the States will be forced to relinquish sovereign control over state law enforcement officials and state law enforcement policies, including policy choices to allow localities to adopt law enforcement and criminal justice policies based on local needs. Localities that lawfully limited voluntary cooperation with federal immigration officials will now be compelled to adopt policies that undermine their relationships of trust with their immigrant communities, to the detriment of effective crime reporting and overall public safety in the States. Immigrants also may be deterred from seeking primary care and preventative health care services, undermining the public health efforts of States and localities. The trust between immigrants and state and local officials, "once destroyed by the mandated cooperation and communication with the federal immigration authorities, [cannot] easily be restored." *City of Chicago*, 888 F.3d at 291.

113.     Public safety will be further undermined because States will be unable to issue

Byrne JAG subgrants to localities that DOJ believes do not comply with one or more of the immigration-related conditions. DOJ has previously sent letters to two major cities in New York State—the City of New York and Albany—alleging that these jurisdictions have laws or policies that violate Section 1373. These cities will be hampered in their ability to promote their law enforcement priorities if New York State is forced to withhold critical Byrne JAG funds from them. And the State itself is injured when its localities are unable to effectively police their communities. As another example, the Washington State Patrol is a subgrantee participant in multi-jurisdictional drug and gang task forces across Washington State. According to a longstanding federal consent decree, the Washington State Patrol is prohibited from participating in the enforcement of immigration laws. Without a Byrne JAG subgrant, the State Patrol will be hindered in its ability to participate in these critical task forces.

114.    DOJ has also sought to require the States to monitor their subgrantees' compliance with the conditions—a process that will require some States to expend considerable time and money, including building an infrastructure to conduct inspections, review records, and compile and transmit data. And if Defendants disagree with the States' determination that a subgrantee complies with the conditions, the States could lose other federal grants and face civil or criminal liability.

115.    Certifying compliance with Section 1373 is particularly perilous for States given Defendants' expansive and ever-changing interpretations of that statute's meaning and application. DOJ has advanced increasingly broad interpretations of what it means to comply with Section 1373. For example, DOJ has suggested that Section 1373 prevents jurisdictions from enacting policies that define the time and manner in which their employees exchange immigration-status

information with federal officials.[34] DOJ also has suggested that Section 1373 requires jurisdictions to not only provide advance notification of an alien's scheduled release from state or local custody, but also to facilitate transfers from State and local jails to federal immigration authorities.[35] DOJ has further suggested that Section 1373 requires jurisdictions to not only share the immigration and citizenship status of individuals, but that it also requires jurisdictions to share an alien's home and work address and his scheduled release date from incarceration.[36] On top of all of this, DOJ has taken the position that jurisdictions have an affirmative obligation to communicate DOJ's interpretation of Section 1373 to their employees.[37] Thus, DOJ requires States not only to certify compliance with the black-letter of Section 1373 but with DOJ's ever-shifting

---

[34] *See, e.g.*, Letter from Alan Hanson, Acting Assistant Attorney General, to Elizabeth Glazer, Director, New York City Mayor's Office of Criminal Justice (Oct. 11, 2017), *available at* https://www.justice.gov/opa/press-release/file/1003041/download (last visited July 6, 2018); Letter from Alan Hanson, Acting Assistant Attorney General, to the Hon. Jim Kenney, Mayor, City of Philadelphia (Oct. 11, 2017), *available at* https://www.justice.gov/opa/press-release/file/1003046/download (last visited July 6, 2018).

[35] *See* Def.'s Proposed Findings of Fact 8-11, *City of Philadelphia v. Sessions*, No. 17-cv-3894 (E.D. Pa. May 17, 2018), ECF No. 200; Pl.'s Mot. for Prelim. Inj. and Mem. of Law in Support 24-26, *United States v. California*, No. 18-cv-00490 (E.D. Cal. Mar. 6, 2018), ECF No. 2-1 (suggesting California law violates § 1373 by restricting the transfer of aliens in state custody to federal custody).

[36] *See, e.g.*, Pl.'s Mot. for Prelim. Inj. and Mem. of Law in Support 27-28, *United States v. California*, 18-cv-00490 (E.D. Cal. Mar. 6, 2018), ECF No. 2-1 (asserting that the phrase "information regarding the citizenship or immigration status . . . of any individual" in § 1373 "does not merely denote an alien's technical immigration status"); Letter from Alan Hanson, Acting Assistant Attorney General, to Elizabeth Glazer, Director, New York City Mayor's Office of Criminal Justice, at 2 (Oct. 11, 2017), *available at* https://www.justice.gov/opa/press-release/file/1003041/download (last visited July 6, 2018) ("In order to comply with 8 U.S.C. § 1373, the Department has determined that New York would need to certify that it interprets and applies Section 9-131(b) and (d) to not restrict New York officers from sharing information regarding the date and time of an alien's release from custody."). But at least one federal court has ruled that Section 1373 does not govern release dates or home or work addresses. Order re: United States of America's Mot. for Prelim. Inj., *United States v. California*, 18-cv-490 (E.D. Cal. July 5, 2018), ECF No. 193.

[37] *See, e.g.*, Letter from Alan Hanson, Acting Assistant Attorney General, to Elizabeth Glazer, Director, New York City Mayor's Office of Criminal Justice, at 1 (Oct. 11, 2017), *available at* https://www.justice.gov/opa/press-release/file/1003041/download (last visited July 6, 2018) ("In order to comply with 8 U.S.C. § 1373, the Department has determined that . . . New York would need to certify that it has communicated this interpretation to its officers and employees."); Letter from Alan Hanson, Acting Assistant Attorney General, to the Hon. Jim Kenney, Mayor, City of Philadelphia, at 2 (Oct. 11, 2017), *available at* https://www.justice.gov/opa/press-release/file/1003046/download (last visited July 6, 2018) ("In order to comply with 8 U.S.C. § 1373, the Department has determined that Philadelphia would need to certify that it interprets and applies this Executive Order to not restrict Philadelphia's officers from sharing information regarding immigration status with federal immigration officers. The Department has also determined that Philadelphia would need to certify that it has communicated this interpretation to its officers and employees.").

interpretation of the scope of that statute.

## CAUSES OF ACTION

### COUNT I
### Violation of Separation of Powers (FY 2017 Conditions)

116. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

117. The Constitution vests the spending power in Congress, not the Executive Branch. U.S. Const. art. I § 8, cl. 1.

118. Congress may delegate some discretion to the Executive to decide how to spend appropriated funds, but that discretion is cabined by the scope of the delegation. *See City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

119. The Executive cannot amend or cancel appropriations that Congress has duly enacted. *See Train v. City of New York*, 420 U.S. 35, 38, 44 (1975); *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

120. The FY 2017 immigration-related conditions amount to a refusal to spend money appropriated by Congress, in violation of the Executive's constitutional authority to administer the law.

121. Congress did not authorize the notice, access or 1373 conditions. Rather, those conditions were imposed by DOJ. Therefore, the three conditions amount to an improper usurpation of Congress's spending power by the Executive.

122. The Byrne JAG statute does not authorize the U.S. Attorney General to impose generally applicable substantive conditions on grant recipients.

123. DOJ does not have authority under 34 U.S.C. § 10102(a)(6) to impose the three conditions.

124. DOJ also does not have the authority to determine that Section 1373 is an

"applicable federal law" for purposes of 34 U.S.C. § 10153(a)(5)(D).

125.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Attorney General's imposition of the three immigration-related conditions on FY 2017 Byrne JAG funds violates the constitutional principle of separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress. Plaintiffs are also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

## COUNT II
## Violation of the Administrative Procedure Act
### *Ultra Vires* Conduct (FY 2017 Conditions)

126.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

127.     Under the Administrative Procedure Act ("APA"), a court must set "aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). DOJ's imposition of the three immigration-related conditions on the FY 2017 Byrne JAG award are such agency action.

128.     DOJ may only exercise authority conferred by statute. *See City of Arlington*, 569 U.S. at 297.

129.     The Byrne JAG statute does not authorize the Attorney General to impose conditions on the receipt of Byrne JAG funds, or to deny funds to states or local governments that fail to comply with those conditions. *See City of Chicago*, 888 F.3d at 283.

130.     DOJ also lacks statutory authority to condition Byrne JAG funds on compliance with Section 1373. The Byrne JAG statute's requirement that grantees comply with "all applicable Federal laws" does not encompass Section 1373. Rather, the phrase "all applicable Federal laws" refers to the laws that regulate the conduct of federal grant recipients *as grant recipients* and not to every section of the U.S. Code that could possibly apply to a state or local government. Section 1373 does not regulate grantees as grantees nor does it mention federal grants or funds.

131.    Congress has repeatedly considered and rejected legislation that would withhold grant funding as a penalty for noncooperation with federal immigration law.[38] Courts should look skeptically on executive action where Congress declined to enact legislation that would have granted the same or substantially similar authority to the executive branch. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000).

132.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Attorney General lacks authority to impose the notice, access, and Section 1373 conditions on FY 2017 Byrne JAG funds and, in doing so, has acted contrary to law in violation of the APA. Plaintiffs are also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

**COUNT III**
**Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law (FY 2017 Conditions)**

133.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

134.    Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

135.    The notice, access, and Section 1373 conditions are invalid under 34 U.S.C. § 10228(a), which prohibits Executive Branch officials from using law enforcement grants to exert "any direction, supervision, or control" over any state or local police force or criminal justice agency.

---

[38] *See, e.g.,* Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. § 4 (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. § 4 (2016); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2016); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. § 2 (2015); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. § 3 (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 3(a) (2015); Stop Sanctuary Cities Act, S. 1814 114th Cong. § 2 (2015); Financial Services and General Government Appropriations Act, FY2017, H.R. 5485, 114th Cong., § 1217 (2016); *see also* H.R. 3355, 103d Cong. § 5119 (Nov. 19, 1993) (Senate version of Violent Crime Control and Law Enforcement Act, which would have authorized DOJ to withhold grant funding if the jurisdiction did not cooperate with the Immigration and Naturalization Service).

136.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Attorney General is without authority to impose the notice, access, and Section 1373 conditions on FY 2017 Byrne JAG funds and, in doing so, has acted contrary to law under the APA. Plaintiffs are also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

## COUNT IV
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action (FY 2017 Conditions)

137.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

138.     Under the APA, a court must set "aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A)—for example, because the agency has failed to consider relevant evidence or "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

139.     An agency's departure from prior practice can also serve as a basis for finding an agency's interpretation to be arbitrary and capricious if the change in policy constitutes an "unexplained inconsistency." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

140.     DOJ departed from more than a decade of past practice when it imposed the notice, access, and Section 1373 conditions, yet provided almost no explanation for its decision. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy"). DOJ has never before sought to impose notice and access conditions on grantees, nor has

it ever "sought to enforce [Section 1373] against a state or local government."[39]

141.    DOJ has never previously determined that Section 1373 is an "applicable Federal law" for the purposes of the Byrne JAG program.

142.    Despite DOJ's shift in policy, it has provided virtually no explanation for its decisions. It released no reports, studies or analysis in connection with its July 25, 2017 announcement of the FY 2017 immigration-related grant conditions, nor has it attempted to justify its aggressive and shifting interpretations of Section 1373.

143.    In addition, DOJ "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, by, for example, evaluating grant applicants on the basis of their compliance with the immigration-related conditions rather than on their compliance with expressly enumerated statutory application requirements. *See* 34 U.S.C. § 10153(a)(1)-(6).

144.    DOJ also "entirely failed to consider an important aspect of the problem" by failing to recognize how Section 1373 interferes with local policies that promote public health and safety. *See Philadelphia*, 280 F. Supp. 3d at 625.

145.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the immigration-related conditions imposed on FY 2017 Byrne JAG funds violate the APA. Plaintiffs are also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

## COUNT V
### Tenth Amendment: Commandeering (FY 2017 Conditions)

146.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

147.    The Tenth Amendment prohibits the federal government from "requir[ing] States

---

[39] Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 170 (2016).

and localities "to govern according to Congress' instructions," *New York v. United States*, 505 U.S. 144, 162 (1992), or "command[ing] the States' officers … to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997).

148.    Section 1373 violates the Tenth Amendment because it "unequivocally dictates what a state legislature may and may not do." *Murphy*, 138 S. Ct. at 1476. *See City of Philadelphia*, --- F. Supp. 3d. ---, 2018 WL 2725503, at *33.

149.    Because Section 1373 violates the Tenth Amendment, DOJ cannot require jurisdictions to comply with that statute as a condition of receiving FY 2017 Byrne JAG funds. *See South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

150.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Section 1373 conditions imposed on FY 2017 Byrne JAG funds violate the Tenth Amendment. Plaintiffs are also entitled to a permanent injunction preventing the Attorney General from putting that condition into effect.

**COUNT VI**
**Violation of Separation of Powers (FY 2018 Conditions)**

151.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

152.    The FY 2018 immigration-related conditions amount to a refusal to spend money appropriated by Congress, in violation of the Executive's constitutional authority to administer the law.

153.    Congress did not authorize the notice, access or 1373 conditions, nor did it authorize the additional immigration-related conditions in the FY 2018 State Solicitation. Rather, those conditions were imposed by DOJ. Therefore, these immigration-related conditions amount to an improper usurpation of Congress's spending power by the Executive.

154.    The Byrne JAG statute does not authorize the U.S. Attorney General to impose

generally applicable substantive conditions on grant recipients.

155.    DOJ does not have authority under 34 U.S.C. § 10102(a)(6) to impose any of the immigration-related conditions.

156.    DOJ also does not have the authority to determine that Sections 1373 and 1644 or 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3) are "applicable federal laws" for purposes of 34 U.S.C. § 10153(a)(5)(D).

157.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Attorney General's imposition of the immigration-related conditions in the FY 2018 State Solicitation violates the constitutional principle of separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress. Plaintiffs are also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

**COUNT VII**
**Violation of the Administrative Procedure Act**
***Ultra Vires* Conduct (FY 2018 Conditions)**

158.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

159.    The Byrne JAG statute does not authorize the Attorney General to impose conditions on the receipt of Byrne JAG funds, or to deny funds to states or local governments that fail to comply with those conditions. *See City of Chicago*, 888 F.3d at 283.

160.    DOJ also lacks statutory authority to condition Byrne JAG funds on compliance with Sections 1373 and 1644 or 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3). The Byrne JAG statute's requirement that grantees comply with "all applicable Federal laws" does not encompass these immigration-related statutes. Rather, the phrase "all applicable Federal laws" refers to the laws that regulate the conduct of federal grant recipients *as grant recipients* and not to every section of the U.S. Code that could possibly apply to a state or local government. None of these statutes regulate grantees as grantees nor does it mention federal

grants or funds.

161.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Attorney General lacks authority to impose the immigration-related conditions in the FY 2018 State Solicitation and, in doing so, has acted contrary to law in violation of the APA. Plaintiffs are also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

### COUNT VIII
### Violation of the Administrative Procedure Act
### Agency Action Not in Accordance with Law (FY 2018 Conditions)

162.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

163.     Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

164.     The immigration-related conditions in the FY 2018 State Solicitation are invalid under 34 U.S.C. § 10228(a), which prohibits Executive Branch officials from using law-enforcement grants to exert "any direction, supervision, or control" over any state or local police force or criminal justice agency.

165.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Attorney General is without authority to impose the immigration-related conditions in the FY 2018 State Solicitation and, in doing so, has acted contrary to law under the APA. Plaintiffs are also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

### COUNT IX
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action (FY 2018 Conditions)

166.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

167.     DOJ has also never previously determined that Section 1644 or 8 U.S.C. §§ 1226(a)

& (c), 1231(a)(4), 1324(a), 1357(a), and 1366(1) & (3) are "applicable federal laws" for the purposes of the Byrne JAG program.

168.     Despite DOJ's shift in policy, it has provided virtually no explanation for its decisions. It released no reports, studies or analysis in connection with its July 25, 2017 announcement of the three immigration-related grant conditions for FY 2017. Neither did it release reports, studies or analysis in connection with its July 20, 2018 release of the FY 2018 State Solicitation containing those and additional immigration-related grant conditions. Nor has it attempted to justify its aggressive and shifting interpretations of Section 1373.

169.     In addition, DOJ "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, by, for example, evaluating grant applicants on the basis of their compliance with the immigration-related conditions rather than on their compliance with expressly enumerated statutory application requirements. *See* 34 U.S.C. § 10153(a)(1)-(6).

170.     DOJ also "entirely failed to consider an important aspect of the problem" by failing to recognize how Section 1373 and laws like it, including Section 1664, interfere with local policies that promote public health and safety. *See Philadelphia*, 280 F. Supp. 3d at 625.

171.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the immigration-related conditions in the FY 2018 State Solicitation violate the APA. Plaintiffs are also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

## COUNT X
### Tenth Amendment: Commandeering (FY 2018 Conditions)

172.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

173.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Section 1373 and 1644 conditions imposed in the State solicitation process for FY 2018 violate the Tenth

Amendment. Plaintiffs are also entitled to a permanent injunction preventing the Attorney General from putting that condition into effect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court:

    (a) Declare that the three immigration-related conditions for the FY 2017 Byrne JAG program are unlawful;

    (b) Declare that the immigration-related conditions for the FY 2018 Byrne JAG program are unlawful;

    (c) Enjoin Defendants from enforcing the three conditions for the FY 2017 Byrne JAG program on any jurisdiction and retain jurisdiction to monitor DOJ's compliance with this Court's judgment;

    (d) Enjoin Defendants from enforcing the immigration-related conditions contained in the FY 2018 State Solicitation on any jurisdiction and retain jurisdiction to monitor DOJ's compliance with this Court's judgment;

    (e) Issue a writ of mandamus compelling Defendants to immediately send a FY 2017 Byrne JAG award letter without the three immigration-related conditions to the States and their localities;

    (f) Issue a writ of mandamus compelling Defendants to immediately issue a new FY 2018 State Solicitation without the immigration-related conditions;

    (g) Award the States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

    (h) Grant other such relief as this Court may deem proper.

Dated: August 6, 2018

Respectfully submitted,

**BARBARA D. UNDERWOOD**
*Attorney General*
*State of New York*

By: /s/ Nancy Trasande
Lourdes M. Rosado,[†] Bureau Chief
Jessica Attie,[†] Special Counsel
Lilia Toson,[†] Assistant Attorney General
Nancy Trasande,[†] Assistant Attorney General
Conor Duffy,[*] Assistant Attorney General
Civil Rights Bureau
28 Liberty St., 20th Floor
New York, NY 10005
Lourdes.Rosado@ag.ny.gov
Jessica.Attie@ag.ny.gov
Lilia.Toson@ag.ny.gov
Nancy.Trasande@ag.ny.gov
Conor.Duffy@ag.ny.gov
Phone: (212) 416-6438

Anisha S. Dasgupta,
Deputy Solicitor General
Caroline A. Olsen,[†]
Assistant Solicitor General
Eric R. Haren,
Special Counsel & Senior Advisor

*Of Counsel*

**GEORGE JEPSEN**
*Attorney General*
*State of Connecticut*

By: /s/ Mark F. Kohler
Mark F. Kohler,[‡] Assistant Attorney General
Michael Skold,[‡] Assistant Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120
Mark.Kohler@ct.gov
Michael.Skold@ct.gov
Phone: (860) 808-5020

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

By: /s/Jonathan Miller
Jonathan Miller,[†] Chief, Public Protection and Advocacy Bureau
Genevieve C. Nadeau,[†] Chief, Civil Rights Division
One Ashburton Place
Boston, MA 02108
Jonathan.Miller@state.ma.us
Genevieve.Nadeau@state.ma.us
Phone: (617) 727-2200

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

By: /s/ Rachel Wainer Apter
Rachel Wainer Apter,[**] Assistant
Attorney General
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor
Trenton, NJ 08625-0116
Phone: (609) 376-2702
Rachel.Apter@njoag.gov

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

By: /s/ Victoria Pearson
Victoria Pearson,[**] Deputy Attorney
General
202 North 9th Street
Richmond, VA 23219
Phone: (804) 786-4319
VPearson@oag.state.va.us

**PETER F. KILMARTIN**
*Attorney General*
*State of Rode Island*

By: /s/ Michael W. Field
Michael W. Field,[**] Assistant Attorney General
The State of Rhode Island
Office of the Attorney General
150 South Main Street
Providence, Rhode Island 02903
Phone: (401) 274-4400, Ext: 2380
mfield@riag.ri.gov

**ROBERT W. FERGUSON**
*Attorney General*
*State of Washington*

By: /s/ Luke Eaton
Luke Eaton[†]
Assistant Attorney General
P.O. Box 40100
Olympia, WA 98504-0100
Phone: (360) 753-6200
LukeE1@atg.wa.gov

[†]Admitted in the S.D.N.Y.
[‡]Admitted *pro hac vice*
[*] S.D.N.Y. admission application forthcoming
[**]*Pro hac vice* motion forthcoming