# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, CONNECTICUT, NEW JERSEY, RHODE ISLAND and WASHINGTON, and COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA, | |
| Plaintiffs, | No. 18-cv-6471 (ER) |
| v. | |
| UNITED STATES DEPARTMENT OF JUSTICE; and JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States, | |
| Defendants. | |

| | |
|---|---|
| CITY OF NEW YORK | |
| Plaintiff, | |
| v. | |
| JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States of America, and the UNITED STATES DEPARTMENT OF JUSTICE, | No. 18-cv-6474 (ER) |
| Defendants. | |

# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ................................................................... 2

    I.     The Byrne JAG Program ..................................................................... 2

    II.    The States' Use of Byrne JAG Funds ................................................ 4

    III.   New York City's Use of Byrne JAG Funds and Relevant Laws and Policies ...... 6

    IV.   Defendants' Imposition of Immigration-Related Conditions on Byrne JAG Awards ...... 10

    V.    Harms to Plaintiffs Resulting from Defendants' Imposition of the Immigration-Related Conditions ...... 12

    VI.   Litigation Challenging the New Conditions ..................................... 15

ARGUMENT ……………………………………………………………………17

    I.     Legal Standard .................................................................................. 18

    II.    Defendants Lack Statutory Authority to Impose the Immigration-Related Conditions ...... 19

          A.    The Byrne JAG statute does not authorize DOJ to impose the new conditions. ...... 20

          B.    The immigration-related conditions are not authorized by 34 U.S.C. § 10102(a)(6). ...... 23

          C.    The immigration-related conditions are not authorized by 34 U.S.C. § 10153(a)(5)(D). ...... 26

    III.   Defendants' Imposition of the Immigration-Related Conditions Violates 34 U.S.C. § 10228(a) ...... 29

    IV.   Defendants' Decision to Impose the Conditions was Arbitrary and Capricious .. 32

    V.    Section 1373 Violates the Tenth Amendment and Principles of Federalism. ...... 34

          A.    Section 1373 is facially unconstitutional under *Murphy v. NCAA*. ...... 34

          B.    Section 1373 is unconstitutional as applied to New York City's laws and policies. ...... 38

i

VI.    DOJ's Imposition of the Immigration-Related Conditions Violates the Constitution's Separation of Powers .................................................................... 41

VII.   This Court Should Enter a Permanent Injunction. .................................................. 42

A.    Plaintiffs will suffer irreparable harm absent an injunction ................................. 42

B.    The balance of the equities and the public interest favor a permanent injunction. 45

C.    The injunction should preclude Defendants from imposing the immigration-related conditions on all FY 2017 Byrne JAG applicants ..................................... 46

VIII.  Plaintiffs Are Entitled to Declaratory, Mandamus, and Injunctive Relief ............ 47

CONCLUSION ....................................................................................................................... 49

# TABLE OF AUTHORITIES

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
  719 F. Supp. 2d 26 (D.D.C. 2010), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011)..............................18

*Ali v. Federal Bureau of Prisons*,
  552 U.S. 214 (2008)...................................................................................................30

*Am. Trucking Ass'n, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ...............................................................................45

*Amarin Pharma, Inc. v. FDA*,
  119 F. Supp. 3d 196 (S.D.N.Y. 2015)....................................................................46

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...................................................................................................18

*Austin v. United States*,
   280 F. Supp. 3d 567 (S.D.N.Y. 2017)............................................................ 37, 38

*California ex rel. Becerra v. Sessions*,
   No. 17-cv-4701 (N.D. Cal. Mar. 5, 2018), ECF No. 88 .......................................16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...................................................................................................18

*City & Cnty. of San Francisco v. Sessions*,
  No. 17-cv-4642 (N.D. Cal. Mar. 5, 2018), ECF No. 78 .......................................16

*City & Cnty. of San Francisco v. Trump*,
  267 F. Supp. 3d 1201 (N.D. Cal. 2017),
  *aff'd*, --- F.3d ---, 2018 WL 3637911 (9th Cir. Aug. 1, 2018)................................15

*City of Arlington v. FCC*,
  569 U.S. 290 (2013)...................................................................................................19

*City of Chicago v. Sessions*,
  No. 1:17-cv-05720, --- F. Supp. 3d ---,
  2018 WL 3608564 (N.D. Ill. July 27, 2018)................................................... *passim*

*City of Chicago v. Sessions*,
  264 F. Supp. 3d 933 (N.D. Ill. 2017) ..............................................................16, 23

*City of Chicago v. Sessions*,
  888 F.3d 272 (7th Cir. 2018) ........................................................................ *passim*

*City of Chicago v. Sessions*,
  No. 1:17-2991 (7th Cir. June 4, 2018), Doc. No. 128 ..........................................16

*City of Chicago v. Sessions*,
   No. 1:17-cv-05720, slip op. (7th Cir. Aug. 10, 2018), Doc. No. 208 ....................................16

*City of Evanston v. Sessions*,
   No. 1:18-cv-04853 (N.D. Ill. Aug. 9, 2018), ECF No. 23 ...................................................1, 16

*City of Los Angeles v. McLaughlin*,
   865 F.2d 1084 (9th Cir. 1989) ...............................................................................................20

*City of New York v. Heckler*,
   742 F.2d 729 (2d Cir. 1984)....................................................................................................48

*City of New York v. United States*,
   179 F.3d 29 (2d Cir. 1999).................................................................................................37, 38

*City of Philadelphia v. Sessions*,
   309 F. Supp. 3d 289 (E.D. Pa. 2018) ............................................................................. *passim*

*City of Philadelphia v. Sessions*,
   280 F. Supp. 3d 579 (E.D. Pa. 2018) ............................................................................. *passim*

*City of Philadelphia v. Sessions*,
   No. 17-cv-3894 (E.D. Pa. May 17, 2018), ECF No. 200.......................................................14

*City of Philadelphia v. Sessions*,
   No. 17-cv-3894 (E.D. Pa. June 28, 2018), ECF No. 228.......................................................17

*Clinton v. City of New York*,
   524 U.S. 417 (1998)................................................................................................................41

*Colorado River Water Conservation Dist. v. United States*,
   424 U.S. 800 (1976)................................................................................................................47

*County of Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017) ...................................................................................44

*Dabney v. Reagan*,
   542 F. Supp. 756 (S.D.N.Y. 1982) ........................................................................................42

*Decker v. O'Donnell*,
   661 F.2d 598 (7th Cir. 1980) .................................................................................................47

*DHS v. MacLean*,
   135 S. Ct. 913 (2015)..............................................................................................................21

*Dodge v. Cnty. of Orange*,
   282 F. Supp. 2d 41 (S.D.N.Y. 2003)......................................................................................42

*Edelhertz v. City of Middletown,*
   943 F. Supp. 2d 388 (S.D.N.Y. 2012) ................................................................18

*Ely v. Velde,*
   451 F.2d 1130 (4th Cir. 1971) ......................................................................3, 30

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) ........................................................................................33

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin,*
   733 F.3d 393 (2d Cir. 2013) ...............................................................................42

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ..............................................................................47

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ............................................................................................22

*FDIC v. Great Am. Ins. Co.,*
   607 F.3d 288 (2d Cir. 2010) ...............................................................................18

*Gateway E. Ry. Co. v. Terminal R. R. Ass'n of St. Louis,*
   35 F.3d 1134 (7th Cir. 1994) ..............................................................................44

*Gordon v. Holder,*
   721 F.3d 638 (D.C. Cir. 2013) ............................................................................46

*In re Aiken Cnty.,*
   725 F.3d 255 (D.C. Cir. 2013) ............................................................................41

*Jolly v. Coughlin,*
   76 F.3d 468 (2d Cir. 1996) .................................................................................43

*Kansas v. United States,*
   249 F.3d 1213 (10th Cir. 2001) ..........................................................................44

*McDermott Int'l, Inc. v. Wilander,*
   498 U.S. 337 (1991) .....................................................................................25, 28

*Mitchell v. Cuomo,*
   748 F.2d 804 (2d Cir. 1984) ...............................................................................43

*Morales v. TWA, Inc.,*
   504 U.S. 374 (1992) ............................................................................................44

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
   *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ........................................32

*Murphy v. NCAA*,
  138 S. Ct. 1461 (2018)....................................................................................... *passim*

*Nat'l Cable & Telecomms. Ass'n v.*
  *Brand X. Internet Servs.*, 545 U.S. 967 (2005) .........................................................33

*Nat'l Mining Ass'n v. U.S. Army Corps. of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998)....................................................................................47

*New York v. United States*,
  505 U.S. 144 (1992)........................................................................................ *passim*

*NFIB v. Sebelius*,
  567 U.S. 519 (2012)....................................................................................................39

*NRDC v. Abraham*,
  355 F.3d 179 (2d Cir. 2004).......................................................................................19

*Printz v. United States*,
  521 U.S. 898 (1997)......................................................................................... *passim*

*Rempfer v. Shaftstein*,
  583 F.3d 860 865 (D.C. Cir. 2009) ...........................................................................19

*Rojas v. Roman Catholic Diocese of Rochester*,
  660 F.3d 98 (2d Cir. 2011)........................................................................................18

*Scelsa v. CUNY*,
  806 F. Supp. 1126 (S.D.N.Y. 1992)...........................................................................43

*Senno v. Elmsford Union Free School Dist.*,
  812 F. Supp. 2d 454 (S.D.N.Y. 2011).......................................................................18

*Train v. City of New York*,
  420 U.S. 35 (1975).....................................................................................................41

*Udall v. State of Wisconsin*,
  306 F.2d 790 (D.C. Cir. 1962) ..................................................................................48

*United States v. California*,
  No. 18-cv-00490, --- F. Supp. 3d ---, 2018 WL 3301414
  (E.D. Cal. July 5, 2018), ECF No. 193 ...............................................................17, 36

*United States v. California*,
  No. 18-cv-00490 (E.D. Cal. Mar. 6, 2018), ECF No. 2-1 ......................................14

*United States v. Emmenegger*,
  329 F. Supp. 2d 416 (S.D.N.Y. 2004).......................................................................38

*Util. Air Reg. Grp. v. EPA,*
    134 S. Ct. 2427 (2014)............................................................................23

*Whitman v. Am. Trucking Ass'ns, Inc.,*
    531 U.S. 457 (2001)...............................................................................27

CONSTITUTION

U.S. CONST. art. I .........................................................................................41

U.S. CONST. art. II ........................................................................................42

U.S. CONST. amend. X ........................................................................ *passim*

STATUTES

5 U.S.C. § 706 ..................................................................................... *passim*

8 U.S.C. § 1373 ................................................................................... *passim*

26 U.S.C. § 432 .............................................................................................27

28 U.S.C. § 1085 ...........................................................................................27

28 U.S.C. § 1361 ...........................................................................................48

34 U.S.C. § 10102 ..........................................................................23, 24, 25

34 U.S.C. § 10151 .....................................................................................3, 21

34 U.S.C. § 10152 ..................................................................................3, 4, 21

34 U.S.C. § 10153 ............................................................................... *passim*

34 U.S.C. § 10156 ............................................................................... *passim*

34 U.S.C. § 10157 .....................................................................................3, 21

34 U.S.C. § 10171 .........................................................................................21

34 U.S.C. § 10172 .........................................................................................21

34 U.S.C. § 10181 .........................................................................................21

34 U.S.C. § 10182 .........................................................................................21

34 U.S.C. § 10191 .........................................................................................21

34 U.S.C. § 10228 ............................................................................... *passim*

34 U.S.C. § 20927..................................................................................................23

34 U.S.C. § 30307..................................................................................................23

42 U.S.C. § 2000d..................................................................................................27

42 U.S.C. § 3753 (2000).........................................................................................22

42 U.S.C. § 3756 (2000).........................................................................................23

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 (1988)................................2

Justice Assistance Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837 (1984)....................................2

Justice System Improvement Act of 1979, Pub. L. No. 96-157, 93 Stat. 1167 (1979) ............2, 27

Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996)...........22

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (1968)..................................................................................................................2, 3, 29

Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006) ....................................................................2, 22

## LEGISLATIVE MATERIALS

Criminal Alien Control Act of 1995, S. 179, 104th Cong. ..........................................................22

Illegal Immigration Control Act of 1995, H.R. 1018, 104th Cong................................................22

Illegal Immigration Control Act of 1995, S. 999, 104th Cong. ...................................................22

Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2015) ................................22

Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. (2015) .................................22

Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016)......................................22

Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016) ..........................................22

Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) ............................................................22

Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015).....................22

Violent Crime Control and Law Enforcement Act of 1994, H.R. 3355, 103d Cong. (Nov. 19, 1993) ............................................................................................................22

H.R. Rep. No. 103-694 (1994)...................................................................................22

H.R. Rep. No. 109-233 (2005) ................................................................................3, 21

S. Rep. No. 90-1097 (1968) ...................................................................................3, 30

*Amendments to Title I (LEAA) of the Omnibus Crime Control and Safe Streets Act:*
    *Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Judiciary*
    *Comm.*, 94th Cong. 404 (1976) ......................................................................28

*Controlling Crime Through More Effective Law Enforcement: Hearings Before the*
    *Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary*, 90th
    Cong. 100 (1967) .............................................................................................30

*Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies*
    *Appropriations for 2004: Hearings Before a Subcomm. of the H. Comm. on*
    *Appropriations*, 108th Cong. 1338 (2003) .....................................................21

*Federal Assistance to State and Local Criminal Justice Agencies: Hearing Before the*
    *Subcomm. on Criminal Laws and Procedures of the S. Comm. on the Judiciary*, 95th
    Cong. 383 (1978) .............................................................................................29

*Restructuring the Law Enforcement Assistance Administration: Hearings Before the*
    *Subcomm. on Crime of the H. Comm. on the Judiciary*, 95th Cong. 3 (1977) ........29

OTHER AUTHORITIES

2 C.F.R. § 200.207 ..................................................................................................26

28 C.F.R. § 66.12(a)-(b) (2006) ..............................................................................25

DOJ, RESTRUCTURING THE JUSTICE DEPARTMENT'S PROGRAM OF ASSISTANCE TO STATE
    AND LOCAL GOVERNMENTS FOR CRIME CONTROL AND CRIMINAL JUSTICE SYSTEM
    IMPROVEMENT 8-9 (June 23, 1977), *available at*
    https://www.ncjrs.gov/pdffiles1/Digitization/64996NCJRS.pdf. ............................28

Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to*
    *Immigration Enforcement and a Poor Substitute for Real Reform*, 20 LEWIS & CLARK
    L. REV. 165, 170 (2016) ...................................................................................33

Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) .........................................15

Federal Awarding Agency Regulatory Implementation, 79 Fed. Reg. 75870 (Dec. 19,
    2014) .............................................................................................................26

FED. R. CIV. P. ...................................................................................................2, 19

John K. Hudzik *et al.*, *Federal Aid to Criminal Justice: Rhetoric, Results, Lessons* 45
    (1984) .............................................................................................................29

LEAA: Guideline Manual: Guide for Discretionary Grant Programs (Sept. 30, 1978) ...............28

Letter from Alan Hanson, Acting Assistant Attorney General, to Elizabeth Glazer,
    Director, N.Y.C. Mayor's Office of Criminal Justice (Oct. 11, 2017), *available at*
    https://www.justice.gov/opa/press-release/file/1003041/download ..................................14, 15

Letter from Alan Hanson, Acting Assistant Attorney General, to the Hon. Jim Kenney,
    Mayor, City of Philadelphia (Oct. 11, 2017), *available at*
    https://www.justice.gov/opa/press-release/file/1003046/download ..................................14, 15

PAUL G. DEMBLING & MALCOLM S. MASON, ESSENTIALS OF GRANT LAW PRACTICE
    (1991) ...........................................................................................................................................25

## INTRODUCTION

In our federal system, States and localities have primary responsibility for designing and implementing law enforcement policies to keep their communities safe and promote trust between law enforcement agencies and the residents they serve. Congress created the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program[1]—a mandatory formula grant—to provide States and localities with a reliable source of funding to promote public safety according to local priorities and needs. Consistent with this goal, States and localities have used Byrne JAG funds to support a diverse array of programs, including initiatives to combat gun violence, reduce violent crime, provide substance abuse services, support diversion and re-entry programs, improve criminal records systems, fight organized crime, and prevent sexual abuse and domestic violence.

Contrary to the purpose and structure of the Byrne JAG program, Defendants, the Department of Justice ("DOJ") and the Attorney General of the United States, have now decided to use the Byrne JAG program to compel States and localities to assist the federal government with its civil immigration enforcement efforts. For the first time in the history of the Byrne JAG program, DOJ has informed applicants that they will not receive their Byrne JAG allocations unless they comply with three immigration-related conditions—conditions that have nothing to do with the program's purpose. Two courts have rejected these conditions as unlawful, while other courts—including the Seventh Circuit—have concluded that the conditions are likely unlawful. *See, e.g., City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018); Order, *City of Evanston v. Sessions*, 18-cv-4853 (N.D. Ill. Aug. 9, 2018), ECF No. 23; *City of Chicago v. Sessions*, --- F. Supp. 3d ---, 2018 WL 3608564 (N.D. Ill. July 27, 2018); *City of Philadelphia v. Sessions*, 309 F.

---

[1] Congress named the Byrne JAG program after New York City police officer Edward R. Byrne, who was killed protecting an immigrant who was acting as a cooperating witness. (State and City Pls.' Local Rule 56.1 Statement of Undisputed Material Facts ("56.1") ¶ 13.)

Supp. 3d 289, 329, 341-42 (E.D. Pa. 2018). Nevertheless, DOJ continues to impose the conditions on grant applicants outside the jurisdiction of those courts, forcing States and localities to file piecemeal litigation around the country.

Plaintiffs—the States of New York, Connecticut, New Jersey, Rhode Island and Washington, and the Commonwealths of Massachusetts and Virginia ("State Plaintiffs"), and the City of New York (the "City") (together, "Plaintiffs")—filed their lawsuits to challenge these unconstitutional and illegal conditions, and to seek a permanent injunction to protect their ability to pursue their own law enforcement prerogatives in the manner that best achieves the safety and security of their communities. Plaintiffs now move the Court for partial summary judgment pursuant to Federal Rule of Civil Procedure 56(a) because they are entitled to judgment as a matter of law that the immigration-related conditions that Defendants have imposed on Fiscal Year ("FY") 2017 Byrne JAG funds are unlawful.[2]

## STATEMENT OF UNDISPUTED FACTS

## I.     The Byrne JAG Program

The Byrne JAG program has its origins in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title I, 82 Stat. 197, which created the first block grants for States and localities to use for law enforcement and criminal justice programs.[3] Recognizing that "crime is essentially a local problem that must be dealt with by State and local governments," 82 Stat. at

---

[2] On August 6, 2018, Plaintiffs amended their complaints to challenge several new immigration-related conditions that Defendants imposed on FY 2018 Byrne JAG funding. The instant motion seeks judgment solely on Plaintiffs' claims challenging the FY 2017 conditions (Counts I-V of the States' amended complaint and Causes of Action One through Three and Five of the City's amended complaint).

[3] See Justice System Improvement Act of 1979, Pub. L. No. 96-157, 93 Stat. 1167, 1179 (amending Title I of the 1968 Act and reauthorizing law enforcement block grants to States and local governments); Justice Assistance Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, 2077-85 (same); Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, pt. E, 102 Stat. 4181, 4329 (amending Title I of the 1968 Act and creating a formula law-enforcement grant); Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006) (amending Title I of the 1968 Act and creating the modern Byrne JAG program).

197, Congress designed the grant to provide a reliable funding stream that States and localities could use to further State and local law enforcement policies.[4]

To ensure federal deference to local priorities, the 1968 Act prohibited federal agencies and executive branch officials from using law enforcement grants to "exercise any direction, supervision, or control over any police force or any other law enforcement agency of any State or any political subdivision thereof." *Id*. § 518(a), 82 Stat. at 208. Although Congress has repeatedly modified the structure and terms of the law enforcement grants authorized under Title I of the 1968 Act, the prohibition originally set forth in § 518 of the 1968 Act remains in effect with virtually no modification, and is now codified in the same chapter of the U.S. Code as Byrne JAG. *See* 34 U.S.C. § 10228(a).

Congress codified the modern Byrne JAG program in 2006. 34 U.S.C. §§ 10151-58. Like its predecessors, Byrne JAG aims to "give state and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). To that end, the Byrne JAG statute gives recipients substantial discretion to use funds for eight "broad purposes," *id.*, including law enforcement, crime prevention and education, and drug treatment, 34 U.S.C. § 10152(a)(1).

DOJ is required by law to issue grants "in accordance with the formula" set forth in the Byrne JAG statute. *Id*. Specifically, "[o]f the total amount appropriated" by Congress, the U.S. Attorney General "shall, except as provided in paragraph (2), allocate" fifty percent of the funds based on each State's population and fifty percent based on each State's crime rate. *Id.*

---

[4] *See, e.g.*, S. Rep. No. 90-1097, at 2 (1968) (stating that Congress sought to encourage States and localities to adopt programs "based upon their evaluation of State and local problems of law enforcement"); *see also Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (reviewing the legislative history of the 1968 Act and concluding that "[t]he dominant concern of Congress apparently was to guard against any tendency towards federalization of local police and law enforcement agencies").

§ 10156(a)(1). The exception in paragraph (2) provides that each State must receive at least one-quarter of one percent of the funds appropriated by Congress for a given year, regardless of what the formula would otherwise dictate. *Id.* § 10156(a)(2).

Of the money allocated to each State, sixty percent of the funding "shall be for direct grants to States," *id.* § 10156(b)(1), and forty percent "shall be for grants" directly to localities (compared within a State based on crime rate), *id.* § 10156(b)(2), (d). Additionally, each State is required to allocate a portion of its award to localities within the State. *Id.* § 10156(c)(2). Thus, some localities, like the City, are both direct grant recipients from DOJ as well as subgrantees of the States.

States and localities are required to submit an application to receive Byrne JAG funds each fiscal year. 34 U.S.C. § 10153(a). The application must include, among other things: a certification that program funds will not be used to supplant state or local funds, *id.* § 10153(a)(1); an assurance that the application was made available for public comment, *id.* § 10153(a)(3); an assurance that the applicant will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," *id.* § 10153(a)(4); and a certification that programs to be funded meet the requirements of the Byrne JAG statute, that all the information in the application is correct, that there has been appropriate coordination with affected agencies, and that "the applicant will comply with all provisions of this part and all other applicable Federal laws," *id.* § 10153(a)(5).

## II.     The States' Use of Byrne JAG Funds

For nearly fifty years, the States, localities, and their subgrantees have used funds from Byrne JAG and its predecessor grant programs to support a broad array of critical law enforcement programs tailored to local needs. To maximize the impact of these funds, States routinely use Byrne JAG monies to fund a number of statewide initiatives that do not have another primary funding source. (*See, e.g.*, Klontz Decl. ¶ 16.) Additionally, numerous cities and counties within

4

each State depend on pass-through grants distributed by the States to combat crime and maintain public safety. (*Id.*) In many instances, there are no alternative state funds budgeted for these programs. (Bennett Decl. ¶ 13 (MA); Klotnz Decl. ¶¶ 16-18 (WA); Dion Decl. ¶ 23 (VA); Fradel Decl. ¶ 23 (NJ); Lawlor Decl. ¶¶ 18-19 (CT).)

State Plaintiffs and their subgrantees have used or intend to use Byrne JAG funding to support numerous criminal justice programs, including the following:

- Multi-jurisdictional drug and gang task forces that investigate, disrupt, or dismantle drug trafficking organizations operating across city, county, and state boundaries. (56.1 ¶ 112; Klontz Decl. ¶¶ 5-11, 18 (WA); 56.1 ¶ (91(a); Fradel Decl. ¶¶ 9-10 (NJ); 56.1 ¶ 87; Bennett Decl. ¶ 7 (MA); 56.1 ¶ 79; Lawlor Decl. ¶ 18 (CT); 56.1 ¶ 99; Hogan Decl. ¶ 16 (RI));

- Specialty courts addressing drug offenses, domestic violence, and veteran populations. (56.1 ¶¶ 52(d), 68; Green Decl. ¶ 12d (NY); 56.1 ¶ 109 (WA); Klontz Decl. ¶ 3 (WA); 56.1 ¶ 96; Hogan Decl. ¶ 5 (RI));

- Opioid-related diversion programs and other efforts geared toward combating heroin, fentanyl, and other illegal drugs. (56.1 ¶ 84; Bennett Decl. ¶ 12 (MA); 56.1 ¶ 80; Lawlor Decl. ¶ 18 (CT); 56.1 ¶ 105 (VA); Dion Decl. ¶ 22 (VA));

- Prosecution and legal defense services designed to enhance the quality and effectiveness of violent crime and drug prosecution. (56.1 ¶ 72(d); Green Decl. ¶ 12(d) (NY); 56.1 ¶ 91(c); Fradel Decl. ¶¶ 10-11 (NJ));

- Prison reentry initiatives, including substance abuse treatment services. (56.1 ¶ 91(e); Fradel Decl. ¶ 11 (NJ); 56.1 ¶ 84; Bennett Decl. ¶¶ 5, 12 (MA); 56.1 ¶ 80; Lawlor Decl. ¶ 18 (CT); 56.1 ¶ 96; Hogan Decl. ¶ 5 (RI));

- Gun violence elimination programs and street outreach programs directed at reducing gun violence. (56.1 ¶ 72(b); Lovely Decl. ¶ 12 (Rochester); Green Decl. ¶ 12b (NY)); and

- Improvements to law-enforcement equipment and technology, and communication system upgrades. (56.1 ¶ 103; Dion Decl. ¶¶ 22, 24 (VA); 56.1 ¶ 72(f)(-(6); (Lovely Decl. ¶ 12 (Rochester)); (Green Decl. ¶¶ 11, 12f-g (NY); 56.1 ¶ 91(f); Fradel Decl. ¶ 11 (NJ); (56.1 ¶ 109; Klontz Decl. ¶ 3 (WA)).

State Plaintiffs have also used Byrne JAG awards to partially or fully fund numerous staff positions in vital programs, including the following:

- A ballistic technician in the New Jersey Division of State Police for its Organized Crime, Gangs, and Guns Task Force. (56.1 ¶ 91(e); Fradel Decl. ¶ 11 (NJ));

- Approximately thirty crime analyst positions in the four Crime Analysis Centers (CACs) that serve the Buffalo, Rochester, Syracuse, and Capital (Albany) regions in New York State. (56.1 ¶¶ 68, 72(a); Green Decl. ¶ 12a (NY));

- Twenty-nine staff positions in the New York State Office of Information Technology Services to support critical public safety IT systems and platforms, including New York's fingerprint identification system, criminal history database, sex offender registry, integrated probation registry, and missing persons clearinghouse. (56.1 ¶¶ 72(f); Green Decl. ¶ 12h (NY));

- Four staff positions in the Connecticut Office of Policy Management (56.1 ¶ 81; Lawlor Decl. ¶ 19 (CT)); and

- A project manager and training director with New York State's SNUG ("GUNS" spelled backwards) street outreach program. (56.1 ¶ 72(b); Green Decl. ¶ 12b (NY)).

For FY 2017, State Plaintiffs collectively have been awarded $25,489,029 in FY 17 Byrne JAG funding, allocated as follows:

- $8,879,161 for the State of New York (Green Decl. ¶¶ 10,13; Ex. 1);

- $1,711,049 for the State of Connecticut (Lawlor Decl. ¶ 9; Ex. 2);

- $4,047,274 for the State of New Jersey (Fradel Decl. ¶ 12; Ex. 3);

- $767,114 for the State of Rhode Island (Hogan Decl. ¶ 7; Ex. 4);

- $3,277,891 for the State of Washington (Klontz Decl. ¶ 2; Ex. 5);

- $3,453,006 for the Commonwealth of Massachusetts (Bennett Decl. ¶ 11; Ex. 6); and

- $3,353,534 for the Commonwealth of Virginia (Dion Decl. ¶ 23; Ex. 7).

## III.   New York City's Use of Byrne JAG Funds and Relevant Laws and Policies

New York City has applied for and received Byrne JAG funding as a direct grantee since 2005. (56.1 ¶ 114.) The Byrne JAG program has long been an important source of funding for the City's criminal justice programs. These funds have been used to:

- Pay the salaries of 911 emergency responders. (56.1 ¶ 116.);

6

- Finance diversion programs for nonviolent felony drug offenders run through the District Attorney's Offices. (56.1 ¶ 117.);

- Support efforts to fight cybercrime and identity theft. (56.1 ¶ 119.);

- Finance drug prosecutions by the City's Office of the Special Narcotics Prosecutor. (56.1 ¶ 119.);

- Finance upgrades to the City's criminal justice data collection, organization, and evaluation systems. (56.1 ¶ 119.);

- Support interventions for individuals with mental and behavioral health needs. (56.1 ¶ 119.); and

- Fund school safety initiatives. (56.1 ¶ 119.)

New York City has adopted laws and policies that encourage people of all backgrounds to trust in government, and particularly in law enforcement, to ensure the public safety and health of the entire community. (56.1 ¶ 146.) The City's laws and policies are predicated on the understanding that (1) the City as a whole benefits when all individuals, regardless of personal attributes, feel safe reporting crimes, cooperating with police investigations, accessing emergency medical treatment and public health programs, and sending their children to school, and (2) residents, including members of the immigrant community, may not seek out critical services if they fear disclosure of the sensitive personal information they provide the City in order to obtain these services. (56.1 ¶¶ 177, 183-85.)

These policies are calibrated to advance public safety, foster community trust in local law enforcement, safeguard individuals' civil rights, and protect the City's finances. (56.1 ¶¶ 173, 183-85.) Importantly, these policies, which promote trust between the City and the public, are instrumental to improving public safety and maintaining the historically low crime rates the City now enjoys. (56.1 ¶ 184.) By maintaining good police-community relations, law enforcement is more effective in solving crime and keeping residents safe. (56.1 ¶ 183.) In addition, these policies are vital to promoting public health. (56.1 ¶ 190-203.)

7

The City's laws and policies provide expansive protections for the information of all New Yorkers. The City's General Confidentiality Policy, which comprises Mayoral Executive Orders Nos. 34 and 41, protects the confidentiality of individuals' information by restricting unnecessary collection and disclosure to external parties. (56.1 ¶¶ 142-44.) Under the General Confidentiality Policy, confidential information is broadly defined to include an individual's status as a victim of domestic violence, status as a victim of sexual assault, status as a crime witness, receipt of public assistance, immigration status, and information contained in income tax records. (56.1 ¶ 145.)

The General Confidentiality Policy generally bars City employees from affirmatively seeking "confidential information" from individuals in the first instance, with certain narrow exceptions. (56.1 ¶¶ 143-44.) For example, the Policy prohibits law enforcement officers from inquiring about the immigration status of crime victims and witnesses, or others who call or approach the police seeking assistance. (56.1 ¶ 147.) However, law enforcement officers may inquire into a person's immigration status if they are "investigating illegal activity other than mere status as an undocumented alien." (56.1 ¶ 146.)

If confidential information is nevertheless acquired from a member of the public, the General Confidentiality Policy bars City employees from disclosing it to third parties, with limited exceptions. (56.1 ¶ 148.) This non-disclosure principle applies generally, and is not limited to immigration enforcement agencies and officials. In fact, exceptions to this policy permit the City to communicate with federal immigration authorities in connection with persons suspected of engaging in illegal activity. (56.1 ¶ 148.)

The City's Identifying Information Laws augment the General Confidentiality Policy by setting forth a uniform, City-wide approach to the collection, disclosure, and retention of identifying information. (56.1 ¶¶ 151-52.) The City has determined that it is important to have a

8

uniform policy for City employees because individuals provide sensitive information to the City with the expectation that it will be kept confidential and only used in their best interests. (56.1 ¶¶ 177-78.) Identifying information is defined as any information that "may be used on its own or with other information to identify or locate an individual," including name, race, citizenship status, or immigration status. (56.1 ¶ 153.) Generally, the Identifying Information Laws forbid employees from collecting or disclosing identifying information unless there are exigent circumstances or another exception applies. (56.1 ¶ 1555.) For example, the New York City Police Department ("NYPD") is allowed to collect and disclose identifying information in connection with the investigation of a crime or attempted impending crime. (56.1 ¶ 156.)

While the City has developed certain laws and policies in an effort to protect the confidential and identifying information of its residents, the City also recognizes the importance of working with federal immigration authorities, as evidenced by the exceptions to its laws and policies. The City cooperates with federal immigration authorities by responding to ICE requests accompanied by a judicial warrant to maintain custody of a person whom the City considers to be a public safety risk beyond the time the person would otherwise be released, so that ICE can assume custody of that individual. (56.1 ¶ 161.) The City similarly cooperates with ICE's requests for notification of release information for individuals in the City's custody by providing ICE with the release date and time for any individual who has been convicted of a violent or serious crime or is identified as a possible match in the terrorist screening database where the request is accompanied by an administrative warrant. (56.1 ¶ 165.) Additionally, New York City Department of Correction ("DOC") voluntarily shares certain information with ICE related to persons entering its custody, which ICE may rely on to issue requests for detention and advance notice of release. (56.1 ¶ 166.) Finally, while the City generally limits access to non-public areas of City property,

9

including correctional facilities, DOC permits ICE to interview inmates in its custody who provide voluntary written consent. (56.1 ¶¶ 172-73.)

## IV.     Defendants' Imposition of Immigration-Related Conditions on Byrne JAG Awards

On July 25, 2017, DOJ announced that it would impose three immigration-related conditions on all Byrne JAG recipients. (56.1 ¶ 16.) The "access condition" requires Plaintiffs to have a statute, rule, regulation, policy, or practice designed to ensure that, upon request, federal agents may access a local, state or state-contracted correctional facility to question suspected aliens about their right to be or remain in the United States. (56.1 ¶¶ 38.) The "notice condition" requires Plaintiffs to have a statute, rule regulation, policy, or practice designed to ensure that local, state or state-contracted correctional facilities will honor any formal written request from the Department of Homeland Security to a correctional facility seeking advance notice of a particular alien's scheduled release date and time as soon as practicable. (56.1 ¶¶ 39.) The notice and access conditions also require the State Plaintiffs to receive assurances from their subgrantees that they will comply with the conditions and monitor subgrantee compliance. (56.1 ¶ 31.)

The third set of conditions—the "Section 1373 conditions"—require Plaintiffs to accept various terms related to 8 U.S.C. § 1373, (56.1 ¶ 31), which prohibits States and localities from restricting their officials from communicating with federal immigration authorities "regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a).[5] Among other requirements imposed by the Section 1373 conditions, Plaintiffs must certify their compliance with Section 1373, comply with Section 1373 throughout the duration of the award,

---

[5] *See also* 8 U.S.C. § 1373(b) ("Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity.").

and notify DOJ in writing if they become aware of "credible evidence" that any subgrantee has violated Section 1373. (56.1 ¶ 31.)

DOJ also requires three certifications from all recipients. The first, which must be executed by a jurisdiction's Chief Executive—e.g., the State's Governor or the City's Mayor—attests to the State's or City's compliance with Section 1373 and the other grant conditions. The second, which must be executed by the State's or City's Chief Legal Officer, certifies that the jurisdiction complies with Section 1373 and that the Legal Officer understands that subgrantees must also comply with Section 1373. The third certification requires the State or City employee who signs the grant award to certify the jurisdiction's compliance with all other grant conditions. Each certification, as it appears in the Administrative Record, carries the risk of personal criminal prosecution, civil penalties, and administrative remedies. (56.1 ¶¶ 33.)

At the time it announced the new conditions, DOJ issued a press release and one-page "Backgrounder," neither of which explained why DOJ decided to impose the conditions, how the conditions would advance the interests of the Byrne JAG program, or what alternatives DOJ had considered. (56.1 ¶¶ 16-20.) Indeed, the "Backgrounder" stated only that the conditions would "improve the flow of information between federal, state, and local law enforcement, and help keep our communities safe," but did not explain why communication between the federal government and states and localities was deficient, or how the conditions would promote public safety. (56.1 ¶ 20.)

On June 26, 2018, State Plaintiffs received notice that they were eligible to receive their FY 2017 Byrne JAG allocations. (56.1 ¶ 29.) Applicants were given 45 days—until August 10, 2018—to accept the awards and agree to the new conditions. On August 1, 2018, as part of this litigation, DOJ agreed not to re-allocate or revert State Plaintiffs' FY 2017 funds for a 60-day

period, which will automatically renew every 30 days thereafter, unless DOJ notifies Plaintiffs that it does not intend to renew the agreement. (56.1 ¶ 27.)[6]

Unlike the State Plaintiffs, the City has not received an award letter for FY 2017 even though it was allocated funds for FY 2017 in the amount of $4.1 million. (56.1 ¶¶ 51, 114.) The City filed a timely application for the FY 2017 Byrne JAG grant on September 5, 2017. (56.1 ¶ 44). The City, under the terms of its FY 2016 Byrne JAG grant, previously submitted a legal opinion validating its compliance with Section 1373 to the extent the provision is constitutionally applicable. (56.1 ¶ 43). DOJ responded to the City's FY 2017 application on October 11, 2017 with a "preliminary" determination that the City has laws, policies, or practices that violate Section 1373. (56.1 ¶ 45).

On June 27, 2018, DOJ announced that, although "reviews of some applications remain ongoing," it was distributing nearly $200 million in JAG Program funds to certain jurisdictions that did not include New York City. DOJ announced that the jurisdictions receiving the funding shared its commitment to "keeping criminal aliens off our streets and our law abiding citizens safe." *See* DOJ Press Releases FY2017 Byrne JAG Funding, at https://bit.ly/2BIIPVy (last accessed Aug. 17, 2018). The City has been informed that its application is on hold. (56.1 ¶ 51.) On August 14, 2018, also as part of this litigation, DOJ agreed not to re-allocate the City's FY 2017 funds for a 60-day period, which will automatically renew every 30 days thereafter, unless DOJ notifies the City that it does not intend to renew the agreement. (56.1 ¶ 52.)

## V.    Harms to Plaintiffs Resulting from Defendants' Imposition of the Immigration-Related Conditions

Defendants' imposition of the immigration-related conditions places Plaintiffs in an

---

[6] On August 9, 2018, DOJ extended this agreement to include Rhode Island, which had joined the case four days earlier. (56.1 ¶ 27.)

untenable position. If Plaintiffs do not acquiesce to the conditions, they will forfeit tens of millions of dollars in law enforcement funding, compromising the critical law enforcement and criminal justice programs those funds support. If they accept the conditions, Plaintiffs will be forced to relinquish sovereign control over their own law enforcement officials, as well as their own criminal justice policies. Localities that lawfully adopt public health and safety policies and laws—such as the City Plaintiff's General Confidentiality Policy and Identifying Information Laws, which define how employees and officials may cooperate with federal immigration officials—will now be compelled to adopt policies that undermine the trust that has been built from community relationships, to the detriment of effective crime reporting and overall public health and safety in the States and the City. (56.1 ¶¶ 177-79, 183-84, 187-88, 194.)

By forcing local officials to forego these carefully thought-out policies, Defendants will make local law enforcement more difficult and less effective. (56.1 ¶¶ 184-85, 187-88.) They will also create a climate of fear that prevents undocumented immigrant crime victims and their family members from coming forward and cooperating with police, causing public safety to suffer as a result. (Kelly Decl. ¶¶ 7-14 (Albany); *see also* Warren Decl. ¶¶ 7-11 (Rochester); Diaz Decl. ¶¶ 4-7 (WA); Torrance Decl. ¶¶ 6-10 (WA); Fradel Decl. ¶¶ 21-22 (NJ); Wang Decl. ¶¶ 5-13 (NJ); 56.1 ¶¶ 120-27.).

A fear that confidential information will be disclosed may also negatively affect public health, because it creates enormous risk that individuals will no longer share information necessary to promote public health or seek out the care they need. (56.1 ¶ 194.) For example, community cooperation is vital to the New York City Department of Health and Mental Hygiene's investigations into and prevention of outbreaks of communicable and chronic diseases. If individuals fear their personal information will be disclosed, they may also refrain from seeking

13

out essential services such as HIV and tuberculosis treatment, immunizations, and childhood developmental programming. (56.1 ¶¶ 197-98.) This failure to seek care would hurt public health as a whole. (56.1 ¶ 203.)

The State Plaintiffs will also be harmed by the requirement that they monitor their subgrantees' compliance with the new conditions—a process that will require the States to expend considerable time and money, including building an infrastructure to conduct inspections, review records, and compile and transmit data. (56.1 ¶ 129; Green Decl. ¶ 20 (NY); 56.1 ¶ 134; Lawlor Decl. ¶ 17 (CT); 56.1 ¶ 135; Bennett Decl. ¶ 14 (MA); 56.1 ¶ 136; Fradel Decl. ¶ 19 (NJ); 56.1 ¶ 128; Dion Decl. ¶¶ 21-22 (VA); Hogan Decl. ¶ 14; 56.1 ¶ 133 (RI)).

Certifying compliance with Section 1373 is particularly perilous for States and localities given DOJ's expansive and ever-changing interpretations of that statute's meaning. For example, DOJ has suggested that Section 1373 prevents jurisdictions from enacting policies that define the time and manner in which their employees exchange immigration-status information with federal officials.[7] DOJ also has suggested that Section 1373 requires jurisdictions to facilitate transfers from State and local jails to federal immigration authorities.[8] DOJ has further suggested that Section 1373 requires jurisdictions to share non-public information about individuals' home and work addresses, as well as their scheduled release date from incarceration.[9] On top of all of this,

_____

[7] *See, e.g.*, Letter from Alan Hanson, Acting Assistant Attorney General, to Elizabeth Glazer, Director, N.Y.C. Mayor's Office of Criminal Justice (Oct. 11, 2017), *available at* https://www.justice.gov/opa/press-release/file/1003041/download (last visited July 6, 2018); Letter from Alan Hanson, Acting Assistant Attorney General, to the Hon. Jim Kenney, Mayor, City of Philadelphia (Oct. 11, 2017), *available at* https://www.justice.gov/opa/press-release/file/1003046/download (last visited July 6, 2018).

[8] *See* Def.'s Proposed Findings of Fact 8-21, *City of Philadelphia v. Sessions*, No. 17-cv-3894 (E.D. Pa. May 17, 2018), ECF No. 200, Trasande/Holt Decl., Ex. 38; Pl.'s Mot. for Prelim. Inj. and Mem. of Law in Support 24-26, *United States v. California*, No. 18-cv-00490 (E.D. Cal. Mar. 6, 2018), ECF No. 2-1 (suggesting California law violates § 1373 by restricting the transfer of aliens in state custody to federal custody), Trasande/Holt Decl., Ex. 42.

[9] *See, e.g.*, Letter from Alan Hanson, *supra* n. 7 ("In order to comply with 8 U.S.C. § 1373, the Department has determined that New York would need to certify that it interprets and applies Section 9-131(b) and (d) to not restrict New York officers from sharing information regarding the date and time of an alien's release from custody.");

DOJ has taken the position that jurisdictions have an affirmative obligation to communicate DOJ's interpretation of Section 1373 to their employees.[10]

Finally, Plaintiffs are harmed by having to make a Hobson's Choice between foregoing millions of dollars in criminal justice funding and accepting immigration conditions that are unlawful and unconstitutional. Either choice does grave harm to Plaintiffs and thus is not a choice at all.

## VI.   Litigation Challenging the New Conditions

Defendants' unlawful imposition of immigration-related conditions on Byrne JAG awards has generated litigation in numerous jurisdictions throughout the country. To date, every court to address the issue has held that Defendants lack or likely lack the authority to impose these conditions. Yet despite the courts' unanimity, Defendants have continued to impose the conditions, forcing jurisdictions to file piecemeal litigation around the country.[11]

In Chicago, the district court has issued preliminary injunctions in cases brought by the City of Chicago, the City of Evanston, and the U.S. Conference of Mayors. *See City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 945-46, 952 (N.D. Ill. 2017); Order, *City of Evanston*, 18-cv-4853 (N.D. Ill. Aug. 9 2018), ECF No. 23 (Ex. 44, Trasande/Holt Decl.). The Seventh Circuit affirmed

---

Trasande/Holt Decl., Ex. 43 (Order re: United States' Mot. for Prelim. Inj., *United States v. California*, 18-cv-490 (E.D. Cal. July 5, 2018), ECF No. 193 (rejecting DOJ's argument that Section 1373 governs release dates and home and work addresses)).

[10] *See, e.g.*, Letter from Alan Hanson, *supra* n. 7 ("In order to comply with 8 U.S.C. § 1373, the Department has determined that … New York would need to certify that it has communicated this interpretation to its officers and employees.").

[11] Even before announcing the new conditions, Defendants sought to condition federal grant funding on compliance with immigration-related conditions. On January 25, 2017, President Trump issued an Executive Order directing the Attorney General and Secretary of the Department of Homeland Security to deny federal grant funding to so-called "sanctuary jurisdictions." Order No. 13,768, 82 Fed. Reg. 8799 at § 9(a) (Jan. 25, 2017). That Executive Order was permanently enjoined by a district court because it violated numerous provisions of the U.S. Constitution, including the Separation of Powers. *City and Cnty. of San Francisco v. Trump*, 267 F. Supp. 3d 1201 (N.D. Cal. 2017), *aff'd*, --- F.3d ---, 2018 WL 3637911 (9th Cir. Aug. 1, 2018) (affirming except as to the nationwide scope of the injunction).

the district court's preliminary injunction in *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), but stayed the nationwide scope of the preliminary injunction.[12] The district court subsequently ruled in favor of the City of Chicago and permanently enjoined all three conditions on multiple grounds, including (1) the notice and access conditions are ultra vires and violate separation of powers, and (2) Section 1373 is unconstitutional under the anti-commandeering principles of the Tenth Amendment. *City of Chicago*, 2018 WL 3608564, at *5-13. The *Chicago* district court stayed the nationwide scope of its permanent injunction, limiting its effect to Chicago. *Id.* at *17-18.

In California, the district court denied Defendants' motion to dismiss lawsuits brought by the State of California and City of San Francisco, holding that those jurisdictions had stated plausible claims that the challenged conditions were unlawful.[13] San Francisco's and California's motions for summary judgment are now pending. In a separate case, the United States sued California and sought a preliminary injunction against the enforcement of several California statutes that, according to DOJ, conflicted with Section 1373 or were otherwise preempted by federal law. In denying the United States' request in part, the district court determined that Section 1373 does not govern release dates or home or work addresses, as DOJ had argued, and characterized the constitutionality of Section 1373 as "highly suspect." *United States v. California*,

---

[12] The Seventh Circuit had previously granted en banc review on the question of the scope of the preliminary injunction and granted a stay of the district court's nationwide preliminary injunction to limit its effect to Chicago. *See City of Chicago v. Sessions*, No. 17-2991 (7th Cir. June 4, 2018), Doc. No. 128 (granting en banc review on scope of preliminary injunction); *id.* (7th Cir. June 26, 2018), Doc. No. 134 (granting partial stay of injunction). In light of the district court's resolution of the underlying litigation, the Seventh Circuit has vacated its order to rehear, en banc, arguments regarding the preliminary injunction as moot. Trasande/Holt Decl., Ex. 37 (*City of Chicago*, No. 1:17-cv-5770, slip op. at 3 (7th Cir. Aug. 10, 2018), Doc No. 208).

[13] Trasande/Holt Decl., Ex. 40 (Order Denying Mot. to Dismiss, *California ex rel. Becerra v. Sessions*, No. 17-cv-4701 (N.D. Cal. Mar. 5, 2018), ECF No. 88); Trasande/Holt Decl., Ex. 41 (Order Denying Mot. to Dismiss, *City & Cnty. of San Francisco v. Sessions*, No. 17-cv-4642 (N.D. Cal. Mar. 5, 2018), ECF No. 78). The court also denied California's request for a preliminary injunction, finding that the record was insufficient at the motion to dismiss stage to enjoin the Section 1373 condition. *See California*, 284 F. Supp. 3d 1015 (N.D. Cal. 2018).

--- F. Supp. 3d ---, 2018 WL 3301414, at *14-17 (E.D. Cal. July 5, 2018). On August 7, 2018, DOJ filed a notice of appeal.

In Philadelphia, the district court permanently enjoined Defendants from imposing all three immigration-related conditions on the city and held that (1) the notice and access conditions were ultra vires, (2) imposition of the three conditions violated separation of powers, (3) the decision to impose all three conditions was arbitrary and capricious, and (4) Section 1373 was unconstitutional under the anti-commandeering principle of the Tenth Amendment. *City of Philadelphia v. Sessions*, 309 F. Supp. 3d at 320-31. The district court also ordered Defendants to issue Philadelphia's FY 2017 award documents without the immigration-related conditions, and to process and approve the City's requests for drawdowns of its funds as it would in the ordinary course, without regard to the conditions. *See* Final Judgment and Decree, *City of Philadelphia*, 17-cv-3894 (MMB) (E.D. Pa. June 28, 2018), ECF No. 228 (Trasande/Holt Decl., Ex. 39). Although DOJ has filed a notice of appeal, it has not sought a stay of this order.

## ARGUMENT

Plaintiffs are entitled to judgment as a matter of law that the three immigration-related conditions placed on FY 2017 Byrne JAG funding are unlawful and unconstitutional. Defendants lack the statutory authority to impose the three conditions and, thus, the conditions are ultra vires under the Administrative Procedure Act ("APA") and must be set aside. In addition, Defendants have not acted in accordance with 34 U.S.C. § 10228(a), which prohibits Defendants from exercising any direction, supervision, or control over any state or local law enforcement agency. Further, the immigration-related conditions must be invalidated because Defendants' process for imposing them was arbitrary and capricious. Additionally, Defendants cannot impose the Section 1373 conditions because 8 U.S.C. § 1373 is unconstitutional under Tenth Amendment anti-

commandeering principles. Finally, imposition of all three conditions violates the separation of powers and principles of federalism.

## I.     Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the non-moving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). While courts must view the facts in the light most favorable to the non-moving party, "[a] motion for summary judgment cannot be defeated on the basis of mere denials or unsupported alternative explanations of fact." *Edelhertz v. City of Middletown*, 943 F. Supp. 2d 388, 393 (S.D.N.Y. 2012) (Ramos, J.). Rather, the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor. *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467-68 (S.D.N.Y. 2011).

In challenges to agency action under the APA, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 32 (D.D.C. 2010) (internal quotation marks omitted), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011). Challenges to agency action "not in

accordance with law" present only a question of law concerning "the legal conclusion to be drawn about the agency action." *Rempfer v. Shaftstein*, 583 F.3d 860 865 (D.C. Cir. 2009). Thus, a motion for summary judgment arguing that agency action was ultra vires requires no factfinding, but simply asks whether the agency action was permissible under existing law. Allegations that agency action was arbitrary and capricious require the court to consult the administrative record and determine whether the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## II.    Defendants Lack Statutory Authority to Impose the Immigration-Related Conditions

Under the APA, a court must "hold unlawful and set aside agency action … found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). An agency may only act within the authority granted to it by statute. *See, e.g., NRDC v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004) (discussing the "well-established principle" that the boundaries of an agency's authority are exclusively drawn by Congress). In reviewing the scope of an agency's authority, "the question … is always whether the agency has gone beyond what Congress has permitted it to do." *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013). Here, DOJ lacks the statutory authority to impose any of the immigration-related conditions on Byrne JAG funds under the program's authorizing statute or any other law.[14]

---

[14] New York City's claim under the APA is ripe for adjudication because Defendants have taken final action with respect to its Byrne JAG award. As in *City of Chicago*, Defendants' decision was final even though the City had not yet applied for FY 2017 funding because 1) the solicitation "explicitly require[s] compliance with all three Conditions" and 2) "forc[ing] [the City] to choose between accepting the award with the Conditions or forgoing the award in favor of maintaining the City's policy preferences" is a serious legal consequence that flows from the agency's decision to impose the new conditions. 2018 WL 3608564 at *5; *see also City of Philadelphia*, 309 F. Supp.3d at 279-80 (holding that "the Attorney General's decision to impose the conditions represents the agency's definitive position on the question, such that it is now final and ripe for this Court's review," even though DOJ had not yet decided whether to award Philadelphia a Byrne JAG award) (internal quotation marks omitted). Additionally, there can be no dispute that

**A.  The Byrne JAG statute does not authorize DOJ to impose the new conditions.**

Defendants have no authority to impose substantive policy conditions of their own design on Byrne JAG grantees. As the Seventh Circuit has recognized, nothing in the Byrne JAG statute "grant[s] the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for their failure to comply with those conditions." *City of Chicago*, 888 F.3d at 283. To the contrary, the statute mandates that the "the Attorney General *shall . . . allocate*" grant money based on the statutory formula, 34 U.S.C. § 10156(a)(1) (emphasis added), and it provides "explicit authority" to DOJ to carry out only a limited set of "specific actions," none of which include imposing generally applicable substantive conditions. By structuring the program as a formula grant, Congress made clear that DOJ had no authority to deviate from the statutory formula. *See, e.g.*, *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (unlike discretionary grants, "formula grants … are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula.") (internal quotation marks omitted).

Other provisions of the Byrne JAG statute likewise confirm Congress's intent to minimize DOJ's ability to deviate from Congress's statutory formula. For example, 34 U.S.C. § 10157(b) permits DOJ to reserve up to five percent of appropriated funds and reallocate them to a State or locality if the U.S. Attorney General determines that reallocation is necessary to combat "extraordinary increases in crime" or to "mitigate significant programmatic harm resulting from" the formula. By expressly restricting DOJ's authority to redirect Byrne JAG funds to a few prescribed circumstances, Congress made clear that DOJ must otherwise abide by the statutory

---

DOJ's award to the State Plaintiffs is "final agency action." On June 26, 2018, the Plaintiff States were each notified that it received a Byrne JAG award for FY 2017.

formula. *See, e.g.*, *DHS v. MacLean*, 135 S. Ct. 913, 919 (2015) (provision of express authority in one section of statute implies intent to exclude elsewhere).[15]

The Byrne JAG statute's legislative history leads to the same conclusion. From the time Congress first created a law enforcement block grant program in 1968, it has sought to ensure that such grants do not become a means for federal agencies to control, direct, or supervise state and local law enforcement. *See infra* § IV. In enacting Byrne JAG—the latest version of the 1968 program—Congress reaffirmed this priority, stating that the grant was designed to "give State and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005).[16] Defendants' imposition of conditions requiring States and localities to enforce executive policy priorities as a condition of receiving grants is inconsistent with the statutory language of Byrne JAG as well as the federalism principles and congressional intent underlying the program.

What is more, since the 1990s, Congress has repeatedly considered and rejected legislation that would withhold grant funding as a penalty for noncooperation with federal immigration law.[17] The same legislation that enacted Section 1373 in September 1996 also funded a predecessor to

---

[15] The structure of title 34, chapter 101 of the U.S. Code also confirms DOJ's limited authority. Byrne JAG is located in part A of Chapter 101, which is entitled "Edward Byrne Memorial Justice Assistance Grant Program." *See* 34 U.S.C. §§ 10151-58. Part B, entitled "Discretionary Grants," authorizes DOJ to issue grants to support projects similar to those supported by Byrne JAG but at DOJ's discretion. *See id.* §§ 10171-10191.

[16] The Bush Administration proposed the modern Byrne JAG program in its 2003 budget, stating that the "paramount goal" was to "provide fund recipients maximum flexibility and control over funding." Trasande/Holt Decl., Ex. 32 (*Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 2004: Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 108th Cong. 1338-39 (2003)).

[17] The Senate version of the 1994 Crime Bill, for example, included a provision conditioning grant funding on immigration cooperation, but it was eliminated in conference. *See* H.R. 3355, § 5119, 103d Cong. (version dated Nov. 19, 1993); H.R. Rep. No. 103-694, at 424 (1994) (Conf. Report).

Byrne JAG.[18] And while that legislation imposed a number of conditions on the use of Byrne JAG

funds, none of those conditions was immigration related. When Congress enacted the modern

Byrne JAG program in 2006, it repealed the only immigration-related condition imposed on grants

under Byrne JAG's predecessor program.[19] Congress has also repeatedly considered and rejected

proposals to impose immigration-related information-sharing requirements on grantees as a

condition of federal funding.[20] More recently, Congress considered and rejected legislative

proposals to impose funding conditions on so-called "sanctuary cities," including through the

Byrne JAG program.[21] Congress's repeated attempts to enact legislation imposing similar,

immigration-related conditions on grants demonstrates that DOJ lacks authority to unilaterally

impose such conditions; if DOJ could unilaterally impose these conditions, there would be no need

for Congress to do so legislatively. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S.

120, 159-60 (2000).

When Congress has wanted to authorize deviations from the Byrne JAG formula, it has

done so explicitly and authorized only modest withholdings. For example, a State that fails to

---

[18] *See* Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, Title I, 110 Stat. 3009, 3009-13 to -15 (1996) (appropriations for the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs); *id.* Title VI (amendments to the Immigration and Nationality Act).

[19] *See* 42 U.S.C. § 3753(a)(11) (2000) (requiring grantees to inform federal immigration authorities of an alien's criminal conviction); Pub. L. No. 109-162, § 1111(a)(1), 119 Stat. at 3094 (repeal).

[20] *See, e.g.*, Criminal Alien Control Act of 1995, S. 179, 104th Cong. § 201 (proposing no crime-bill grant funding if participant refuses to cooperate with the Immigration and Naturalization Service (INS) in the "identification, location, arrest, prosecution, detention, and deportation of aliens"); Illegal Immigration Control Act of 1995, S. 999, 104th Cong. § 405 (proposing twenty percent funding cut for refusing to cooperate with INS officers or employees with respect to arrest and removal of aliens); Illegal Immigration Control Act of 1995, H.R. 1018, 104th Cong. § 405 (same).

[21] *See, e.g.*, Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. § 4 (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. § 4 (2016); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3 (2015); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. § 2 (2015); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. § 3(a) (2015); Stop Sanctuary Cities Act, S. 1814, § 2 (2015). The full text of the bills and their legislative histories are available at https://www.congress.gov.

"substantially implement" relevant provisions of the Sex Offender Registration and Notification Act "shall not receive 10 percent of the funds" it would otherwise receive under Byrne JAG. *See* 34 U.S.C. § 20927(a).[22] Congress has never imposed a condition on Byrne JAG that would withhold *all* funding as DOJ now seeks to do.

In short, DOJ's newly asserted power to impose generally applicable substantive conditions is unprecedented and "would bring about an enormous and transformative expansion" of DOJ's authority "without clear congressional authorization." *Util. Air Reg. Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014).

### B.  The immigration-related conditions are not authorized by 34 U.S.C. § 10102(a)(6).

In previous litigation, Defendants have argued that the immigration-related conditions are authorized by 34 U.S.C. § 10102, which is located in "an entirely different subchapter" from the Byrne JAG program. *See City of Chicago*, 264 F. Supp. 3d at 941; *City of Philadelphia*, 309 F. Supp. at 321 (referencing *City of Philadelphia*, 280 F. Supp. 3d 579, 616 (E.D. Pa. 2017)). Section 10102(a)(6) outlines the powers of the Assistant U.S. Attorney General for the Office of Justice Programs, which administers the Byrne JAG program, and authorizes the Assistant Attorney General to "exercise such powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." As every court to consider the question has concluded, Section 10102(a)(6) does not authorize the immigration-related conditions. *See id.*

First, "[t]he Attorney General's interpretation [of Section 10102(a)] is contrary to the plain

---

[22] *See also* 34 U.S.C. § 30307(e)(2) (providing a five-percent penalty for non-compliance with the Prison Rape Elimination Act); 42 U.S.C. § 3756(f) (2000) (providing a ten-percent penalty for not testing sex offenders for HIV at the victim's request).

meaning of the statutory language." *City of Chicago*, 888 F.3d at 284. The "plain meaning" of Section 10102(a) "is to set forth a subcategory of the types of powers and functions that the Assistant Attorney General may exercise when vested in the Assistant Attorney General either by the terms of this chapter or by the delegation of the Attorney General." *Id.* at 285. However, the power to impose generally applicable substantive conditions is not authorized anywhere in the statute. Accordingly, the Attorney General cannot delegate any such authority to the Assistant Attorney General for the simple reason that he does not possess in the first place. *Id.* In sum, as the Seventh Circuit has concluded, "the Byrne JAG provisions set forth the duties of the Attorney General and do not provide any open-ended authority to impose additional conditions." *Id.*

Second, reading Section 10102(a)(6) as a broad grant of authority to impose generally applicable substantive conditions is inconsistent with the structure of Section 10102 generally. As the Seventh Circuit explained, "[t]he preceding 'powers'" listed in Sections 10102(a)(1)-(5) "address the communication and coordination duties of the Assistant Attorney General," which are primarily ministerial. *Id.* "A clause in a catch-all provision at the end of a list of explicit powers would be an odd place indeed to put a sweeping power to impose *any* conditions on *any* grants— a power much more significant than all of the duties and powers that precede it in the listing, and a power granted to the Assistant Attorney General that was not granted to the Attorney General." *Id*. Indeed, Defendants' interpretation, which would allow the Assistant Attorney General to impose any conditions on the grants at will, is inconsistent with Byrne JAG's goal of providing flexibility to localities, and with the nature of the grant, which is mandatory rather than discretionary. *See id*. at 285-86. "It is inconceivable that Congress would have anticipated that the Assistant Attorney General could abrogate the entire distribution scheme and deny all funds to states and localities … based on the Assistant Attorney General's decision to impose his or her

own conditions—the putative authority for which is provided in a different statute." *Id*.

Third, Section 10102(a)(6) only authorizes the Assistant Attorney General to impose "special conditions," and "the term 'special conditions' … is a term of art for conditions intended for 'high-risk grantees' with difficulty adhering to existing grant requirements." *City of Philadelphia*, 309 F. Supp. 3d at 321 (referencing *City of Philadelphia*, 280 F. Supp. 3d at 617).[23] When Congress amended Section 10102(a)(6) in 2006 to add a reference to "special conditions," a DOJ regulation defined that term to mean a condition that is imposed for a limited time to address financial or performance concerns specific to a particular applicant—for example, a requirement that a financially unstable grantee provide a more detailed financial report. 28 C.F.R. § 66.12(a)-(B) (2006).[24] Under established approaches to statutory construction, this history and context offers strong support for reading Section 10102(a)(6) to incorporate that regulatory definition. *See McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991) ("[W]e assume that when a statute uses [a term of art], Congress intended it to have its established meaning."). The immigration-related conditions are not "special conditions" because they do not relate to any existing grant requirements and do not concern the grant-related performance issues of any particular grantee. To the contrary, Defendants are seeking to use the three immigration-related conditions to force states and localities to cooperate in federal immigration enforcement efforts that are entirely

---

[23] *See also City of Chicago*, 888 F.3d at 285 n.2 (suggesting without deciding that DOJ's interpretation of Section 10102(a)(6) would also fail because "the term 'special conditions' is a term of art referring to conditions for high-risk grantees with difficulty attending to grant requirements, and cannot be read as an unbounded authority to impose 'any' conditions generally"); Paul G. Dembling & Malcolm S. Mason, Essentials of Grant Law Practice § 11.01, at 107 (1991) (noting that "special conditions" is a term of art describing conditions that are "tailored to problems perceived in a particular grant project" rather than "generally applicable to all grants under a particular grant program").

[24] *See* Trasande/Holt Decl., Ex. 32.1. In 2014, DOJ repealed Section 66.12 but adopted a virtually identical substitute promulgated by the federal Office of Management and Budget. *See* Federal Awarding Agency Regulatory Implementation, 79 Fed. Reg. 75870, 76081 (Dec. 19, 2014). That regulation uses the phrase "specific condition" instead of "special condition," but the regulations are otherwise parallel. *See* 2 C.F.R. § 200.207.

unrelated to the Byrne JAG program.

### C. The immigration-related conditions are not authorized by 34 U.S.C. § 10153(a)(5)(D).

Defendants have argued that 34 U.S.C. § 10153(a)(5)(D) provides an independent source

of authority to impose the Section 1373 conditions. *See, e.g., City of Philadelphia*, 309 F. Supp.

3d at 280-81.[25] Section 10153(a)(5)(D) requires grant applicants to provide "[a] certification, made

in a form acceptable to the Attorney General," that assures "the applicant will comply with all

provisions of this part and all other applicable Federal laws." Contrary to Defendants' argument,

Congress did not make the Byrne JAG statute a compliance mechanism for "all Federal laws,' but

only *applicable* Federal laws." The text, history, and structure of § 10153—which appears in a

section of Byrne JAG statute enumerating the responsibilities of grant recipients, and authorizes

the Attorney General to require applicants to certify compliance "with all provisions of this part

*and all other* applicable Federal laws," *id.* § 10153(a)(5)(D) (emphasis added)—establishes that

"applicable Federal laws" refers only to the body of laws that by their express text apply to federal

grants.

First, Section 1373 is not an "applicable" law within that meaning of Section 10153: it

concerns only information-sharing with federal authorities, contains no limits on the use of federal

funds, and is textually unconnected to the Byrne JAG program. *Compare* 42 U.S.C. § 2000d

(providing that "[n]o person in the United States shall, on the ground of race, color, or national

origin, be excluded from participation in . . . any program or activity receiving Federal financial

---

[25] The Court need not reach this argument it if determines that Section 1373 is unconstitutional. For example, even though the *City of Chicago* court concluded that Section 1373 falls within the "applicable Federal laws" described in the Byrne JAG statute, it nonetheless held that Section 1373 does not qualify as an "applicable Federal law" because it violates the Tenth Amendment anti-commandeering principle and is therefore unconstitutional. *City of Chicago*, 2018 WL 3608564, at *13 ("As an unconstitutional law, Section 1373 automatically drops out of the possible pool of 'applicable Federal laws").

assistance"). Had Congress intended Section 10153(a)(5)(D) to be a broad grant of authority to DOJ, it would have said so explicitly, as it has done in other statutes. *See, e.g.,* 26 U.S.C. § 432(e)(9)(E)(iv)(II) (special rule for benefit increases does not apply if taxpayer is "required to comply with other applicable law, *as determined by the Secretary of the Treasury*" (emphasis added)); 28 U.S.C. § 1085(e)(9)(E)(iv)(II) (same). As the Supreme Court has observed, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

This common-sense interpretation is confirmed by the structure of the provision. Section 10153 appears in a section of Title 34 entitled "Applications," which sets forth technical and ministerial application requirements for grant applicants, such as the certifications and assurances that applicants must provide to receive a grant. It would make no sense for Congress to bury a broad grant of authority in such a provision.

The legislative history of Section 10153 further confirms that Congress understood the "applicable Federal law" language to refer to statutes that expressly govern the provision of federal financial assistance, and not to collateral statutes like Section 1373. Congress first enacted the "applicable Federal law" language in the Justice System Improvement Act of 1979, which reauthorized a predecessor to Byrne JAG. *See* Pub. L. No. 96-157, § 2, secs. 401-05, 93 Stat. 1167, 1179-92 (1979) (amending the 1968 Omnibus Crime Control and Safe Streets Act). At the time the 1979 Act was drafted, DOJ's Law Enforcement Assistance Administration (LEAA)—the agency responsible for administering law enforcement grants—issued manuals providing "guidance to grantees on their responsibilities of [sic] *applicable federal laws and regulations*"

(emphasis added).[26] A 1978 manual listed the laws DOJ understood to apply to federal law enforcement grants, and the list contained only statutes governing federal grant-making. Other contemporaneous DOJ documents take the same approach.[27]

The phrase "applicable Federal law" must be construed to have this meaning. Absent some contrary indication, when Congress incorporates a term of art into a statute, courts "assume" that "Congress intended" the language "to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991). The inference is particularly strong here because Congress was aware of DOJ's understanding of what constituted an "applicable Federal law" when it adopted the relevant language. In 1977, DOJ prepared a report identifying the laws that DOJ deemed applicable to LEAA grants: approximately twenty federal laws that, by their terms, governed federal grant making.[28] That report was distributed to every Member of Congress, among others, and was subject to public comment and hearings.[29]

DOJ's interpretation of Section 10153(a)(5)(D) is also contrary to one of the main goals of the 1979 Act that adopted the relevant language: to reduce administrative burdens associated with

---

[26] *Amendments to Title I (LEAA) of the Omnibus Crime Control and Safe Streets Act: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Judiciary Comm.*, 94th Cong. 404 (1976) (statement of Richard Velde, LEAA Administrator), Transande/Holt Decl., Ex. 20.

[27] *See, e.g.*, LEAA: Guideline Manual: Guide for Discretionary Grant Programs (Sept. 30, 1978), Trasande/Holt Decl., Ex. 26; LEAA, General Briefing 6 (1977) (identifying twenty-three laws "applicable" to DOJ grants, and providing the National Environmental Protection Act and civil rights statutes as examples), Transande/Holt Decl., Ex. 21; *see also* John K. Hudzik et al., *Federal Aid to Criminal Justice: Rhetoric, Results, Lessons* 45, 66-68 (1984) (listing the "19 different 'cross-cutting' laws which governed the expenditure of federal grants"), Trasande/Holt Decl., Ex. 30.

[28] *See* DOJ, *Restructuring the Justice Department's Program of Assistance to State and Local Governments for Crime Control and Criminal Justice System Improvement* 8-9 (June 23, 1977), *at* https://www.ncjrs.gov/pdffiles1/Digitization/64996NCJRS.pdf., Transande/Holt Decl., Ex. 22.

[29] *See Restructuring the Law Enforcement Assistance Administration: Hearings Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 95th Cong. 3, 9 (1977), Trasande/Holt Decl., Ex. 23.

DOJ grants.[30] A principal concern highlighted in DOJ's 1977 report was that the then-body of federal laws applicable to LEAA grants—the twenty statutes scattered across the U.S. Code that applied to federal grant-making—imposed excessive burdens on grantees.[31] It is unlikely that the "applicable Federal law" language would have been supported by DOJ or enacted by Congress if either entity believed it could be used to drastically increase the compliance burdens on States and localities.

### III.    Defendants' Imposition of the Immigration-Related Conditions Violates 34 U.S.C. § 10228(a)

This court must also set aside the new conditions because DOJ's actions are "not in accordance with law," 5 U.S.C. § 706(2)(A)—more specifically, with 34 U.S.C. § 10228(a). The language now comprising Section 10228(a) was first enacted in 1968, at the same time as the first law enforcement block grant program, and has consistently prohibited executive branch officials from using law enforcement grants to exert "any direction, supervision, or control" over any state or local police force or criminal justice agency. Pub. L. No. 90-351, § 518(a), 82 Stat. at 208. As presently codified, Section 10228(a) is located in the same chapter of the U.S. Code as Byrne JAG and provides that "*[n]othing in this chapter* or *any* other Act shall be construed to authorize *any* department, agency, officer, or employee of the United States to exercise *any* direction, supervision, or control over *any* police force or *any* other criminal justice agency of *any* State or *any* political subdivision thereof" (emphasis added). The statute's repeated use of "any" signals

---

[30] *See, e.g., Federal Assistance to State and Local Criminal Justice Agencies: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Comm. on the Judiciary*, 95th Cong. 383 (1978) (transmittal letter from U.S. Attorney General Griffin Bell) (stating that the bill was "designed" to "simplify[] the grant process"), Transande/Holt Decl., Ex. 25; Office of Representative Peter W. Rodino, Press Release, Committee Approves Law Enforcement Assistance Administration (LEAA) Reorganization (May 10, 1979) (noting the 1979 Act was "designed to drastically reduce the red tape which has plagued the process of getting federal assistance to states and local governments" (quotation marks omitted)), Transande/Holt Decl., Ex. 28.

[31] *Restructuring the Justice Department's Program, supra* n. 29 at 8-9.

Congress's intent to speak broadly, *see Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 218-19 (2008), and in the present context, to prohibit all agency action that could interfere with state and local authority over law enforcement.

The legislative history of Section 10228(a) confirms this meaning. Opponents of the Omnibus Crime Control and Safe Streets Act of 1968 expressed concerns that the U.S. Attorney General would use law enforcement grants to coerce States and localities into adopting federal law enforcement priorities.[32] Supporters responded that Section 10228, which was pending before Congress as part of the 1968 Act, would prohibit such control. U.S. Attorney General Ramsey Clark testified it would violate both "the mandate and spirit" of Section 10228(a) to withhold funds because police departments were not run "the way the Attorney General says they must," and that Section 10228(a) prevented DOJ from imposing extra-statutory conditions on law enforcement grants.[33] Reviewing this history, the Fourth Circuit has observed that Section 10228(a)'s purpose is "to shield the routine operations of local police forces from ongoing control by [DOJ]—a control which conceivably could turn the local police into an arm of the federal government." *Ely*, 451 F.2d at 1136. DOJ's imposition of the three immigration-related conditions seeks to do just that— and accordingly must be held unlawful and set aside.

Although arising in a different context, the Supreme Court's anti-commandeering jurisprudence makes clear that anti-commandeering prohibitions prevent the federal government from directing state legislative action (or inaction), *see Murphy v. NCAA*, 138 S. Ct. 1461, 1478

---

[32] *See, e.g.*, S. Rep. No. 90-1097, at 230 (1968) (views of Senators Dirksen, Hruska, Scott, and Thurmond) (expressing concern that the Act would enable the U.S. Attorney General to "become the director of state and local law enforcement"), Transande/Holt Decl., Ex. 19. *See generally* Hudzik, *supra* n. 27 at 15, 23-26 (1984) (discussing opposition to the grant).

[33] *Controlling Crime Through More Effective Law Enforcement: Hearings Before the Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary*, 90th Cong. 100, 384, 497 (1967) (discussing Section 408 of the bill, which became Section 10228(a)).

(2018), or compelling States to enact federal programs, *see Printz v. United States*, 521 U.S. 898, 904, 930, 935 (1997). Specifically, *Printz* suggests that at least two actions constitute impermissible "direction" or "control": requiring state or local law enforcement officers to assist in "the administration of a federally enacted regulatory scheme," and requiring those officers to receive information as part of their administrative responsibilities. *See id.* at 904.[34]

The three immigration-related conditions violate Section 10228(a)'s prohibition on "direction, supervision, or control" in a number of ways. The Section 1373 conditions require States and localities to monitor their subgrantees for compliance with 8 U.S.C. § 1373 and to report any violations to DOJ—effectively turning States and localities into an enforcement arm of the Department of Homeland Security ("DHS") and prohibiting the City from exercising control over local law enforcement and policies. The notice and access conditions likewise require all grantees to monitor their subgrantees for compliance.

In addition, the Section 1373 conditions "direct" law enforcement agencies to allow communications regarding immigration status between individual States and local governments and federal immigration enforcement officials, and thus interfere with state and local control over their own law enforcement officials and employees. *See City of Philadelphia*, 309 F. Supp. 3d at 327 ("Literal compliance with Section 1373 would inherently prevent Philadelphia from, among other things, disciplining an employee for choosing to spend her free time or work time assisting in the enforcement of federal immigration laws.")

Lastly, the notice condition requires State and city officials to administer federal immigration policy by mandating that those officials respond to DHS requests for information,

---

[34] The legislation at issue in *Printz*, the Brady Act, violated these prohibitions by requiring local officers to run background checks on handgun purchasers, and requiring state officers "to accept" forms from gun dealers. *Id.* at 904, 905, 934.

while the access condition violates anti-commandeering principles by requiring state and city officials to devote staff, resources, and real property to facilitate federal agents' access to aliens in correctional facilities. If requiring State and city officials to "accept" a form is impermissible direction, *see Printz*, 521 U.S. at 904, then surely requiring them to accept and assist federal officials at state facilities is too. *See also City of Philadelphia*, 280 F. Supp. 3d at 651 (suggesting that the conditions are at odds with anti-commandeering principles).

IV.    **Defendants' Decision to Impose the Conditions was Arbitrary and Capricious**

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." U.S.C. § 706(2)(A). At a minimum, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. DOJ's imposition of the challenged conditions violates the prohibition on arbitrary and capricious conduct in a number of ways. *See City of Philadelphia*, 280 F. Supp. 3d at 620-25 (holding that the conditions are arbitrary and capricious); *City of Philadelphia*, 309 F. Supp. 3d at 323-24 (same).

As an initial matter, DOJ's imposition of the challenged conditions was arbitrary and capricious because it departed from over a decade of past practice with virtually no explanation. DOJ has never before sought to impose the access or notice conditions on grantees, and, as explained above, *supra* at 22, Congress removed the only immigration-related condition that was ever contained in a law enforcement grant when it enacted the current Byrne JAG statute. Moreover, since Section 1373 was enacted in 1996, "the United States government has never

sought to enforce … compliance with Section 1373 a condition for receiving a grant."[35] Indeed, Congress has consistently *rejected* efforts to make Section 1373 compliance a condition of receiving a grant. *See supra* n. 20-21; *City of Philadelphia*, 309 F. Supp. 3d at 323 (referencing *City of Philadelphia*, 280 F. Supp. 3d at 625 (concluding that DOJ failed to adequately explain its decision to impose the conditions)).

When an agency deviates from past practice so dramatically, "it must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quotation marks omitted); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X. Internet Servs.*, 545 U.S. 967, 981 (2005) (an "unexplained inconsistency" in an agency's policy is "a reason for holding an interpretation to be an arbitrary and capricious change"). Despite its departure from past practice, DOJ provided virtually no explanation for this shift in policy. It released no reports, studies, or analysis whatsoever alongside its July 25, 2017 announcement of the immigration-related grant conditions. Instead, DOJ issued a one-page "Backgrounder," which stated only that the conditions would "improve the flow of information between federal, state, and local law enforcement, and help keep our communities safe." (56.1 ¶ 18, 53-58.) But DOJ offered no evidence that communication between the federal government and State and local governments was deficient, that the conditions would actively promote public safety, or that requiring grant recipients to certify compliance with Section 1373 would promote compliance with these goals.

Nothing in the Administrative Record provides a "satisfactory explanation" for DOJ's departure from prior practice. The Administrative Record is devoid of findings or analyses that

---

[35] Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 170 (2016).

explain why DOJ imposed the challenged conditions. Rather, the record confirms that DOJ understood that it had no discretion to impose the challenged conditions on Byrne JAG. For example, in 2015, Senator Richard Shelby requested that DOJ "use its administrative authorities to limit the availability of [Byrne] JAG and COPS grants to only those state and local agencies that comply with ICE detainer requests." (AR-113; 56.1 ¶ 58.) In response, DOJ explained that it lacked the power to do so:

> Withholding the funding would have a significant, and unintended, impact on the underserved local populations who benefit from these programs, most of whom have no connection to immigration policy. Additionally, many Department grant funds are formula-based, with the eligibility criteria (and related penalties, if any) set firmly by statute. In many cases, therefore, the Department does not have the discretion to suspend funding at all.

(*Id.*) Accordingly, as the *Philadelphia* court held, not only does the Administrative Record not support DOJ's decision to impose the new conditions, but it reinforces the conclusion that their imposition was arbitrary and capricious. *City of Philadelphia*, 309 F. Supp. 3d at 324.

## V.     Section 1373 Violates the Tenth Amendment and Principles of Federalism.

### A.  Section 1373 is facially unconstitutional under *Murphy v. NCAA*.

Section 1373 violates the Tenth Amendment anti-commandeering principle because it seeks to control state and local governments' exercise of "sovereign authority to 'regulate their own citizens.'" *Murphy v. NCAA*, 138 S. Ct. 1461, 1479 (2018). As the Supreme Court has explained, "[t]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instruction." *New York v. United States*, 505 U.S. 144, 162, 166 (1992). To the contrary, "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." Under these principles, a federal law cannot stand where, as here, "the whole *object* of the law [is] to direct the functioning

of the state executive," *Printz*, 521 U.S. at 932, or to dictate what a legislature may or may not do, *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018).

In its most recent application of anti-commandeering principles, the Supreme Court struck down provisions of a federal statute that made it unlawful for any state or local government to sponsor or authorize sports gambling on competitive sports events. *See Murphy*, 138 S. Ct. 146. The Court clarified that the anti-commandeering principle applies both to laws that compel a State or locality to enact legislation, and to those that "unequivocally dictate what a state legislature may and may not do." *Id*. at 1478. The Court thus labeled as "empty" the distinction that the law's defenders sought to draw between "compel[ling] a State to enact legislation … [and] prohibiting a State from enacting new laws." *Id*. "The basic principle applies in either event": Congress cannot directly regulate how state and local governments exercise their sovereign authority. *Id*.

The Court's ruling in *Murphy* led both the *Chicago* and *Philadelphia* district courts to hold Section 1373 unconstitutional. *See City of Chicago*, 2018 WL 3608564, at *6 (explaining that *Murphy* "pulls the lynchpin from this Court's earlier Section 1373 constitutionality analysis); *City of Philadelphia*, 309 F. Supp. 3d at 329. In *City of Chicago*, for example, the court explained that "Section 1373 impermissibly directs the functioning of local government in contravention of Tenth Amendment principles" in several ways. 2018 WL 3608564, at *10. First, the statute supplants local control of local officers by precluding states and localities from directing how their employees spend their time and what information employees can share in the course of their jobs.[36] *See id*. at *8. Section 1373 thus infringes on the sovereign power of states and localities by

---

[36] Further, as the *Chicago* court noted, the immigration and citizenship status information at issue is owned by States and local governments, and is therefore only accessible to employees in their official capacities. *See Chicago*, 2018 WL 3608564, at *8 (citing *Printz*, 521 U.S. at 932 n.17 (noting that a constitutionally impermissible statute required state employees "to provide information that belongs to the State and is available to them only in their official capacity")).

stripping decision-making power from state and local policymakers and vesting it in line-level employees who may decide on their own whether or not to communicate with federal immigration authorities. *See id.* (explaining that Section 1373 "effects a federally-imposed restructuring of power within state government").

Second, Section 1373 eliminates states' and localities' ability to control their employees' communications with ICE, thereby forcing states and localities to participate in federal immigration enforcement and impermissibly foreclosing a "critical alternative" to Plaintiffs, namely, non-participation in a federal program. *Id.* at *9 (citing *New York*, 505 U.S. at 176). This is incompatible with our constitutional system of dual sovereignty, as the States and the City cannot be forced to relinquish sovereign control over their state and local law enforcement officials and policies.

Furthermore, there can be no dispute that Section 1373 impermissibly constrains state and local rule-making under *Murphy*: the statute directly prohibits State and local government entities from taking "any" steps to prohibit or restrict its entities or officials from maintaining or sharing confidential information. The States have many subgrantees—including the cities of Albany and Rochester in New York—with distinct laws and policies that represent considered local judgment about the handling of immigration and citizenship status information. (Kelly Decl. ¶¶ 7-14 (Albany); *see also* Warren Decl. ¶¶ 7-11 (Rochester); Fradel Decl. ¶¶ 21-22 (Middlesex County, NJ); 5.1 ¶¶ 131-32, 136.) By prohibiting States and localities from adopting these types of laws and policies, Section 1373 violates the Tenth Amendment. *See Chicago*, 2018 WL 3608564, at *8; *see also California*, 2018 WL 3301414, at *13 ("Section 1373 does just what *Murphy* proscribes: it tells States they may not prohibit (i.e., through legislation) the sharing of information regarding immigration status with the INS or other government entities.").

Finally, because *Murphy* overrules the notion that the Tenth Amendment prohibits only affirmative commands to state and local government, this Court is not bound by *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), which relied on that precise view in rejecting a facial Tenth Amendment challenge to Section 1373 brought by the City. *See Austin v. United States*, 280 F. Supp. 3d 567, 572 (S.D.N.Y. 2017) (A district court should follow Supreme Court precedent over Second Circuit precedent when "'a subsequent decision of the Supreme Court so undermines Second Circuit precedent that it will almost inevitably be overruled.'") (citation omitted); *see also Chicago*, 2018 WL 3608564, at *11 ("respectfully disagree[ing] with *City of New York*" and holding Section 1373 unconstitutional); *City of Philadelphia*, 309 F. Supp. 3d at 329 (holding Section 1373 unconstitutional).

In *City of New York,* the court rejected the City's Tenth Amendment challenge to Section 1373 because the City "fail[ed] to demonstrate an impermissible intrusion on state and local power to control information in the course of official business or to regulate the duties and responsibilities of state and local governmental employees." 179 F.3d at 36. The court made clear that it remained an open question whether Section 1373 "would survive a constitutional challenge" in the face of evidence that Section 1373 interferes with state or local policies "necessary to the performance of legitimate municipal functions." *Id.* at 37. Here, Plaintiffs have alleged numerous ways in which DOJ's expansive interpretation of § 1373 interferes with their governmental functions. *See infra* Part V(B).

To the extent the court's holding in *City of New York* was premised on a view that 8 U.S.C. § 1373 "has not compelled state and local governments to enact or administer any federal regulatory program," 179 F.3d at 35, that reasoning does not survive *Murphy*. In *Murphy*, the Court rejected as "empty" the distinction between compelling a State or state actors to act and prohibiting

a State from taking specific regulatory action. *See* 138 S. Ct. at 1478. "It was as matter of happenstance that the laws challenged in *New York* and *Printz* commanded 'affirmative' action as opposed to imposing a prohibition. "The basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event."[37] *Murphy*, 138 S. Ct. at 1478.

For all of these reasons, this Court should follow the reasoning of the *Chicago* and *Philadelphia* courts and strike down Section 1373 on its face.

**B.  Section 1373 is unconstitutional as applied to New York City's laws and policies.**

The logic of *Murphy* and the anti-commandeering principle is equally strong when applied in the specific context of New York City's laws and policies. Since 2003, New York City has had in place generalized confidentiality laws and policies that prescribe how City employees should interact with the public. These policies protect a broad swath of confidential information about individuals who happen to interact with City employees, generally barring disclosure to third parties.[38] As expressed in the preamble of Mayoral Executive Order 41, these laws and policies are necessary to the performance of legitimate municipal functions, as the obtaining of pertinent information is essential to the performance of a wide variety of governmental services, and this information may be "difficult or impossible [to obtain] if some expectation of confidentiality is

---

[37] A district court should follow Supreme Court precedent over Second Circuit precedent when, as here, "'a subsequent decision of the Supreme Court so undermines Second Circuit precedent that it will almost inevitably be overruled.'" *Austin v. United States*, 280 F. Supp. 3d 567, 572 (S.D.N.Y. 2017) (quoting *United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004)) (brackets omitted).

[38] *City of New York* does not preclude New York City's "as applied" challenge to Section 1373. In addition to the Supreme Court's intervening decision in *Murphy*, which abrogates *City of New York*, the city policy and regulations at issue in *City of New York* no longer exist. (56.1 ¶ 143.) That pre-existing policy was found by the Second Circuit to be "not a general policy … [but rather] single[d] out a particular federal policy for non-cooperation while allowing City employees to share freely the information in question with the rest of the world." 179 F.3d at 36-37; *see also* 56.1 ¶ 143. The Second Circuit specifically declined to rule on whether Section 1373 would survive a constitutional challenge in the face of "generalized confidentiality policies that are necessary to the performance of legitimate municipal functions and that include federal immigration status." *Id.* Since 2003, the City has in place such generalized policies that protect a wide array of confidential information and broadly limit the dissemination of that information. (56.1 ¶¶ 142-58.)

not preserved." (56.1 ¶ 150.) Application of Section 1373 to the City's legal framework offends the anti-commandeering doctrine in three ways.

First, Section 1373 effectively strips the City of its authority to control its workforce by preventing the City from adopting policies or rules that promote uniform handling of individuals' personal information with federal immigration authorities. The insidious effect of Section 1373 is, therefore, to undermine the laws and policies the City has had in place for decades to protect the sensitive information of the people who work, live, and visit the City. (56.1 ¶¶ 143, 179.) These policies generally bar City employees from affirmatively seeking sensitive, personal information from individuals and broadly prohibit disclosure to unauthorized third parties. (56.1 ¶¶ 144-45, 153-55.) By prohibiting the City from adopting such policies, Section 1373 infringes on the City's ability to control its officers and employees, which "lies at the heart of state sovereignty" and therefore "weighs heavily on the constitutional analysis." *Chicago*, 2018 WL 3608564, at *8 (citing *Printz*, 521 U.S. at 931). In this way, Section 1373 runs roughshod over the Constitution's division of "authority between federal and state governments for the protection of individuals," including their public safety and health. *See Murphy*, 138 S. Ct. at 1477 (citing *New York*, 505 U.S. at 181).

Second, Section 1373 impermissibly interferes with the City's "police power," which enables it "to perform many of the vital functions of modern government—punishing street crime, running public schools, and zoning property for development, to name but a few." *NFIB v. Sebelius*, 567 U.S. 519, 535 (2012). A far cry from Defendants' representations that Section 1373 imposes no affirmative obligations on the City, the statute would force City agencies or individual employees to make *ad hoc* decisions about how to handle confidential and/or identifying information. (56.1 ¶178). The overall effect would be to allow City officials and employees to

freelance as federal informants, resulting in confusion at the City's myriad agencies as employees struggle with how to handle information on the immigration status of residents, as opposed to other confidential or identifying information. (56.1 ¶¶ 178-79). Such confusion has real-world consequences: application of Section 1373 to City agencies will compromise the Department of Health and Mental Hygiene's ability to fulfill its responsibility to protect and promote the health of everyone who lives in, works in, or visits New York City. (56.1 ¶ 194). It will also compromise the NYPD's efforts to gain the trust of City residents, which promotes public safety for the whole City. (56.1 ¶¶ 185, 187, 184). City residents, particularly those in immigrant communities, may retreat into the shadows if they believe that the NYPD has a policy or practice of generally sharing identifying information about them or their family members with ICE or other federal immigration authorities. (56.1 ¶184). Section 1373 thus conscripts City officers and employees in a manner that purports to force the City to substantially alter laws and policies enacted for the benefit of residents based on the City's priorities, jeopardizing historic improvements in public safety, health, and welfare. (56.1 ¶¶ 178-79, 184, 194, 203).

Third, Section 1373 intrudes upon New York City's "direct relationship ... [with] the people who sustain it and are governed by it" by interposing the federal government between the City and its citizens. *See Printz*, 521 U.S. at 920 (citation omitted). Such interpolation destroys the trust the City has cultivated between its people and the City itself. (56.1 ¶¶ 184, 203.) When New York City officials "cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation" then "the accountability of both state and federal officials is diminished." *New York*, 505 U.S. at 168, 169. Such a loss of accountability cannot be tolerated in our federalist system. *See id.* at 188 (invalidating a federal law that reduced state and federal accountability); *see also Chicago*, 2018 WL 3608564, at *9 (noting that the anti-commandeering

principle "promotes political accountability by clarifying whether laws and policies are promulgated by federal or state actors," which "further counsel[s] its application [with respect to Section 1373]").

In sum, Section 1373 impermissibly and unlawfully interferes with New York City's laws and policies, rendering the statute unconstitutional as applied.

## VI.   DOJ's Imposition of the Immigration-Related Conditions Violates the Constitution's Separation of Powers

The Constitution vests Congress, not the Executive, with the spending power. *See* U.S. Const. art. I, § 8, cl. 1. "Congress may, of course, delegate such authority to the Executive Branch." *City of Chicago*, 888 F.3d at 283. But Congress has not done so here. Neither the President nor his Attorney General "have the inherent authority" under the Byrne JAG program or any other statute "to condition the payment of such federal funds on adherence to its political priorities." *Id.* They may not amend or cancel an appropriation that Congress has duly enacted. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Nor can they choose to spend less than the full amount of funding Congress has authorized under a statute. *See Train v. City of New York*, 420 U.S. 35, 42-45 (1975) (holding that the EPA Administrator lacked the authority to withhold the fully authorized amount under the statute where there was no source of authority that would permit the Executive Branch official to negate "a firm commitment" of funds by Congress "to achieve" its objective); *see also In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (the President cannot "spend less than the full amount appropriated by Congress" for a "particular project or program"); *Dabney v. Reagan*, 542 F. Supp. 756, 764-68 (S.D.N.Y. 1982) (officials at HUD could not decide unilaterally not to "mak[e] available" statutorily "appropriated funds"). Rather, the Executive's constitutional duty, and that of his appointees, is to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3, cl. 5.

41

As the courts in *Philadelphia* and *Chicago* held, Defendants' imposition of the immigration-related conditions—and the use of those conditions as a basis to withhold from localities' their congressionally appropriated Byrne JAG funds—exceeds Defendants' authority and violates the separation of powers between the legislative and executive branches. *City of Chicago*, 2018 WL 3608564, at *11-12 (holding that imposition of notice and access conditions violates the constitutional principle of separation of powers); *City of Philadelphia*, 309 F. Supp. 3d at 321 (holding that all three conditions violate separation of powers). It is also telling that, elsewhere in the Byrne JAG statute, Congress foreclosed the ability of Defendants to use such grants as a means for federal agencies to control, direct, or supervise state and local law enforcement, which is precisely the kind of authority Defendants now claim. Accordingly, Defendants' attachment of the immigration-related conditions is contrary to the Byrne JAG statute, and therefore contrary to the Constitution's vesting of power to create and fund grant programs such as Byrne JAG in Congress.

## VII.   This Court Should Enter a Permanent Injunction.

A plaintiff seeking a permanent injunction must demonstrate (1) that it has suffered an irreparable injury, (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury, (3) that an equitable remedy is warranted in light of the balance of hardships between the plaintiff and defendant, and (4) that the public interest would not be disserved by a permanent injunction. *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 422 (2d Cir. 2013) (quotation marks omitted); *see also Dodge v. Cnty. of Orange*, 282 F. Supp. 2d 41, 71 (S.D.N.Y. 2003) (the standard for permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed on the merits).

### A.  Plaintiffs will suffer irreparable harm absent an injunction.

To establish irreparable harm, the injury alleged must be one for which "monetary remedies

cannot provide adequate compensation." *Scelsa v. CUNY*, 806 F. Supp. 1126, 1135 (S.D.N.Y. 1992). It is well established in the Second Circuit that the violation of a constitutional right suffices, by itself, to show irreparable harm. *Id.* at 1135; *see also Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir. 1996) ("[T]he alleged violation of a constitutional right [ ] triggers a finding of irreparable harm."); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (quotations omitted). As explained above, Defendants' imposition of the new conditions violates the constitutional separation of powers and forces Plaintiffs to comply with Section 1373, an unconstitutional statute.

Second, requiring states and localities to adopt the immigration-related conditions and assist in federal immigration enforcement will reverse years of state and local efforts to build trust with immigrant communities, encourage immigrants to participate in government, and ensure the public health and safety of the entire community. (56.1 ¶¶ 120-26, 142, 159, 177-79, 183-89, 192-203.) Localities have concluded that building trust with immigrant communities will enhance the health and safety of all residents and that protecting their sensitive information will maintain that trust. (*Id.*) For instance, the City's policies facilitate trust between government and City residents, creating a climate in which victims and witnesses are willing to report crimes, cooperate with government, including law enforcement. (*Id.*) Any change in the City's policies would upset this calibrated balance to the detriment of the health, safety, and welfare of its residents.  (*Id.*)

Forcing states and localities to accept the conditions and assist in federal immigration enforcement will undermine the trust that New York City and other localities have built with their communities. This, in turn, will discourage individuals from reporting crimes, cooperating with police investigations, pressing charges, and testifying in court, thus making communities less safe

for all residents. (56.1 ¶¶ 120-26, 141, 177, 183, 188.) "Trust once lost is not easily restored, and as such, this is an irreparable harm for which there is no adequate remedy at law." *City of Chicago*, 2018 WL 3608654, at *15; (citing *Gateway E. Ry. Co. v. Terminal R. R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (holding that loss of goodwill can qualify as irreparable harm for which there is no adequate remedy at law). Moreover, forcing States and localities to change their policies would interfere with their autonomy and exercise of their police powers, which courts have recognized as irreparable injury. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

Finally, the Hobson's choice that Defendants have forced upon the States and City— whether to suffer these injuries or decline much-needed criminal justice funding—is not a choice at all and thus is sufficient to establish irreparable harm. *See City of Chicago*, 2018 WL 3608654, at *15 (citing *Morales v. TWA, Inc.*, 504 U.S. 374, 381 (1992) (holding that injunctive relief is available where respondents were faced with the Hobson's choice between continually violating state law and exposing themselves to liability, or suffering the injury of obeying an allegedly unconstitutional law during the pendency of review)); *accord City of Philadelphia*, 280 F. Supp. 3d at 656-57 (the Hobson's choice between complying with an unconstitutional law and foregoing funds constitutes irreparable harm); *County of Santa Clara*, 250 F. Supp. 3d at 538 (counties suffer irreparable harm when forced to choose between complying with an allegedly unconstitutional executive order or defying the order and forfeiting hundreds of millions of dollars); *see also Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057-59 (9th Cir. 2009) (plaintiffs suffer irreparable harm when faced with a Hobson's choice between signing unconstitutional agreements or suffering loss of business and goodwill). If Plaintiffs do not accept the conditions, they will forfeit more than $29.5 million dollars in funding and frustrate Congress' intent to

provide states and localities with a reliable source of funding to promote public safety according to local priorities and needs. (56.1 ¶ 26 (States); ¶ 114 (City)).  Indeed, in many states, loss of FY 2017 Byrne JAG funds leaves many critical programs without funding. (Bennett Decl. ¶ 13 (MA); Klotnz Decl. ¶¶ 16-18 (WA); Dion Decl. ¶ 23 (VA); Fradel Decl. ¶ 23 (NJ); Lawlor Decl. ¶¶ 18-19 (CT); Green Dec. ¶ 12a (NY).) The loss of this funding could potentially compromise the critical law enforcement and criminal justice programs those funds support.

### B.  The balance of the equities and the public interest favor a permanent injunction.

The balance of the equities and public interest favor permanently enjoining Defendants from imposing the new conditions. As described above, Plaintiffs will suffer irreparable harm if Defendants' imposition of the conditions is not enjoined. Given the significance of the federal funds at issue, ranging from hundreds of thousands to millions of dollars for each state, "noncompliance is a particularly poor option." *City of Chicago*, 888 F.3d at 291; *see also* 56.1 ¶ 26 (States); ¶ 114 (City). Moreover, the harms are not limited to Plaintiffs. States and localities across the country use Byrne JAG funds to support a diverse array of vital law enforcement and criminal justice programs. Many of those jurisdictions, like Plaintiffs here, face the same Hobson's choice: accept conditions that they believe are unlawful, or forego the vital programs that those funds support.[39]

On the other side of the scale, Defendants experience little hardship from the imposition of a permanent injunction. *See City of Chicago*, 2018 WL 3608564, at *16. Defendants have never before imposed these conditions on Byrne JAG applicants, and cannot point to any changed

---

[39] For example, fifteen states and the District of Columbia—including eight States that have not brought their own lawsuits challenging the conditions—joined an amicus brief in the U.S. District Court for the Eastern District of Pennsylvania arguing that the conditions were unlawful, and provided examples of the kinds of programs that were jeopardized by DOJ's immigration-related conditions. *See* Br. For Amicus Curiae States of New York et al., *City of Philadelphia*, No. 17-cv-3894 (E.D. Pa. 2018), ECF No. 121-2, Transande/Holt Decl., Ex. 37.1.

circumstances that justify the new conditions. Indeed, the Administrative Record is devoid of evidence that state and local communication with the federal government is deficient or that the new conditions will promote public safety. Even without these conditions, Defendants are free to enforce federal immigration laws, and nothing about so-called "sanctuary city" policies interferes with immigration enforcement by federal authorities. In fact, the City's policies permit sharing of information with federal authorities in a number of ways, especially in the case of individuals convicted of violent felonies or identified on the terrorist watch list. Additionally, "[t]hough the Attorney General has many tools at his disposal to increase [ ] local cooperation, conditioning the Byrne JAG grant as he has here is not one of them." *Id*. Thus, an injunction would not harm Defendants because it would not deprive them of an option they could lawfully exercise. *See id*.

Finally, a permanent injunction serves the public interest. By enjoining the unlawful conditions, this Court will act as a check on the executive's usurpation of congressional power, thereby serving the public's interest in guarding the separation of powers. *See City of Chicago*, 888 F.3d at 277; *cf. Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."); *Amarin Pharma, Inc. v. FDA*, 119 F. Supp. 3d 196, 237 (S.D.N.Y. 2015) ("the Government does not have an interest in the unconstitutional enforcement of a law") (internal citations and quotation marks omitted).

### C. The injunction should preclude Defendants from imposing the immigration-related conditions on all FY 2017 Byrne JAG applicants.

When agency action is invalidated, the ordinary result "is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps. of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quotation marks omitted). Likewise, when a party brings a successful facial challenge to a statute, the general rule is that the "statute is wholly invalid and cannot be applied to *anyone*." *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th

Cir. 2011); *see also Decker v. O'Donnell*, 661 F.2d 598, 617-18 (7th Cir. 1980) (upholding a nationwide injunction where the statute was held to be facially unconstitutional).

Under these well-established principles, DOJ should be barred from imposing the challenged conditions on all FY 2017 Byrne JAG applicants. The new conditions apply uniformly throughout the country and do not vary by jurisdiction. DOJ has no more authority to impose them on non-plaintiffs as it does on Plaintiffs. As such, the issues before the Court are not fact-dependent, *see City of Chicago*, 888 F.3d at 290-91, but instead concern pure issues of law and are appropriately suited to an injunction barring DOJ from imposing the conditions on any grant recipient.

Moreover, issuing an injunction on a nationwide basis serves the public's interest in judicial economy by ameliorating the need for repetitive and piecemeal litigation in multiple jurisdictions across the country. "As between federal district courts … the general principle is to avoid duplicative litigation." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). The public interest is ill served by requiring piecemeal litigation on the same federal grant program in numerous jurisdictions throughout the country, *see City of Chicago*, 888 F.3d at 291-92, particularly when the litigation concerns a single, yearly appropriation by Congress.

## VIII.   Plaintiffs Are Entitled to Declaratory, Mandamus, and Injunctive Relief.

For the reasons set forth above, this Court should issue a declaratory judgment finding that the three immigration-related conditions are unlawful and unconstitutional, as well as a permanent injunction barring Defendants from imposing them. The Court should further issue a writ of mandamus compelling Defendants to re-issue the State Plaintiffs' award letters without the immigration-related conditions, and disburse the State Plaintiffs' FY 2017 awards as Defendants

would in the ordinary course, without regard to the challenged conditions. With respect to the City, Defendants should be compelled to disburse New York City's FY 2017 award.

The Mandamus Act, 28 U.S.C. § 1361, grants this Court jurisdiction "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to" Plaintiffs. Mandamus relief is appropriate if the plaintiff has a right to have the act performed, the defendant owes the plaintiff a clear non-discretionary duty, and the plaintiff has exhausted all other avenues of relief. *City of New York v. Heckler*, 742 F.2d 729, 739 (2d Cir. 1984). These conditions are met here. Defendants' duty to disburse formula grant funds is nondiscretionary, when, as here, the applicants meet the lawfully imposed requirements of the grant, and there are no other available avenues of relief to Plaintiffs. *See Udall v. State of Wisconsin*, 306 F.2d 790, 793 (D.C. Cir. 1962) (recognizing that district court had jurisdiction to issue writ of mandamus where the Secretary of the Interior was given no discretion in apportioning a wildlife restoration fund).

New York City is also entitled to relief under the APA, 5 U.S.C. § 706(1), which authorizes the Court to "compel agency action unlawfully withheld or unreasonably delayed." *Cf. City of Philadelphia*, 309 F. Supp. 3d at 343-44 (granting relief under the APA). The relevant factors for the Court to consider are: (1) "[t]he length of time that has elapsed since the agency came under a duty to act, (2) "[t]he reasonableness of the delay . . . in the context of the statute authorizing the agency's action," (3) [t]he consequences of the agency's delay," and (4) "[a]ny plea of administrative error, administrative inconvenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." *Id.* These factors support mandamus relief here. New York City filed its Byrne JAG application on September 5, 2017, but has not received its award even though over $200 million in state and local FY 2017 funding has already been awarded to other applicants. (56.1 ¶¶ 44, 51.) The delay is unreasonable since the Byrne JAG

statute is a formula, and not a discretionary grant. *See* DOJ Press Releases FY2017 Byrne JAG Funding, at https://bit.ly/2BIIPVy (last accessed Aug. 17, 2018).The delay has harmed the City by depriving it of significant federal funds intended for FY 2017.

## CONCLUSION

For the reasons set forth above, the Court should grant summary judgment to State Plaintiffs on Counts I through V of the Amended Complaint and grant summary judgment to the City on Causes of Action One, Two, Three, and Five of the Amended Complaint. The Court should also issue a declaratory judgment that the three conditions are unlawful and a permanent injunction enjoining Defendants from imposing the notice, access, and Section 1373 conditions on any Byrne JAG grantee. Further, the Court should issue a writ of mandamus directing Defendants to disburse New York City's FY 2017 JAG award and immediately send FY 2017 Byrne JAG award documents that do not contain the notice, access, and Section 1373 conditions to all grantees that previously received such award documents from Defendants. The Court may award other relief as it deems just and proper.

New York, NY                                    Respectfully submitted,
Dated: August 17, 2018


                                                **BARBARA D. UNDERWOOD**
                                                *Attorney General*
                                                *State of New York*
Anisha S. Dasgupta,
Deputy Solicitor General
                                                By: /s/ Jessica Attie
                                                Lourdes M. Rosado,[†] Bureau Chief
Caroline A. Olsen,[†]                           Jessica Attie,[†] Special Counsel
Assistant Solicitor General                     Lilia Toson,[†] Assistant Attorney General
                                                Nancy Trasande,[†] Assistant Attorney General
Eric R. Haren,                                  Conor Duffy,[*] Assistant Attorney General
Special Counsel & Senior Advisor                Civil Rights Bureau
                                                28 Liberty St., 20th Floor
*Of Counsel*                                    New York, NY 10005
                                                Lourdes.Rosado@ag.ny.gov
                                                Jessica.Attie@ag.ny.gov
                                                Lilia.Toson@ag.ny.gov
                                                Nancy.Trasande@ag.ny.gov
                                                Conor.Duffy@ag.ny.gov
                                                Phone: (212) 416-6438


**DEBEVOISE & PLIMPTON LLP**                    **ZACHARY W. CARTER**
919 Third Avenue                                Corporation Counsel of the City of New York
New York, NY 10022                              100 Church Street
Tel: (212) 909-6077                             New York, NY 10007
mfishbein@debevoise.com                         Tel: (212) 356-2296
                                                tjeneret@law.nyc.gov


By:  /s/ Matthew E. Fishbein                    By:  /s/  Doris Bernhardt
Matthew E. Fishbein[†]                          Doris Bernhardt[†]
Meryl Holt[†]                                   Tonya Jenerette[†]
                                                Sabita Krishnan[†]
Of Counsel                                      Gail Rubin[†]
Dana Rehnquist

*Attorneys for Plaintiff the City of New York*


**MAURA HEALEY**                                **GEORGE JEPSEN**
*Attorney General*                              *Attorney General*
*Commonwealth of Massachusetts*                 *State of Connecticut*


                                                50

By:  /s/Jonathan Miller
Jonathan Miller,[†] Chief, Public Protection
and Advocacy Bureau
Genevieve C. Nadeau,[†] Chief, Civil Rights
Division
One Ashburton Place
Boston, MA 02108
Jonathan.Miller@state.ma.us
Genevieve.Nadeau@state.ma.us
Phone: (617) 727-2200

By:  /s/ Mark F. Kohler
Mark F. Kohler,[‡] Assistant Attorney General
Michael Skold,[‡] Assistant Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120
Mark.Kohler@ct.gov
Michael.Skold@ct.gov
Phone: (860) 808-5020

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

By:  /s/ Rachel Wainer Apter
Rachel Wainer Apter,[‡]
Assistant Attorney General
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor
Trenton, NJ 08625-0116
Phone: (609) 376-2702
Rachel.Apter@njoag.gov

**PETER F. KILMARTIN**
*Attorney General*
*State of Rhode Island*

By:  /s/ Michael W. Field
Michael W. Field,[‡] Assistant Attorney General
The State of Rhode Island
Office of the Attorney General
150 South Main Street
Providence, Rhode Island 02903
Phone: (401) 274-4400, Ext: 2380
mfield@riag.ri.gov

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

By:  /s/ Victoria Pearson
Victoria Pearson,[**]
Deputy Attorney General
202 North 9th Street
Richmond, VA 23219
Phone: (804) 786-4319
VPearson@oag.state.va.us

**ROBERT W. FERGUSON**
*Attorney General*
*State of Washington*

By:  /s/ Luke Eaton
Luke Eaton[‡]
Assistant Attorney General
P.O. Box 40100
Olympia, WA 98504-0100
Phone: (360) 753-6200
LukeE1@atg.wa.gov

[†]Admitted in the S.D.N.Y.
[‡]Admitted *pro hac vice*
[*] S.D.N.Y. application pending
[**]*Pro hac vice* motion forthcoming