# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, CONNECTICUT, NEW JERSEY, RHODE ISLAND and WASHINGTON, and COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA, | |
|     Plaintiffs, | No. 18-cv-6471 (ER) |
|     v. | |
| UNITED STATES DEPARTMENT OF JUSTICE; and JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States, | |
|     Defendants. | |

| | |
|---|---|
| CITY OF NEW YORK | |
|     Plaintiff, | |
|     v. | |
| JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States of America, and the UNITED STATES DEPARTMENT OF JUSTICE, | No. 18-cv-6474 (ER) |
|     Defendants. | |

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................. 2

    I.    Defendants' Imposition of the Immigration-Related Conditions on Fiscal Year 2017 Funding Constitutes Final Agency Action under the APA............................ 3

    II.    Congress Did Not Authorize the Executive to Impose the Immigration-Related Conditions on States and Localities that Receive Byrne JAG Funding................. 5

        A. Defendants are not authorized under 34 U.S.C. § 10102(a)(6) to withhold Byrne JAG awards from jurisdictions that do not implement the immigration-related conditions. ............................................................ 6

        B. Section 1373 is not an "applicable law" within the meaning of 34 U.S.C. § 10153(a)(5)(D). ........................................................................... 16

    III.    The Immigration-Related Conditions Violate 34 U.S.C. § 10228(a) .................. 20

    IV.    Defendants' Decision to Impose the Immigration-Related Conditions was Arbitrary and Capricious....................................................................... 24

    V.    Section 1373 Is Unconstitutional under the Tenth Amendment. .......................... 28

        A. The Second Circuit's decision in *City of New York v. United States* does not bind this Court's decision in the current action. .............................. 28

        B. Section 1373 is unconstitutional under the Tenth Amendment and *Murphy v. NCAA*. ...................................................................................... 31

        C. Section 1373 is unconstitutional as applied to New York City's laws and policies. ......................................................................................... 37

    VI.    The Immigration-Related Conditions Violate the Spending Clause.................... 38

        A. The immigration-related conditions are neither reasonably related to, nor sufficiently tailored to address, the particular purpose of the JAG Program.. 38

        B. The immigration-related conditions are unconstitutionally ambiguous. ......... 40

    VII.    Plaintiffs Are Entitled to Declaratory Relief. ...................................... 43

        A. The City's request for a ruling regarding compliance with Section 1373 is justiciable and ripe for review........................................................ 43

i

B.  Defendants' attempts to dismiss New York City's declaratory judgment claim should be denied. ............................................................................... 45

C.  Section 1373 does not encompass contact information and release status....... 46

VIII.   Plaintiffs Are Entitled to Mandamus Relief............................................................ 48

IX.   Plaintiffs Are Entitled to Injunctive Relief. ........................................................... 51

A.  The balance of the equities and the public interest favor a permanent injunction. .......................................................................................................... 51

B.  The Court should issue a nationwide injunction. ............................................ 54

CONCLUSION............................................................................................................................ 57

# TABLE OF AUTHORITIES

Page

CASES

*ACLU v. Clapper,*
   785 F.3d 787 (2d Cir. 2015)......................................................................19

*Arizona v. United States,*
   567 U.S. 387 (2012).............................................................................33, 40

*Arkansas v. Oklahoma,*
   503 U.S. 91 (1992)...................................................................................20

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
   548 U.S. 291 (2006).............................................................................41, 42

*Atkins v. Parker,*
   472 U.S. 115 (1985).................................................................................19

*Bennett v. Spear,*
   520 U.S. 154 (1997)...................................................................................3

*Benning v. Georgia,*
   391 F.3d 1299 (11th Cir. 2004) ...............................................................43

*Califano v. Yamasaki,*
   442 U.S. 682 (1979).................................................................................55

*California ex rel. Becerra v. Sessions,*
   284 F. Supp. 3d 1015 (N.D. Cal. 2018) ...............................................3, 34

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986).................................................................................37

*Charles v. Verhagen,*
   348 F.3d 601 (7th Cir. 2003) ...................................................................43

*Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri,*
   802 F.3d 267 (2d Cir. 2015).....................................................................25

*City of Chicago v. Sessions,*
   --- F. Supp. 3d ---, 2018 WL 3608564 (N.D. Ill. July 27, 2018) .................... *passim*

*City of Chicago v. Sessions,*
   264 F. Supp. 3d 933 (N.D. Ill. 2017) .............................................41, 42, 45

*City of Chicago v. Sessions,*
    888 F.3d 272 (7th Cir. 2018) ................................................................ *passim*

*City of Evanston v. Sessions,*
    No. 18-cv-4853 (N.D. Ill. Aug. 9, 2018), ECF No. 23 .......................................1, 31

*City of Los Angeles v. Coleman,*
    397 F. Supp. 547 (D.D.C. 1975) .............................................................48

*City of Los Angeles v. McLaughlin,*
    865 F.2d 1084 (9th Cir. 1989) .............................................................. *passim*

*City of New York v. United States,*
    179 F.3d 29 (2d Cir. 1999)................................................................. *passim*

*City of Philadelphia v. Sessions,*
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ....................................................... *passim*

*City of Philadelphia v. Sessions,*
    309 F. Supp. 3d 289 (E.D. Pa. 2018) ....................................................... *passim*

*Corley v. United States,*
    556 U.S. 303 (2009)...................................................................... 19-20

*Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.,*
    529 U.S. 193 (2000)........................................................................50

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006)........................................................................54

*Dalton v. Spector,*
    511 U.S. 462 (1994)........................................................................4

*Davis v. Shah,*
    821 F.3d 231 (2d Cir. 2016)................................................................18

*Ely v. Velde,*
    451 F.2d 1130 (4th Cir. 1971) ..............................................................24

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016)......................................................................25

*Fed. Express Corp. v. Holowecki,*
    552 U.S. 389 (2008)........................................................................49

*Forest Guardians v. Babbitt,*
    174 F.3d 1178 (10th Cir. 1998) .............................................................50

iv

*Freilich v. Upper Chesapeake Health, Inc.*,
   313 F.3d 205 (4th Cir. 2002) ...............................................................35

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018)........................................................................55

*Gonzales v. Oregon*,
   546 U.S. 243 (2006)............................................................................17

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991)............................................................................32

*Halliburton, Inc. v. Admin. Review Bd.*,
   771 F.3d 254 (5th Cir. 2014) ...............................................................20

*Humane Soc'y v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) .............................................................27

*In re Aiken Cty.*,
   725 F.3d 255 (D.C. Cir. 2013).............................................................53

*L.A. Haven Hospice, Inc. v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011) ...............................................................56

*L.V.M. v. Lloyd*,
   318 F. Supp. 3d 601 (S.D.N.Y. 2018)..................................................52

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016).................................................................52

*LG Display Co. v. Madigan*,
   665 F.3d 768 (7th Cir. 2011) ...............................................................56

*Lopez v. Davis*,
   531 U.S. 230 (2001)............................................................................49

*Lunney v. United States*,
   319 F.3d 550 (2d Cir. 2003)...................................................................4

*Mastro Plastics Corp. v. NLRB*,
   350 U.S. 270 (1956)............................................................................50

*McDermott Int'l Inc. v. Wilander*,
   498 U.S. 337 (1991)............................................................................19

*MCI Telecomm. Corp. v. AT&T*,
   512 U.S. 218 (1994)............................................................................17

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ....................................................................................18

*Mid-Con Freight Sys., Inc. v. Mich. Pub. Serv. Comm'n,*
    545 U.S. 440 (2005) ....................................................................................19

*Murphy v. NCAA,*
    138 S. Ct. 1461 (2018) ........................................................................ *passim*

*Nev. Dep't of Human Res. v. Hibbs,*
    538 U.S. 721 (2003) ....................................................................................20

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) .............................................................................32, 34

*Nken v. Holder,*
    556 U.S. 418 (2009) ....................................................................................51

*NLRB v. Express Publ'g Co.,*
    312 U.S. 426 (1941) ....................................................................................54

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) .................................................................................40, 42

*Printz v. United States,*
    521 U.S. 898 (1997) ............................................................................ *passim*

*Reno v. Condon,*
    528 U.S. 141 (2000) ....................................................................................35

*Richards v. United States,*
    369 U.S. 1 (1962) ........................................................................................50

*Sharkey v. Quarantillo,*
    541 F.3d 75 (2d Cir. 2008) ............................................................................3

*South Dakota v. Dole,*
    483 U.S. 203 (1987) .............................................................................38, 40

*Steinle v. City & Cnty. of San Francisco,*
    230 F. Supp. 3d 994 (N.D. Cal. 2017) .......................................................47

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
    402 U.S. 1 (1971) ....................................................................................54-55

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ......................................................................20

*Texas v. United States*,
    523 U.S. 296 (1998)............................................................................................43, 44

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017)..............................................................................................55

*Train v. City of New York*,
    420 U.S. 35 (1975)..............................................................................................48, 53

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    136 S. Ct. 1807 (2016)................................................................................................4

*United States v. California*,
    314 F. Supp. 3d 1077 (E.D. Cal. 2018), *appeal docketed*, No. 18-16496 (9th Cir. Aug.
    9, 2018) ............................................................................................... *passim*

*United States v. Sampson*,
    898 F.3d 287 (2d Cir. 2018)......................................................................................18

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994) ....................................................................................52

*Whitfield v. United States*,
    543 U.S. 209 (2005)..................................................................................................18

*Yerdon v. Henry*,
    91 F.3d 370 (2d Cir. 1996)........................................................................................20

## CONSTITUTION

U.S. Const. art. III....................................................................................................54

U.S. Const. amend. X.................................................................................... *passim*

## STATUTES

5 U.S.C. § 704............................................................................................................4

5 U.S.C. § 706....................................................................................................21, 24

8 U.S.C. § 1373 ............................................................................................ *passim*

8 U.S.C. § 1644.....................................................................................................7, 29

28 U.S.C. § 510...........................................................................................................7

28 U.S.C. § 1361......................................................................................................51

34 U.S.C. § 10102 ........................................................................................ *passim*

34 U.S.C. § 10151 ............................................................................................................22

34 U.S.C. § 10152 ...................................................................................................... *passim*

34 U.S.C. § 10153 ...................................................................................................... *passim*

34 U.S.C. § 10154 ............................................................................................................22

34 U.S.C. § 10155 ............................................................................................................22

34 U.S.C. § 10156 ...............................................................................................7, 22, 49

34 U.S.C. § 10157 ............................................................................................................22

34 U.S.C. § 10158 ............................................................................................................22

34 U.S.C. § 10228 ...................................................................................................... *passim*

42 U.S.C. § 713 .................................................................................................................7

42 U.S.C. § 1395l ..............................................................................................................7

42 U.S.C. § 3712 (2005) .................................................................................................8

42 U.S.C. § 18031 ...........................................................................................................20

52 U.S.C. § 10301 ...........................................................................................................20

Airline Deregulation Act of 1978,
     Pub. L. No. 95-504, 92 Stat. 1705 (1978) ...................................................... 33-34

Justice Assistance Act of 1984,
     Pub. L. No. 98-473, 98 Stat. 2077 (1984) ...............................................................22

Justice for All Reauthorization Act of 2016,
     Pub.L. No. 114-324, § 14(b), 130 Stat. 1948  (2016) ...........................................16

Justice System Improvement Act of 1979,
     Pub. L. No. 96-157, 93 Stat. 1167 (1979) .........................................................19, 22

Omnibus Crime Control and Safe Streets Act of 1968,
     Pub. L. No. 90-351, 82 Stat. 197 (1968)...................................................... *passim*

Professional and Amateur Sports Protection Act of 1992,
     Pub. L. No. 102-559, 106. Stat. 4227 (1992)..........................................................32

Violence Against Women and Department of Justice Reauthorization Act of 2005,
     Pub. L. No. 109-162, 119 Stat. 2960 (2006)..........................................................22

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
Pub. L. No. 104-193, 110 Stat. 2105 (1996)..................................................29

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
Pub. L. No. 104-208, 110 Stat. 3009 (1996)..................................................29

**LEGISLATIVE MATERIALS**

*Controlling Crime Through More Effective Law Enforcement: Hearings Before the
Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary*, 90th
Cong. (1967) ...................................................................................................24

S. Rep. No. 96-142 (1979) .........................................................................................19

H.R. Rep. No. 104-469 (1996)....................................................................................46

H.R. Rep. No. 109-233 (2005) ............................................................................39, 52

**REGULATIONS**

2 C.F.R. pt. 200 ............................................................................................................9

2 C.F.R. pt. 2800 ..........................................................................................................9

2 C.F.R. § 200.203 ......................................................................................................42

2 C.F.R. § 200.207 ..................................................................................................9, 10

28 C.F.R. § 66.12 (2006) .........................................................................................9, 10

**RULES**

Fed. R. Civ. P. 56.......................................................................................................37

Fed. R. Civ. P. 65.......................................................................................................54

**OTHER AUTHORITIES**

*About Us*, OJP, https://ojp.gov/about/about.htm ..........................................................5

DOJ, *Organizational Chart*, https://www.justice.gov/file/1047436/download ............5

DOJ, *Summary of General Provisions contained in the FY 2018 President's Budget*, n. 7,
https://www.justice.gov/jmd/page/file/968406/download ......................................48

Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 State
Solicitation, https://www.bja.gov/funding/JAGState18.pdf ...................................10

Exec. Order No. 13809, *Presidential Executive Order on Restoring State, Tribal, and Local Law Enforcement's Access to Life-Saving Equipment and Resources*, 82 Fed. Reg. 41499 (Aug. 28, 2017), https://www.whitehouse.gov/presidential-actions/presidential-executive-order-restoring-state-tribal-local-law-enforcements-access-life-saving-equipment-resources/ ...............................................................................13

Memorandum from Dep't of Justice to General Counsel, Dep't of Commerce, Relationship Between Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and Statutory Requirement for Confidentiality of Census Information (May 18, 1999), https://www.justice.gov/opinion/file/844106/download .......................................46

N.Y.C. Exec. Order No. 124, City Policy Concerning Aliens (Aug. 7, 1989), www.nyc.gov/html/records/pdf/executive_orders/1989EO124.pdf ...........................28, 30, 31

N.Y.C. Exec. Order No. 41, City-Wide Privacy Policy and Amendment of Executive Order No. 34 Relating to City Policy Concerning Immigrant Access to City Services (Sept. 17, 2003), https://www1.nyc.gov/assets/immigrants/downloads/pdf/eo-41.pdf ...........36

OJJDP FY 2018 Title II Formula Grants Program Solicitation (Mar. 28, 2018), https://www.ojjdp.gov/grants/solicitations/FY2018/TitleII.pdf ...............................................10

Part 200 Uniform Requirements, OJP, https://ojp.gov/funding/Part200UniformRequirements.htm ...............................................9, 11

## INTRODUCTION

The central issue in this case is whether the Executive can disregard the congressional design of the Byrne JAG statute and prevent states and localities from receiving the monies that Congress has appropriated for use in implementing state and local public safety priorities. Every court to consider this question has ruled that Defendants exceeded their constitutional and statutory authority when they attempted to condition federal funding on acquiescence to federal immigration priorities. *See, e.g., City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018); Order, *City of Evanston v. Sessions*, 18-cv-4853 (N.D. Ill. Aug. 9, 2018), ECF No. 23 (Ex. 47, Trasande/Holt Decl.); *City of Chicago v. Sessions*, --- F. Supp. 3d ---, 2018 WL 3608564, at *5-13 (N.D. Ill. July 27, 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 320-331 (E.D. Pa. 2018). So should this Court here.

Ignoring these many holdings, Defendants characterize this case as a dispute over whether states and cities can thwart the federal government's immigration enforcement efforts. This characterization is a "red herring." *City of Chicago*, 888 F.3d at 283-87. As the Seventh Circuit has explained, nothing in this case involves interference or noncooperation with federal immigration enforcement. *See id.* at 282-83. Defendants also attempt to justify imposition of new immigration-related conditions on Byrne JAG awards by inventing a relationship between the Byrne JAG statute and federal immigration enforcement that simply does not exist. As intended by Congress, the purpose of the Byrne JAG grant is to provide federal financial assistance to enable states and cities to address crime and public safety at the local level, according to local needs— not to facilitate "intergovernmental cooperation" with federal immigration enforcement. To be sure, Defendants' inability to conscript Plaintiffs into federal immigration enforcement may make the federal government's goals more difficult to attain. *See City of Chicago*, 2018 WL 3608564,

at *10. But "these inefficiencies are part of federalism's intended structure, not imperfections to be remedied by judicially-wrought consolidation of power." *Id.*

Neither the Constitution nor the Byrne JAG statute authorizes the Executive to impose new substantive conditions on Byrne JAG awards. Defendants invite the Court to hold that the Executive may cast aside these constitutional and statutory limits and vest itself with power to impose spending conditions of its own creation—even when the conditions are inconsistent with Congress's purpose. This Court should join the other courts that have ruled to date and reject Defendants' invitation.

## ARGUMENT

Plaintiffs are entitled to partial summary judgment, and Defendants' motion to dismiss or motion for partial summary judgment should be denied. Defendants lack constitutional and statutory authority to impose the immigration-related conditions on Plaintiffs and therefore have violated the Administrative Procedure Act ("APA") and the separation of powers. By imposing the immigration-related conditions on Plaintiffs, Defendants also have violated 34 U.S.C. § 10228(a), which prohibits Defendants from exercising any direction, supervision, or control over any state or local law enforcement agency—and which was adopted by Congress to prevent the Department of Justice ("DOJ") from turning local police into an arm of the federal government. Moreover, although Defendants departed from more than a decade of past practice when they imposed the conditions, the Administrative Record is devoid of any findings or analysis to explain why they changed course, rendering Defendants' decision arbitrary and capricious. Finally, not only do the undisputed material facts show that New York City complies with 8 U.S.C. § 1373, but, as the *Philadelphia* and *Chicago* courts have held, that statute itself is unconstitutional under

2

the Supreme Court's decision in *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018). *See City of Chicago*, 2018 WL 3608564, at \*6-11; *City of Philadelphia*, 309 F. Supp. 3d at 329-30.

I.     **Defendants' Imposition of the Immigration-Related Conditions on FY 2017 Funding Constitutes Final Agency Action under the APA.**

Defendants assert that New York City's claims are not reviewable under the APA because DOJ has not issued a final decision granting or denying the City's Byrne JAG application. However, as the *Los Angeles*, *Philadelphia*, and *Chicago* courts have uniformly held, DOJ made a final decision to impose the immigration-related conditions on any award it does issue for the Byrne JAG program when it expressly included the conditions in the FY 2017 Solicitations. Pls.' 56.1 ¶ 21. *See* Order Den. Defs.' Mot. to Dismiss at 3-4, *City of Los Angeles*, No. 94-7215-R-JC, ECF No. 94 (Trasande/Holt Supp. Decl. Ex. 49); *City of Chicago*, 2018 WL 3608564 at \*4-5; *City of Philadelphia*, 309 F. Supp. 3d at 280; *see also California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031-32 (N.D. Cal. 2018).[1] This Court should follow the reasoning of the other district courts that have considered the issue and hold that the decision to impose the conditions on any Byrne JAG award was final agency action even though the Attorney General had yet to finalize the decision to award the funds.

In order for an APA challenge to be ripe for judicial review, the challenged agency action must be "final." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *Sharkey v. Quarantillo*, 541 F.3d 75, 87 (2d Cir. 2008). For agency action to be "final," it must both "'mark the consummation of the agency's decisionmaking process'" and "'be [an action] by which rights or obligations have been determined, or from which legal consequences will flow.'" *U.S. Army Corps of Eng'rs v.*

---

[1] Defendants challenge the finality of the agency action only with respect to Counts II and III of New York City's Amended Complaint—namely, that Defendants' imposition of the immigration-related conditions on FY 2017 funding is *ultra vires* and arbitrary and capricious, respectively. Defs.' Mem. of Law in Opp'n to Pls.' Mot. For Partial Summ. J. ("Defs.' Mem.") at 11.

*Hawkes Co.*, 136 S. Ct. 1807, 1811, 1813 (2016) (agency action was final where the agency had changed permitting requirements, but the petitioner had not yet applied for a permit); *see* 5 U.S.C. § 704. "The 'core question' for determining finality is 'whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003) (quoting *Dalton v. Spector*, 511 U.S. 462, 470 (1994)).

Both conditions are met here. First, as the district court in *Chicago* found under identical facts, DOJ's decision-making process was complete when it determined that any award "explicitly require[d] compliance with all three Conditions" even though FY 2017 funds had not yet been awarded to any localities. *City of Chicago*, 2018 WL 3608564 at *5; *see also City of Philadelphia*, 309 F. Supp. 3d at 280 ("[T]he Attorney General's decision to impose the conditions represents the agency's definitive position on the question, such that it is now final and ripe for this Court's review." (internal citations omitted)). Thus, even though DOJ has not issued a decision granting or denying New York City FY 2017 funding, its decision to impose the conditions represents the agency's final and definitive position.

Second, DOJ's imposition of the immigration-related conditions on Byrne JAG funding will have a direct, serious effect on the City. Together with DOJ's October 11, 2017 "preliminary" determination that the City's laws and policies violate 8 U.S.C. § 1373, the imposition of the immigration-related conditions impels the City to choose to either forfeit critical funding that it is otherwise entitled to receive, or repeal laws and policies, some of which have been effective since at least 2003 in protecting the health, safety, and general welfare of its residents. Pls.' 56.1 ¶ 45. As the *Chicago* court explained, imposition of the conditions "force[s] [the city] to choose between accepting the award with the Conditions or forgoing the award in favor of maintaining the City's

policy preferences." *City of Chicago*, 2018 WL 3608564 at *5; *see also City of Philadelphia*, 309

F. Supp. 3d at 279-80 (referencing *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 614-15

(E.D. Pa. 2017)); Order Den. Defs.' Mot. to Dismiss at 3, *City of Los Angeles*, No. 17-cv-7215-R-

JC, ECF No. 94 (Trasande/Holt Supp. Decl. Ex. 49).[2]

## II.    Congress Did Not Authorize the Executive to Impose the Immigration-Related Conditions on States and Localities that Receive Byrne JAG Funding.

In an effort to create statutory authority to justify their imposition of the immigration-

related conditions where none exists, Defendants take out of context a handful of statutory phrases:

"special conditions," "priority purposes," and "applicable Federal laws." Specifically, Defendants

advance the flawed argument that because the Assistant Attorney General, pursuant to 34 U.S.C.

§ 10102(a)(6), may place "special conditions" on and determine "priority purposes" for formula

grants, the Executive's authority "necessarily includes the authority to *prioritize* federal grant

monies for those state and local jurisdictions that assist in furthering relevant federal *purposes*."

Defs.' Mem. at 28. This assertion is completely without support. Indeed, Defendants'

interpretation plainly ignores how these terms have been defined and routinely used by both courts

and by the Bureau of Justice Assistance ("BJA")[3] in its administration of the Byrne JAG program.

Additionally, Defendants' expansive reading of "applicable Federal laws" in 34 U.S.C.

§ 10153(a)(5)(D) would give them unlimited discretion to convert into grant conditions any of the

thousands of laws that apply to states and localities—including the Affordable Care Act, the Clean

---

[2] Defendants' position is particularly problematic here because Defendants are solely responsible for the delay in issuing a decision on New York City's Byrne JAG application. The City timely applied for the grant and timely responded to all of Defendants' inquiries, yet its application has remained in limbo for more than a year while over $200 million in grant funds has been awarded to other applicants. Pls.' 56.1 ¶ 44; Pls.' Mem. at 12.

[3] The BJA is part of the Office of Justice Programs ("OJP"), which is, in turn, part of DOJ. DOJ Organizational Chart, *available at*, https://www.justice.gov/file/1047436/download https://ojp.gov/about/about.htm (last visited Sept. 26, 2018); OJP, *About Us, available at*, https://ojp.gov/about/about.htm (last visited Sept. 26, 2018)

Water Act, the Family and Medical Leave Act, and the Voting Rights Act—thereby impermissibly converting the Byrne JAG program from a mandatory formula grant into a discretionary grant. Nothing in the Byrne JAG statute suggests that Congress intended to confer such broad powers on Defendants. Indeed, Defendants' claimed powers conflict with the text, purpose, structure, and legislative history of the Byrne JAG statute.

### A. Defendants are not authorized under 34 U.S.C. § 10102(a)(6) to withhold Byrne JAG awards from jurisdictions that do not implement the immigration-related conditions.

Nothing in the Byrne JAG statute "grant[s] the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for their failure to comply with those conditions." *City of Chicago*, 888 F.3d at 28. Nor does 34 U.S.C. § 10102(a)(6)—a provision located in a different chapter of the United States Code from the Byrne JAG statute—provide Defendants with such authority.

First, 34 U.S.C. § 10102(a)(6) does not allow Defendants to substitute their own criteria for determining Byrne JAG eligibility or to impose substantive requirements on state and local law enforcement agencies to further Defendants' unrelated federal immigration agenda. Congress determined that every state and certain localities are eligible to receive Byrne JAG funds so long as they use the monies for one of the broad purposes permitted by statute, and submit an application in accordance with the requirements of 34 U.S.C. § 10153(a). *See* 34 U.S.C. §§ 10152(a)(1)(A-H), 10156(a)-(d) ("the Attorney General *shall* . . . allocate" grant money based on the statutory formula) (emphasis added).[4] Defendants' broad interpretation of 34 U.S.C. § 10102(a)(6) would

---

[4] Specifically, "[o]f the total amount appropriated" by Congress, the U.S. Attorney General "shall, except as provided in paragraph (2), allocate" fifty percent of the funds based on each State's population and fifty percent based on each State's crime rate. 34 U.S.C. § 10156(a)(1). The exception in paragraph (2) provides that each State must receive at least one-quarter of one percent of the funds appropriated by Congress for a given year, regardless of what the formula

deviate from the Byrne JAG program's expressly stated grant formula which Congress, in enacting the program, made clear that Defendants had no authority to rewrite. *See, e.g.*, *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (unlike discretionary grants, "formula grants … are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula.") (internal quotation marks omitted). Section 10102(a)(6) merely delegates to the Assistant Attorney General for the Office of Justice Programs ("OJP") whatever powers the U.S. Attorney General has been granted elsewhere by statute. *See City of Chicago*, 888 F.3d at 286-87.[5]

Moreover, none of the purportedly analogous federal grant statutes that Defendants proffer, Defs.' Mem. at 28 n. 6, authorizes the Executive to exercise powers not delegated by Congress as Defendants attempt to do here. Neither 42 U.S.C. § 713(a)(1)(C)—which provides grants for personal responsibility education—nor 25 U.S.C. § 1644(b)—which provides grants and contracts to facilitate outreach, enrollment, and coverage of Indians under the Social Security Act for health benefit programs—gives the administering agency discretion to impose open-ended requirements of the agency's own choosing; rather, the requirements and conditions that may be imposed by the agency are expressly constrained to those enumerated in statute. *See* 42 U.S.C. § 713(a)(1)(C)(ii)(I)-(III); 25 U.S.C. § 1644(b)(1)-(4). Likewise, 42 U.S.C. § 1395l(t)(2)(E), which

_____

would otherwise dictate. *Id.* § 10156(a)(2). Of the money allocated to each State, sixty percent of the funding "shall be for direct grants to States," *id.* § 10156(b)(1), and forty percent "shall be for grants" directly to localities (compared within a State based on crime rate), *id.* § 10156(b)(2), (d).

[5] Defendants are incorrect in insisting that such a reading of § 10102(a)(6) renders superfluous 28 U.S.C. § 510, Defs.' Mem. at 27, a provision which generally permits the U.S. Attorney General to delegate tasks "from time to time . . . as he considers appropriate." Section 10102(a)(6) serves a different function: to empower the Assistant Attorney General to carry out the ministerial duties of the U.S. Attorney General with respect to grant administration, even in the absence of a specific determination by the U.S. Attorney General to delegate any such duties pursuant to 28 U.S.C. § 510.

permits limited adjustments to Medicare grant disbursements "to ensure equitable payments," provides no authority for the administering agency to withhold funds altogether if recipients do not implement conditions unrelated to Medicare.

Further, none of the cases cited by Defendants supports their overly expansive reading of 34 U.S.C. § 10102(a)(6) as these cases merely stand for the unremarkable proposition that "Congress may, consistent with the separation of powers, properly delegate to the Executive Branch the authority to attach conditions to agency spending." Defs.' Mem. at 26. None of these cases provide support for Defendants' argument that 34 U.S.C. § 10102(a)(6) independently provides the Executive with the authority to exercise discretion where, as here, Congress has not expressly delegated that authority in the grant statute.

Additionally, Defendants fail to discuss any of the numerous recent decisions which have consistently held that the Executive lacks statutory authority to impose the immigration-related conditions at issue here and that 34 U.S.C. § 10102(a)(6) certainly does not provide such powers. *See generally* Pls.' Mem. of Law in Support of Mot. for Partial Summ. J. ("Pls.' Mem.") at 31-37. Nor have Defendants offered any argument why this Court should depart from the sound conclusions reached by those other courts.

Defendants also attempt to argue that language added to the predecessor provision of Section 10102(a)(6) empowers them to mandate that grant recipients implement the immigration-related conditions. Defs.' Mem. at 26-27. Prior to 2006, the relevant statutory language provided that the Assistant Attorney General for the OJP was authorized to "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General." *See* 42 U.S.C. § 3712(a)(6) (2005). Defendants argue that the 2006 addition of the clause "including placing *special conditions* on all grants, and determining

*priority purposes* for formula grants" to the end of the preceding sentence indicates that Congress intended to "confer distinctive and meaningful power" to the Assistant Attorney General. Defs.' Mem at 27 (emphasis added). As explained below, the legislative and operational history of the Byrne JAG program, as well as the statute itself, demonstrate that this language does not authorize Defendants to impose substantive conditions like the ones challenged here under the guise of "special conditions" or "priority purposes."

> **1.  The challenged immigration-related conditions are not statutorily authorized "special conditions."**

As explained in Plaintiffs' opening brief, the legislative history of Section 10102(a)(6) demonstrates that Congress understood "the term 'special conditions' … [is] a term of art referring to conditions for 'high-risk grantees' with difficulty adhering to existing grant requirements." *City of Philadelphia*, 309 F. Supp. 3d at 321 (referencing *City of Philadelphia*, 280 F. Supp. 3d at 617). The term was originally defined by the federal Office of Management and Budget in 28 C.F.R. § 66.12(a)-(b) (2006) and later incorporated into Section 10102(a)(6) during the statutory amendments of that year. Although 28 C.F.R. § 66.12(a)-(B) was later repealed, a virtually identical substitute, 2 C.F.R. § 200.207, uses the phrase "specific condition" instead of "special condition" regarding additional requirements that may be imposed on grantees. The circumstances that trigger application of a "specific condition" under 2 C.F.R. § 200.207 are almost the same as those that existed for "special conditions" in 28 C.F.R. § 66.12(a)-(b). *Compare* 28 C.F.R. § 66.12(a)-(b) (2006) *with* 2 C.F.R. § 200.207. Moreover, in December 2014, DOJ adopted the Office of Management and Budget's Uniform Guidance regarding federal awards set forth in 2 C.F.R. Part 200 for purposes of its grant administration. Despite the limited exceptions that were supplemented with additional guidance by DOJ, 2 C.F.R. § 200.207 was adopted in its entirety. *See generally* 2 C.F.R Part 2800; *see also* DOJ OJP Part 200 Uniform Requirements, *available at*

https://ojp.gov/funding/Part200UniformRequirements.htm (last visited Sept. 26, 2018)

(Trasande/Holt Supp. Decl. Ex. 51 at 1). Defendants fail to address, let alone distinguish, this

history behind the term "special conditions" set forth in Plaintiffs' brief. *Compare* Defs.' Mem. at

31-32 *with* Pls.' Mem. 36-38 (quoting *City of Philadelphia*, 309 F. Supp. 3d at 321 (referencing

*City of Philadelphia*, 280 F. Supp. 3d at 617) and discussing established approaches to statutory

construction, indicating that that regulatory definition would be applied).

Moreover, the definition of "special conditions" advanced by Defendants is directly

contradicted by how they use that term in FY 2018 solicitations for Byrne JAG funding and Office

of Juvenile Justice and Delinquency Prevention ("OJJDP") Title II funding (part of another

formula grant program administered by Defendants that addresses the juvenile justice system).

Both solicitations discuss "that an applicant [that] poses a higher risk to OJP may affect the funding

decision and/or result in additional reporting requirements, monitoring, *special conditions*,

withholding of award funds, or other additional award requirements". *See* Edward Byrne Memorial

Justice Assistance Grant (JAG) Program FY 2018 State Solicitation at 26 (emphasis added),

*available at* https://www.bja.gov/funding/JAGState18.pdf (last visited Sept. 25, 2018),

(Trasande/Holt Supp. Decl. Ex. 45 at 26); OJJDP FY 2018 Title II Formula Grants Program

Solicitation) (emphasis added), at 21, *available at*

https://www.ojjdp.gov/grants/solicitations/FY2018/TitleII.pdf (last visited Sept. 25, 2018)

(Trasande/Holt Supp. Decl. Ex. 46 at 21).

Further, while the FY 2017 State and Local Solicitations do not use the term "special

conditions," both explicitly recognize the imposition of additional conditions directed at high-risk

grantees consistent with how the term was originally defined by the federal Office of Management

and Budget in 28 C.F.R. § 66.12(a)-(b) and as amended in 2 C.F.R. § 200.207. *See* Trasande/Holt

Decl. Ex. 17 at AR-01016 (FY 2017 State Solicitation at 23) ("OJP may, however, consider the information in award decisions, and may impose additional OJP oversight of any award under this solicitation (including through the conditions that accompany the award document"); *see also* Trasande/Holt Decl. Ex. 33 at 22 (FY Local Solicitation) (same).[6]

Additionally, merely labeling the immigration-related conditions annexed to the State Plaintiffs' award letters (Trasande/Holt Decl. Ex. 1 at ¶¶ 52-56) as "special conditions" does not make them rise to such a meaning. The dispositive question is what Congress meant by the term "special condition" when it enacted that language in Section 10102(a)(6). Defendants' misuse of the term does not guide the inquiry faced by this Court; how Congress, the Office of Management and Budget, and other courts have construed and defined "special conditions" does.

The disputed immigration-related conditions are fundamentally different from any of the long-standing grant requirements, and are not "special conditions" under the meaning intended by Congress, because the immigration-related conditions do not concern the grant-related performance issues of any particular grantee. The "special conditions" listed in State Plaintiffs' award letters fall into one or more of the following three categories: (1) conditions authorized by other provisions of the Byrne JAG statute;[7] (2) conditions authorized by other federal statutes,

---

[6] *See also* Trasande/Holt Decl. Ex. 17 at AR-01023 (2017 State Solicitation at 30) ("OJP itself has in place a framework for evaluating risks posed by applicants. OJP takes into account information pertinent to matters such as— 1. Applicant financial stability and fiscal integrity[;] 2. Quality of the management systems of the applicant, and the applicant's ability to meet prescribed management standards, including those outlined in the DOJ Grants Financial Guide[;] 3. Applicant's history of performance under OJP and other DOJ awards (including compliance with reporting requirements and award conditions), as well as awards from other federal agencies[;] 4. Reports and findings from audits of the applicant, including audits under the (DOJ) Part 200 Uniform Requirements[; and] 5. Applicant's ability to comply with statutory and regulatory requirements, and to effectively implement other award requirements"; *see also* Trasande/Holt Decl. Ex. 33 at 28 (FY 2017 Local Solicitation) (same).)

[7] Examples of Category One conditions include those that provide guidance as to *how* grantees provide the assistance specified in the Byrne JAG statute to support one or more of the eight program areas identified in the Byrne JAG statute, 34 U.S.C. § 10152(a)(1); 34 U.S.C. § 10153(a)(5)(A), 34 U.S.C. § 10153(b)(1), or conditions that relate to the administration of the grant itself, including the maintenance and reporting of "such data, records, and information

regulations, or legal authorities that apply either to all federal grantees or recipients of BJA federal funds;[8] and (3) conditions that are advisory and non-mandatory, or impose certain restrictions on how *disbursed* Byrne JAG funds may be used within the eight broad categories authorized by Congress in the Byrne JAG statute. Trasande/Holt Supp. Decl. Ex. 52.[9] The challenged immigration-related conditions do not fall into any of these categories. Nor are these conditions authorized by another statute applicable to use of federal monies or by the Byrne JAG statutory scheme.

An examination of the conditions identified by Defendants in support of their argument that the immigration-related conditions are like any other previous ones, *see* Defs.' Mem. at 21, demonstrates why their argument is flawed. For example, Special Condition ¶ 28[10] is a use restriction that seeks to bolster Byrne JAG's programmatic goals of strengthening localities' criminal justice systems by requiring localities to adopt specified practices when planning to share information across agencies, and is authorized by the Byrne JAG statute at 34 U.S.C. §§ 10153(a)(5)(A) and (a)(4). Special Condition ¶ 31[11] refers to federal regulations that directly speak

---

(programmatic and financial) as the Attorney General may reasonably require." 34 U.S.C. § 10153(a)(4). *See generally* Trasande/Holt Supp. Decl. Ex. 52.

[8] Examples of Category Two include statutes requiring all recipients of federal funds to comply with anti-discrimination and environmental laws (*see e.g.* Trasande/Holt Decl. Ex. 1 ¶¶ 10, 16, 17, 18, 31, 32, 37) as well as statutes and regulations specific to criminal justice grant recipients (*see e.g.* Trasande/Holt Decl. Ex. 1 ¶¶ 30, 46, 62). *See generally* 34 U.S.C. § 10153(a)(5)(D); Trasande/Holt Supp. Decl. Ex. 52.

[9] As an example of a non-mandatory condition, grantees are encouraged but not required to have a policy prohibiting texting while driving. *See, e.g.*, Trasande/Holt Decl. Ex. 1 ¶¶ 24, 58. Special Conditions restrictions on how disbursed funds can be used within the eight categories include instances in which technical specifications are provided for equipment—e.g., body armor and bulletproof vests—that the grantee can choose but is not required to buy with Byrne JAG funding. *See, e.g.*, Trasande/Holt Decl. Ex. 1 ¶¶ 39-41, 57.

[10] Trasande/Holt Decl. Ex. 1 ¶ 28. This condition falls into Category 1.

[11] Trasande/Holt Decl. Ex. 1 ¶ 31. This is a Category 2 condition.

to the use of federal funds for research that involves human subjects. Special Condition ¶ 34[12] is another use restriction that seeks to bolster Byrne JAG's programmatic goal of strengthening localities' criminal justice systems by ensuring that "each current member of a law enforcement task force funded with these funds . . .will complete required online . . . task force training." Special Conditions ¶¶ 40[13] and 41[14] as well 2016 New York State Special Condition ¶ 45[15] apply only where funding is sought for a particular type of equipment as part of a grantee's program narrative or comprehensive law enforcement plan (*see* discussion, *infra*). A jurisdiction that does not wish to comply with any of the Category 3 conditions can tailor their plan accordingly; for example, a state or locality can decide to not buy equipment with its Byrne JAG monies. By contrast, grantees have no choice but to comply with the immigration-related conditions if they want Byrne JAG funding; it is an all or nothing proposition.

Defendants advance a mystifying argument that there is a "built-in structural check" over the imposition of unreasonable conditions as state and localities could merely decline to participate and "thus, effectively annul—the Byrne JAG Program were this authority invoked to impose unreasonable conditions." Defs.' Mem. at. 27. Defendants ignore that turning down the grant funds would result in their reallocation and forfeiture. A jurisdiction should not have to forego monies that Congress intended for it to receive through a mandatory grant program because it declines to

---

[12] Trasande/Holt Decl. Ex. 1 ¶ 34. This is a Category 1 condition.

[13] Trasande/Holt Decl. Ex. 1 ¶ 40. This is a Category 3 condition.

[14] Trasande/Holt Decl. Ex. 1 ¶ 41. This is a Category 3 condition.

[15] Trautman Decl. Ex. B. ¶ 45 (ECF No. 91-2) (emphasis added). This condition is identical to 2016 New York City Special Condition ¶ 46. As originally written, this was a Category 3 condition. Defendants also fail to alert the Court to the fact that Executive Order 13688 underlying 2016 New York State Special Condition ¶ 45 was revoked on August 28, 2017. *See* Exec. Order 13809, *Presidential Executive Order on Restoring State, Tribal, and Local Law Enforcement's Access to Life-Saving Equipment and Resources*, 82 Fed. Reg. 41499 (Aug. 28, 2017), *available at*, https://www.whitehouse.gov/presidential-actions/presidential-executive-order-restoring-state-tribal-local-law-enforcements-access-life-saving-equipment-resources/ (last visited Sept. 24, 2018).

follow a condition that Defendants did not have the authority to impose in the first place.

> **2. Defendants' statutory authority to express "priority purposes" for Byrne JAG grants does not authorize Defendants to withhold such funding from jurisdictions that do not implement the immigration-related conditions.**

Defendants incorrectly assert that their authority to identify a "priority purpose" for the Byrne JAG grants equates to authority to impose mandatory conditions that correspond to their unilaterally determined "priority purposes" and to deny the monies to states and localities that do not meet the "impose(d) eligibility conditions reflecting the priority purpose." Defs.' Mem. at 28. But this assertion is contrary to Defendants' own practice in administering the Byrne JAG program—that is, in determining advisory, non-mandatory priority purposes and encouraging states and localities to consider such priorities in their use of disbursed grant monies.

First, as used by Defendants in the FY 2017 Byrne JAG application, the "priority purposes" identified by the BJA in both the state and local solicitations were not binding. BJA merely invited or encouraged grantees to consider addressing certain areas of interest to BJA in their proposed law enforcement plans. Specifically, the FY 2017 Solicitation included the following language under the header "BJA Areas of Emphasis":

> BJA recognizes that there are significant pressures on local criminal justice systems. In these challenging times, shared priorities and leveraged resources can make a significant impact. As a component of OJP, BJA intends to focus much of its work on the areas of emphasis described below, and *encourages each unit of local government recipient of an FY 2017 JAG award to join us in addressing these challenges*.

*See* Trasande/Holt Decl. Ex. 17 at AR-01003-01004 (2017 State Solicitation at 10) (emphasis added); *see also* Trasande/Holt Decl. Ex. 33 at 9 (Local Solicitation) (same). After this preamble, BJA then enumerated its areas of interest within the universe established by 34 U.S.C. § 10152(a)(1)(A-H), prefacing each identified area with language of "encouragement" not obligation:

- **Reducing Gun Violence**: "BJA *encourages* States to invest JAG funds in programs to

combat gun violence, enforce existing firearms laws, and improve the process for ensuring that persons prohibited from purchasing guns are prevented from doing so, by enhancing reporting to the FBI's NICS." *See* Trasande/Holt Decl. Ex. 17 at AR-01003 (FY 2017 State Solicitation at 10) (emphasis added); *see also* Trasande/Holt Decl. Ex. 33 at 9 (FY 2017 Local Solicitation) (same).)

- **National Incident-Based Reporting System (NIBRS):** "BJA *encourages* State recipients of FY 2017 JAG awards to use JAG funds to expedite the transition to NIBRS." *See* Trasande/Holt Decl. Ex. 17 at AR-01003-01004 (FY 2017 State Solicitation at 10) (emphasis added); *see also* Trasande/Holt Decl. Ex. 33 at 9 (FY 2017 Local Solicitation) (same).)

- **Officer Safety and Wellness**: "BJA *encourages* States to use JAG funds to address these needs by providing training, such as paying for tuition and travel expenses related to attending trainings such as the VALOR training, as well as funding for health and wellness programs for law enforcement officers." *See* Trasande/Holt Decl. Ex. 17 at AR-01004 (FY 2017 State Solicitation at 10) (emphasis added); *see also* Trasande/Holt Decl. Ex. 33 at 9 (FY 2017 Local Solicitation) (same).

- **Border Security**: "BJA *encourages* States to use JAG funds to support law enforcement hiring, training, and technology enhancement in the area of border security." *See* Trasande/Holt Decl. Ex. 17 at AR-01004 (FY 2017 State Solicitation at 10) (emphasis added); *see also* Trasande/Holt Decl. Ex. 33 at 9 (FY 2017 Local Solicitation) (same).

- **Collaborative Prosecution**: "BJA *strongly encourages* State and local law enforcement to foster strong partnerships with prosecutors to adopt new collaborative strategies aimed at combating increases in crime, particularly violent crime. *See* Trasande/Holt Decl. Ex. 17 at AR-01004 (FY 2017 State Solicitation at 10) (emphasis added); *see also* Trasande/Holt Decl. Ex. 33 at 9 (FY 2017 Local Solicitation) (same).

Moreover, states and localities selected which programs they wished to pursue and drafted comprehensive strategic law enforcement plans after conducting a self-directed assessment of the law enforcement problems arising within their jurisdictions. *See* Trasande/Holt Decl. Ex. 17 at AR-01011 (FY 2017 State Solicitation at 18); Trasande/Holt Decl. Ex. 33 at 16-17 (FY 2017 Local Solicitation).[16]

---

[16] The Byrne JAG program, both at its origin and as articulated today, has required the preparation and adoption of comprehensive plans by grantees based upon their individual "evaluation of State and local problems of local law enforcement". *Compare* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title I, 82 Stat. 197 § 201 ("[I]t is the purpose of this part to encourage States and units of general local government to prepare and adopt comprehensive law enforcement plans based on their evaluation of State and local problems of law enforcement") and §§ 202-203 (calling for the creation of "state planning agencies that shall develop, in accordance

Because Defendants' now-proffered interpretation of "priority purposes" cannot be reconciled with their own practice, this Court should reject it.

### B. Section 1373 is not an "applicable law" within the meaning of 34 U.S.C. § 10153(a)(5)(D).

The statute governing the Byrne JAG application process dictates that state and local governments should submit their funding applications "in such form as the Attorney General may require" and then lists items the application "shall" include, including a certification that "the applicant will comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(a). This statutory text accomplishes just what it says: it permits the Attorney General the administrative power to prescribe the *form* of an application for grants—not their substantive conditions. As used in Section 10153(a)(5)(D), the phrase "all other applicable Federal laws" refers only to federal laws that govern federal grants and grant-making—a category that does not include 8 U.S.C. § 1373. Unlike Plaintiffs' construction of the phrase, Defendants' construction—that "all other applicable Federal laws" incorporates as grant conditions "the corpus of federal laws that actually do apply, independently, to Byrne JAG grantees," Defs.' Mem. at 20—conflicts with the Byrne JAG program's text, structure, purpose, and history, and would have

---

with part C [specifying permissible subject areas for federal grant funds] a comprehensive state-wide plan … [that shall] define, develop, and correlate programs and projects for the State and the units of general local government in the State or combinations of States or units for improvement" and "establish priorities for the improvement in law enforcement throughout the State") *with* 34 U.S.C. § 10153(a)(6)(A-E) (outlining requirements for statewide strategic planning and report requirements describing how the funds are to be allocated among the uses specified among subparagraphs (A) through (G) of 34 U.S.C. § 10152(a)(1)). Meanwhile, the present language concerning strategic plan requirements has been in place since the passage of the Justice for All Reauthorization Act of 2016, Pub. L. 114-324, § 14(b), 130 Stat. 1948 (2016). Consequently, strategic plans as enumerated in the statute are presently discretionary and encouraged but will become mandatory starting with the FY 2019 Byrne JAG program. *Id.* (provided that: "The requirement to submit a strategic plan under section 501(a)(6) [which should likely be "502(a)(6),"] of title I of the Omnibus Crime Control and Safe Streets Act of 1968, as added by subsection(b) [, subsec. (a)(6) of this section], shall apply to any application submitted under such section [502] for a grant for any fiscal year beginning after the date that is 1 year after the date of enactment of this Act [, December 16, 2016]"); *see also* Trasande/Holt Decl. Ex. 17 at AR-01017 (FY 2017 State Solicitation at 24); *see also* Trasande/Holt Decl. Ex. 33 at 17 (FY 2017 Local Solicitation).

extreme implications for the Byrne JAG program.

Defendants argue that "Congress's decision to empower the Attorney General to determine the form of Byrne JAG applications renders the most natural reading of this provision as a delegation to the Attorney General to determine whether a particular federal law constitutes an 'applicable Federal law.'" Defs.' Mem. at 19. This assertion cannot be correct. Congress's decision to authorize Defendants to design an application form for the Byrne JAG program does not "empower" the Attorney General to change the program's substance fundamentally. *See Gonzales v. Oregon*, 546 U.S. 243, 267 (2006). Imposing grant conditions is "a tremendous power of widespread impact, and is not the type of authority that would be hidden in a clause without any explanation." *City of Chicago*, 888 F.3d at 287. "[T]he notion of the broad grant of authority to impose any conditions on grant recipients is at odds with the nature of the Byrne JAG grant, which is a formula grant rather than a discretionary grant." *Id.* at 285. Even when Congress expressly grants an agency the power to add conditions to a federal program (a grant of authority absent here), such an authorization "does not contemplate fundamental changes" to the underlying program. *MCI Telecomm. Corp. v. AT&T*, 512 U.S. 218, 228 (1994).

Furthermore, as the Seventh Circuit concluded—and consistent with Plaintiffs' argument—Section 10153(a)(5)(D) contains *none* of the textual hallmarks Congress employs when Congress grants an agency discretion to impose conditions on grants. *See* Pls.' Mem. at 20–27; *City of Chicago*, 888 F.3d at 286–87. Defendants essentially confirm as much by referencing other statutes that do include such language—allowing agencies to impose "conditions as deemed necessary" or "such additional requirements as the Secretary may specify"—as examples that Congress has previously delegated discretionary authority over federal grants. Defs.' Mem. at 15 n.6. Those examples underscore that such language is absent here. *Cf. Whitfield v. United States*,

543 U.S. 209, 216 (2005) (noting that Congress's choice to include express language in twenty-two other places meant that decision not to so in another place would not be "overrid[den] … based on vague and ambiguous signals").

Had Congress intended to take the drastic step of coercing states into compliance with a vast array of other significant laws, "its failure even to hint at it is spectacularly odd." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 491 (1996). Courts do not read generic language in one statute to effect major modifications to other statutory schemes, as Defendants misconstrue the Byrne JAG statute to do. *See United States v. Sampson*, 898 F.3d 287, 302 (2d Cir. 2018) (implied repeals disfavored); *Davis v. Shah*, 821 F.3d 231, 251 (2d Cir. 2016) (specific provisions control over general provisions). Congress is presumed to be aware of that principle, and Congress's typical practice is thus to declare in express terms that compliance with a particular law is enforceable as a federal funding condition.

Additionally, Plaintiffs' construction is consistent with Byrne JAG's structure as a formula grant whose "goal . . . [is] to support the needs of law enforcement while providing flexibility to state and local governments." *City of Chicago*, 888 F.3d at 285–86. Defendants do not dispute that the Byrne JAG statute is structured to afford a formula-based amount of funding to states and localities each year to use as they see fit within broad purpose areas, as the Seventh Circuit explained in *Chicago*. *Id.* at 285–87. [17] This formula grant structure is consistent with the goals of providing financial assistance and flexibility to state and local governments.

---

[17] Defendants reference language in the long title of the entire Omnibus Crime Control and Safe Streets Act of 1968. Defs.' Mem. at 6. That long title is: "To assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes." Public Law 90–351, 82 Stat. 197, 197. It is not clear why Defendants invoke this language, but the language is followed by the following: "Congress finds further that crime is essentially a local problem that must be dealt with by State and local governments if it is to be controlled effectively." *Id.*

Plaintiffs' construction is also supported by the legislative history of Section 10153(a)(5)(D). Pls.' Mem. at 27–28. As Plaintiffs previously explained, this phrase first appeared in the application section of formula grants established by the Justice System Improvement Act of 1979 ("1979 Act"), which reauthorized and streamlined Byrne JAG's predecessor grant program then administered by the Law Enforcement Assistance Administration (LEAA) and was designed to reduce administrative burdens associated with LEAA grants. Pls.' Mem. at 28. The Senate Report on the 1979 Act listed "reduced redtape," greater flexibility for grantees, and greater control for localities as the Act's first three key intended reforms. S. Rep. 96-142, at 8. As Plaintiffs argued—and as Defendants have not disputed—DOJ's and Congress's understanding of which laws applied to LEAA funding at the time *only* included statutes governing federal grants and grant-making. Pls.' Mem. at 27–28 (citing various primary sources). Defendants have not offered any contrary view of the relevant legislative history or any argument why this history does not support Plaintiffs' construction.

The phrase "all other applicable Federal laws" thus necessarily refers to federal laws governing grants and grant-making. "[W]here 'Congress was … well aware of, and legislated on the basis of, … contemporaneous administrative practice,'" such as the definition of applicable laws used by DOJ and reported to Congress, Congress "'must be presumed to have intended to maintain that practice absent some clear indication to the contrary.'" *ACLU v. Clapper*, 785 F.3d 787, 819–20 (2d Cir. 2015) (quoting *Atkins v. Parker*, 472 U.S. 115, 140 (1985)); *see also Mid-Con Freight Sys., Inc. v. Mich. Pub. Serv. Commn.*, 545 U.S. 440, 449 (2005); *McDermott Int'l Inc. v. Wilander*, 498 U.S. 337, 342 (1991). There is no such "clear indication to the contrary" here, and Defendants' failure to offer any after ample time to do so is compelling evidence that Plaintiffs' view is correct. *Cf. Corley v. United States*, 556 U.S. 303, 320 (2009) ("In sum, the

legislative history strongly favors Corley's reading. The Government points to nothing in this history supporting its view.").

Last, Defendants' position is untenable when taken to its logical conclusion. Defendants argue that the phrase "all other applicable Federal laws" refers to "the corpus of federal laws that actually do apply, independently, to Byrne JAG grantees." Defs.' Mem. at 20. It would be difficult to catalog the vast number of laws that could meet this test. Among them are the Affordable Care Act, the Clean Water Act, the Clean Air Act, the Family and Medical Leave Act, and the Voting Rights Act.[18] Defendants' conclusion that they have discretion to decide which laws apply has no grounding in the statute's text, which says "all other applicable Federal laws," not *some* other applicable Federal laws. *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 266 (5th Cir. 2014) ("[W]e think Congress meant what it said. All means all.") (internal quotation marks omitted). "Where," as here, "an examination of the statute as a whole demonstrates that a party's interpretation would lead to absurd or futile results plainly at variance with the policy of the legislation as a whole, that interpretation should be rejected." *Yerdon v. Henry*, 91 F.3d 370, 376 (2d Cir. 1996) (internal quotation marks and citations omitted).

In sum, the phrase "all other applicable Federal laws" in 34 U.S.C. § 10153(a)(5)(D) refers to federal laws governing grants and grant-making. Since 8 U.S.C. § 1373 plainly is not such a law, the Court should conclude that 34 U.S.C. § 10153(a)(5)(D) does not authorize imposition of compliance with 8 U.S.C. § 1373 as a condition of receiving Byrne JAG funds.

### III.    The Immigration-Related Conditions Violate 34 U.S.C. § 10228(a)

---

[18] The Affordable Care Act has a variety of provisions that apply to States. *See, e.g.*, 42 U.S.C. § 18031(b) (creation of exchanges); *id.* § 300gg-22(a) (state enforcement of key provisions). So do the Clean Air Act, *see Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016), and Clean Water Act, *see Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992). The Family and Medical Leave Act applies to States too. *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003). The Voting Rights Act also governs States and their political subdivisions. *See, e.g.*, 52 U.S.C. § 10301.

Defendants' actions violate 34 U.S.C. § 10228(a), which prohibits executive branch officials from using law enforcement grants to exert "any direction, supervision, or control" over any state or local police force or criminal justice agency, and are therefore "not in accordance with law." *See* 5 U.S.C. § 706(2)(A). Defendants do not meaningfully dispute the fact that the immigration-related conditions violate Section 10228(a)'s prohibition on "direction, supervision, or control" in a number of ways, nor do they dispute Plaintiffs' interpretation of those terms.[19] For example, Defendants do not dispute that the access condition requires state and city officials to devote staff, resources, and real property to facilitate federal agents' access to aliens in correctional facilities. *See* Pls.' Mem. at 31-32.

Instead, Defendants argue that Section 10228(a) cannot apply to the Byrne JAG program because it is voluntary. This argument is belied by both the structure of the statute itself and its legislative history. Defendants also argue that the immigration-related conditions must be lawful because Plaintiffs are not challenging other conditions to the Byrne JAG program, which Defendants imply would equally violate Section 10228(a)'s prohibition on "direction, supervision, or control" as Plaintiffs interpret it. This argument is without support—legal or otherwise—in part because the unchallenged conditions are unrelated to and substantively different from the immigration-related conditions. *See supra* Part II(A). Additionally, Defendants contend that DOJ is willing to allow states to use their grant funds for a limited amount of their

---

[19] Defendants incorrectly assert that Plaintiffs rely on *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), to support this position. Defs.' Mem. at 21 n.10. In fact, Plaintiffs cited the Supreme Court's anticommandeering jurisprudence to illuminate the terms and principles used in Section 10228(a). Specifically, Plaintiffs noted that *Printz v. United States* suggests that at least two actions constitute impermissible "direction" or "control": requiring state or local law enforcement officers to assist in "the administration of a federally enacted regulatory scheme," and requiring those officers to receive information as part of their administrative responsibilities. 521 U.S. 898, 904 (1997). Defendants offer no alternative reading of the terms contained in Section 10228(a) or the statute's meaning or application.

expenditures in complying with the challenged conditions, but such an allowance is not relevant to DOJ's compliance with Section 10228(a).

Defendants' emphatic proclamation that "Byrne JAG is a *voluntary* program" does not absolve it of its mandatory statutory obligation under Section 10228(a), which Congress clearly intended to govern grant programs, which are by their nature voluntary. The language now comprising Section 10228(a), which prohibits executive branch officials from using law enforcement grants to exert "any direction, supervision, or control" over any state or local police force or criminal justice agency, was first enacted at the same time as the first law enforcement block grant program—and was intended to govern that program. *See* Pub. L. No. 90-351, § 518(a), 82 Stat. at 208. As first enacted, this language appeared as one of several administrative provisions governing grant programs in Title I of the 1968 Act. *Id.* § 101–406, 82 Stat. at 198–205. The current statutory scheme reflects this same basic structure. Byrne JAG, codified at 34 U.S.C. §§ 10151–58, is in Title I of the 1968 Act as amended. Pub. L. No. 109-162, § 1111(a), 119 Stat. 2960, 3094 (creation of Byrne JAG). Section 10228(a), in the same chapter of the U.S. Code as Byrne JAG, is an administrative provision also in Title I of the 1968 Act as amended. *See* 34 U.S.C. § 10228 (providing that "*[n]othing in this title* … shall be construed to authorize … the United States to exercise any direction, supervision, or control over state or local law enforcement" (emphasis added)).[20] The statutory text is plain that it applies to all federal executive activities governed by Title I of the 1968 Act as amended; it makes no distinction between federal grant-making activities and other activities. By its text, structure, and design, this

---

[20] On several occasions when enacting wholesale revisions to Title I grant programs, Congress has reenacted or renumbered this provision but left the language's substance intact. In 1979, Congress enacted a wholesale revision of these programs, numbering the provision as Section 815 of the 1968 Act. Pub. L. No. 96-157, § 2, 93 Stat. 1167, 1206. The provision was given its current number as Section 809 of the 1968 Act when Congress enacted another wholesale revision of Title I grant programs in 1984. *See* Justice Assistance Act of 1984, Pub. L. No. 98-473, 98 Stat. 2077, 2093 (redesignating section 815 of the 1968 Act as section 809).

provision has applied and continues to apply to the grant program at issue here.

Defendants ignore this statutory context altogether and instead focus on generic statements of statutory purpose that include the promotion of "coordination" and "cooperation" between federal and state governments. Defs.' Mem. at 18, 29, and 31. Plaintiffs' arguments are not to the contrary of these purposes. As the Seventh Circuit has explained, nothing in this case involves interference or noncooperation with federal immigration enforcement. *City of Chicago*, 888 F.3d at 282-83. Rather, it involves federal interference with state and local law enforcement—contrary to the purposes of the Byrne JAG program. Indeed, Congress designed Byrne JAG and its predecessors to provide federal assistance to state and local law enforcement efforts to meet local crime-fighting needs. *City of Chicago*, 888 F.3d at 285–86. One need only look at the Byrne JAG application process for confirmation that the ultimate purpose of the program is to address crime at the state and local level. *See supra* Part II(A). By contrast, Defendants offer no evidence that Congress' objective in enacting the Byrne JAG statute was to mandate that states and localities cooperate with the federal government to implement federal immigration policies and objectives.

The legislative history of Section 10228(a), which Defendants also ignore, confirms the statute's meaning. As Plaintiffs detailed, opponents of the initial 1968 legislation containing the predecessor to Byrne JAG worried about a situation exactly like this one: that the U.S. Attorney General would use law enforcement grants to coerce states and localities into adopting federal law enforcement priorities. Supporters of the legislation responded that Section 10228 would prohibit such control. In fact, the then-U.S. Attorney General testified that it would violate Section 10228(a) to withhold funds from local law enforcement agencies because state and local actors did not operate those agencies "the way the Attorney General says they must," and that

Section 10228(a) prevented DOJ from imposing extra-statutory conditions on law enforcement grants.[21] Essentially, Section 10228(a)'s purpose is to prohibit DOJ from "turn[ing] the local police into an arm of the federal government." *Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971). Defendants' imposition of the immigration-related conditions seeks to do just that and must be held unlawful and set aside.

Defendants next argue that the new immigration-related conditions do not violate Section 10228(a) because Plaintiffs "only challenge three" of the conditions on the Byrne JAG program. Defs.' Mem. at 22. As detailed in Section II(A), *supra*, the unchallenged conditions are of a different kind entirely than the new immigration-related conditions. Additionally, the lack of challenge to one condition cannot make another lawful, and Defendants cite no case or proposition supporting that illogical inference. Defendants also argue that their conduct does not violate Section 10228(a) because DOJ will provide limited reimbursement of the costs of compliance from grant funds. DOJ cannot pay its way out of statutory noncompliance, however, and cites no authority indicating that it can do so. The idea that "direction, supervision, and control" for which some costs are reimbursed (out of a jurisdiction's own grant funds) is not yet "direction, supervision, and control" is not based in law or fact. Neither is Defendants' imposition of the immigration-related conditions, which should be held unlawful and set aside.

## IV.     Defendants' Decision to Impose the Immigration-Related Conditions was Arbitrary and Capricious.

Defendants' imposition of the immigration-related conditions on Byrne JAG funds is arbitrary and capricious and must be set aside. *See* 5 U.S.C. § 706(2)(A). Defendants argue that

---

[21] *Controlling Crime Through More Effective Law Enforcement: Hearings Before the Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary*, 90th Cong. 100, 384, 497 (1967) (discussing Section 408 of the bill, which became Section 10228(a)).

the conditions are justified because they facilitate federal access to aliens who may have committed crimes and promote "inter-governmental coordination" in matters relating to criminal justice. *See* Defs. Mem. at 23-24. In support of their arguments, Defendants cite four documents in the administrative record: a 2007 report issued by the Office of the Inspector General ("OIG"); a 2016 report issued by the OIG; a one-page "Backgrounder"; and a press release. Defs. Mem. at 24-27.[22] In *Philadelphia*, the court parsed each of these documents and concluded that they did not provide adequate reasons for Defendants' decision to impose the conditions. *City of Philadelphia*, 309 F. Supp. 3d at 323-24; *City of Philadelphia*, 280 F. Supp. 3d at 620-25. In fact, the court found that portions of the Administrative Record "reinforce[d]" the conclusion that imposition of the conditions was arbitrary and capricious. *City of Philadelphia*, 309 F. Supp. 3d at 324-25. Defendants make no effort to distinguish the court's ruling in *Philadelphia*, offer no new arguments beyond what they presented to that court, and fail to explain, much less acknowledge, that the imposition of the immigration-related conditions represented a dramatic departure from prior practice. *See, e.g., Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (when an agency deviates from past practice, "it must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'") (quotation marks omitted).

First, neither of the OIG reports provides an adequate explanation for Defendants' decision to impose the Section 1373 conditions. The 2007 OIG report concerned an audit of the State Criminal Alien Assistance Program—an entirely separate program from Byrne JAG—and predated Defendants' decision to impose the immigration-related conditions by nine years. *See*

---

[22] Notably, the only documents in the administrative record that purport to justify the notice and access conditions are the Backgrounder and press release. Defendants also cite the Declaration of Francisco Madrigal to support the notice and access conditions, Defs.' Mem. at 28, but that document was not part of the administrative record and should not be considered by this Court. *See Citizens Against Casino Gambling in Erie Cnty. v. Chaudhuri*, 802 F.3d 267, 279 (2d Cir. 2015).

AR-00002. As justification for the Section 1373 conditions, Defendants cite the OIG's finding that "many state, county, and local law enforcement agencies are unwilling to initiate immigration enforcement but have policies that suggest they are willing to cooperate with ICE when they arrest individuals on state or local charges and learn that those individuals may be criminal aliens." Defs.' Mem. at 25 (citing AR-00040-41). But, as the *Philadelphia* court held, it makes no sense to "point to a report concluding that localities are *willing* to cooperate with ICE as the justification for attaching conditions to grants nine years later which *require* such cooperation." *City of Philadelphia*, 309 F. Supp. 3d at 324 (emphasis added).

Defendants also fail to note the limited scope of the OIG's report. As the *Philadelphia* court noted, the OIG only reviewed a sample of 100 criminal histories—out of more than 262,000 criminal history files—and concluded that it could not "statistically extrapolate the number of offenses committed by undocumented criminal aliens who were released from local custody without a referral to ICE." *City of Philadelphia*, 309 F. Supp. 3d at 324; AR-00030. The OIG also reported that it "could not determine if ICE was notified before the criminal aliens in our sample were released from custody." AR-30. Thus, as the *Philadelphia* court explained, the 2007 OIG report cannot support Defendants' decision to impose the immigration-related conditions for the simple reason that the OIG, and therefore Defendants, never "examine[d] the relevant data." *City of Philadelphia*, 309 F. Supp. 3d at 324 (alteration in original) (quoting *State Farm*, 463 U.S. at 43).

The 2016 OIG Report is similarly inadequate. Like the 2007 report, the OIG's 2016 report was limited in scope: it went only so far as to assess whether a sample of jurisdictions that received Byrne JAG awards were complying with Section 1373. AR-00367; *City of Philadelphia*, 280 F. Supp. 3d at 624. Although the report proposed, among other ideas, that DOJ "provide clear

guidance to grant recipients regarding whether Section 1373 is an 'applicable federal law' that recipients would be expected to comply with," it did not assess the wisdom of such a proposal or its effect on immigration policy or criminal justice. AR-00374; *City of Philadelphia*, 280 F. Supp. 3d at 624. Because it failed to weigh the benefits or drawbacks of imposing the Section 1373 conditions, it cannot justify imposition of the conditions. *City of Philadelphia*, 280 F. Supp. 3d at 624, referenced in *City of Philadelphia*, 309 F. Supp. 3d at 324.

Third, neither the Backgrounder nor the press release supports Defendants' decision to impose the immigration-related conditions.[23] As Plaintiffs previously noted, the Backgrounder is devoid of any analysis showing that the conditions would promote public safety. *See* Pls.' Mem. at 33; *see also City of Philadelphia*, 280 F. Supp. 3d at 621-23 (explaining that the Section 1373 condition lacks a rational connection to the goals described in the Backgrounder). The press release fares no better. As the *Philadelphia* court found, the press release makes a number of claims that lack "any support whatsoever." *City of Philadelphia*, 280 F. Supp. 3d at 623. This is not surprising in light of Defendants' admission that they conducted no studies, analyses or reports to determine how the conditions would affect Byrne JAG awardees or whether the conditions would further the purposes of the Byrne JAG program. *See* Defs.' 56.1 ¶ 58. This is a striking omission, given that the conditions represented a dramatic shift in policy and affected hundreds of millions of dollars in federal funds.[24]

Moreover, despite Defendants' insistence that the immigration-related conditions are

---

[23] Defendants cite, without discussion, a 2016 OJP memorandum stating that Section 1373 is an applicable federal law for the Byrne JAG program. Defs.' Mem. at 26. That memorandum did not require jurisdictions to sign separate certifications of compliance with Section 1373. *See* Trautman Decl., Ex B (States' case ECF Nos. 91-92).

[24] Apparently recognizing that the administrative record is insufficient, Defendants now rely on unsupported, post-hoc explanations, Defs.' Mem. at 23-24, 28, which "serve only to underscore the absence of an adequate explanation in the administrative record itself." *Humane Soc'y v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010).

"common-sense measures," Defs.' Mem. at 26, there is a glaring disconnect between Defendants' stated reasons for imposing the conditions and the actual effects of those conditions—which the administrative record does nothing to resolve. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary where there is no "rational connection between the facts found and the choice made") (quotation marks omitted). For example, the Backgrounder claims to need information about "illegal aliens who commit crimes," AR-00993; Defs.' Mem. at 26, but Section 1373 relates to *any* individual's citizenship and immigration status, *see City of Philadelphia*, 280 F. Supp. 3d at 622; *see also id.* at 621-24 (describing the lack of rational connection between Defendants' goals and the immigration-related conditions). The administrative record lacks any indication that Defendants even considered the mismatch between their stated goals and their chosen means for achieving them.

**V.    Section 1373 Is Unconstitutional under the Tenth Amendment.**

   **A. The Second Circuit's decision in *City of New York v. United States* does not bind this Court's decision in the current action.**

Defendants contend that the Second Circuit's decision in *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), requires this Court to reject Plaintiffs' Tenth Amendment challenge to 8 U.S.C. § 1373 because *City of New York* involved "many of the same arguments" Plaintiffs advance here. Defs.' Mem. at 34. This argument fails because the Supreme Court's recent decision in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), thoroughly undermined the Second Circuit's reasoning, abrogating *City of New York*. In addition, *City of New York* does not bind this Court's review of the City's current laws and policies, none of which were before the Second Circuit in 1999.

In *City of New York,* the City sought a declaration that Section 1373 was facially unconstitutional under the Tenth Amendment and therefore did not invalidate Executive Order

124, a since-repealed, mayoral executive order that prohibited City officials from transmitting information regarding immigration status to federal immigration authorities.[25] 179 F.3d at 31-33. The Second Circuit held Section 1373 facially constitutional because, although it "interfer[ed]" with the City's policies, it only served to "prohibit state and local governmental entities or officials … from directly restricting the voluntary exchange of immigration information with the INS" and did not "affirmatively conscript[] states, localities, or their employees into the federal government's service." *Id.* at 35-36. The Second Circuit's holding was based on a perceived distinction between unlawful "federal measures that seek to impress state and local governments into the administration of federal programs" and what the court viewed as "valid federal measures that prohibit states from compelling passive resistance to particular federal programs." *Id.* at 35.

However, the Supreme Court has since roundly rejected this distinction as "empty." *Murphy*, 138 S. Ct. at 1478. In *Murphy*, the Supreme Court applied Tenth Amendment anti-commandeering principles equally to all federal government efforts to commandeer state and local governments, whether through affirmative obligations or passive prohibitions. *Id.* at 1478-79. In eviscerating the key legal distinction underpinning the Second Circuit's reasoning in *City of New York*, *Murphy* abrogated the Second Circuit's holding rejecting the Tenth Amendment facial challenge to Section 1373. Accordingly, *City of New York* is not binding on this Court. *See Austin v. United States*, 280 F. Supp. 3d 567, 572 (S.D.N.Y. 2017) (district court should follow Supreme Court precedent over Second Circuit precedent when "a subsequent decision of the Supreme Court

---

[25] *City of New York* challenged Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which now appears at 8 U.S.C. § 1373, and 8 U.S.C. § 1644, a statute virtually identical to Section 1373(a), which was enacted a few weeks earlier as Section 434 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. *See* 179 F.3d at 30.

so undermines [Second Circuit] precedent that it will almost inevitably be overruled." (alteration in original) (internal quotations omitted)).

Indeed, two other federal district courts, unaccountably ignored by Defendants, have already recognized that *Murphy* undercuts the Second Circuit's "central" rationale for upholding Section 1373 and in fact requires the facial invalidation of the statute. *City of Chicago*, 2018 WL 3608564, at *11 ("[T]he Court believes that *Murphy*'s holding deprives *City of New York* of its central support and thus provides the Attorney General little counterweight to Chicago's argument against [Section 1373's] constitutionality."); *see also City of Philadelphia*, 309 F. Supp. 3d at 329 (rejecting Defendants' argument that "*Murphy* has no bearing on this case" and finding Section 1373 unconstitutional under the Tenth Amendment).

Additionally, *City of New York* is not binding as applied to the City's current laws and policies, including the City's General Confidentiality Policy and Identifying Information Laws, all of which were enacted well after *City of New York*. The Second Circuit's inquiry in *City of New York* explicitly limited its holding to Executive Order 124, explaining that "[t]he City's facial challenge … rests entirely on the interference of [Section 1373] with that Executive Order and that Order alone." 179 F.3d at 36. Critically, Executive Order 124 was solely directed at federal immigration officials and "not a general policy that limits the disclosure of confidential information to only specific persons or agencies or prohibits such dissemination generally." *Id.* The Second Circuit specifically declined to rule on whether Section 1373 "would survive a constitutional challenge in the context of generalized confidentiality policies that are necessary to the performance of legitimate municipal functions and that include federal immigration status." *Id.* at 37. The court went a step further, stating it might have viewed the effect of Section 1373 on Executive Order 124 differently had the City shown that "the information covered by the Executive

Order might in fact be subject to other confidentiality provisions that would prevent its dissemination generally." *Id*. Executive Order 124 has since been repealed and the City laws and policies at issue in the present litigation are exactly the sort of "generalized" confidentiality laws and policies barring disclosure to third parties, including but not limited to federal immigration authorities, that the Second Circuit suggested could result in the unconstitutional application of Section 1373. Pls.' 56.1 ¶¶ 142-58.

In view of *Murphy*'s evisceration of the key legal distinction drawn by the Second Circuit in *City of New York* and critical changes in City laws and policies since 1999, *City of New York* does not control the result in this case.

### B. Section 1373 is unconstitutional under the Tenth Amendment and *Murphy v. NCAA*.

Disregarding the various federal courts that have reached the opposite conclusion, Defendants argue without qualification that the "Tenth Amendment generally, and the *Murphy* decision specifically, are wholly inapposite" in this case. Defs.' Mem. at 36-37. To the contrary, every federal court to consider the issue in the wake of *Murphy* has either held outright that Section 1373 violates the Tenth Amendment on its face, *City of Chicago*, 2018 WL 3608564, at *7-11; *City of Philadelphia*, 309 F. Supp. 3d at 329-31, or expressed concerns about Section 1373's constitutionality, Order Granting Preliminary Injunction at 9, *City of Evanston v. Sessions*, No. 18-cv-4853 (N.D. Ill. Aug. 9, 2018), ECF No. 23 (Trasande/Holt Supp. Decl. Ex. 47); *United States v. California*, 314 F. Supp. 3d 1077, 1100-01 (E.D. Cal. 2018), *appeal docketed*, No. 18-16496 (9th Cir. Aug. 9, 2018). Defendants inexplicably fail to address this consistent authority.

Defendants also do not explain how Section 1373's significant intrusion into Plaintiffs' sovereignty does not run afoul of the Tenth Amendment. *See* Pls.' Mem. at 38-41. Rather, Defendants assert that Plaintiffs "are challenging conditions on a *voluntary federal grant*," Defs.'

Mem. at 37 (emphasis in original), without acknowledging that Plaintiffs also separately challenge Section 1373 as an unconstitutional conscription of state and local power, independent of the Byrne JAG grant. *See City of Chicago*, 2018 WL 3608564, at *6.

Defendants' efforts to distinguish *Murphy* are similarly unavailing. First, Defendants argue that *Murphy* is inapposite because Section 1373 implicates federal immigration enforcement, a federal matter over which Congress has plenary power, while *Murphy* involved a challenge to the Professional and Amateur Sports Protection Act of 1992 ("PAPSA"), a sports gambling statute that implicates state and local police powers. Defs.' Mem. at 37-41. But this argument misses the mark. The federal government's immigration powers do not permit it to "impose its will on the States," Defs.' Mem. at 39 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)), in contravention of the Tenth Amendment. To the contrary, the Supreme Court has made clear that the existence of a federal interest cannot overcome a violation of state sovereignty where, as here, "it is the whole *object* of the law to direct the functioning" of the state or locality and "hence to compromise the structural framework of dual sovereignty." *Printz v. United States*, 521 U.S. 898, 932 (1997). Because Section 1373 impermissibly compromises Plaintiff's sovereignty, "no comparative assessment" of the various federal, state and local interests at play can "overcome that fundamental defect." *Id.*

Further, contrary to Defendants' argument, Section 1373 impermissibly interferes with the ability of Plaintiffs to "perform many of the vital functions of modern government," *NFIB v. Sebelius*, 567 U.S. 519, 535 (2012), in the same way that the gambling regulation did in *Murphy*. For instance, as interpreted by Defendants, Section 1373 would interfere with Plaintiffs' ability to promote public safety and protect public health. *E.g.*, Pls.' 56.1 ¶¶ 177-79, 183-84, 187-88, 194. Plaintiffs' residents, particularly those in immigrant communities, may retreat into the shadows if

they believe that state and local law enforcement has a policy or practice of generally sharing identifying information about them or their family members with ICE or other federal immigration authorities. Pls.' 56.1 ¶ 184; *see also* Pls.' Mem. at 39-40.

Second, Defendants argue that Section 1373, unlike the statute at issue in *Murphy*, is not subject to an anti-commandeering challenge because it regulates only individuals, not state and local governments, and thus cannot violate the Tenth Amendment.[26] Defs.' Mem. at 38-39. Nothing could be further from the truth. "On their face, [Sections 1373 (a) and (b)] regulate state and local governmental entities and officials," *City of Philadelphia*, 309 F. Supp. 3d at 329, and supplant local policymaking, *City of Chicago*, 2018 WL 3608564, at *10, which are fatal to their constitutionality under the Tenth Amendment.

This defeats Defendants' assertion that Section 1373 lawfully preempts state and local laws, because every form of preemption is based on federal law that regulates the conduct of private actors, not states or localities. For a statute to preempt state law, it must not only (1) "'represent the exercise of a power conferred on Congress by the Constitution,'" but also (2) "'be best read as [a provision] that regulates private actors,' rather than governmental entities or officials." *City of Philadelphia*, 309 F. Supp. 3d at 329 (alteration in original) (quoting *Murphy*, 138 S. Ct. at 1479). The authorities relied on by Defendants—the Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705, and *Arizona v. United States*, 567 U.S. 387 (2012), both cited in *Murphy*—are thus readily distinguishable from Section 1373 because they involve straightforward applications of preemption doctrine. As the *Murphy* Court noted, although the

---

[26] If this argument were correct, which it is not, it would defeat the Defendants' assertion that Section 1373 is an applicable law because, according to Defendants, applicable laws are those laws that "apply to Byrne JAG grantees" all of which are "state and local jurisdictions rather than private individuals or entities." Defs.' Mem. at 20. Defendants cannot have it both ways.

"language [of the Airline Deregulation Act] might appear to operate directly on the States, … it is clear that this provision operates just like any other federal law with preemptive effect. It confers on *private entities* (*i.e.*, covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 138 S. Ct. at 1480 (emphasis added). In *Arizona*, the Supreme Court invalidated local laws imposing greater "alien" registration and work authorization requirements than those allowed by federal law, because federal law "occupie[s] the field of alien registration." 567 U.S. at 401. The Airline Deregulation Act and the statute in *Arizona* apply primarily to private actors, with an incidental impact on states and localities. By contrast, the plain language of Section 1373 makes clear that it is intended to regulate states and localities and can in no way be read as doing so to protect private actors' federal rights. 8 U.S.C. § 1373(a) ("[A] Federal, State or local government entity or official may not prohibit, or in any way restrict any government entity or official. . ."). As such, the Tenth Amendment rather than preemption is the appropriate legal framework for evaluating the constitutionality of Section 1373.

Third, Defendants incorrectly contend that statutes concerning "access to information" cannot implicate the anti-commandeering doctrine. Defs.' Mem. at 39-42. Citing only case law predating *Murphy*, Defendants assert that "[m]erely protecting the transmission of information to federal authorities does not 'compel the State[] to enact or administer a federal regulatory program.'" Defs.' Mem. at 39 (alteration in original) (quoting *NFIB*, 567 U.S. at 575).[27] But under Defendants' expansive interpretation of the statute, Section 1373 in fact requires state and local government entities to participate in federal immigration enforcement by prohibiting them from

---

[27] Defendants rely on the pre-*Murphy* decision *State ex rel. Becerra*, 284 F. Supp. 3d 1015. But courts that have considered the constitutionality of Section 1373 following *Murphy* have deemed the statute "highly suspect." *See, e.g.*, *California*, 314 F. Supp. 3d at 1101. Defendants also cite *City of New York*, 179 F.3d at 34-35, which, as described *supra* at Section V(A), was abrogated by *Murphy*.

taking "any" steps to restrict their employees from sharing information with the federal government. Pls.' 56.1 ¶¶ 59-62. *Murphy* makes clear that the anti-commandeering principle bars precisely this type of legislation. 138 S. Ct. at 1478-79. Defendants' interpretation would inevitably lead some state and local officials to spend time responding to ICE inquiries, while disallowing Plaintiffs from having any policy or protocol that regulates those employees' activities. In other words, Section 1373 would result in some individual state and local officers dedicating their official time to federal immigration enforcement rather than state or local tasks, in effect allowing ICE to commandeer those state and local officers in furtherance of a federal program. *Printz* prohibits the federal government from siphoning off state and local resources to "administer a federal regulatory program" in such a manner. 521 U.S. at 926-28 (quoting *New York v. United States*, 505 U.S. 144, 188 (1992)).

Furthermore, Defendants completely misconstrue the pre-*Murphy* case law, which does not support their assertion that anti-commandeering principles do not apply to information sharing. Defs.' Mem. at 40 (citing *Reno v. Condon,* 528 U.S. 141, 151 (2000); *Printz*, 521 U.S. at 918, 936; *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002)). Contrary to Defendants' contention, the *Reno* court did not hold that information sharing in aid of a federal statutory scheme is wholesale constitutional; rather, the Court upheld a statute that required information sharing because the particular statute did "not require the States in their sovereign capacity to regulate their own citizens" and applied equally to state and private actors. 528 U.S. at 151. In *Freilich*, the Fourth Circuit upheld a federal law requiring the sharing of information regarding physician peer review proceedings because the law explicitly provided that it should not "be construed as … preempting or overriding any State law" and required nothing more than the State itself had "already required, authorized, or provided by its own legislative command," and thus did not direct

the State's legislative actions. 313 F.3d at 214. *Printz* actually supports Plaintiffs' position because, there, the Court held that a federal law directing state law enforcement to conduct background checks using "information that belongs to the State and is available to [the States' chief law enforcement officers] only in their official capacity" violated the Tenth Amendment. 521 U.S. at 932 n.17. There is no exception to the Tenth Amendment for federal statutes concerning information sharing.[28]

Finally, Defendants assert that Section 1373 "does not present any legitimate concern regarding a deflection of political responsibility" because Section 1373 "merely secures information needed to carry out the federal removal scheme." Defs.' Mem. at 41. But Defendants are demanding that Plaintiffs permit the unfettered disclosure of sensitive, personal information that state and local law officials obtain and possess solely through their work for state or local government. In many instances, Plaintiffs' elected representatives have determined, in their considered judgment, that disclosure of such information would undermine community trust and harm Plaintiffs' interest in promoting public health and safety. *See* N.Y.C. Exec. Order No. 41 ("[T]he obtaining of pertinent information, which is essential to the performance of a wide variety of governmental functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved, and preserving confidentiality in turn requires that governments regulate the use of such information by their employees."); *see also, e.g.*, Torrance Decl. ¶¶ 6-10 (WA); Diaz Decl. ¶¶ 4-6 (WA); Kelly Decl. (Albany, NY); Wang Decl. (NJ); Negron Decl., Cho Decl., Royster Decl., and Bassett Decl. If state and local officials cannot restrict their employees

---

[28] Defendants note that states and localities may be compelled to share information "relevant to federal regulation of individuals" pursuant to judicial subpoenas, grand jury subpoenas and administrative agency subpoenas. Defs.' Mem. at 49. It should come as no surprise that federal subpoena power does not constitute commandeering, given that, unlike Section 1373, it applies to both States and private actors alike, and does not regulate the way in which States govern their citizens.

from disclosing confidential information such as immigration status and citizenship with Defendants, it is likely that residents will see state and local officials as arms of federal immigration enforcement, thereby undermining the efforts to build community trust. (Pls.' 56.1 ¶¶ 120-26, 141, 177, 183, 188-89.)

### C.  Section 1373 is unconstitutional as applied to New York City's laws and policies.

Defendants argue that Section 1373 is constitutional as applied to the City's laws and policies, but utterly fail to engage with the City's laws and policies themselves. Instead, Defendants reprise the same flawed arguments they made in support of the facial validity of Section 1373, Defs.' Mem. at 47, all of which are way off the mark. *See supra* Sections V(B).

As Plaintiffs argued in their opening brief, not only does Section 1373 violate the Tenth Amendment on its face, it is unconstitutional as applied to the City's laws and policies. Pls.' Mem. at 38-41. Since 2003, New York City has had in place generalized confidentiality laws and policies, necessary to the performance of legitimate municipal functions, that prescribe how City employees should interact with the public. As interpreted by Defendants, Section 1373 impermissibly strips the City of the authority to control its workforce by preventing the City from adopting policies or rules that promote uniform handling of individuals' personal information with immigration authorities, interferes with the City's police power, and intrudes upon the City's direct relationship with its residents by interposing the federal government between them.[29] As such, Section 1373 impermissibly and unlawfully interferes with New York City's laws and policies, rendering the

---

[29] In its response to Plaintiffs' 56.1, Defendants assert without explanation that portions of the City's declarations should not be considered because they incorporate hearsay. *See, e.g.*, Defs.' Responses to Pls.' 56.1 ¶¶ 194-96. But these declarations are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Moreover, Federal Rule of Civil Procedure 56(c)(2) requires only that evidence in support of summary judgment be capable of presentation in admissible form at the time of trial; it does not require that the materials be presented in an admissible form on summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (on summary judgment, party need not produce evidence in a form that would be admissible at trial).

statute unconstitutional as applied.

## VI.     The Immigration-Related Conditions Violate the Spending Clause.

Defendants argue the immigration-related conditions do not violate the Spending Clause because they are sufficiently related to the "criminal justice" purpose of the Byrne JAG Program, Defs.' Mem. at 29, and are unambiguous, *id*. at 32-33. Neither of these assertions is true. The notice, access, and Section 1373 conditions are not at all related to the purposes of the Byrne JAG grant program and are so ambiguous that they do not give grant applicants fair notice of their terms.

### A. The immigration-related conditions are neither reasonably related to, nor sufficiently tailored to address, the particular purpose of the JAG Program.

The Spending Clause requires conditions on federal funding to be related to the specific federal interest in the project or program to which they are attached. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987). As two federal courts have concluded, the imposition of immigration-related conditions on law enforcement grants offends the Spending Clause because such conditions are not sufficiently related to the grant's purpose of enhancing local law enforcement efforts. *City of Philadelphia*, 309 F. Supp. 3d at 325; *Los Angeles,* 293 F. Supp. 3d at 1099.

In *Philadelphia*, the court granted plaintiffs summary judgment on their Spending Clause claim. 309 F. Supp. 3d at 325 (adopting the reasoning in *City of Philadelphia*, 280 F. Supp. 3d at 625). The court noted that the challenged conditions pertain to federal civil immigration whereas the Byrne JAG program pertains to local criminal justice enforcement. *City of Philadelphia,* 280 F. Supp. 3d at 625. While the court recognized that there are many areas of intersection between the two, "[t]he important question is whether the conditions at issue relate to the federal interest in the particular program they are attached to." *Id.* at 642. The court found that they did not—the purpose of the Byrne JAG statute is to enhance *local* criminal justice efforts by providing "fiscal assistance to states and localities for any of a wide variety of permissible purposes … not the

Attorney General's interest in public safety or immigration enforcement, which is not mentioned in the statute." *Id.* at 643; *see also City of Los Angeles*, 293 F. Supp. 3d at 1099 (finding the immigration enforcement conditions attached to the COPS grant are not "reasonably related" to the program's articulated *local* goals). Here, not only are the challenged conditions unrelated to the Byrne JAG program's goal of promoting flexible, locally driven policing and crime reduction policies, they undermine them.

Congress enacted the Byrne JAG statute "to give State and local governments more flexibility to spend [federal] money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). That purpose is reflected in the program's structure: rather than impose substantive conditions on localities, the statute affords recipients flexibility to use program funds for any of eight broadly defined purposes. *See* 34 U.S.C. § 10152(a)(1). The immigration-related conditions Defendants now seek to impose are not only unrelated to the program's goal of supporting policing and crime-reduction policies that are tailored to local needs and are proven effective for the local community, they do violence to it. The very policies Defendants seek to restrict through the immigration-related conditions help New York City combat crime and keep residents safe. Pls.' 56.1 ¶¶ 180-89.

Defendants do not contest that the conditions are unrelated (and, in fact antithetical) to the purpose of providing local governments with flexibility to spend Byrne JAG funds. Rather, they argue that the relevant federal interest is a substantially broader one: to "provide resources for 'criminal justice.'" Defs.' Mem. at 29. This argument misses the mark because the inquiry into "relatedness" must focus on the federal interest in the "*particular* national projects or programs" to which the conditions are attached. *Dole*, 483 U.S. at 207 (emphasis added). Contrary to Defendants' assertions, the Byrne JAG's particular purpose is to support locally-driven projects

and policies, and it is this interest that is the relevant benchmark. *See City of Philadelphia*, 280 F. Supp. 3d at 642, 643 (purpose of Byrne JAG is to "enhance[] local criminal justice" and to provide money for municipalities to use "as they see fit").

Moreover, even if Defendants' position were correct, which it is not, the immigration-related Byrne JAG conditions would not satisfy the relatedness requirement because federal immigration law and immigration status "ha[ve] nothing to do with the enforcement of local criminal laws." *Id.* at 642. Immigration enforcement is fundamentally an area of civil—not criminal—law and is a function of federal—not state or local—government. *See Arizona v. United States*, 567 U.S. 387, 396 (2012). In any event, the scope of the immigration-related conditions extends well beyond "criminals" to reach anyone who state or local law enforcement has information about, even if not convicted of a crime.

Because conditions related to the enforcement of federal, civil immigration law are unrelated to the goals and purposes of Byrne JAG grant, they cannot be sustained under the Spending Clause.[30]

### B.  The immigration-related conditions are unconstitutionally ambiguous.

The immigration-related conditions also violate the Spending Clause because their ambiguity contravenes that Clause's requirement that Congress condition the states' receipt of federal funds "'unambiguously…, enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Far from refuting the vagueness of the immigration-related conditions, Defendants make the conclusory

---

[30] Indeed, Section 1373 has nothing to do with criminal justice whatsoever. It is a stand-alone statute that does not so much as mention law enforcement or federal funding. Section 1373 is not in the least related to the purposes of the Byrne JAG grant.

assertion that the challenged immigration conditions clearly state what conduct is required of Plaintiffs and, if any questions remain, "the FY 2017 Byrne JAG solicitation invited any prospective grantee with a question about any requirement of the solicitation to contact OJP's Response Center (customer service center)." Defs.' Mem. at 32-33. But the availability of a customer service center is not sufficient to cure the ambiguity—the Spending Clause requires the statute provide "clear notice" of attached conditions. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The immigration-related conditions do not give applicants constitutionally adequate notice of the terms to which they are agreeing.

The ambiguity of the immigration-related conditions is demonstrated by the Defendants' own changing interpretations of Section 1373 and its attendant compliance obligations. For example, Defendants have stated at various times both that the Section 1373 condition imposes no affirmative obligations, and that it does.[31] Defendants' interpretation of the phrase "information regarding citizenship or immigration status" in Section 1373 is likewise a moving target.[32] Given Defendants' refusal to commit to a single interpretation of Section 1373, a City official is unable to "clearly understand" what qualifies as information regarding immigration status, let alone

---

[31] Tr. of Proceedings – Prelim. Inj. Hr.'g at 59, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017), ECF No. 76 ("[T]he current administration very much believes in the 10th Amendment and separation of powers, and so affirmative obligations to actually go and employ the regulatory system would be one thing, but 1373 doesn't require that at all."), *with* Mem. of Law in Support of Def.'s Mot. to Dismiss at 14, *City of Chicago v. Sessions*, No. 17-c-5720, 2018 WL 3608564 (N.D. Ill. July 27, 2018), ECF No. 139 (explaining that compliance requires the affirmative act of informing local personnel "that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials").

[32] *Compare* Ex. A to Decl. of Ari Holtzblatt in Support of Pl. City of Chicago's Mot. for Prelim. Inj. at 1, *City of Chicago v. Sessions*, 264 F. Supp. 3d 333 (N.D. Ill. 2017), ECF No. 103-1 (reflecting Defendant's position, as of October 11, 2017, that information regarding "a person's custody status or release date" constitutes "information regarding immigration status"), *with* Mem. of Law in Support of Def.'s Mot. to Dismiss at 19-20, *City of Chicago v. Sessions*, No. 17-c-5720, 2018 WL 3608564 (N.D. Ill. July 27, 2018), ECF No. 139 (expanding their original position to say that "information regarding immigration status" also includes information "regarding the presence, whereabouts, and activities of illegal aliens" and any "information that assists the federal government in carrying out its statutory responsibilities").

whether the Section 1373 condition imposes any affirmative obligations with respect to that information. *See Arlington*, 548 U.S. at 296.

Defendants have been similarly capricious with respect to the meaning and requirements of the notice and access conditions, thereby precluding grantees from receiving the requisite notice of the "consequences of their participation." *Pennhurst*, 451 U.S. at 17. In their brief, Defendants refer to the "award documents" to show that the notice and access conditions are unambiguous; however, Defendants themselves have admitted that the notice and access conditions as articulated in the grant solicitation will not be imposed, but that different versions of those conditions will apply. Defendants acknowledge that "the notification [of the applicability of the notice and access conditions] contained in the FY 2017 solicitation is not itself a grant condition, akin to those contained in the grant award documents; rather, it is merely a notification designed to 'help an applicant make an informed decision about whether to submit an application'" pursuant to 2 C.F.R. § 200.203. *See* Def.'s Opp. to Pl.'s Mot. for Prelim. Inj. at 9, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017), ECF No. 32. In other words, the precise text of the condition is only included in the grant award documents specific to each state and locality, and is presumably subject to change. By only including the specific language of the condition in the award documents, and not in the solicitation, Defendants appear to concede that applicants are not provided clear notice of the conditions until after they go through the application process and receive an award.

These discrepancies and lack of consistency go beyond any "marginal uncertainty regarding the outer boundaries of the conditions," and are clearly distinguishable from the cases on which Defendants rely. Defs.' Mem. at 33. In each of those cases, the asserted ambiguity was

based on alleged uncertainty as to how a grant condition would be applied,[33] whereas here fundamental questions remain as to what the conditions mean.

For the foregoing reasons, the immigration-related conditions violate the Spending Clause.[34]

## VII.   Plaintiffs Are Entitled to Declaratory Relief.

### A.  The City's request for a ruling regarding compliance with Section 1373 is justiciable and ripe for review.[35]

Defendants further contend that the City's claim for declaratory relief regarding its compliance with Section 1373 should be denied because it is non-justiciable. The crux of Defendants' argument is that the City's claim is not ripe for adjudication because it "rests upon contingent future events" inasmuch as Defendants have not issued a final administrative determination on "th[e] subject" of whether "some of the City's ordinances may violate Section 1373." Defs.' Mem. at 45-46 (citing *Texas v. United States*, 523 U.S. 296, 300 (1998)). Defendants made the same argument in the *Philadelphia* case and it was rejected. There, under very similar facts, the court found that Philadelphia's declaratory judgment claim was ripe even though

---

[33] At issue in both cases cited by Defendants were conditions imposed by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which "forbids the states from imposing substantial burdens on religious exercise absent a compelling government interest accomplished by the *least restrictive means necessary* to serve that interest." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) (emphasis added); *see also Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003). In both cases, the courts rejected arguments that the "least restrictive means" standard was ambiguous, finding that "Congress permissibly conditioned the receipt of federal money in such a way that each State is made aware of the condition and simultaneously given the freedom to tailor compliance according to its particular penological interests and circumstances." *Benning*, 391 F.3d at 1307 (quoting *Charles*, 348 F.3d at 608). "RLUIPA gives states wide latitude in applying its provisions, but this flexibility does not make the conditions of RLUIPA opaque." *Id.* at 1306.

[34] The Court need not address Defendants' Spending Clause argument if it grants Plaintiffs the summary relief requested in their motion.

[35] Defendants argue that the City's claim is non-justiciable in Section V(D)(i) of their brief, which purportedly addresses the Tenth Amendment as-applied argument. Defs.' Mem. at 45-47. However, as Defendants acknowledge, their justiciability argument addresses City Plaintiff's Eleventh Cause of Action—the request for declaratory judgment that the City is in compliance with Section 1373. *Id.* at 45. As such, the City addresses Defendants' argument in the Declaratory Judgment section of our briefing.

Defendants were still in the process of assessing whether Philadelphia complied with Section 1373. *See City of Philadelphia*, 309 F. Supp. 3d at 342. This court should follow the reasoning of the *Philadelphia* court and reject Defendants' contention.

While Defendants make no mention of the *Philadelphia* case, the primary case they cite in support of their ripeness argument, *Texas v. United States,* is inapposite. 523 U.S. at 297. In *Texas*, the State sought a declaratory judgment that the Voting Rights Act of 1965 did not apply to sections of the Texas Education Code that permitted the Texas Commissioner of Education to appoint a master to oversee a school district if that district failed to meet state-mandated achievement levels and less intrusive sanctions had proved unsuccessful. *Id.* at 297-300. Finding that there was no evidence that the appointment of a master was "currently foreseen or even likely," and that the State had "no idea whether or when" the Voting Rights Act would be enforced, the Court determined that the claim was unripe for adjudication because a potential enforcement action under the Voting Rights Act by the federal government was uncertain. *Id.* at 300 (citation and internal quotation marks omitted). Also relevant to the ripeness analysis, the Court found that the regulation did not have a day-to-day effect on the plaintiff because "Texas is not required to engage in, or to refrain from, any conduct, unless and until it chooses to implement one of the noncleared remedies." *Id.* at 301.

Here, unlike in *Texas*, Defendants have already attached Section 1373 as a condition of Byrne JAG grant funding and in a letter dated October 11, 2017 indicated their preliminary assessment that the City appears to have laws, policies, or practices that violate Section 1373. Pls.' 56.1 ¶ 45. The City timely applied for the funding to which it is entitled under the Byrne JAG formula and, despite the passage of several months beyond the normal timeframe for awarding a grant, Defendants have stalled in awarding the City its grant even as they awarded over $200

million in grants to other municipalities and states in July. Pls.' 56.1 ¶ 44; Pls.' Mem. at 12; *see also City of Philadelphia*, 309 F. Supp. 3d at 343 ("Typically, the JAG awards are received by September or August of the relevant grant year."). Defendants have no legitimate basis for refusing to provide the Byrne JAG grant to the City and, as the *Philadelphia* court found, Defendants' failure to act under such circumstances is sufficient to meet the ripeness test. It is both foreseeable and likely that, absent a declaration, Defendants will force the City to either forfeit this critical public safety funding, which it has received and relied on for at least thirteen years, or agree to unlawful and unconstitutional conditions that would require the City to change its local laws and policies. The harm to the City of this Hobson's choice is indisputable. *See City of Chicago*, 264 F. Supp. 3d at 950, *aff'd*, 888 F.3d at 272 ("[F]orcing the City either to decline the grant funds based on what it believes to be unconstitutional conditions or accept them and face an irreparable harm, is the type of 'Hobson's choice' that supports irreparable harm."); *City of Philadelphia*, 309 F. Supp. 3d at 340-41 (same).

### B. Defendants' attempts to dismiss New York City's declaratory judgment claim should be denied.

Defendants argue that, since the City "flatly refuses to comply with Section 1373," this Court must dismiss the City's request for a declaratory judgment that its laws and policies operate within the constitutional bounds of Section 1373 if this Court finds Section 1373 facially constitutional. Defs.' Mem. at 50-51. This argument is erroneous. The City challenges Section 1373 as applied to City laws and policies as well as on its face and, contrary to Defendants' arguments, the City complies with the narrow interpretation of Section 1373 that Defendants espoused for decades. DOJ's Office of Legal Counsel has opined that a narrow construction of Section 1373 is appropriate, noting that Congress's focus in enacting Section 1373 appeared to be ensuring that ICE "would not be placed at a comparative disadvantage," rather than "privileging"

the agency. Memorandum from Dep't of Justice to General Counsel, Dep't of Commerce, Relationship Between Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and Statutory Requirement for Confidentiality of Census Information, at 12-13 (May 18, 1999) (citing H.R. Rep. No. 104-469, pt. 1, at 277 (1996)), https://www.justice.gov/opinion/file/844106/download (Trasande/Holt Decl., Ex. 50); *see also* Soler Decl., Ex. A at 4. The Second Circuit likewise found that a general confidentiality policy that is necessary to perform the functions of local government may well comply with Section 1373. *City of New York*, 179 F.3d at 37. The City's General Confidentiality Policy and Identifying Information Laws fall squarely within the zone identified by Defendants and the Second Circuit; the City's laws and policies are legitimate general confidentiality laws and policies that apply to all disclosures of protected information, regardless of to whom.

Moreover, the City's laws and policies authorize local officials to communicate with federal authorities about citizenship or immigration status in situations that the City determines legitimately implicate public safety, such as exigent circumstances or where an individual has been convicted of a violent or serious crime or is identified as a possible match in a terrorist screening database. Pls.' 56.1 ¶¶ 151-56. There is no basis for Defendants' claim that the City is not at all willing to comply with Section 1373 and Defendants have not established grounds for dismissing the City's claim for a declaratory judgment that it complies with Section 1373.

### C.  Section 1373 does not encompass contact information and release status.

Defendants argue, as they have unsuccessfully in other cases, that Section 1373 prohibits states and localities from restricting disclosure of broad categories of information, including the

contact information and release status of aliens.[36] Defs.' Mem. at 42. But as three district courts have held, Section 1373 does not say what Defendants want it to say. *California*, 314 F. Supp. 3d at 1101-02; *see also City of Philadelphia*, 309 F. Supp. 3d at 332-33; *Steinle v. City & Cnty. of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).

Section 1373 prohibits state and local government restrictions on the sharing of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" and of "information regarding the immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a), (b). The plain language of the statute covers only two types of information: "immigration status" and "citizenship." In other words, information related to the "individual's category of presence in the United States—e.g., undocumented, refugee, lawful permanent resident, U.S. citizen, etc.—and whether or not an individual is a U.S. citizen, and if not, of what country." *City of Philadelphia*, 309 F. Supp. 3d at 333. The statute does not address alien contact information or release status.

Courts have uniformly held that Section 1373 is properly interpreted to encompass only immigration status and citizenship information. In *California*, the court held that it "agrees with its fellow district courts that the plain meaning of Section 1373 limits its reach to information strictly pertaining to immigration status (i.e. what one's immigration status is) and does not include information like release dates and addresses." *California*, 314 F. Supp. 3d at 1102; *see also City of Philadelphia*, 309 F. Supp. 3d at 333; *Steinle*, 230 F. Supp. 3d at 1015.

Indeed, Defendants are well aware that Section 1373 does not compel states and localities to provide release date information when DOJ makes a request in a detainer. The 2016 OIG report

---

[36] Defendants addressed this point in the context of arguing that Section 1373 is consistent with the Tenth Amendment. Defs.' Mem. at 42-45. This argument does not bear on the constitutionality of Section 1373.

reiterates that Section 1373 "does not specifically address restrictions by state or local entities on cooperation with ICE regarding detainers." Trasande/Holt Decl. Ex. 9, at AR-00369. And, as recently as last year, Defendants suggested a statutory amendment to expand the scope of Section 1373 to require compliance with detainer requests. DOJ, *Summary of General Provisions contained in the FY 2018 President's Budget*, n. 7, *available at* https://www.justice.gov/jmd/ page/file/968406/download. Specifically, Defendants' amendment proposed replacing the phrase "information regarding citizenship and immigration status" in Section 1373 with "information related to the nationality, citizenship, immigration status, removability, *scheduled release date and time*, home address, work address, or *contact information*." *Id.* (emphasis added). Even if the plain language of the statute and judicial interpretation were not enough to prove the point, Defendants' actions make clear that Section 1373 does not apply to contact information or release status. As such, this Court should find that Section 1373, if it applies at all, only applies to what it says on its face—immigration status and citizenship information.

## VIII.   Plaintiffs Are Entitled to Mandamus Relief.

Defendants argue that they cannot be compelled to award Byrne JAG funds. Defs.' Mem. at 51. But the opposite is true: administrators of formula grants—such as Defendants here—have extremely limited discretion over the awarding of funds to applicants that meet the applicable statutory criteria and must disburse funds allocated under the formula. *See, e.g.*, *Train v. City of New York*, 420 U.S. 35 (1975) (holding that the administrator of a formula grant was required to allot the total amount of the sums authorized to be appropriated); *City of Los Angeles v. Coleman*, 397 F. Supp. 547 (D.D.C. 1975) (finding that the administrator of a grant has no inherent discretionary power to refuse to make grants to persons who are entitled to them by terms of a mandatory congressional statute).

In support of their position that mandamus is unavailable, Defendants rely on a single word—"may"—in a cherry-picked provision of the Byrne JAG statute. *See* Defs.' Mem. at 51 (citing 34 U.S.C. § 10152(a)(1)). Defendants assert that because the statute says that "the Attorney General '*may*' make grants" to states and units of local government in accordance with the formula established under § 10156, the Attorney General has discretion over whether to issue a grant at all. *Id*. (emphasis added).[37] But, the singular word "may" in § 10152(a)(1) does not give the Attorney General the authority to eviscerate an entire formula grant scheme established by Congress. This argument was rejected out of hand in *Philadelphia*, which recognized that the word "may" "does not enable the DOJ to withhold funds to which state and local governments are otherwise entitled under the statutory formula." 309 F. Supp. 3d at 343-44 n.18. Indeed, the section of the Byrne JAG statute that addresses the allocation of Byrne JAG funds explicitly makes the provision of funds mandatory. It states that, "[o]f the total amount appropriated for this subpart, the Attorney General *shall* … allocate [funds] to each State" in accordance with the specified formula. 34 U.S.C. § 10156(a)(1) (emphasis added); *see City of Philadelphia*, 309 F. Supp. 3d at 343 (noting that the Byrne JAG program's enabling statute contains mandatory language); *see also Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 400 (2008) ("Congress' use of the term 'shall' [in a statute] indicates an intent to 'impose discretionless obligations.'" (quoting *Lopez v. Davis*, 531 U.S. 230, 241 (2001)).

Moreover, Defendants' interpretation of the statute runs afoul of the well-established principle of statutory interpretation that "a section of a statute should not be read in isolation from

---

[37] The relevant statutory text reads: "From amounts made available to carry out this subpart, the Attorney General may, in accordance with the formula established under section 10156, make grants to States and units of local government, for use by the State or unit of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of the following programs…." 34 U.S.C. § 10152(a)(1).

the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, [courts] must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy." *Richards v. United States*, 369 U.S. 1, 11 (1962) (second alteration in original) (quoting *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285 (1956)). Read in the context of the statutory program as a whole, the word "may" in § 10152(a)(1) simply means that the Attorney General is permitted to provide Byrne JAG funding only for the programs enumerated in § 10152(a)(1)(A)-(H). *See, e.g.*, *Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 U.S. 193, 198 (2000) ("[T]he mere use of 'may' is not necessarily conclusive of congressional intent to provide for a permissive or discretionary authority."). Moreover, the provision cited by Defendants addresses the purposes for which funds may be used, not the Attorney General's authority to grant or withhold funds.[38]

To the extent Defendants argue that mandamus is not available because the Byrne JAG statute does not include a deadline by which DOJ must issue decisions on applications, this argument must fail. Mandamus is available where, as here, an administrative agency has "unreasonably delayed" action. *See Forest Guardians v. Babbitt*, 174 F.3d 1178, 1189-91 (10th Cir. 1998). Plaintiffs have now gone without their anticipated JAG funds for over a year. "Typically, the JAG awards are received by September or August of the relevant grant year." *City of Philadelphia*, 309 F. Supp. 3d at 343. "Because this case arises in the context of an annual grant program, a one-year delay represents a far greater delay than might be the case in a different context." *Id.* at 343 n.16 (granting mandamus relief in favor of plaintiffs). The consequences, both

---

[38] Section 10152(a)(1) is in fact entitled "Grants authorized" and is cross-referenced in the statutory provision on application requirements, which requires that applications "include a description of how the State will allocate funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title." 34 U.S.C. § 10153(a)(6)(B).

for Plaintiffs and the congressional design of the program, are severe. Plaintiffs planned to receive these funds and allocate them to meet their important law enforcement and public safety needs. *See, e.g.*, Pls.' 56.1 ¶¶ 72-73, 114-19.

Pursuant to the Mandamus Act, 28 U.S.C. § 1361, this Court should issue a writ of mandamus compelling Defendants to re-issue the State Plaintiffs' award letters without the immigration-related conditions, and disburse the State Plaintiffs' FY 2017 awards. Defendants should also be compelled to disburse Plaintiff New York City's FY 2017 award without the imposition of the immigration-related conditions.

## IX.    Plaintiffs Are Entitled to Injunctive Relief.

### A.    The balance of the equities and the public interest favor a permanent injunction.

The balance of equities and public interest favor the Plaintiffs' claim for a permanent injunction barring Defendants from imposing the immigration-related conditions. The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Attorney General's imposition of the new immigration-related conditions places Plaintiffs in a Hobson's choice of either accepting conditions they believe are unlawful—and thereby allowing a substantial interference in their sovereign powers and ability to make considered policy judgments to promote trust between local governments and the communities they serve—or foregoing substantial amounts of public safety funding. *See City of Chicago*, 888 F.3d at 291 (noting that "given the significance of the federal funds at issue, amounting to hundreds of thousands to millions of dollars for each state, noncompliance is a particularly poor option"). In contrast, the harm to Defendants is miniscule because DOJ can distribute the funds—"as has been done for over a decade"—without imposing the immigration-related conditions. *Id.*

Defendants argue that the balance of the equities and the public interest weigh in their favor because the Attorney General's immigration-related conditions are "designed to promote the enforcement of federal immigration law in jurisdictions that receive federal law enforcement grants." Defs.' Mem. at 51-52. And in justifying their argument that the challenged notice and access conditions are in the public interest, Defendants claim that these conditions "promote … operational efficiency by conserving resources," more easily allow for the removal of "criminal aliens," and reduce federal expenditures. *Id.*

These arguments lack merit. The federal government "cannot suffer any harm from an injunction that terminates an unlawful practice." *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018) (citation omitted) (noting that the court was "hard-pressed to see how setting aside an unlawful [agency] practice could be against the public interest"). "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citations omitted); *Wash. v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994).

While Defendants have no legitimate interest in unlawfully operating the Byrne JAG program as a means of requiring cooperation with federal immigration authorities, Plaintiffs have a powerful interest in Defendants operating the program to foster state and local flexibility, as Congress intended. H.R. Rep. No. 109-233, at 89 (2005); *see also* Pls.' Mem. at 3. Plaintiffs have relied on the flexibility established by the broad purposes of the Byrne JAG statute to support a variety of multifaceted programs and initiatives, including multi-jurisdictional drug and gang taskforces, Pls.' 56.1 ¶¶ 79 (CT), 87 (MA), 91 (NJ), 112 (WA), opioid abuse-related diversion and

other programs, Pls.' 56.1 ¶¶ 80 (CT), 84 (MA), 105 (VA), efforts to prevent gun violence, Pls.'

56.1 ¶ 72(b), and 911 emergency responders, Pls.' 56.1 ¶ 116 (NYC).

Defendants' reference to "operational efficiency by conserving resources" is also not a

legitimate justification for their actions. As much as they may disagree with Congress's adoption

of a required formula in the program's enabling statute to dictate how Byrne JAG funds will be

disbursed, Defendants are not constitutionally permitted to withhold those funds or spend them

differently. *See City of Chicago*, 2018 WL 3608564, at \*10 ("the federalist diffusion of power

necessarily creates political barriers and inefficiencies." But "these inefficiencies are part of

federalism's intended structure, not imperfections to be remedied by judicially-wrought

consolidation of power."). The executive also may not unilaterally withhold funds that Congress

has directed it to spend. *See Train*, 420 U.S. at 38–44 (holding that a congressional direction that

an authorized amount "shall be allotted" by an agency foreclosed agency discretion to allot a lesser

amount); *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (noting that the Executive lacks

the power to "spend less than the full amount appropriated by Congress for a particular project or

program").

Finally, jurisdictions that lawfully limit their involvement in federal civil immigration

enforcement do not "interfere in any way" with the federal government's civil immigration

enforcement activities. *City of Chicago*, 888 F.3d at 281. In fact, the opposite is true: should the

immigration-related conditions take effect, the Attorney General would be interfering in Plaintiffs'

governmental operations. *See City of Philadelphia*, 280 F. Supp. 3d at 652 ("Literal compliance

with Section 1373 would inherently prevent Philadelphia from, among other things, disciplining

an employee for choosing to spend her free time or work time assisting in the enforcement of

federal immigration laws."). Requiring Plaintiffs' employees to serve federal civil immigration

enforcement purposes would detract from those state and local purposes for which they were hired. Plaintiffs would also suffer unnecessary interference brought on in the form of the significant administrative and financial burdens they would incur by ensuring compliance with the notice, access, and section 1373 requirements. Pls.' 56.1 ¶¶ 129 (NY), 133 (RI), 134 (CT), 135 (MA), 137 (NJ), 138 (WA).[39]

### B.  The Court should issue a nationwide injunction.

Defendants do not dispute that Plaintiffs have standing to seek injunctive relief. Rather, they appear to argue that Plaintiffs do not have standing to seek relief that extends to non-parties. *See* Defs.' Mem. at 52-53. In so arguing, Defendants conflate the injury-in-fact requirement under Article III with questions concerning the proper scope of relief. Federal courts possess "broad power to restrain acts" by injunction, *NLRB v. Express Pub'g Co.*, 312 U.S. 426, 435-437 (1941)). So long as a live "case" or "controversy" exists, U.S. Const. art. III, § 2, this injunctive power extends fully to each of the "parties" properly before the court, *see* Fed. R. Civ. P. 65(d). To be sure, Article III requires that a plaintiff have standing for each *claim* and each *form* of relief sought. *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). But once a party establishes standing for a claim and its entitlement to relief, the district court has discretion to design a remedy that fully protects the plaintiff's interests. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402

---

[39] Defendants note that compliance with the immigration-related conditions is not an "unfunded mandate" placed on Plaintiffs because, they claim, the program's conditions allow for use up to 10% of the total grant to comply with the conditions. *See* Defs.' Mem. at 10, 22. Defendants' position is misleading, however, because the percentage of the award to be used for compliance covers compliance with *all* of the grant conditions, i.e., there is not a separate portion of the award or an additional funding stream to cover the substantial monitoring and other costs associated with the notice, access, and Section 1373 conditions. And to the extent that grantees would use Byrne JAG funds to pay for the compliance and implementation costs associated with immigration-related conditions, these funds will be diverted away from the intended State and local law enforcement and related programs that the Byrne JAG program was created to support.

U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad.").

The cases cited by Defendants in support of their standing argument deal with the question of injury in fact, not scope of relief. For example, in *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018), the Supreme Court addressed the scope of a plaintiff's *injury* in partisan gerrymandering cases. The Court explained that the harm to a voter was confined to the particular composition of the voter's district, and did not extend statewide. *Id*. at 1930-31.To the extent the plaintiffs in *Gill* argued that they suffered a statewide injury in "their collective representation in the legislature," the Court held their injury was too generalized to satisfy the requirements of Article III standing. *Id*. at 1931 (remanding where plaintiffs failed to prove a concrete and particularized injury). Similarly, in *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650-51 (2017), the Supreme Court considered whether *intervenors* are required to assert an independent basis for standing if they seek a different form of relief from the plaintiff. These cases are inapposite because Plaintiffs here have established that they suffered an injury in fact and have standing to seek injunctive relief, a point that Defendants do not dispute.

Defendants' other legal objections to a nationwide injunction are inapposite for a variety of reasons. First, contrary to Defendants' suggestion, Defs.' Mem. at 54, a nationwide injunction would not interfere with the orderly development of the law. While it is true that the percolation of legal issues in the lower courts can be an important feature of the judicial process, one of the primary rationales for seeking such diversity in judicial perspectives is "to gain the benefit of adjudication by different courts *in different factual contexts*." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added). This case is not fact dependent, however, and Defendants have conceded that the Administrative Record is identical to the record produced in another cases

around the country. In any event, numerous courts have already had the opportunity to adjudicate the legality of the challenged conditions and each court has held that one or more of the conditions are unlawful. *See, e.g., City of Chicago*, 888 F.3d at 283-87; *City of Philadelphia*, 309 F. Supp. 3d at 320-331.[40]

Finally, Defendants are mistaken in suggesting that a nationwide injunction would be inequitable. The key case on which Defendants rely—*L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011)—is not on point. There, the Ninth Circuit held that the district court abused its discretion by enjoining a Medicare regulation nationwide: the regulation had been in effect for 25 years, and "a nationwide injunction would not be in the public interest because it would significantly disrupt the administration of the Medicare program … and would create great uncertainty." *Id.* at 665. In this case, by contrast, the immigration-related conditions have upset the status quo and disrupted administration of the JAG program, creating uncertainty for jurisdictions nationwide. *L.A. Haven Hospice* was concerned with the equitable burden on Defendants.

Assuming this Court agrees with Plaintiffs' legal arguments, there will then be an unbroken string of decisions in three different judicial Circuits holding that Defendants are administering Byrne JAG unlawfully. Plaintiffs here and jurisdictions throughout the country rely on their annual Byrne JAG funding to support ongoing law enforcement activities that are vital to the safety of their communities. Requiring every state to litigate its entitlement to these formula grant funds in

---

[40] Defendants are mistaken in suggesting that nationwide injunctions are only appropriate in class actions. Defs.' Mem at 53-54. Class actions are a particularly poor vehicle for states and localities to vindicate their governmental and proprietary interests. While Congress may have expressed a preference for class actions in the context of private litigation, no such preference exists in the context of public litigation brought by states and localities. Rather, Congress has specifically exempted states from the class-action requirements imposed on private litigants. *See, e.g., LG Display Co. v. Madigan*, 665 F.3d 768 (7th Cir. 2011) (antitrust actions brought by States not subject to restrictions of the Class Action Fairness Act, 28 U.S.C. § 1332(d)).

separate lawsuits does not serve the public interest, nor does it serve the important interest of judicial economy. A nationwide injunction would place no undue burden on Defendants, as it would simply require them to administer Byrne JAG lawfully and in the exact same manner as it has in the past.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motion to dismiss and motion for partial summary judgment and grant summary judgment to State Plaintiffs on Counts I through V of the Amended Complaint and to New York City on Causes of Action One, Two, Three, and Five of the Amended Complaint. The Court should also issue a declaratory judgment that the immigration-related conditions are unlawful and a permanent injunction enjoining Defendants from imposing the notice, access, and Section 1373 conditions on any Byrne JAG grantee. Further, the Court should issue a writ of mandamus directing Defendants to disburse New York City's FY 2017 JAG award and immediately send FY 2017 Byrne JAG award documents that do not contain the notice, access, and Section 1373 conditions to all grantees that previously received such award documents from Defendants. The Court may award other relief as it deems just and proper.

New York, NY                                    Respectfully submitted,
Dated: September 26, 2018


                                                **BARBARA D. UNDERWOOD**
                                                *Attorney General*
Anisha S. Dasgupta,                             *State of New York*
Deputy Solicitor General

                                                By: /s/ Lourdes Rosado
Linda Fang,[†]                                  Lourdes M. Rosado,[†] Bureau Chief
Assistant Solicitor General                     Jessica Attie,[†] Special Counsel
                                                Lilia Toson,[†] Assistant Attorney General

Eric R. Haren,
Special Counsel & Senior Advisor

*Of Counsel*

Nancy Trasande,[†] Assistant Attorney General
Conor Duffy,[*] Assistant Attorney General
Civil Rights Bureau
28 Liberty St., 20th Floor
New York, NY 10005
Lourdes.Rosado@ag.ny.gov
Jessica.Attie@ag.ny.gov
Lilia.Toson@ag.ny.gov
Nancy.Trasande@ag.ny.gov
Conor.Duffy@ag.ny.gov
Phone: (212) 416-6438

**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6077
mfishbein@debevoise.com

**ZACHARY W. CARTER**
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007
Tel: (212) 356-2296
tjeneret@law.nyc.gov

By: /s/ Matthew E. Fishbein
Matthew E. Fishbein[†]
Meryl Holt[†]
Dana Rehnquist[†]

Of Counsel
Alexandra N. Mogul

By: /s/ Doris Bernhardt
Doris Bernhardt[†]
Tonya Jenerette[†]
Sabita Krishnan[†]
Gail Rubin[†]

*Attorneys for Plaintiff the City of New York*

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

**GEORGE JEPSEN**
*Attorney General*
*State of Connecticut*

By: /s/Jonathan Miller
Jonathan Miller,[†] Chief, Public Protection
and Advocacy Bureau
Genevieve C. Nadeau,[†] Chief, Civil Rights
Division
One Ashburton Place
Boston, MA 02108
Jonathan.Miller@state.ma.us
Genevieve.Nadeau@state.ma.us
Phone: (617) 727-2200

By: /s/ Mark F. Kohler
Mark F. Kohler,[†] Assistant Attorney General
Michael Skold,[†] Assistant Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120
Mark.Kohler@ct.gov
Michael.Skold@ct.gov
Phone: (860) 808-5020

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

By: /s/ Rachel Wainer Apter
Rachel Wainer Apter,[†]
Assistant Attorney General
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor
Trenton, NJ 08625-0116
Phone: (609) 376-2702
Rachel.Apter@njoag.gov

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

By: /s/ Victoria Pearson
Victoria Pearson,[**]
Deputy Attorney General
202 North 9th Street
Richmond, VA 23219
Phone: (804) 786-4319
VPearson@oag.state.va.us

**PETER F. KILMARTIN**
*Attorney General*
*State of Rhode Island*

By: /s/ Michael W. Field
Michael W. Field,[†] Assistant Attorney General
The State of Rhode Island
Office of the Attorney General
150 South Main Street
Providence, Rhode Island 02903
Phone: (401) 274-4400, Ext: 2380
mfield@riag.ri.gov

**ROBERT W. FERGUSON**
*Attorney General*
*State of Washington*

By: /s/ Luke Eaton
Luke Eaton[‡]
Assistant Attorney General
P.O. Box 40100
Olympia, WA 98504-0100
Phone: (360) 753-6200
LukeE1@atg.wa.gov

[†]Admitted in the S.D.N.Y.
[‡]Admitted *pro hac vice*
[*] S.D.N.Y. application pending
[**]*Pro hac vice* motion forthcoming