IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **STATE OF NEW YORK,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES DEPARTMENT OF JUSTICE,** *et al.*, <br><br> Defendants, | Civil Action No. 1:18-cv-06471-ER |

| | |
|---|---|
| **CITY OF NEW YORK**, <br><br> Plaintiff, <br><br> v. <br><br> **JEFFERSON B. SESSIONS III,** *et al.*, <br><br> Defendants, | Civil Action No. 1:18-cv-06474-ER |

**DEFENDANTS' REPLY
IN SUPPORT OF THEIR MOTION TO DISMISS, OR ATERNATIVELY,
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## Table of Contents

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................2

I.    The challenged immigration-related Byrne JAG conditions are authorized by statute and do not violate the separation of powers. ..............................................2

    a.  Congress has authorized Byrne JAG grants to be used for immigration-related purposes. ..............................................................................................2

    b.  It is routine for the Department to add conditions to the Byrne JAG grants to reflect the particular law enforcement priorities of a given Administration. ................3

    c.  The Notice and Access Conditions are lawful. ....................................................5

    d.  The Section 1373 Condition is lawful. ...............................................................7

        i.  Section 1373 is an "Applicable Federal Law" within the meaning of 34 U.S.C. § 10153(a)(5)(D). ...................................................................7

        ii.  The *Murphy* Court did not consider the context of federal grants. .............................8

        iii.  *Murphy* focused on a statute fundamentally different from Section 1373. .................9

        iv.  The core reasoning of *Murphy* supports the constitutionality of Section 1373. ...... 10

        v.  *City of New York* is binding precedent upon this Court. ............................................. 12

        vi.  Section 1373 encompasses, at minimum, the contact information and status of aliens. ........................................................................................ 14

II.    The Notice, Access, and Section 1373 Conditions are consistent with the Spending Clause. .................................................................................................. 15

III.    New York City does not challenge final agency action reviewable under the APA. ........ 17

IV.    Plaintiffs' APA claims fail because the Department's decision to impose the immigration conditions was rational, not arbitrary or capricious. ..................................... 18

V.    If the Court grants an Injunction, it should be limited to the parties in this case. ............ 21

CONCLUSION .................................................................................................................. 23

## Table of Authorities

**Cases**

*Arizona v. United States*,
  567 U.S. 387(2012) ............................................................................ 10, 11, 12, 19

*Benning v. Georgia*,
  391 F.3d 1299 (11th Cir. 2004) ........................................................................15

*Charles v. Verhagen*,
  348 F.3d 601 (7th Cir. 2003) ............................................................................15

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ..........................................................................................19

*City and County of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ..........................................................................22

*City of Chicago v. Sessions*,
  __ F.Supp.3d __, 2018 WL 3608564 (N. D. Ill. July 27, 2018) ......................23

*City of Chicago v. Sessions*,
  No. 17-cv-2991 (7th Cir. June 26, 2018) ..........................................................22

*City of New York v. United States*,
  179 F.3d 29 (2d Cir. 1999) ..........................................................................12, 13

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..............................................................................19, 20, 21

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ......................................................................................22

*Hills v. Gautreaux*,
  425 U.S. 284 (1976) ..........................................................................................22

*Invention Submission Corp. v. Rogan*,
  357 F.3d 452 (4th Cir. 2004) ............................................................................18

*Lamar, Archer & Cofrin, LLP v. Appling*,
  138 S. Ct. 1752 (2018) ......................................................................................14

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004) ..............................................................................................14

*Lunney v. United States*,
  319 F.3d 550 (2d Cir. 2003) ............................................................................18

*Mayweathers v. Newland,*
    314 F.3d 1062 (9th Cir. 2002) ............................................................................... 15, 16

*Murphy v. National Collegiate Athletic Ass'n,*
    138 S. Ct. 1461 (2018) ...................................................................................8, 9, 10, 12

*Naik v. Dir. U.S. Citizenship & Immigration Servs. Vt.,*
    575 F. App'x 88 (3d Cir. 2014) ..................................................................................18

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ......................................................................................................9

*New York v. United States,*
    505 U.S. 144 (1992) ....................................................................................................17

*Printz v. United States,*
    521 U.S. 898 (1997) ............................................................................................. 11, 12

*Providence Yakima Med. Ctr. v. Sebelius,*
    611 F.3d 1181 (9th Cir. 2010) ..................................................................................19

*Rattlesnake Coal. v. EPA,*
    509 F.3d 1095 (9th Cir. 2007) ..................................................................................18

*Reno v. Condon,*
    528 U.S. 141 (2000) ....................................................................................................11

*S. Dakota v. Dole,*
    483 U.S. 203 (1987) .................................................................................9, 13, 15, 16

*Stone v. INS,*
    514 U.S. 386 (1995) ......................................................................................................6

*W. Fuels-Illinois, Inc. v. ICC,*
    878 F.2d 1025 (7th Cir. 1989) ..................................................................................20

**Statutes**

5 U.S.C. § 553 ....................................................................................................................20

8 U.S.C. § 1226 ..........................................................................................................15, 19

8 U.S.C. § 1227 ....................................................................................................15, 17, 19

8 U.S.C. § 1229 ..................................................................................................................15

8 U.S.C. § 1231 ..................................................................................................................15

8 U.S.C. § 1305 ..................................................................................................................15

8 U.S.C. § 1357 .................................................................................................................. 17, 19

8 U.S.C. § 1373 .................................................................................................................. 1, 8, 9

34 U.S.C. § 10102 ............................................................................................................ 1, 5, 6, 19

34 U.S.C. § 10152 ............................................................................................................ 2, 3, 16, 17

34 U.S.C. § 10154 ................................................................................................................ 18

34 U.S.C. § 10156 ................................................................................................................. 7

34 U.S.C. § 10157 ................................................................................................................. 7

34 U.S.C. § 10251 ............................................................................................................... 16, 19

42 U.S.C. § 3753 ................................................................................................................. 2, 17

DOJ Reauthorization Act of 2005,
     Pub. L. No. 109-162, 119 Stat. 2960 (2006) ............................................................. 6

Organized Crime Control Act of 1970,
     Pub. L. No. 91-452, 84 Stat. 922 (1970) .................................................................... 11

**Regulations**

8 C.F.R. § 214.1 ................................................................................................................... 15

8 C.F.R. § 287.5 ................................................................................................................... 17

28 C.F.R. § 66.12 ................................................................................................................. 6

28 C.F.R. Part 18 ................................................................................................................ 18

**Other Authorities**

H.R. Conf. Rep. 104-725 (July 30, 1996) .......................................................................... 15

H.R. Rep. No. 109-233 (2005) .......................................................................................... 2, 7

# INTRODUCTION

Law enforcement in this country is a cooperative endeavor.  Unlawful acts often implicate the jurisdiction of more than one agency, and thus local, state, tribal, and federal officials work together in a variety of ways to fight crime and ensure public safety.  Not surprisingly, then, federal law often contemplates, and is premised upon, such coordination.  This is true for the Immigration and Nationality Act ("INA"), and it is true for the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program").  Both statutes explicitly contemplate and encourage effective law enforcement by promoting coordination between the Federal Government on the one hand, and local, state, and tribal governments on the other.  Unfortunately, the Plaintiffs have adopted policies of non-cooperation with respect to law enforcement involving aliens who have committed crimes.  And in this suit, the Plaintiffs seek to further those policies by claiming that the Federal Government cannot condition its own law enforcement grants on such cooperation – even when the express statutory purpose of that funding is to promote cooperation.

Grant award conditions are a traditional aspect of participation in the Byrne JAG Program, and there is no legal infirmity in the decision of the U.S. Department of Justice ("DOJ" or "Department") to impose the three conditions that the Plaintiffs challenge.  To further information-sharing, those conditions require Byrne JAG Program grantees to comply with 8 U.S.C. § 1373, to give federal immigration authorities access to a grant recipient's detention facilities to meet with aliens, and to give those authorities "as much advance notice as practicable" before releasing the alien.

As a threshold matter, New York City does not challenge final agency action so as to bring a proper challenge to the imposition of the conditions.  Even setting that objection aside, however, the conditions are consistent not only with statutes governing the Byrne JAG Program, *see* 34 U.S.C. § 10102(a)(6), 10153(a), but also with legislative history confirming that the Department is

empowered to "place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

Moreover, there is no merit to Plaintiffs' claims that the conditions violate the Spending Clause or the Tenth Amendment, nor is imposition of the conditions arbitrary or capricious because the conditions are rationally targeted at furthering the Byrne JAG Program's goals of advancing criminal justice and public safety. For all of these reasons, the Court should either dismiss the Plaintiffs' claims or grant summary judgment in Defendants' favor and deny Plaintiffs' motions for summary judgment.

## ARGUMENT

### I.     The challenged immigration-related Byrne JAG conditions are authorized by statute and do not violate the separation of powers.

#### a.   Congress has authorized Byrne JAG grants to be used for immigration-related purposes.

Plaintiffs argue that the Department of Justice has "invent[ed] a relationship between the Byrne JAG statute and federal immigration enforcement that simply does not exist." Opp., at 1. This is not so, because a relationship already exists. Prior to 2006, the Byrne JAG predecessor statute expressly required each State grantee to establish a system that would notify the Immigration and Naturalization Service within 30 days of an alien's criminal conviction. *See* 42 U.S.C. § 3753(a)(11) (as in effect immediately before January 5, 2006). When the Byrne JAG statutes were revised in 2006, Congress incorporated by reference this requirement as an optional purpose for which a grantee may use Byrne JAG funds. By statute, the Byrne JAG grant purposes (which are specified at 34 U.S.C. § 10152(a)(1)) "shall be construed to ensure that a grant . . . may be used for any purpose for which a grant was authorized to be used under either or both of the programs specified in section 10151(b) of this title, as those programs were in effect immediately before January 5, 2006." 34 U.S.C. § 10152(a)(2).

Plaintiffs appear to believe, mistakenly, that the eight enumerated Byrne JAG program purposes set forth in Section 10152(a)(1) are an exhaustive list. The next subsection, Section 101052(a)(2) incorporates by reference the earlier purpose to identify criminal aliens to federal authorities as a permissible purpose for Byrne JAG funds. *See* 34 U.S.C. § 10152(a)(2). In other words, the Plaintiffs' protestations that Byrne JAG has nothing to do with federal immigration enforcement is simply wrong. Congress has already authorized grant recipients to spend Byrne JAG funds on programs that will identify criminal aliens to federal immigration authorities. Thus, it is well within the Department's legal authority to impose conditions upon grantees relating to immigration enforcement.

### b. It is routine for the Department to add conditions to the Byrne JAG grants to reflect the particular law enforcement priorities of a given Administration.

Plaintiffs argue that "[n]either the Constitution nor the Byrne JAG statute authorizes the Executive to impose new substantive conditions on Byrne JAG awards," (Opp., at 2), and yet, they acknowledge the numerous conditions that various Executive Administrations have put in place to effect particular policy goals. *See, e.g., id.* at 12-13.

It is undisputed that numerous long-standing special conditions within the Byrne JAG program are not directly related to local crime reduction. For example, Special Condition 37 in state awards requires compliance with the "National Environmental Policy Act (NEPA), the National Historic Preservation Act, and other related federal environmental impact analyses requirements," if such compliance is requested by BJA. *See* States' Complaint, Ex. A, ¶ 37 (ECF No. 1-1) (New York state's FY 2017 Byrne JAG Award Letter). This condition covers the use of Byrne JAG funds involving the "renovation or remodeling of a property located in an environmentally or historically sensitive area, including properties located within a 100-year flood plain, a wetland, or habitat for

endangered species, or a property listed on or eligible for listing on the National Register of Historic Places." *Id.*

Other special conditions reflect other priorities beyond local law enforcement, such as requiring recipients to comply with the Department's civil rights and nondiscrimination policies. Special Condition 17 in state awards requires a recipient to comply with the Department's regulations regarding "nondiscrimination on the basis of sex in certain 'educational programs.'" *Id.* at ¶ 17. Special Condition 18 requires compliance with regulations that prohibit "specific forms of discrimination on the basis of religion, a religious belief, a refusal to hold a religious belief, or refusal to attend or participate in a religious practice." *Id.* at ¶ 18. Special Condition 23 requires recipients to comply with applicable provisions of federal law that prohibits "discrimination against an employee as reprisal for the employee's disclosure of information related to gross mismanagement of a federal grant, a gross waste of federal funds, an abuse of authority relating to a federal grant, [or] a substantial and specific danger to publish health or safety." *Id.* at ¶ 23.

Similarly, during the Obama Administration, new conditions were imposed on local jurisdictions that sought to purchase certain tactical law enforcement equipment. These conditions sought to ensure appropriate "Community Policing" and "Constitutional Policing" policies were observed by local law enforcement:

> [L]aw enforcement agencies that acquire controlled equipment through Federal programs must adopt robust and specific written policies and protocols governing General Policing Standards and Specific Controlled Equipment Standards. General Policing Standards includes policies on (a) Community Policing; (b) Constitutional Policing; and (c) Community Input and Impact Considerations.

Trautman Dec., Ex. A, ¶ 46 (FY 2016 Byrne JAG award to the City of New York). *See also id.* at Ex. B, ¶ 45 (FY 2016 Byrne JAG award to the State of New York containing the same special condition).

These special conditions demonstrate that the Plaintiffs overstate their narrative that the Byrne JAG program is supposedly only concerned with local law enforcement. Rather, these conditions represent various, reasonable, legitimate purposes that should be encouraged by the use of federal dollars, as determined by the Executive.

Moreover, these conditions demonstrate the reasonableness of the immigration conditions challenged by the plaintiffs. The three immigration conditions are directly geared towards reducing local crime (by facilitating the removal of criminal aliens), more so than conditions focused on environmental compliance, protecting historic structures, encouraging nondiscrimination, or providing whistleblower protection to government employees. Thus, it was perfectly reasonable for the Obama Administration to institute the first Section 1373 condition in the FY 2016 grants. *See* AR-00384 (July 7, 2016 OJP Memorandum stating determination that Section 1373 is an applicable federal law for Byrne JAG Program). And it is similarly reasonable for the current Administration to renew the Section 1373 condition and institute the Notice and Access conditions.

### c. The Notice and Access Conditions are lawful.

Plaintiffs' claim that the Notice and Access conditions violate the separation of powers is premised on an incorrect view that Congress has not authorized the Department of Justice to impose these conditions. *See* Opp. at 6-16. These conditions fall squarely within the Department's multi-faceted authority – expressly granted by Congress – to "plac[e] special conditions on all grants," 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for formula grants," *id.*, and to ensure that grantees "comply with . . . all other applicable Federal laws." *Id.* § 10153(a)(5)(D). The Plaintiffs' counter-arguments are unpersuasive.

First, Plaintiffs contend that 34 U.S.C. § 10102(a)(6) is not itself a grant of authority, but rather merely describes powers the Assistant Attorney General ("AAG") may exercise when vested in him by some independent source of authority. *See* Opp. at 6-7. As discussed in Defendants'

Opening Brief, however, the authorities to "plac[e] special conditions on all grants, and [to] determin[e] priority purposes for formula grants" were added as part of the same legislation that created the Byrne JAG Program. *See* DOJ Reauthorization Act of 2005, Pub. L. No. 109-162, § 1152(b), 119 Stat. 2960 (2006) ("Reauthorization Act") (adding language to subsection (a)(6)); *id.* § 1111 (creating the current Byrne JAG Program). There is no reason why Congress would have added that language if not to confer the authority described. Despite this, the Plaintiffs' interpretation of the amendment would render wholly superfluous *both* the "special condition" and the "priority purpose" powers – each of which, in order to be given effect, must confer independent and meaningful authority. *Cf. Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect.").[1]

Second, Plaintiffs argue that the term "special conditions," as used in Section 10102(a)(6), is necessarily limited to certain accountability measures that may only be imposed on "high risk" grantees, because a *repealed* regulation, 28 C.F.R. § 66.12, so defined that term at the time of the passage of the Reauthorization Act. *See* Opp. at 10-11. But the statutory "special conditions" authority contains no language referencing, incorporating, or otherwise limiting its application to the former regulation. On the contrary, the legislative history contains the same broad language as the statute, explaining that the new provision "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005). And, in any event, the Plaintiffs' reading leaves unexplained the AAG's

---

[1] The full text of 34 U.S.C. § 10102(a)(6) authorizes the AAG to "exercise such other powers and functions *as may be vested in the Assistant Attorney General pursuant to this chapter* or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants.*" 34 U.S.C. § 10102(a)(6) (emphasis added).

complementary power to "determin[e] priority purposes" for formula grants like those in the Byrne JAG Program.[2]

Third, the Plaintiffs argue that the Byrne JAG Program's structure as a formula grant, the limitations on DOJ's discretion to withhold funds, and the relationship between the funding and specific federal policy objectives somehow supposedly deprive DOJ of the authority to enforce the conditions. *See* Opp. at 6. The first two items, however, confuse conditions placed on grant awards – such as the conditions at issue here – with the *formula* for allocating funds to eligible recipients. Although deviation from the statutory formula for allocating funds among eligible jurisdictions is not permitted except in limited circumstances, *see* 34 U.S.C. §§ 10156-10157, the amount of a jurisdiction's award under that formula is unrelated to conditions on spending under the award. And the Notice and Access award conditions do less to mandate a "one size fits all" approach than, for example, a Byrne JAG condition that for years prohibited using award funds to purchase items on a Prohibited Expenditure List that includes various types of equipment and weapons that some law enforcement agencies might otherwise have wanted to acquire. *See* FY 2016 Byrne JAG Award to New York City (States Case ECF No. 91-1) ¶ 49.

### d.   The Section 1373 Condition is lawful.

#### i.   Section 1373 is an "Applicable Federal Law" within the meaning of 34 U.S.C. § 10153(a)(5)(D).

Plaintiffs go to great length to invite this Court to ignore the plain meaning of "all other applicable Federal laws," arguing that the term is limited to "federal laws governing grants and grant-making." Opp., at 19. New York City, however, raised no such challenge during the Obama

---

[2] All of the foregoing applies to the Section 1373 condition as well; it is supported by the AAG's authority to "plac[e] special conditions on all grants," 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for formula grants," *id.*, and, especially, to ensure that grantees "comply with . . . all other applicable Federal laws." *Id.* § 10153(a)(5)(D).

Administration when the Section 1373 condition was first imposed in the FY 2016 grant cycle.  *See* Trautman Dec., Ex. A, ¶ 53 (States Case ECF No. 91-1) (FY 2016 Byrne JAG award to New York City requiring that "[t]he recipient agrees to undertake a review to validate its compliance with 8 U.S.C. § 1373.").  The challenge should be dismissed now.

Section 10153(a)(5)(D) of Title 34, U.S. Code, is properly read to refer to the corpus of federal laws that independently apply to Byrne JAG grantees – recognizing that such grantees are state and local jurisdictions (not private individuals and entities) as to whom some federal laws are inapplicable.  If Congress had intended to limit the term "applicable Federal laws" as referencing only statutes of the kind that the Plaintiffs suggest, it could have done so expressly without requiring resort to the attempts at straightjacketed statutory interpretation that the Plaintiffs offer.  Instead, the prefatory language "all other" in Section 10153(a)(5)(D) connotes that "applicable Federal laws" has a broader reach than the artificial limit that Plaintiffs ascribe.

### ii.  The *Murphy* Court did not consider the context of federal grants.

Citing the Supreme Court's recent decision in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018), Plaintiffs argue that Section 1373 is facially unconstitutional under the Tenth Amendment and, *a fortiori*, cannot be "applicable" to the Byrne JAG Program.  *See* Opp. at 31-37. That is incorrect, for the reasons cited in the Defendants' Opening Brief.  *See* Defs.' Op. Brief, at 36-42.

The *Murphy* decision has little application to Plaintiffs' claim that 8 U.S.C. § 1373 is unconstitutional.  It is black-letter law that "a perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *S. Dakota v. Dole*, 483 U.S. 203, 210 (1987); *see, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012).  Thus, the Tenth Amendment does not constrain the conditions that the Federal Government may impose on grants, and the only pertinent question

in that regard is whether the conditions satisfy the strictures of the Spending Clause – which, it incontrovertibly does.

### iii. *Murphy* focused on a statute fundamentally different from Section 1373.

Even assuming, however, that Plaintiffs could overcome these initial deficiencies, to the extent the Plaintiffs could nevertheless proceed with an attack on Section 1373 as an independent statutory mandate, any such claim would be without merit.  The statute at issue in *Murphy* – the Professional Amateur Sports Protection Act of 1992 ("PASPA") – prohibited the States from authorizing any "betting, gambling, or wagering scheme based . . . on competitive sporting events." *Id.* at 1470. That statute was a clear effort to avoid accountability by requiring the States themselves to regulate sports betting in the manner Congress wished.  *See id.* at 1477.  Section 1373, on the other hand, is simply an information-access component of a regulatory scheme – immigration removal – over which the Federal Government retains full responsibility and accountability for its actions.

In *Murphy*, New Jersey repealed its existing statutory prohibition on sports gambling, and the NCAA challenged that repeal as a violation of PASPA.  *Id.* at 1471.  The Supreme Court rejected the challenge, holding that PASPA violated the Tenth Amendment by effectively requiring each State to enact and "maintain" a prohibition on sports gambling.  *Id.* at 1478-79.  The Court held that the Tenth Amendment prohibits Congress from "command[ing] a state government to enact *state* regulation" or "compelling them to enact and enforce a federal regulatory program."  *Id.* at 1476-77 (*quoting New York v. United States*, 505 U.S. 144, 161, 178 (1992)).  Chief among the Court's concerns was that Congress could seek to deflect political accountability by commanding the States to impose regulation in an area where the Federal Government itself had been largely silent.  *Id.* at 1477.

By comparison, the Immigration and Naturalization Act ("INA") as a whole, and Section 1373 in particular, are very different.  Rather than compelling the States to "enact state regulation"

or to "enact and enforce a federal regulatory program," Section 1373 is merely an information-access component of the overall alien removal scheme, over which the Federal Government takes full responsibility for regulation of and enforcement against individuals under the INA. *See generally Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."). Whereas PASPA sought to compel the enactment and maintenance of a state statutory scheme, Section 1373 merely protects the Federal Government's ability to access the information necessary to carry out a *federal* scheme in an area highly regulated by the Federal Government. As such, Section 1373 ensures that the Federal Government has the information it needs to "regulate individuals, not States." *Murphy*, 138 S. Ct. at 1479 (quotation omitted).

### iv.  The core reasoning of *Murphy* supports the constitutionality of Section 1373.

The reasoning of *Murphy* supports the constitutionality of Section 1373 for four additional reasons. First, *Murphy* did not call into question any aspect of *Arizona v. United States*, but cited it favorably with respect to the settled understanding that the Federal Government enjoys broad authority in the area of immigration and that Congress may "'foreclose any state regulation in the area,'" *id.* at 1481 (*quoting Arizona*, 567 U.S. at 401). Here, Section 1373 forecloses conflicting state regulation that would preclude access to information regarding the regulated individuals. *Murphy* thus supports defendant's argument that States may not employ conflicting standards and practices that interfere with the federal scheme. *See Arizona*, 567 U.S. at 395, 406 (noting that "[f]ederal governance of immigration and alien status is extensive and complex" and that States may not "interfere with the careful balance struck by Congress" in immigration law).

Second, Section 1373 simply underscores that States and localities may not use their custody of aliens subject to removal proceedings to impair the Federal Government's enforcement of federal law. The analysis in *Murphy* would likely have been very different if PASPA had only required States

to share information regarding sports betting operations to facilitate federal regulation. *See Printz v. United States*, 521 U.S. 898, 918 (1997) (stating that federal statutes that "require only the provision of information to the Federal Government, do not involve . . . the forced participation of the States' executive in the actual administration of a federal program"); *see also, e.g.*, Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 806, 84 Stat. 922, 939-40 (creating commission to evaluate national policy towards gambling, which was "authorized to call upon . . . States to furnish, on a reimbursable basis or otherwise, such statistical data, reports, and other information as the Commission deems necessary").

Third, the Supreme Court has explained elsewhere that its precedents on "commandeering" do not apply in the same way when access to information is at issue, a principle that *Murphy* did not question. The Constitution does not prohibit federal enactments that "do[ ] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[ ] the States as the owners of data bases." *Reno v. Condon*, 528 U.S. 141, 151 (2000). Thus, the Court upheld a federal statute that "restrict[ed] the States' ability to disclose a driver's personal information without the driver's consent." *Id.* at 144. It made no difference that compliance with the statute would "require time and effort on the part of state employees," *id.* at 150, or that the State had acquired the relevant information in its capacity as a regulator of drivers. Further, the Court has recognized that statutes "which require only the provision of information to the Federal Government[ ] do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Printz*, 521 U.S. at 918. As Justice O'Connor explained, the Supreme Court's Tenth Amendment cases are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)). This is because an information-access requirement like Section 1373 does not "regulate the States' sovereign authority

to regulate their own citizens," *Murphy*, 138 S. Ct., at 1479 (internal quotation marks omitted), but ensures federal access to information regarding regulated individuals that is needed for the Federal Government to regulate those individuals.  Thus, since Section 1373 merely secures information needed to carry out a federal statutory scheme, there is no concern here regarding a deflection of political responsibility.  *See Arizona*, 567 U.S. at 401 (referring to "comprehensive" federal statutory framework for regulation of immigration).

Finally, Plaintiffs seek to rely on the *Murphy* Court's observation that PASPA's characterization as a positive demand or a negative prohibition was irrelevant to the Court's holding. *See* Opp., at 29.  But that observation was not the fulcrum of the Court's decision nor the operative distinction between PASPA and Section 1373.  PASPA violated the Tenth Amendment because it sought to compel the States to enact state regulation and deflect federal accountability for that regulation; the Court's observation regarding positive demands and negative prohibitions was simply a rejection of an attempt to establish that PASPA did not constitute such a compulsion.  *Murphy*, 138 S. Ct., at 1478.  Thus, for purposes of determining the effect of *Murphy* in this case, if any, it is irrelevant whether Section 1373 is a positive demand or a negative prohibition.

### v.  *City of New York* is binding precedent upon this Court.

In *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), the Second Circuit rejected the City's facial challenge to Section 1373.  *Id.* at 34-35.  Focusing on the fact that "Congress has plenary power to legislate on the subject of aliens," the Second Circuit relied upon the unique powers and duties that the Federal Government has in the immigration context.  *Id.* at 34.  Relying upon *Murphy*, Plaintiffs argue that this Court should effectively overrule the Second Circuit's decision in *City of New York*.  For the reasons explained above, *Murphy* does not abrogate *City of New York* or undercut the constitutionality of Section 1373.  And, for the reasons explained in detail in Defendants'

Opening Brief, *City of New York* is still good law. *See* Defs.' Op. Brief, at 34-36. The decision of whether to overrule it should be left to the Second Circuit.

Because *City of New York* is still binding precedent, Plaintiffs' facial challenges to Section 1373 must be dismissed. *See* States' Am. Compl., ¶¶ 146-150 (Count V); City's Am. Compl., ¶¶ 142-148 (Count V).

While considering a facial challenge to Section 1373 in *City of New York*, it is true that the Second Circuit faced a different set of New York City ordinances. In an effort to distinguish that case, the Plaintiffs rely upon *dicta* from the Second Circuit stating that its decision did not consider "generalized confidentiality policies that are necessary to the performance of legitimate municipal functions and that include federal immigration status." *City of New York*, 179 F.3d at 37. *See* Opp., at 30-31. The City goes on to argue that, even if the facial challenges to Section 1373 fail, the statute is unconstitutional as applied to the City's new ordinances. *See id.* at 37-38.

The problem with Plaintiffs' "as-applied" challenge is that the Federal Government is not seeking to enforce Section 1373 directly against the City's ordinances in this action. The Defendants do not seek in this action, for example, an injunction or a declaratory judgment holding the City's ordinances are unenforceable. Instead, the Federal Government seeks to enforce conditions in a *voluntary* grant program. It is well-established that "a perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *Dole*, 483 U.S. at 210. If Section 1373 is facially constitutional, then the Defendants have the authority to require compliance with the valid statute as a condition for accepting grant money. New York City has no obligation to take the grant money. If the City cannot honestly certify compliance with the conditions, the City is free to forego the grant funds, and this lawsuit will not disturb any of the City's ordinances.

The reality here is that the City's "as-applied" challenge is merely another facial attack on Section 1373. As set forth in the Defendants' Opening Brief, the Plaintiffs' challenge is an all-or-nothing argument. *See* Defs.' Op. Brief, at 50-51. Only a cursory review of the City's ordinances is necessary to show that they are wholly incompatible with Section 1373. *See generally* NY Mem., at 38-41. *See also* Pls.' Local R. 56.1 Statement of Undisputed Material Facts (States Case ECF No. 57-1), ¶ 148 ("In the event that officers and employees come into possession of confidential information, the General Confidentiality Policy limits disclosure of such information to" five enumerated situations but not including Section 1373).

The City fails to make its case that the Federal Government is unconstitutionally applying Section 1373 to the City. If Section 1373 is facially constitutional – as the Second Circuit as already said – then, compliance with that valid statute is the proper subject of a condition in a *voluntary* grant program.

### vi. Section 1373 encompasses, at minimum, the contact information and status of aliens.

Plaintiffs argue that Section 1373 "covers only two types of information: 'immigration status' and 'citizenship.'" Opp., at 47. This construction is wrong, however, because it reads words out of the statute. Section 1373 forbids a state or local government from prohibiting the exchange of "information *regarding*" an individual's immigration status, not merely the individual's immigration status. The courts "must give effect to every word of a statute wherever possible," *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004), and the use of "regarding" and similar words in a statute "generally has a broadening effect," *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1760 (2018). "Information regarding" immigration status under the INA necessarily includes one's address, both home and work, which is crucial to the fulfillment of several federal responsibilities, including determining whether an alien has kept federal authorities informed of any change of address and whether an alien has engaged in unauthorized employment. 8 U.S.C. §§ 1227(a)(1)(C), 1229b(a)(1),

(a)(2), (b)(1)(A), 1305; 8 C.F.R. § 214.1; *see* H.R. Conf. Rep. 104-725, at 383 (July 30, 1996) (stating that language of Section 1373 was intended to enable state and local officials to "communicate with the INS regarding the presence, whereabouts, and activities of illegal aliens").

Additionally, since federal authorities generally cannot remove an alien from the United States until after release from state or local custody, the timing of that release is necessarily included within "information regarding" immigration status. 8 U.S.C. § 1231(a)(1)(B)(iii), (a)(4); *see id.* § 1226(c)(1). Therefore, Section 1373 protects, at minimum, the contact information and release status of aliens.

## II.     The Notice, Access, and Section 1373 Conditions are consistent with the Spending Clause.

In relation to Plaintiffs' Spending Clause claim (*see* Opp., at 38-43), the challenged conditions enable potential Byrne JAG applicants to "exercise their choice" to participate in the program "knowingly, cognizant of the consequences of their participation," *Dole*, 483 U.S. at 207 (citations omitted), and the conditions bear much more than "some relationship" to the purposes of the program, *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002).  On the first question – whether the conditions are such that potential applicants can choose to participate "cognizant of the consequences of their participation" – plaintiffs attack the applicability of *Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003), and *Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004), which held, respectively, that "the exact nature of [grant] conditions may be largely indeterminate, provided that the existence of the conditions is clear," 348 F.3d at 607, and that "[o]nce Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper," 391 F.3d at 1306. Plaintiffs argue that those decisions are not relevant because the "asserted ambiguity was based on alleged uncertainty as to how a grant condition would be applied, whereas here fundamental questions remain as to what the conditions mean."  Opp. at 42-43.  That is a distinction without a

difference.  In either case, the conditions satisfy this aspect of the test if potential applicants can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted). The access and notice conditions clearly require grant recipients to allow federal immigration officers to visit suspected deportable aliens in custody and to provide reasonable advance notice of any releases from custody, and the "existence" of the Section 1373 condition is clear and unambiguous.

In relation to the germaneness element of Spending Clause analysis, have failed to carry their heavy burden.  Plaintiffs must bear that heavy burden because the relationship between grant conditions and the grant program under the Spending Clause is a "low-threshold" inquiry that "is a far cry . . . from an exacting standard for relatedness." *Mayweathers*, 314 F.3d at 1067. The conditions challenged here easily meet that threshold.

Plaintiffs attempt to create the narrative that the Byrne JAG program's purpose is to "enhance[e] local law enforcement efforts."  Opp., at 38.  Plaintiffs' characterization of the program, however, is much too narrow.  Congress ordained that the program should "make grants to States and units of local government . . . for criminal justice" (a very broadly defined term under the statute; *see* 34 U.S.C. § 10251(a)(1)), *id.* § 10152(a)(1), and, among other things, should aid crime *prevention* in addition to criminal *enforcement*. *Id.* § 10152(a)(1)(C) (directing that Byrne JAG funds may be used for crime "[p]revention and education programs.").  In fact, Congress authorized the use of Byrne JAG funds for a host of other aspects of criminal justice, including "drug treatment . . . programs", "mental health . . . programs", and "community corrections programs." *Id.* §§ 10152(a)(1)(A-H).  This is *in addition to* funding for "[l]aw enforcement programs." *Id.* § 10152(a)(1)(A); *see id.* § 10152(a)(2).  And, as described above, that DOJ may adopt immigration-related "priority purposes" for Byrne JAG grants is further shown by Congress's express incorporation of the optional immigration-related purpose from one of the predecessor programs.

DEFENDANTS' REPLY

*See* 34 U.S.C. § 10152(a)(2).  *See also* 42 U.S.C. § 3753(a)(11) (as in effect immediately before January 5, 2006) (requiring each recipient to develop a plan to notify the INS of any criminal conviction of an alien).

One reasonable way to prevent future crime is to remove deportable aliens who have committed past crimes, and the Notice and Access conditions aid federal immigration authorities in accomplishing that task.  The Access condition allows immigration authorities to interview suspected deportable aliens – who are already being held on state or local criminal charges – about their removability and their criminal backgrounds.  *Cf.* 8 U.S.C. § 1357(a) (stating that federal immigration authorities "have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States"); 8 C.F.R. § 287.5(a) (stating that authority in 8 U.S.C. § 1357(a) may be exercised "anywhere in or outside the United States"). The Notice condition allows immigration authorities to take removable aliens into safe, controlled custody after their release from criminal custody.  And the Section 1373 condition enables law enforcement personnel to identify criminal aliens within their custody and to determine the aliens' removability.  Considering the numerous provisions of the INA that directly relate to criminal law (*see, e.g.,* 8 U.S.C. § 1227(a)(2) (delineating list of crimes that render an alien immediately deportable)), a reasonable, rational relationship exists between the challenged conditions and the Byrne JAG Program's goal of preventing crime.  This easily satisfies the nexus requirement of the Spending Clause, as the conditions "bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992).

### III.   New York City does not challenge final agency action reviewable under the APA.

"[T]he Administrative Procedure Act does not provide judicial review for everything done by an administrative agency." *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004) (*quoting Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). One limitation is that "[t]he

APA provides for judicial review of [only] 'final agency action.'" *Naik v. Dir. U.S. Citizenship & Immigration Servs. Vt.*, 575 F. App'x 88, 92 (3d Cir. 2014) (*citing* 5 U.S.C. §§ 702, 704).  *See also Lunney v. United States*, 319 F.3d 550, 558 (2d Cir. 2003).

For the reasons set forth in Defendants' opening memorandum, New York City has not identified a final agency action allowing for judicial review.  According to the Second Circuit, the "'core question' for determining finality is 'whether the agency has completed its decision making process, and whether the result of that process is one that will directly affect the parties.'"  *Lunney*, 319 F.3d at 555 (*quoting Dalton v. Specter*, 511 U.S. 462, 470 (1994)).  Moreover, "the congressional appropriation to [an agency] of funds for a particular project does not constitute a final agency action by the [agency] until the [agency] has reviewed [and adjudicated] a grant application." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007).  Such action has not yet occurred here regarding New York City because DOJ has not made a final determination on the City's grant application.  Further, by statute, the Byrne JAG Program has an administrative review and reconsideration process that must be exhausted before a grant application is "finally disapprove[d]." 34 U.S.C. § 10154; *see generally* 28 C.F.R. Part 18.  Accordingly, no final agency action has been taken against New York City, as necessary for it to pursue its APA claims.

## IV.   Plaintiffs' APA claims fail because the Department's decision to impose the immigration conditions was rational, not arbitrary or capricious.

The challenged conditions are not arbitrary or capricious, because they relate rationally to the Byrne JAG Program's purposes.  The Supreme Court directs that the "arbitrary and capricious" standard affords only a "narrow standard of review," under which "a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted).  This standard is "highly deferential," *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (citation omitted), and does not authorize a district court "to

substitute its judgment for that of the agency," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

402, 416 (1971).  Where the action represents a shift in policy, the agency "need not demonstrate to

a court's satisfaction that the reasons for the new policy are better than the reasons for the old one;

it suffices that the new policy is permissible under the statute, that there are good reasons for it, and

that the agency believes it to be better."  *Fox Television*, 556 U.S. at 515.

The challenged conditions easily meet this standard because they support the Byrne JAG

Program's criminal justice purposes with respect to "activities pertaining to *crime prevention, control, or*

*reduction*, or the enforcement of the criminal law, including, but not limited to, police efforts to

prevent, control, or reduce crime or to *apprehend criminals*, . . . activities of courts having criminal

jurisdiction, and *related agencies*," 34 U.S.C. § 10251(a)(1) (emphases added), by facilitating federal

efforts to remove criminal aliens.  Once removed, an alien who has committed a removable criminal

offense is undeniably no longer present in this country with the potential to re-offend.  *See* 8 U.S.C.

§ 1227(a)(2) (providing that a criminal conviction for any of a wide array of criminal offenses

renders an alien removable).  The conditions also rationally promote interests  in "maintain[ing]

liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2),

and comport with the intergovernmental cooperation that Congress contemplates in immigration

enforcement, *see* 8 U.S.C. §§ 1226(d), 1357(g), 1373; *Arizona*, 567 U.S. at 411-12 (noting that

Congress "has encouraged the sharing of information about possible immigration violations").

The Department believes that the conditions are fully justified because they work to reduce

crime through cooperative information-sharing that supports immigration enforcement to remove

criminal aliens.  The Department found that it is "common-sense" that facilitating removal to

eliminate the threat of recidivism by criminal aliens "help[s] keep our communities safe," AR-00993,

and "even in the absence of evidence, the agency's predictive judgment (which merits deference)

makes entire sense" as "an exercise in logic rather than clairvoyance." *Fox Television*, 556 U.S. at 521;

*see W. Fuels-Illinois, Inc. v. ICC*, 878 F.2d 1025, 1030 (7th Cir. 1989) (noting "great deference to an agency's predictive judgments … within the agency's field of discretion and expertise") (citation omitted).  The Plaintiffs' apparent expectation that the Department should have issued a comprehensive supporting study also ignores that Congress did not intend to encumber agencies with burdensome procedural prerequisites for determining grant conditions; to the contrary, Congress expressly exempted "grants" from the APA's ordinary notice-and-comment rulemaking procedures.  5 U.S.C. § 553(a)(2).

In any event, the challenged conditions are wholly rational.  Independent of the authority conferred in Section 10102(a)(6), the Department has statutory authority to ensure that Byrne JAG grantees "comply with . . . all other applicable Federal laws."  34 U.S.C. § 10153(a)(5)(D).  This authority plainly permits the Department to impose as a funding condition a requirement that recipients certify their compliance with an existing federal law (Section 1373) with which a state or locality is *already obligated independently* to comply.  Recall that the Obama Administration formally imposed the Section 1373 condition for the first time in Fiscal Year 2016.  *See* AR-00384 (July 7, 2016 OJP Memorandum stating determination that Section 1373 is an applicable federal law for Byrne JAG Program).  Doing so was a straight-forward exercise of this authority.

With respect to the FY 2017 conditions at issue here, Defendants have explained these conditions were the logical outgrowth of two investigations conducted by the Department's Office of Inspector General ("OIG") – the respective import of which the Plaintiffs fundamentally misunderstand.  As explained at greater length in Defendants' opening memorandum, *see* Defs.' Op. Brief, at 24-26, the first of these investigations was conducted in 2007 and concerned the cooperation of State Criminal Alien Assistance Program ("SCAAP") recipients in the removal of criminal aliens from the United States. *See* AR-00001-00109 ("2007 OIG Audit").  The 2007 OIG Audit concluded broadly that "many state, county, and local law enforcement agencies are unwilling

to initiate immigration enforcement but have policies that suggest they are willing to cooperate with ICE when they arrest individuals on state or local charges and learn that those individuals may be criminal aliens." *Id.* at AR-00022-23.  Nine years later, OIG issued a second report, finding deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States." *Id.* at AR-00366-67 n.1.  In response to the changed circumstances reflected by the disparities between the 2007 and 2016 Reports – as well as the "common-sense" understanding that facilitating removal to eliminate the threat of recidivism by criminal aliens "help[s] keep our communities safe," AR-00993 – the Department rationally determined to renew the Section 1373 Condition and add the Notice and Access Conditions.  Accordingly, and for the additional reasons set forth in Defendants' opening memorandum, *see* Defs.' Op. Brief, at 22-28, Plaintiffs' APA claims fail because the Department's "reasons for" imposing the challenged conditions "were entirely rational."  *Fox Television*, 556 U.S. at 513, 517.

## V.      If the Court grants an Injunction, it should be limited to the parties in this case.

Lastly, the Plaintiffs attempt to overreach by seeking nationwide injunctive relief to benefit parties that are not before this Court.  But the Plaintiffs have failed to sufficiently explain why a nationwide injunction – as opposed to an injunction limited to the parties before this Court – is necessary to afford appropriate relief.  The Plaintiffs have not, for example, successfully shown that any funds to which they are supposedly entitled are at risk of transfer to other jurisdictions.  As the Supreme Court noted last term, "[t]he Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."  *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018).  This Court should not attempt to regulate the relationship between the United States and non-parties, many of which do not object to the conditions challenged here.

The Plaintiffs have clearly chosen one set of public policies regarding immigration.  Yet the Plaintiffs' request for nationwide relief ignores the reality that other jurisdictions are free to choose

vastly different policies.  Many jurisdictions have chosen policies that closely mirror the United States' immigration enforcement priorities, and as such, would have no objection to the challenged conditions.  At the same time, still other jurisdictions have chosen policies that are a mixture of opposition and cooperation to federal priorities.  Considering the gravity of any constitutional challenge to federal action, each of these choices by different jurisdictions must be evaluated on its own merits.  A one-size-fits-all injunction issued by a single district court is inappropriate, and the potential for "divergent results" counsels against issuing a nationwide injunction settling the propriety of the challenged conditions in relation to all States and localities.  Percolation of legal issues across the country is proper, necessary, and helpful for the federal courts to grapple with complicated issues.  "Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) (citations omitted).  This is so because "broad injunctions may stymie novel legal challenges and robust debate." *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).

Further, events in the current Byrne JAG litigation in Chicago reflect the inadvisability of a nationwide injunction.  The district court in that case initially entered a preliminary injunction with nationwide scope, but the *en banc* Seventh Circuit stayed the injunction as to all parties outside Chicago. *See City of Chicago v. Sessions*, No. 17-cv-2991 (7th Cir. June 26, 2018) (ECF No. 134).  And later, in entering a permanent injunction, the district court *sua sponte* chose to stay its nationwide application pending appeal. *See City of Chicago v. Sessions*, __ F.Supp.3d __, 2018 WL 3608564, at *18 (N. D. Ill. July 27, 2018).  The district court justified the stay by noting that the "scope of the injunction involves novel issues upon which reasonable minds could differ" and that because the appellate court had granted rehearing *en banc*, "Chicago's nationwide-scope argument is less auspicious than it had otherwise been." *Id.*

The reality of our legal system is that parties are generally expected to vindicate their own rights, not to sit on their hands.  To award nationwide injunctive relief reaching non-parties to this case would be an extraordinary step – a step from which other district courts have retreated.  Doing so would make significant new law, undermine the existence of class-action rules, and set courts on a path with no discernible limiting principle.  This Court should decline the Plaintiffs' invitation to do so.

## CONCLUSION

For the reasons set forth above and in the Defendants' Opening Brief, the Court should deny Plaintiffs' motion for partial summary judgment and grant in the Defendants' favor the motion to dismiss the Plaintiffs' claims challenging the FY 2017 immigration conditions, or alternatively, the motion for partial summary judgment on those same claims.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

CHAD A. READLER
Principal Deputy Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. TYLER
Assistant Director

  /s/ Daniel D. Mauler
DANIEL D. MAULER
Virginia State Bar No. 73190
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
(202) 616-0773
(202) 616-8470 (fax)
dan.mauler@usdoj.gov
Counsel for Defendants

## CERTIFICATE OF SERVICE

I certify that on October 8, 2018, I filed the foregoing document with the Clerk of Court via the CM/ECF system, causing it to be served electronically on all counsel of record.

  /s/ Daniel D. Mauler
DANIEL D. MAULER
Virginia State Bar No. 73190
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
(202) 616-0773
(202) 616-8470 (fax)
dan.mauler@usdoj.gov
Counsel for Defendants