IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**STATE OF NEW YORK,** *et al.*,

        Plaintiffs,

    v.

**UNITED STATES
DEPARTMENT OF JUSTICE,** *et al.*,

        Defendants,

Civil Action No. 1:18-cv-06471-ER

**CITY OF NEW YORK**,

        Plaintiff,

    v.

**WILLIAM P. BARR,** *et al.*,

        Defendants,

Civil Action No. 1:18-cv-06474-ER

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR
ALTERNATIVELY, MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

STATUTORY AND ADMINISTRATIVE BACKGROUND........................................................5

   I.   The Immigration and Nationality Act...........................................................5

   II.   DOJ's Office of Justice Programs and the Byrne JAG Program...................7

   III.   Defendants' Reservation of Arguments....................................................11

ARGUMENT........................................................................................................................12

   I.   Plaintiffs lack standing to challenge the FY 2018 Certification Requirement....................12

   II.   The FY 18 Conditions are authorized by statute and do not violate the
Separation of Powers. .........................................................................14

      A. The FY 18 Conditions are authorized by statute. ...............................14

      B.  The FY 18 Conditions do not violate the Separation of Powers. ...............15

      C.  The FY 18 Conditions do not violate 34 U.S.C. § 10228(a)......................19

   III.   The FY 18 Conditions do not violate the Spending Clause................................20

      A. The FY 18 Conditions are related to the purposes of the Byrne JAG Program. ..........21

      B. The FY 18 Conditions are unambiguous................................................22

   IV.   The FY 18 Conditions are rational under the Administrative Procedure Act....................23

   V.   If the Court grants an injunction, it should be limited to the current parties. ..................26

CONCLUSION......................................................................................................................27

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Altman v. Bedford Cent. Sch. Dist.*,
    245 F.3d 49 (2d Cir. 2001) ...............................................................................................12

*Arizona v. United States*,
    567 U.S. 387 (2012) .................................................................................................. 5, 25

*Barbour v. Wash. Metro. Area Transit Auth.*,
    374 F.3d 1161 (D.C. Cir. 2004) ........................................................................................21

*Bell v. Reno*,
    218 F.3d 86 (2d Cir. 2000) ...............................................................................................15

*Benning v. Georgia*,
    391 F.3d 1299 (11th Cir. 2004) .......................................................................................23

*Bigelow v. Virginia*,
    421 U.S. 809 (1975) ...........................................................................................................13

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ............................................................................................26

*Charles v. Verhagen*,
    348 F.3d 601 (7th Cir. 2003) ............................................................................................23

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ..................................................................................................... 24, 26

*City & Cty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ..........................................................................................26

*City of Chicago v. Sessions*,
    No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) ............................................26

*Clinton v. City of N.Y.*,
    524 U.S. 417 (1998) ...........................................................................................................16

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
    527 U.S. 666 (1999) ...........................................................................................................21

*County of Suffolk, N.Y. v. Sebelius*,
    605 F.3d 135 (2d Cir. 2010) .............................................................................................12

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND
MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*,
  887 F.2d 275 (D.C. Cir. 1989)*, as amended* (Oct. 10, 1989) .................................................16

*Duvall v. Att'y Gen. of U.S.*,
  436 F.3d 382 (3d Cir. 2006) .................................................................................................22

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .......................................................................................................24, 25

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) .............................................................................................................13

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018)..........................................................................................................26

*Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.*,
  46 F.3d 1264 (2d Cir. 1995) .................................................................................................24

*Klein v. Qlik Tech., Inc.*,
  906 F.3d 215 (2d Cir. 2018) .................................................................................................12

*Koslow v. Pennsylvania*,
  302 F.3d 161 (3d Cir. 2002) .................................................................................................22

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002).........................................................................................21, 23

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) .............................................................................................................20

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013) .................................................................................................13

*New York v. Dep't of Justice*,
  343 F. Supp. 3d 213 (S. D. N. Y. 2018) ..................................................................................2

*New York v. United States*,
  505 U.S. 144 (1992)...............................................................................................................21

*Nielsen v. Preap*,
  139 S. Ct. 954, 960 (2019) ......................................................................................................5

*Padilla v. Kentucky*,
  559 U.S. 356 (2010).................................................................................................................22

*Ross v. Bank of Am., N.A. (USA),*
    524 F.3d 217 (2d Cir. 2008) ...................................................................................12

*Sikhs for Justice Inc. v. Kerry,*
    663 Fed. App'x 54 (2d Cir. 2016) ...........................................................................13

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ..........................................................................................21, 22

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ...................................................................................................13

*Stone v. INS,*
    514 U.S. 386, 397 (1995) .........................................................................................15

*Town of Chester v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017) .............................................................................................26

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) .............................................................................................27

*TRW Inc. v. Andrews,*
    534 U.S. 19, 31 (2001) .............................................................................................15

*United States v. Quattrone,*
    402 F.3d 304 (2d Cir. 2005) .....................................................................................12

*Van Wyhe v. Reisch,*
    581 F.3d 639 (8th Cir. 2009) ....................................................................................23

*Virginia Soc'y for Human Life, Inc. v. FEC,*
    263 F.3d 379 (4th Cir. 2001) ....................................................................................27

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) .................................................................................................13

*Wojciechowski v. Metro. Life Ins. Co.,*
    1 Fed. App'x 77 (2d Cir. 2001) ................................................................................24

**STATUTES**

8 U.S.C. § 1101 ...................................................................................................... 5, 6

8 U.S.C. § 1226 ...................................................................................................22, 25

8 U.S.C. § 1227 ...................................................................................................... 5, 21

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND
MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

8 U.S.C. § 1228 ................................................................................................................22

8 U.S.C. § 1231 ................................................................................................................22

8 U.S.C. § 1252 ............................................................................................................. 6, 7

8 U.S.C. § 1306 ..................................................................................................................6

8 U.S.C. § 1324 ........................................................................................................... 6, 10

8 U.S.C. § 1357 ..................................................................................................................6

8 U.S.C. § 1366 ..................................................................................................................5

8 U.S.C. § 1373 ..........................................................................................................passim

8 U.S.C. § 1644 ............................................................................................................. 2, 7

18 U.S.C. § 1071 ..............................................................................................................10

28 U.S.C. § 510 ................................................................................................................15

34 U.S.C. § 10102 .....................................................................................................passim

34 U.S.C. § 10141 ............................................................................................................17

34 U.S.C. § 10152 .....................................................................................................passim

34 U.S.C. § 10153 ..............................................................................................................8

34 U.S.C. § 10156 ..............................................................................................................8

34 U.S.C. § 10202 ..............................................................................................................9

34 U.S.C. § 10122 ............................................................................................................20

34 U.S.C. § 10251 ......................................................................................................... 8, 21

42 U.S.C. § 3753 ..............................................................................................................19

An Act to Restructure the Federal Law Enforcement Assistance Administration,
  Pub. L. No. 96-157, §§ 202, 815, 93 Stat. 1167, 1172, 1206 (1979) ...................................20

Violence Against Women and Department of Justice Reauthorization Act of 2005,
  Pub. L. No. 109-162, 119 Stat. 2960 (2006) .....................................................7, 14, 16, 18

An Act to Assist State and Local Governments in Reducing the Incidence of Crime, to Increase the
Effectiveness, Fairness, and Coordination of Law Enforcement and Criminal Justice Systems at
all Levels of Government, and for other purposes,
Pub. L. No. 90-351, 82 Stat. 197 (1968)..................................................................................................3

**OTHER AUTHORITIES**

Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015),
rescinded by Exec. Order No. 13,809, 82 Fed. Reg. 41,499 (Aug. 28, 2017).....................................9

Best Practices in Event Deconfliction, Commission on Accreditation for Law
Enforcement Agencies,
https://www.calea.org/sites/default/files/EventDeconfliction_PoliceFoundation.pdf (last
visited Apr. 7, 2019)...................................................................................................................................1

Nationwide Officer Safety Event Deconfliction, National Criminal Intelligence
Resource Center, https://www.ncirc.gov/Deconfliction/ (last visited Apr. 7, 2019) ............1

Carl Campanile and Emily Saul, *Illegal immigrant charged with biting off ICE officer's fingertip*, NEW YORK
POST (Mar. 15, 2019), https://nypost.com/2019/03/15/illegal-immigrant-charged-with-
biting-off-ice-officers-fingertip/ .............................................................................................................3

*ICE arrests more than 20 released in New York after detainers ignored* (Mar. 5, 2019),
https://www.ice.gov/news/releases/ice-arrests-more-20-released-new-york-after-detainers-
ignored .........................................................................................................................................................3

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND
MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Law enforcement in this country is a cooperative endeavor.  Unlawful acts often implicate the jurisdiction of more than one agency, and local, state, tribal, and federal officials must work together in a variety of ways to fight crime and ensure public safety.  In order to work together effectively and safely, the free flow of law enforcement information is essential.  Each law enforcement agency possesses different information and different tools for collecting intelligence. When agencies operate in isolation, no agency has the complete picture, and the implications for public safety can be dire.  Further, when agencies conduct law enforcement operations, they must "de-conflict" to protect officer safety and ensure that other agencies do not inadvertently jeopardize their operations.  *See, e.g.*, Nationwide Officer Safety Event Deconfliction, National Criminal Intelligence Resource Center, https://www.ncirc.gov/Deconfliction/ (last visited Apr. 7, 2019); Best Practices in Event Deconfliction, Commission on Accreditation for Law Enforcement Agencies, https://www.calea.org/sites/default/files/EventDeconfliction_PoliceFoundation.pdf (last visited Apr. 7, 2019).  Obviously, information-sharing diminishes if agencies fear that recalcitrant jurisdictions will publicly release information shared through these channels for purposes of subverting the law.

In this case, Plaintiffs challenge certain requirements in the Fiscal Year ("FY") 2018 Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program"), including a requirement that protects against the public disclosure of sensitive federal law enforcement information by grant recipients.[1]  In Amended Complaints, the Plaintiffs challenge these requirements under Separation

---

[1] Two different cases have been related together in this action, as they have overlapping issues.  When necessary, Case No. 1:18-cv-06471-ER with plaintiffs led by the State of New York will be referred to as the "States Case," and Case No. 1:18-cv-06474-ER with the single plaintiff of

of Powers principals, the Spending Clause, and the Administrative Procedure Act.  Plaintiffs'

challenges to these common sense requirements must fail.  There is nothing improper in requiring

that a grant recipient that accepts federal funds designed to enhance law enforcement not actively

thwart federal law enforcement priorities.

This Court has previously considered certain conditions on the Byrne JAG grant program

that were also included in the 2017 fiscal year (specifically, the Access and Notice conditions, and

the Section 1373 compliance condition ), as well as the constitutionality of 8 U.S.C. § 1373.  *See New

York v. Dep't of Justice*, 343 F. Supp. 3d 213 (S. D. N. Y. 2018).  Defendants respectfully disagree with

the Court's rulings, and hereby reiterates, incorporates, and preserves for further review the

arguments made therein, including their arguments regarding the constitutionality of Section 1373,

which apply equally to 8 U.S.C. § 1644.[2]

Defendants respectfully urge the Court to revisit its prior ruling for reasons summarized

below.  There are real world consequences to Plaintiffs' failure to provide notice of release dates of

criminal illegal aliens for whom ICE detainers have been served, to provide access to prisons to

interview inmates for whom detainers have been served, and to share information mandated by

Section 1373.  This breakdown in cooperation endangers ICE agents, who must now undertake

enforcement actions outside the controlled confines of a prison.  *See* Decl. of Francisco Madrigal,

U.S. Immigration and Customs Enforcement, States Case ECF No. 90, ¶ 13 (contrasting situations

in which ICE officers are able to take qualifying criminal aliens into federal custody in "controlled,

---

the City of New York will be referred to as the "City Case."  For convenience, when referring to
documents previously filed in this case, the citation to the States Case will be given unless context
requires otherwise.

[2] *See* States Case, Dkt. Nos. 89, 99; City Case, Dkt. Nos. 51, 62.

law enforcement setting, where they have been searched for weapons and contraband" with "at-large in the community," in which "other people may be present, the surroundings are not secure, and individuals may be armed or ready to flee").  Just last month, an ICE agent was injured apprehending a suspect in the Bronx who had been released from custody despite an ICE detainer,[3] amongst many other examples of lack of cooperation endangering ICE agents and communities.[4]

Plaintiffs also challenge new Byrne JAG conditions not previously considered by this Court.  Even if the Court is inclined to maintain its earlier rulings regarding the Access and Notice conditions and the Section 1373 compliance conditions, it should rule in Defendants' favor on the new conditions.  Pursuant to the first of these conditions, beginning in FY 2018, the Office of Justice Programs ("OJP" or "Office") is requiring that Byrne JAG recipients not publicly disclose federal law enforcement information for the purpose of frustrating law enforcement operations. That the Department of Justice ("Department" or "DOJ") would include such a requirement as a condition on federal law enforcement funds should be unsurprising.  When Congress created OJP, which is the Department's primary grant-making component, it made a specific finding that "law enforcement efforts must be better coordinated, intensified, and made more effective at all levels of government." Pub. L. No. 90-351, 82 Stat. 197 (1968).

Consistent with that congressional finding, the purpose of this Byrne JAG condition is obvious:  If law enforcement partners at various levels of government are going to work together to address public safety, they must be free to share information without fear that the information will

---

[3]  Carl Campanile and Emily Saul, *Illegal immigrant charged with biting off ICE officer's fingertip*, NEW YORK POST (Mar. 15, 2019), https://nypost.com/2019/03/15/illegal-immigrant-charged-with-biting-off-ice-officers-fingertip/

[4]  *ICE arrests more than 20 released in New York after detainers ignored* (Mar. 5, 2019), https://www.ice.gov/news/releases/ice-arrests-more-20-released-new-york-after-detainers-ignored

be misappropriated and misused.  That Plaintiffs are now seeking to vindicate a contrary position is

remarkable, as OJP's authority to include this condition is clear:  The Office is authorized to

"maintain liaison with . . . State [and local] governments in matters relating to criminal justice."

34 U.S.C. § 10102(a)(2), (4).  When federal authorities liaise with State and local authorities, it is

natural for federal authorities to insist on the protection of sensitive law enforcement information

which, if publicly released, could endanger federal law enforcement and personnel.  The need for

this condition is even clearer given that an elected local official in another State recently made public

an impending federal law enforcement operation, intentionally frustrating the enforcement of federal

law and putting officers' lives at risk.  Moreover, this condition applies to federal law enforcement

information regarding both illegal aliens and "fugitive[s] from justice" under the federal criminal

laws, further illustrating the condition's relationship to the purposes of the Byrne JAG Program.

Defendants further demonstrate below that Plaintiffs lack standing to challenge another

condition not previously addressed by the Court, *viz.*, that an applicant for an FY 2018 Byrne JAG

grant submit certifications stating that the jurisdiction has no laws or policies that impede the

exercise of federal authority under certain statutes.  The Department of Justice has not chosen to

enforce this condition against any specific person in this case, and Plaintiffs accordingly cannot

satisfy the injury-in-fact requirement for Article III standing.

For these reasons, Plaintiffs' claims (other than those covered by the Court's ruling in this

matter of November 30, 2018 (*see* States Case, Dkt. No. 114; City Case, Dkt. No. 81) should be

dismissed with prejudice.

## STATUTORY AND ADMINISTRATIVE BACKGROUND

### I.      The Immigration and Nationality Act.

Enforcement of the immigration laws, including and especially the investigation and apprehension of criminal aliens, is quintessentially a law enforcement function.  Through the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States.  These responsibilities are assigned to law enforcement agencies, as the INA authorizes the Department of Homeland Security ("DHS"), the Department of Justice, and other Executive agencies to administer and enforce the immigration laws.  The INA gives the Executive Branch considerable authority and discretion to conduct and direct immigration enforcement pursuant to federal policy objectives.  *See Arizona v. United States*, 567 U.S. 387, 396-97 (2012).

Several outcomes and federal agency responsibilities under the INA turn on the existence and timing of local or state criminal proceedings against aliens.  For example, the INA provides that aliens who have committed certain classes of crimes – whether federal, state, or local – "shall" be removed from the United States upon order of the Attorney General or the Secretary of Homeland Security. *See*, *e.g.*, 8 U.S.C. § 1227(a).  A specific statute provides that every twelve months, the Attorney General must report to the House and Senate judiciary committees on "the number of illegal aliens convicted of felonies in any Federal or State court [during the preceding year]" and "the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies" – "stating the number incarcerated for each type of offense."  *Id.* § 1366(1), (2).  As the Supreme Court recognized, the mandatory detention provision of the INA "sprang from a 'concer[n] that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers.'" *Nielsen v. Preap*, 139 S. Ct. 954, 960 (2019) (quoting *Demore v. Kim*, 538 U.S. 510, 513 (2003)).

The connection between immigration law and criminal law is also reflected in the fact that the INA contains a number of criminal provisions related to immigration.  For example, the statute imposes criminal penalties on an alien for failing to register with federal authorities and for failing to notify federal authorities of a change of address.  8 U.S.C. §§ 1306(a), (b).  More seriously, the INA imposes criminal penalties on any person who conceals, harbors, or shields an alien from detention "in any place, including any building or any means of transportation," "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law."[5]  *Id.* § 1324(a)(1)(A)(iii).  It also imposes penalties for "engag[ing] in any conspiracy to commit any of the preceding acts" and for "aid[ing] or abet[ting] the commission of any of [those] acts."  *Id.* § 1324(a)(1)(A)(v).

The INA repeatedly contemplates coordination between federal officials and state and local officials on immigration enforcement.  For example, state and local officers are authorized to make arrests for violation of the INA's prohibitions against smuggling, transporting, or harboring aliens, *id.* § 1324(c), and to arrest certain felons who have unlawfully returned to the United States, *id.* § 1252c; *see id.* § 1357(g) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens).  Consistent with this coordination and with the importance of state and local criminal proceedings under the INA, certain provisions of federal immigration law protect the transfer of information regarding aliens between and among federal officials and state and local government entities.  Section 1373 of Title 8 provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government

---

[5] "Person" for purposes of that crime means "an individual or an organization."  8 U.S.C. § 1101(b)(3).

entity or official from sending to, or receiving from [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." Section 1644 of Title 8 contains substantially the same proscription. Section 1373 also states that no person or agency may prohibit or restrict a federal, state, or local government entity from "[m]aintaining such information" or from "[e]xchanging such information with any other Federal, State, or local government entity." By the same token, the INA requires federal immigration authorities to "cooperate with the States" to ensure that state and local officials have information to assist them in making arrests under the INA. *Id.* § 1252c(b).

## II.    DOJ's Office of Justice Programs and the Byrne JAG Program.

As described in prior filings before this Court, the Assistant Attorney General ("AAG") for OJP possesses "[s]pecific, general and delegated powers," including the power to "maintain liaison with . . . State [and local] governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(2), (4). The statute also authorizes the AAG to "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." *Id.* § 10102(a)(6). As will be discussed in detail below, Congress added the phrase conferring this general authority to impose special conditions and priority purposes in the Violence Against Women and Department of Justice Reauthorization Act of 2005, the same law that created the current version of the Byrne JAG Program. Pub. L. No. 109-162, §§ 1111, 1152(b), 119 Stat. 2960, 3094, 3113 (2006).

The predecessor to the Byrne JAG Program was created in the same statute that created OJP. Under this program, OJP is authorized to "make grants to States and units of local government . . . to provide additional personnel, equipment . . . and information systems for criminal justice, including for any one or more of [certain enumerated] programs." *Id.* § 10152(a)(1). In the same chapter,

"criminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies." *Id.* § 10251(a)(1).

The Byrne JAG Program provides that the "Attorney General may . . . make grants to States and units of local government" for law enforcement and related purposes. 34 U.S.C. § 10152(a)(1). The program provides "formula grants" – that is, grants that, when awarded are calculated using a statutory formula based on population, the rate of violent crime, and other factors. *Id.* § 10156. By statute, in order to request a Byrne JAG grant, the chief executive officer of a State or unit of local government must submit an application "in such form as the Attorney General may require," *id.* § 10153(a), and the application must include, among other things, "[a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will comply with . . . all . . . applicable Federal laws," and agree to undertake various activities to advance law-enforcement goals. *Id.* § 10153(a)(5)(D). For example, Applicants must provide assurances that they will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies." *Id.* § 10153(a)(4), (5)(C).

The Byrne JAG Program is also subject to the general authority of the AAG. Although the dollar amount of Byrne JAG grants are calculated using a formula, the AAG may still impose special conditions that grant recipients must meet in order to access allocated funds. *Id.* § 10102(a)(6). As particularly relevant here, the statute provides that he may "exercise such other powers and functions as may be vested in [him] pursuant to [Chapter 101 of Title 34, which includes the Byrne JAG Program] or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6) (emphases added).

Indeed, OJP has historically included numerous special conditions in Byrne JAG awards. For example, the Office has imposed, without objection, conditions related to information-sharing and

privacy protection, *see* State Case, Dkt. No. 91, Ex. A (New York City's FY 2016 Byrne JAG award)

¶ 30, research using human subjects, *see id.* ¶ 29, and training, *see id.* ¶¶ 32-33; Dkt. No. 91, Ex. B (New

York State's FY 2016 Byrne JAG award), ¶¶ 29, 30, 33 (same conditions applied to state jurisdictions).

Still additional conditions are intended to address a wide variety of goals, ranging from combating

human trafficking (*see* States Case, Dkt. No. 133, Ex. 53, ¶ 12 (New York State's FY 18 Byrne JAG

Award letter setting forth Special Conditions)), to requiring state compliance with DOJ's civil rights

and nondiscrimination regulations (*id.* at ¶¶ 18-20), to requiring an environmental impact analysis in

compliance with the National Environmental Policy Act under certain circumstances (*id.* at ¶ 50), and

to encouraging recipients to ban their employees from texting while driving (*id.* at ¶ 26).   Other

historical conditions imposed by the Assistant Attorney General have been inspired by Executive

Branch prerogatives, and in some instances resulted in *subsequent* congressional codification.   One such

condition, which prohibited use of Byrne JAG funds to purchase military style equipment, related in

part to an Executive Order issued by President Obama in 2015.  *See* State Case, Dkt. No. 91, Ex. A

¶ 49 (New York City's FY 2016 Byrne JAG award); Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan.

16, 2015), *rescinded by* Exec. Order No. 13,809, 82 Fed. Reg. 41,499 (Aug. 28, 2017).   Since 2012, other

conditions have required that recipients: (a) comply with specific national standards when purchasing

body armor and (b) institute a "mandatory wear" policy for any purchased armor.   State Case, Dkt.

No. 91, Ex. A ¶¶ 38-39 (New York City's FY 2016 Byrne JAG award).   While those conditions have

now been codified by Congress, *see* 34 U.S.C. § 10202(c)(1)(B), (C), they originated as exercises of

DOJ's authority to impose special conditions.   And the AAG has imposed an "American-made"

requirement for body armor purchases, something Congress did not choose to codify.   *Id.* at Ex. A,

¶ 38.   In recent years, the number of conditions attached to Byrne JAG Grants has typically numbered

over 50.  *See id.* at Ex. A (New York City's FY 2016 award, containing 52 conditions); States Case, Dkt.

No. 133, Ex. 53 (New York State's FY 2018 award, containing 67 conditions).   The conditions

— 9 —

attached to Byrne JAG grants have varied over time, depending on national law enforcement necessities and Department priorities.

For the current Byrne JAG grant cycle, Fiscal Year 2018, OJP notified potential applicants that awards under the Program would include certain conditions requiring modest cooperation with federal law enforcement responsibilities in the immigration setting. The Plaintiffs now challenge three of these new conditions. As issued to most of the 2018 applicants, those conditions require Byrne JAG recipients, within the "program or activity" funded by the award to observe the following new conditions:[6]

- Consistent with the objectives of federal law enforcement statutes – including 8 U.S.C. § 1324(a), the smuggling/harboring statute referred to above, and 18 U.S.C. § 1071 – not to publicly disclose any sensitive federal law enforcement information in an attempt to harbor or shield from detection either a "fugitive from justice" under the federal criminal laws or an alien who "has come to, entered, or remains in the United States" in violation of federal immigration law, regardless of whether the disclosure would violate 8 U.S.C. § 1324(a) (the "public-disclosure condition"), States Case, Dkt. No. 133, Ex. 53, Special Condition ¶ 44 (New York State's FY 2018 Byrne JAG award).

- To collect information from the recipient of a subaward regarding any policies about communication or cooperation with the Department of Homeland Security (DHS) or the Immigration and Customs Enforcement (ICE) (the "information collection condition"), *id.* at Ex. 53, Special Condition ¶ 47 (New York State's FY 2018 Byrne JAG award).

- In order to assess each applicant's ability to fulfill the FY 2018 Access and Notice conditions, the FY 2018 Byrne JAG solicitation stated that OJP would require each applicant to submit

---

[6] These three conditions will be collectively referred to as the "FY 18 Conditions" in this brief.

certifications from its chief legal officer and chief executive stating that the jurisdiction had no laws or policies that impede the Federal Government's exercise of its authority under the statutes cited in those conditions (the "FY 2018 certification requirement").  *See* Administrative Record ("AR") at AR01193, AR01207, AR01211 (2018 Local Solicitation at 1, 41, 45).[7]  The certifications were part of the application, and were due no later than when the applicant accepted an award.  *Id.* at AR01193 (2018 Local Solicitation at 27).

### III.          Defendants' Reservation of Arguments.

As noted above, Defendants recognize that this Court has ruled against conditions used in the FY 2017 Byrne JAG Program that are similar to the FY 2018 Notice, Access, and Section 1373 conditions.  Defendants also recognize that the Court's injunction regarding these conditions apply to future grant years.  Defendants respectfully disagree with these rulings and ask the Court to approve the FY 18 version of those conditions, but do not now repeat in full their arguments in defense of the Notice, Access, and Section 1373 conditions in the FY 2018 Byrne JAG Program, other than to incorporate herein their arguments made previously and to preserve them for appellate review.  *See* State Case, Dkt. Nos. 89, 99 (Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of their Motion to Dismiss or in the alternative, Motion for Summary Judgment regarding FY 17 conditions and Reply); City Case, Dkt. Nos. 51, 62 (same).  The Defendants have appealed to the U.S. Court of Appeals for the Second Circuit regarding this Court's November 30, 2018 ruling on the FY 2017 conditions.  *See Dep't of Justice v. New York*, Case No. 19-267 (2d Cir.).

---

[7] The Administrative Record supporting the FY 18 Conditions consists of 1,867 pages and was filed by the Plaintiffs as a series of exhibits to the Declaration of Nancy M. Trasande.  *See* States Case, Dkt. No. 133, Exs. 61-79. Duplicate copies of the AR was also filed in the City Case.  *See* City Case, Dkt. No. 102, Exs. 61-79.

Additionally, New York City now challenges Section 1644 using arguments substantially similar to those advanced against Section 1373 in prior briefing.  *See* Pls.' Memo., at 26-27.  Defendants will not repeat at length their arguments regarding the constitutionality of Section 1373, which apply equally to Section 1644, and instead, incorporate them by reference to preserve them for appellate review.  *See* State Case, Dkt. No. 99 at 34-45 (Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of their Motion to Dismiss or in the alternative, Motion for Summary Judgment regarding FY 17 conditions); City Case, Dkt. No. 51 at 34-45 (same).

Defendants reserve their right to defend the FY 2018 Byrne JAG conditions based on the outcome of *Dep't of Justice v. New York*, Case No. 19-267 (2d Cir.), and other cases.

# ARGUMENT

## I.      Plaintiffs lack standing to challenge the FY 2018 Certification Requirement.

Under Article III of the Constitution, the jurisdiction of the federal courts extends only to "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  "Article III of the Constitution limits federal courts' authority—that is, our subject matter jurisdiction—to disputes involving 'live cases and controversies.'"  *County of Suffolk, N.Y. v. Sebelius*, 605 F.3d 135, 140 (2d Cir. 2010) (quoting *United States v. Quattrone*, 402 F.3d 304, 308 (2d Cir. 2005)).

Two principles of justiciability are involved here:  standing and ripeness.  "Standing and ripeness are closely related doctrines that overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical."  *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 226 (2d Cir. 2008) (quotation marks and alterations omitted).  "'[S]tanding doctrine evaluates a litigant's personal stake as of the outset of litigation.'"  *Klein v. Qlik Tech., Inc.*, 906 F.3d 215, 221 (2d Cir. 2018) (quoting *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir. 2001)).  Meanwhile, "[t]o be justiciable, a cause of action must be ripe—it must present a real,

substantial controversy, not a mere hypothetical question.  Ripeness is peculiarly a question of timing." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (internal quotation marks and citations omitted).  Where a plaintiff lacks standing or its claims are non-justiciable, the court lacks jurisdiction.  *See Sikhs for Justice Inc. v. Kerry*, 663 Fed. Appx. 54, 56 (2d Cir. 2016).

Both the State and City Plaintiffs challenge the certification requirements imposed under the FY 18 Conditions.  *See* State Case, Am. Compl., ¶ 104; City Case, Am. Compl., ¶¶ 48-50.  *See also* Pls.' Memo, at 11-12 (challenging he "Certification of Compliance" condition).  To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must demonstrate an "injury in fact," a "fairly traceable" causal connection between the injury and defendant's conduct, and redressability. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998).  The injury needed for constitutional standing must be "concrete," "objective," and "palpable," not merely "abstract" or "subjective."  *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975). Additionally, the injury must be "certainly impending" rather than "speculative."  *Whitmore*, 495 U.S. at 157, 158.  "[S]tanding is perhaps the most important of [the jurisdictional] doctrines."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation marks omitted).

Applying these standards here, the Plaintiffs cannot show any "injury in fact" from the FY 2018 certification requirement.  DOJ has not sought to enforce the certifications against any specific person in this case.  No case has been brought by the United States allegeing a violation of this certification, and until that actually happens, such a development is "speculative" rather than "certainly impending."  *Whitmore*, 495 U.S. at 157, 158.[8]

---

[8] In any event, the FY 2018 certification requirement is permissible on its merits for the reasons Defendants have stated in relation to the Access, Notice, and Section 1373 compliance conditions, which are incorporated herein by reference.  *See* State Case, Dkt. No. 89, at 12-50; City Case, Dkt. No. 51, at 12-50.

II.    **The FY 18 Conditions are authorized by statute and do not violate the Separation of Powers.**

A.    **The FY 18 Conditions are authorized by statute.**

The Byrne JAG Program provides that the "Attorney General may . . . make grants to States and units of local government" for law enforcement and related purposes. 34 U.S.C. § 10152(a)(1). Yet, Plaintiffs allege that the three Byrne JAG conditions described above exceed DOJ's statutory authority and intrude upon the powers of Congress. *See* State Case, Am. Compl. ¶¶ 4, 88-97, 104, 106, 151-173; City Case, Am. Compl., ¶¶ 6, 45-53, 99, 101, 149-172. *See also* Pls. Memo., at 15-21. Nevertheless, an examination of the relevant statutes, with their framework and history, shows that the Assistant Attorney General for OJP possesses ample authority to impose the FY 18 Conditions discussed above, including requiring award recipients not to disclose sensitive federal law enforcement information in an attempt to harbor or shield an alien or fugitive from detection.

As previously noted, Congress amended the relevant statutes to authorize the AAG to place "special conditions on all grants," and to determine "priority purposes for formula grants" 34 U.S.C. § 10102(a)(6).  As mentioned above, the phrase conferring this general authority to impose special conditions and priority purposes was added by Congress in 2006. Pub. L. No. 109-162, §§ 1111, 1152(b), 119 Stat. 2960, 3094, 3113 (2006).

This amendment is significant.  Plaintiffs attempt to turn this amendment into a dead letter by arguing that is "not a stand-alone grant of authority to the Assistant Attorney General to attach any conditions to the grants," and that "such authority must come from elsewhere in the chapter or have been delegated by the Attorney General, who may only delegate it to the extent that he has such power himself."  Pls.' Memo, at 19 (internal quotation marks and citations omitted).

The problem here is that Plaintiffs never coherently explain what the amendment of "special conditions" and "priority purposes" means.  Effectively, their reading deprives the amendment of

any meaning.  But this runs against long-standing statutory interpretation principles that "no clause, sentence, or word shall be [rendered] superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).  *See also Bell v. Reno*, 218 F.3d 86, 91 (2d Cir. 2000) (discussing the "well-known canon of statutory construction that, in general, a statute should not be construed so as to render a word or clause inoperative").  That principle has particular force here because Congress expressly added the "special conditions" and "priority purposes" authority in 2006, which would have been entirely unnecessary if it merely referred to pre-existing authority conferred by Congress. After all, another law *already* authorized the Attorney General to delegate the performance of his functions. *See* 28 U.S.C. § 510.  Confirming the plain text of Section 10102(a)(6), a report accompanying the enactment of this language stated that the provision "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).  Thus, Plaintiffs' denial of this authority gives no practical effect to *either* the "special condition" *or* the "priority purpose" power.  In other words, Plaintiffs attempt to read the amendment out of existence.  "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). Thus, the most natural meaning of "special conditions" and "priority purposes" allows the AAG to require the challenged conditions in this case.

Indeed, if the court is to rule against Defendants, doing so will call into question the ability to impose numerous other conditions tied to Byrne JAG grants, including but not limited to conditions regarding training and reporting related to the use of force and prevention of bias, IT interoperability, and compliance with the Department of Justice Global Justice Information Sharing Initiative.

### B.  The FY 18 Conditions do not violate the Separation of Powers.

As a preliminary matter, Plaintiffs do not dispute that Congress may, consistent with the

separation of powers, properly delegate to the Executive Branch the authority to attach conditions on agency spending. *See, e.g., Clinton v. City of N.Y.*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money.") (Breyer, J. dissenting); *DKT Mem'l Fund Ltd.*, 887 F.2d 275 at 280-81 (upholding conditions on spending imposed by President where statute authorized President to set certain "terms and conditions as he may determine"). Accordingly, Plaintiffs' assertion that Congress itself does not currently impose immigration enforcement conditions on the receipt of Byrne JAG funds, *see* Pls.' Memo., at 18, is wholly beside the point. Rather, the sole relevant question here is whether Congress has *delegated* sufficient authority to DOJ to impose these conditions.

The history of 34 U.S.C. § 10102(a)(6) and the structure of the relevant statutes demonstrate that Congress has delegated such authority to OJP. Congress created the current version of the Byrne JAG Program in 2006, when the Reauthorization Act merged two earlier programs. Pub. L. No. 109-162, 119 Stat. 2960. Before the 2006 amendments, the relevant statute provided only that the AAG for OJP was authorized to "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the [AG]." *See* 42 U.S.C. § 3712(a)(6) (2005). In the Reauthorization Act, Congress expressly amended this provision by inserting the words "including placing special conditions on all grants, and determining priority purposes for formula grants." Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113; *see* 34 U.S.C. § 10102(a)(6). And confirming this amendment's plain text, a committee report accompanying the Act states unequivocally that the amendment would "allow[] the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

Moreover, this authority clearly applies to the Byrne JAG Program. Section 10102(a) sets forth the general duties and authorities of the AAG for OJP, and the Bureau of Justice Assistance,

which directly administers the Byrne JAG Program, is part of OJP.  By statute, the Director of the

Bureau of Justice Assistance "report[s] to the Attorney General through the Assistant Attorney

General [for OJP]."  34 U.S.C. § 10141(b); *see* OJP, *About Us*, https://ojp.gov/about/about.htm

(OJP organizational chart) (last visited Apr. 8, 2019).  Thus, the authority conferred on the AAG by

Section 10102(a)(6) necessarily reaches all programs under his supervision, including the Byrne JAG

Program.

      Also, both of the conditions at issue – requiring grant recipients to refrain from disclosing

federal law enforcement information in order to harbor or shield an alien from federal immigration

authorities and to identify laws and policies contrary to federal priorities – are closely related to OJP's

statutory responsibility to "maintain liaison" among federal, state, and local authorities.  34 U.S.C. §

10102(a)(2).  Federal, state, and local law enforcement priorities may differ, and federal authorities

are entitled to know when state and local laws or policies may conflict with federal priorities.  An

agency statutorily charged with maintaining that "liaison" is naturally empowered to secure

information regarding state and local laws and policies.  And where federal law enforcement officials

do work with state and local officials, federal officials are naturally entitled to insist on the protection

of sensitive federal law enforcement information.  In this way, requiring disclosure of such

information is no different than three other long-standing information disclosure obligations under

the current program.  JAG Recipients are required to provide certain information to the National

Instant Background Check Systems (NICS) under certain circumstances.  *See* States Case, Dkt. No.

133, Ex. 53, ¶ 40 (New York State's FY Byrne JAG award letter and Special Conditions).  Recipients

are also required to provide an environmental impact analysis under certain circumstances.  *Id.* at Ex.

53, ¶ 50.  And finally, recipients are required to upload eligible DNA profiles to a FBI database

under certain circumstances.  *See id.* at Ex. 53, ¶ 59.  Yet, the Plaintiffs fail to challenge these three

information-sharing requirements.

Further, the independent authority to "determin[e] priority purposes for formula grants" plainly reflects an intent to allow the AAG to exercise a degree of discretion over *formula* grants in particular.  Such discretion must, if this language is to be afforded any meaningful legal effect, encompass at least the minimal authority to (1) articulate broad priorities for a given Fiscal Year's grant program; (2) include, on program application forms, inquiries regarding the designated priority purpose; and (3) protect the confidentiality of related federal law enforcement information.  In other words, the authority to "determine priority purposes" necessarily includes the authority to *prioritize* federal grant monies for those state and local jurisdictions that assist in furthering relevant federal *purposes*.  Additionally, because states and localities would decline to participate in – and thus, effectively annul – the Byrne JAG Program were this authority invoked to impose unreasonable conditions, any arguable risk of overreach that might otherwise inhere in this authority has a built-in structural check.

That OJP may adopt immigration-related "priority purposes" for Byrne JAG grants is further shown by Congress's express incorporation of an optional immigration-related purpose from one of the predecessor programs.  In enacting the current Byrne JAG Program, Congress provided that the purposes of the program "shall be construed to ensure that a grant . . . may be used for any purpose for which a grant was authorized to be used under either or both of the programs specified in section 10151(b) of this title [the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs and the Local Government Law Enforcement Block Grants program], as those programs were in effect immediately before January 5, 2006."  34 U.S.C. § 10152(a)(2).  And assisting federal immigration authorities was clearly among the purposes of the Edward Byrne Memorial State and Local Law Enforcement Assistance Program, under which each State grantee was required to establish,

> [A] plan under which the State will provide without fee to the Immigration and Naturalization Service, within 30 days of the date of their conviction, notice of conviction of aliens who have been convicted of violating the criminal laws of the State . . . .

42 U.S.C. § 3753(a)(11) (in effect before Jan. 5, 2006).  Thus, Congress's express incorporation of the prior program's purposes further supports OJP's authority to include assisting in the enforcement of immigration law as one of the priority purposes of the current Byrne JAG Program.

## C.  The FY 18 Conditions do not violate 34 U.S.C. § 10228(a).

Plaintiffs argue that the FY 18 Conditions violate 34 U.S.C. § 10228(a), which provides that nothing in the federal statutes "shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof."  *See* Pls.' Memo., at 21-24.  But nothing in either the public-disclosure condition or the questionnaire condition has that effect.  To begin with, Byrne JAG grantees voluntarily consent to award conditions in return for receiving federal funds.  Thus, this is a *voluntary* program.  If grantees are unhappy with the conditions, they are free to decline the award and thus avoid any obligation to comply with its conditions.  Additionally, requiring modest cooperation with federal law enforcement in exchange for federal law enforcement funds does not constitute exercising "direction, supervision, or control."  Rather, the conditions challenged here only enhance coordination among federal, state, and local law enforcement officers, which Congress expressly encourages.  For example, concurrent with the enactment of 34 U.S.C. § 10228, Congress created the National Institute of Justice (a component of OJP), *see* An Act to Restructure the Federal Law Enforcement Assistance Administration, Pub. L. No. 96-157, §§ 202, 815, 93 Stat. 1167, 1172, 1206 (1979), which has as one of its express statutory purposes "to develop programs and projects . . . to improve and expand cooperation among the Federal Government, States, and units of local government . . . ."  34

U.S.C. § 10122(c)(2)(F).

Plaintiffs' assertion that these conditions constitute prohibited "direction, supervision, and control" is also belied by their acceptance of numerous other Byrne JAG conditions.  Plaintiffs' Byrne JAG award for FY 2016, which they accepted without challenge, imposed over fifty "special conditions."  *See* State Case, Dkt. No. 91, Ex. A (New York City's FY 2016 Byrne JAG award containing 53 Special Conditions); State Case, Dkt. No. 91, Ex. B (New York State's FY 2016 Byrne JAG award containing 54 Special Conditions).  The Plaintiffs agreed, for example, to *require* that certain law enforcement officers wear body armor, *see id.*, Ex. A ¶ 39; refrain from certain specific actions related to human trafficking, including any "[a]cts that directly support or advance trafficking in persons," *see id.*, Ex. A ¶ 9; to comply with DOJ regulations on civil rights and non-discrimination, including regulations prohibiting specific forms of discrimination on the basis of religion, *see id.*, Ex. A ¶ 16; to refrain from requiring employees to sign any "internal confidentiality agreement or statement that prohibits or otherwise restricts, or purports to prohibit or restrict, the reporting (in accordance with law) of waste, fraud, or abuse," *see id.*, Ex. A ¶ 20; and to participate in "training events, technical assistance events, or conferences" sponsored by OJPJ's Bureau of Justice Assistance, *see id.*, Ex. A ¶ 33.  If those conditions do not constitute exercising "direction, supervision, and control" over grantees – as shown by Plaintiffs' own agreement to them – then neither do the immigration-related conditions challenged here.

### III.   The FY 18 Conditions do not violate the Spending Clause.

Count Nine of the City's First Amended Complaint contends that the challenged Byrne JAG conditions violate the Spending Clause.  First Am. Compl. ¶¶ 165-69.  Under its spending authority, Congress "may offer funds to the States, and may condition those offers on compliance with specified conditions."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012) ("*NFIB*").  It is well-established that the Spending Clause confers broad authority, such that conditions imposed

pursuant to this authority may permissibly require States to "tak[e] certain actions that Congress could not [otherwise] require them to take." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999). Nevertheless, the spending authority is subject to certain discrete limitations, two of which are purportedly at issue here: (1) "conditions on federal grants may be illegitimate if they are unrelated to the federal interest in particular national projects or programs"; and (2) conditions must be "unambiguous[]." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). As set forth below, both the FY 18 Conditions easily satisfy each of these requirements.

### A. The FY 18 Conditions are related to the purposes of the Byrne JAG Program.

Initially, it is well-established that the "relatedness" aspect of *Dole* does not pose a difficult hurdle; to the contrary, this is a "low-threshold" inquiry that "is a far cry from . . . an exacting standard for relatedness." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *see New York v. United States*, 505 U.S. 144, 167 (1992) (stating that only "some relationship" is necessary between spending conditions and "the purpose of the federal spending."). As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The FY 18 Conditions at issue here plainly satisfy this permissive requirement. The Byrne JAG Program promotes "criminal justice" by supporting programs such as law enforcement, prosecution, crime prevention, and corrections. 34 U.S.C. § 10152(a)(1). The term "criminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies." *Id.* § 10251(a)(1). Further, immigration enforcement, which the conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, at a minimum for the simple reason that a conviction for any of a wide variety of criminal offenses renders an alien removable from this country. *See* 8 U.S.C. § 1227(a)(2). Indeed, the term "criminal alien" appears multiple

times in the INA, and "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes." *Duvall v. Att'y Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006); 8 U.S.C. §§ 1226(c), 1228(a), 1231(a)(6), 1378; *see Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes") (citation omitted). Once removed, a criminal alien who has committed a removable offense – for example, an aggravated felony, domestic violence, child abuse, or certain firearm offenses – is no longer present in this country with the potential to re-offend.

Thus, the challenged conditions ensure that any "program or activity" funded by the Byrne JAG Program does not thwart the federal government's exercise of its ability to remove aliens not lawfully present in the United States or removable due to a criminal conviction. *See Koslow v. Pennsylvania*, 302 F.3d 161, 176 (3d Cir. 2002) (observing that the challenged condition "govern[ed] only a 'program or activity' receiving federal funds," and noting that this limitation aided in satisfying "the 'relatedness' requirement articulated in *Dole*"). Declining to fund jurisdictions that disclose federal law enforcement information in an attempt to hinder federal law enforcement is plainly related to the criminal-justice purposes of the Byrne JAG Program.

## B.     The FY 18 Conditions are unambiguous.

Another limitation on the spending power is that when the Federal Government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted). The FY 18 Conditions easily satisfy this requirement, especially in light of the accompanying "Rules of Construction." *See, e.g.*, State Case, Dkt. No. 133, Ex 53, ¶ 44(4)(A) (New York State's FY 18 Byrne JAG Award Approval Letter and Special Conditions).

The public-disclosure condition states very clearly that it prohibits the "public disclosure . . . of federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from

detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12 – without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. [§§] 1071 or 1072 or of 8 U.S.C. [§] 1324(a)." *Id.* at ¶ 44(1).  The Rules of Construction, moreover, define "alien," "federal law enforcement information," and "public disclosure" in detail.  *See id.* at ¶ 44(4).  Similarly, the questionnaire condition in the Byrne JAG solicitation asks very clearly whether the recipient has "any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE" or is "subject to any [such] laws from a superior political entity (e.g., a state law that binds a city)."  AR1250-51 (FY 18 Byrne JAG State Solicitation).

Finally, any arguable marginal uncertainty regarding the outer boundaries of these conditions would not render them unconstitutionally ambiguous.  Indeed, "the exact nature of [grant] conditions may be largely indeterminate, provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required."  *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see also Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper." (citation omitted)); *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) (finding notice requirement satisfied even where condition "provides a pliable standard"); *Mayweathers*, 314 F.3d at 1067 (finding notice requirement satisfied even where condition required compliance with a "standard [that] is perhaps unpredictable because it has resulted in different determinations in different courts").

## IV.     The FY 18 Conditions are rational under the Administrative Procedure Act.

Plaintiffs assert that the FY 18 Conditions violate the Administrative Procedure Act.  *See* States' Am. Compl., ¶¶ 158-171; City's Am. Compl., ¶¶ 154-164; Pls.' Memo., at 24-26 (arguing that the additional conditions are "arbitrary and capricious").   These claims are without merit.

— 23 —

As an initial matter, if the challenged conditions are statutorily authorized and comport with the Spending Clause – which, as shown above, they do – it is unclear how "arbitrary or capricious" scrutiny could otherwise limit DOJ's broad discretion.

In any event, when the courts review an agency's action under the "arbitrary or capricious" standard, it is required to be highly deferential, and to presume the agency action is valid as long as it is supported by a rational basis.  "Under the 'highly deferential' arbitrary and capricious standard, the 'question before a reviewing court . . . is whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *Wojciechowski v. Metro. Life Ins. Co.*, 1 Fed. Appx. 77, 79 (2d Cir. 2001) (quoting *Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.,* 46 F.3d 1264, 1271 (2d Cir. 1995)).  This standard of review is "narrow," and does not authorize a district court "to substitute its judgment for that of the agency."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Here, Plaintiffs' claims fail because "the agency's reasons for" imposing the challenged conditions "were entirely rational."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009).  Even assuming OJP's imposition of the conditions were subject to arbitrary-and-capricious review notwithstanding the absence of any statutory standards governing the choice of special conditions and priority purposes, it is reasonable for OJP to deny federal law enforcement funding to a jurisdiction that releases aliens whom the jurisdiction itself suspects of criminal conduct without allowing federal officials to interrogate or apprehend those aliens.  That judgment does not depend on a factual determination of the sort that Plaintiffs appear to demand.  It simply requires asking whether OJP should blind itself to the degree of cooperation provided (or not provided) by localities to federal law enforcement efforts when distributing federal law enforcement grants, as well as to the public safety threats caused by that lack of cooperation.  Thus, the challenged conditions are "common-sense measures," *id.*, and "even in the absence of evidence, the agency's predictive

judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *Fox Television*, 556 U.S. at 521.

In any event, the Administrative Record submitted by the Defendants further supports the rationality of the conditions.  Prompted partly by a DOJ Inspector General report describing deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States," AR00366, DOJ under the prior Administration instituted a requirement for FY 2016 Byrne JAG grantees to certify compliance with 8 U.S.C. § 1373 in order to protect the exchange of information among federal, state, and local law enforcement.  *Id.* at AR00392-97.  For the FY 2017 grant cycle, the Department maintained that condition and added conditions similar to the interview and custody conditions described above, to "increase[e] information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep our communities safe."  *Id.* at AR00993 (Backgrounder on Grant Requirements).  The FY 2018 conditions challenged here responded to further developments, including, in relation to the public-disclosure condition, at least one instance in which an elected local official publicly disclosed an impending federal law enforcement operation designed to apprehend suspected illegal aliens.  *Id.* at AR01038-39 (Tweet and Facebook post of Oakland, California, Mayor Libby Schaaf announcing planned ICE enforcement operation).

Finally, as discussed above in relation to the Spending Clause, immigration enforcement undoubtedly relates to criminal justice.  Numerous federal statutes expressly connect these two subjects.  The challenged conditions thus rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress plainly contemplates in immigration enforcement.  *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373; *Arizona*, 567 U.S. at 411-12 ("Consultation

between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations.").

Accordingly, the challenged conditions are rational, and this Court should not "substitute its judgment" for that of the Department of Justice. *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416.

## V.     If the Court grants an injunction, it should be limited to the current parties.

Finally, the State Plaintiffs' prayer for relief in their Amended Complaint seek a permanent injunction against use of the challenged requirements in the Byrne JAG Program overall, without regard to the identity of the applicant or grantee. *See* State Case, Am. Compl., at 42.  The Plaintiffs, however, seem to retreat from this request in their Memorandum, instead seeking an injunction against Defendants imposing the FY 18 Conditions on them and their political subdivisions. *See* Pls.' Memo, at 31 (noting that the Court previously granted an injunction in favor of the Plaintiffs and their political subdivisions regarding FY 17 conditions and stating that the "Court should do the same with respect to the FY 2018 immigration-related conditions.").

To be crystal-clear, the Plaintiffs lack standing to seek such an injunction on behalf of any non-parties in this case, other than their political subdivisions.  As the Supreme Court has observed many times, a plaintiff "must establish standing separately for each form of relief sought," *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017), and a "plaintiffs' remedy must be limited to the inadequacy that produced [its] injury in fact," *Gill v. Whitford,* 138 S. Ct. 1916 (2018); *see City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) (vacating nationwide aspect of injunction); *accord California v. Azar*, 911 F.3d 558, 582-84 (9th Cir. 2018) (reversing nationwide preliminary injunction as abuse of discretion); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1243-45 (9th Cir. 2018) (vacating and remanding nationwide injunction).  Moreover, as an equitable matter, nationwide injunctions "take a toll on the federal court system – preventing

legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (noting tendency of nationwide injunctions to "thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue").

## CONCLUSION

Accordingly, the Court should dismiss with prejudice Plaintiffs' challenges to the FY 2018 public-disclosure condition, the information collection condition, and the certification requirement.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. TYLER
Assistant Director

 /s/ Daniel D. Mauler
DANIEL D. MAULER
Virginia State Bar No. 73190
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20530
(202) 616-0773
(202) 616-8470 (fax)
dan.mauler@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on April 12, 2019, I filed the foregoing document with the Clerk of Court via the CM/ECF system, causing it to be served electronically on all counsel of record.

 /s/ *Daniel D. Mauler*
DANIEL D. MAULER
Virginia State Bar No. 73190
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20530
(202) 616-0773
(202) 616-8470 (fax)
dan.mauler@usdoj.gov

*Counsel for Defendants*
