IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**STATE OF NEW YORK,** *et al.*,

        Plaintiffs,

        v.

**UNTED STATES
DEPARTMENT OF JUSTICE,** *et al.*,

        Defendants,

Civil Action No. 1:18-cv-06471-ER

**CITY OF NEW YORK**,

        Plaintiff,

        v.

**WILLIAM P. BARR,** *et al.*,

        Defendants,

Civil Action No. 1:18-cv-06474-ER

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS, OR
IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................................................1

ARGUMENT........................................................................................................................................3

    I.   Plaintiffs Lack Standing to Challenge the FY 2018 Certification Requirement....................3

    II.  The FY 18 Conditions Are Authorized By Statute and Do Not Violate
        Either the Separation of Powers or Other Provisions. ..........................................................4

        A.   The FY 18 Conditions Are Authorized by Statute.................................................4

        B.   The FY 18 Conditions Do Not Violate the Separation of Powers.................................. 10

        C.   The FY 18 Conditions Do Not Violate 34 U.S.C. § 10228(a). ........................................ 10

    III.  The Additional Conditions Are Consistent with the APA. ............................................. 12

    IV.  The Challenged Conditions are Consistent with the Spending Clause. ......................... 13

        A.   The FY 2018 Conditions Are Related to the Purposes of the Byrne JAG Program. ... 13

        B.   The Requirements Are Unambiguous................................................................. 16

    V.   If the Court Grants an Injunction, It Should Be Limited to the Current Parties............. 18

CONCLUSION.................................................................................................................................. 18

# TABLE OF AUTHORITIES

**CASES**

*American Sur. Co. of N.Y. v. Marotta,*
  287 U.S. 513 (1933)...................................................................................... 6

*Barbour v. Wash. Metro. Area Transit Auth.,*
  374 F.3d 1161 (D.C. Cir. 2004) ................................................................... 14

*Benning v. Georgia,*
  391 F.3d 1299 (11th Cir. 2004) ............................................................. 16, 17

*Bigelow v. Virginia,*
  421 U.S. 809 (1975).......................................................................................... 3

*California v. Sessions,*
  284 F. Supp. 3d 1015 (N.D. Cal. 2018) ...................................................... 15

*Charles v. Verhagen,*
  348 F.3d 601 (7th Cir. 2003) ....................................................................... 16

*Duvall v. Atty. Gen. of U.S.,*
  436 F.3d 382 (3d Cir. 2006).......................................................................... 14

*Ely v. Velde,*
  451 F.2d 1130 (4th Cir. 1971) ...................................................................... 11

*Eringer v. Principality of Monaco,*
  No. CV 10-1803 GAF (EX), 2011 WL 13134271 (C.D. Cal. Aug. 23, 2011),
  *aff'd,* 533 F. App'x 703 (9th Cir. 2013).................................................... 9

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009)...................................................................................... 13

*Garcia v. United States,*
  469 U.S. 70 (1984).......................................................................................... 6

*Holder v. Hall,*
  512 U.S. 874 (1994)........................................................................................ 6

*Mayweathers v. Newland,*
  314 F.3d 1062 (9th Cir. 2002) .......................................................... 2, 14, 17

*National Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012)...................................................................................... 11

DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR
IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT

*New York v. United States*,
   505 U.S. 144 (1992) ........................................................................... 2, 13, 14

*Providence Yakima Med. Ctr. v. Sebelius*,
   611 F.3d 1181 (9th Cir. 2010) ................................................................. 2, 12

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ......................................................................... 13, 16, 18

*Stone v. INS*,
   514 U.S. 386 (1995) ........................................................................................ 8

*United States v. Atlantic Research Corp.*,
   551 U.S. 128 (2007) ........................................................................................ 5

*Van Wyhe v. Reisch*,
   581 F.3d 639 (8th Cir. 2009) ...................................................................... 17

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ........................................................................................ 3

**STATUTES**

1 U.S.C. § 1 ....................................................................................................... 6

5 U.S.C. § 552 ................................................................................................... 9

8 U.S.C. § 1226 ............................................................................................... 14

8 U.S.C. § 1228 ............................................................................................... 14

8 U.S.C. § 1231 ............................................................................................... 14

8 U.S.C. § 1378 ............................................................................................... 14

34 U.S.C. § 10102 ..................................................................................... *passim*

34 U.S.C. § 10152 ......................................................................................... 4, 8

34 U.S.C. § 10153 ......................................................................................... 8, 9

34 U.S.C. § 10202 ............................................................................................. 8

34 U.S.C. § 10228 ......................................................................... 1, 2, 11, 12

34 U.S.C. § 10251 ........................................................................................... 14

42 U.S.C. § 3712 (2000) ........................................................................................................ 4, 5

Violence Against Women and Department of Justice Reauthorization Act of 2005,
    Pub. L. No. 109-162, 119 Stat. 2960 (2006) ............................................................... 4

**REGULATIONS**

28 C.F.R. § 66.12 (2014) ...................................................................................................... 6, 7

**OTHER AUTHORITIES**

Best Practices in Event Deconfliction, Commission on Accreditation for Law Enforcement
    Agencies, https://www.calea.org/sites/default/files/EventDeconfliction_PoliceFoundation.pdf
    (last visited Apr. 7, 2019) ................................................................................................ 10

H.R. Rep. No. 109-233 (2005)............................................................................................... 5, 6

*Liaison*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998) ................................. 9

Marial Alper, Mathew R. Durose, & Joshua Markman, *2018 Update on Prisoner Recidivism: A
    9-Year Follow-UP Period (2005-2014)*, Bureau of Justice Statistics (May 23, 2018),
    https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6266 .......................................................... 15

Nationwide Officer Safety Event Deconfliction, National Criminal Intelligence Resource Center,
    https://www.ncirc.gov/Deconfliction/ (last visited Apr. 7, 2019) .......................................... 10

# INTRODUCTION

This case asks whether the Department of Justice ("DOJ") can require recipients of Byrne JAG funds to refrain from publicly disclosing federal law enforcement information for the purpose of shielding from detection unlawfully present aliens and fugitives (the "public-disclosure condition"); to collect certain information from the recipient of a subaward regarding any policies about communication or cooperation with the Department of Homeland Security or Immigration and Customs Enforcement (the "information collection condition"); and to certify the absence of any laws or policies that impede the Federal Government's exercise of its authority under certain specifically identified statutes (the "FY 2018 certification condition") (collectively, the "FY 2018 conditions"). Plaintiffs ignore or discount the statutes and standards that govern their challenge to these requirements.

At the outset, Plaintiffs lack standing to challenge the FY 2018 certification condition—and any such challenge is in any event unripe—since it is undisputed that DOJ has not attempted to enforce the requirement against anyone in this case. On the merits, although Congress has expressly empowered the Assistant Attorney General ("AAG") of the Office of Justice Programs ("OJP") to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants," 34 U.S.C. § 10102(a)(6), Plaintiffs assert that this provision confers no authority other than that already vested by other statutes. This argument would transform a grant of authority into meaningless surplusage. Plaintiffs further discount Congress' mandate for the AAG of OJP to "maintain liaison" with state and local governments "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), essentially arguing that the authority makes the AAG only a messenger. In fact, the challenged conditions fall squarely within the authority conferred by each of these provisions. And although Plaintiffs assert that the FY 2018 conditions amount to "direction, supervision or control over [a] police force or . . . criminal justice agency" of a state or locality, 34 U.S.C. § 10228(a), Plaintiffs' argument grapples with neither the

*voluntary* nature of the Byrne JAG program nor the implications of their boundless interpretation of § 10228(a) (which would call into question dozens of other requirements that neither Plaintiffs nor any other grantees have ever challenged). Plaintiffs also ignore both the Supreme Court's instruction that the "relatedness" aspect of the Spending Clause requires only "some relationship" between spending conditions and the purposes of the program involved, *New York v. United States*, 505 U.S. 144, 167 (1992), and the principle that this "low-threshold" inquiry is "a far cry from imposing an exacting standard," *Mayweathers v. Newland,* 314 F.3d 1062, 1067 (9th Cir. 2002). Similarly, Plaintiffs ignore that the "arbitrary and capricious" standard under the Administrative Procedure Act ("APA") is "highly deferential" to the agency. *See Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010).

Under the statutes and standards that govern here, Plaintiffs' challenge to the FY 2018 Byrne JAG Program should be dismissed.[1] The AAG's authority to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants" amply supports each of the FY 2018 conditions. In addition, the AAG's authority to "maintain liaison" (together with his other statutory authorities) requires him to facilitate a close bond of cooperation between federal law enforcement and state and local enforcement. This authority independently supports both the public-disclosure condition and the requirement for Byrne JAG applicants to provide information about their laws and policies on communicating with certain law enforcement authorities. These requirements, moreover, bear more

---

[1] As noted in Defendants' previous memorandum (ECF No. 147), Defendants recognize that this Court has previously ruled against certain FY 2017 Byrne JAG conditions that are very similar to the notice, access, and information conditions in the FY 2018 Byrne JAG Program, and that the Court's injunction regarding those provisions apply to future grant years. As previously stated, Defendants respectfully disagree with these rulings and ask the Court to approve the FY 18 version of those conditions, but do not now repeat in full their arguments in defense of the notice, access, and Section 1373 conditions in the FY 2018 Byrne JAG Program, other than to incorporate their arguments made previously and to preserve them for appellate review.

than "some relationship" to the purposes of the Byrne JAG Program, as the subject requirements and the Program seek to further criminal justice and public safety. And these requirements are more than reasonable under the APA, especially given the demonstrated need to protect federal law enforcement information to safeguard federal officers, the suspects they encounter, and the general public.

## ARGUMENT

### I. Plaintiffs Lack Standing to Challenge the FY 2018 Certification Requirement.

As Defendants explained in their previous brief, Plaintiffs cannot show any "injury in fact" from the FY 2018 certification requirement because DOJ has not sought to enforce the certifications against any specific person or entity in this case. *See* ECF No. 147 ("Dfts.' Mem.") at 12-13. Plaintiffs thus lack constitutional standing to challenge this requirement, because they fail to demonstrate injury that is "concrete," "objective," and "palpable," as opposed to merely "abstract" or "subjective." *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975). Any future injury is instead merely "speculative" rather than "certainly impending." *Whitmore*, 495 U.S. at 157, 158. For similar reasons, Plaintiffs' challenge to that condition is not yet ripe, because it depends entirely on the conjecture that the United States will seek to enforce that requirement against Plaintiffs. Dfts.' Mem. at 12-13.

Plaintiffs resist this straightforward conclusion, but their responses miss the point. Defendants' position is not that the certification is "entirely optional," ECF No. 154 ("Pltfs. Mem.") at 3—they expect prospective grantees to comply with this entirely reasonable condition.[2] The point is that, unless and until DOJ seeks to enforce the FY 2018 certification condition against Plaintiffs, it is entirely speculative to suggest that application of the condition will result in the withholding of funds. This aspect of Plaintiffs' challenge must be dismissed for lack of jurisdiction.

---

[2] As noted in Defendants' previous brief, the FY 2018 certification requirement is permissible on its merits for the reasons Defendants have previously stated. *See* Dfts' Mem. at 13 n.8

## II.    The FY 18 Conditions Are Authorized By Statute and Do Not Violate Either the Separation of Powers or Other Provisions.

### A.    The FY 18 Conditions are Authorized By Statute.

The Byrne JAG Program provides that the "Attorney General may . . . make grants to States and units of local government" for law enforcement and related purposes.  34 U.S.C. § 10152(a)(1).  Contending that the additional conditions exceed DOJ's statutory authority, Plaintiffs focus heavily on the formula used for Byrne JAG grants.  Pltfs' Mem. at 5-8.  But the Department has never claimed authority to deviate from the statutory formula established by Congress for determining the size of a particular jurisdiction's award.  The fact that a grantee's *allocation* is determined by the statutory formula does not excuse a grantee from the *requirements* of the grant, nor does it permit a grantee to demand its share free from special conditions—provided, of course, that those conditions are statutorily authorized.  As Defendants have previously explained, the additional conditions are authorized by multiple statutory provisions.

1.    Plaintiffs do not dispute that, in 2006, when Congress created the Byrne JAG program, the AAG for OJP *already* possessed the authority to "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the Attorney General." 42 U.S.C. § 3712(a)(6) (2000).  Yet in the same statute that created the Byrne JAG program, Congress amended this language, for the first time conferring power on the AAG to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6); *see* Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, §§ 1111, 1152(b), 119 Stat. 2960, 3094, 3113 (2006).  And to remove any doubt about the new nature of this power, the legislative history of the Byrne JAG program confirms that the language added in 2006 "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants."  H.R. Rep. No. 109-233, at 101 (2005).

Congress' statutory amendments here are significant. Congress expressly delegated authority to set "priority purposes" on *formula* grants to the AAG. Inherent in setting "priority purposes" is the authority to determine whether a particular grant application would advance the "priority purposes" established by the AAG. This undermines the Plaintiffs' overly-simplistic argument that the AAG has only a ministerial role to issue formula grants. Otherwise, Congress' 2006 amendment is empty language. And this is in addition to Congress' delegation of authority to the AAG to place "special conditions" on *all* grants (including formula grants). Thus, Congress recognized (and authorized) the AAG to set "special conditions" on formula grants, along with establishing "priority purposes" for the use of formula grants.

Plaintiffs' argument amounts to a contention that Congress added this language for no purpose at all. They insist that the "special conditions" and "priority purposes" language provides no new authority, but merely "reflects a choice by Congress to clarify that the Assistant Attorney General may exercise powers delegated by the Attorney General." Pltfs' Mem. at 9. No one doubts that statutory language can "perform[] a significant function simply by clarifying" the meaning of statutory text, *United States v. Atlantic Research Corp.*, 551 U.S. 128, 137 (2007), but it can only perform that function where there is some ambiguity that requires clarification in the first place. There was no need for clarification here: again, when the relevant language was added in 2006, the AAG already possessed authority to exercise powers already granted to him by statute or delegated by the Attorney General. *See* 42 U.S.C. § 3712(a)(6) (2000). Plaintiffs surely cannot suggest that Congress needed a statutory amendment to "clarify" or "illustrate" that the AAG possessed authority that Congress had already expressly conferred on him.

Plainly, the term "including" as used in this statute means "and" or "in addition to." *See, e.g., American Sur. Co. of N.Y. v. Marotta*, 287 U.S. 513, 517 (1933) (observing that the term "include" is often used as "a word of extension or enlargement"). Indeed, the Dictionary Act uses the term in

precisely this fashion, repeatedly using the word "include" to expand the meaning of the preceding language. *See* 1 U.S.C. § 1 (explaining, for example, that "words importing the masculine gender include the feminine as well"). Whatever the limits of the Department's previous authority, the amendment undoubtedly established that the AAG has the power to impose "special conditions" and determine "priority purposes" for grants. If that were not the case, there would have been no reason to enact the amendment. Thus, even if the "including" clause were read to refer only to authority that was conferred on the AAG in Chapter 101 of Title 34, the "including" clause itself, as the legislative history confirms, "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101.

In addition to plain text, Plaintiffs' argument ignores, among other things, the statement by the House Judiciary Committee that this language does indeed "allow[] the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005) (emphasis added). The Supreme Court has "repeatedly stated that [when resort to legislative history is necessary,] the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill [in question], which represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Garcia v. United States*, 469 U.S. 70, 76 (1984) (citation omitted); *see Holder v. Hall*, 512 U.S. 874, 932 n. 28 (1994) (Thomas, J., concurring).

Plaintiffs thus attempt to give some content to their interpretation of § 10102(a)(6) by reprising their previous arguments that "special conditions" should be read to refer to a particular type of special condition imposed on "high-risk" grantees under a general Department regulation, 28 C.F.R. § 66.12 (2014), that was in effect between 1988 and 2014. Pltfs' Mem. at 10-11. But Plaintiffs do not explain why Congress would need to provide additional statutory authority for a regulation that existed, apparently unchallenged, under the authority that predated the 2006 amendment. On the other hand,

Congress would have reason to make explicit the AAG's authority to impose special conditions as deemed appropriate, especially given the many wide-ranging substantive conditions that cannot be explained by Plaintiffs' theory and that have been imposed on these grants for many years. Moreover, even on its own terms, the cited regulation did not purport to define the universe of "special conditions" applicable to all types of grantees. Rather, the regulation merely described one type of special condition that was applicable to one type of grantee: "Special grant or subgrant conditions for 'high-risk' grantees." 28 C.F.R. § 66.12 (2014). Plaintiffs do not explain why the only type of special conditions authorized under § 10102(a)(6) would be those applicable to high-risk grantees; the statute, unlike the regulation, does not mention high-risk grantees and includes further authority to impose priority purposes on grants which cannot be squared with Plaintiffs' theory.

Relatedly, Plaintiffs' assertion that "the FY 2018 solicitations for Byrne JAG funding apply this interpretation of 'special conditions,'" Pltfs' Mem. at 11, is meritless. The language Plaintiffs cite merely states that a higher-risk applicant "may affect the funding decision and/or result in additional reporting requirements, monitoring, *special conditions*, withholding of award funds, or other additional award requirements." FY 2018 State Solicitation at 26-27 (emphasis added). This does not amount to a claim that *all* special conditions are limited to high-risk applicants—just as this language, by suggesting that high-risk applicants may be subject to "monitoring" and "withholding of award funds," of course does not mean that other applicants are exempt from these and other generally applicable features of the Byrne JAG program.

In short, Plaintiffs' denial of Defendants' authority under § 10102(a)(6) gives no practical effect to *either* the "special condition" *or* the "priority purpose" power. But "[w]hen Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). Thus, the most natural meaning of "special conditions" and "priority purposes" allows the AAG to require the challenged conditions in this case.

Moreover, as Defendants previously explained, *see* Dfts' Mem. at 15, Plaintiffs' reading of § 10102(a)(6) as adding nothing to the AAG's authority would call into question the Government's ability to impose numerous other conditions tied to Byrne JAG grants.  This includes conditions regarding training and reporting related to the use of force and prevention of bias, IT interoperability, and compliance with the Department of Justice Global Justice Information Sharing Initiative.  Dfts' Mem. at 15.  Urging otherwise, Plaintiffs' labor mightily to distinguish the FY 2018 conditions from others applicable to the program, contending that they "are fundamentally different from any prior or current condition because all were authorized by a statute or other federal authority governing federal grant-making, or concern the grant-related performance issues of any particular grantee."  Pltfs' Mem. at 11.  But this is wrong.  For example, the conditions restricting the purchase of certain military-style equipment go beyond the restrictions on "vehicles" and "luxury items" contained in 34 U.S.C. § 10152(d).  Similarly, the codification of certain conditions relating to body armor in 2016, see 34 U.S.C. § 10202(c)(1)(B), (C), occurred only after the AAG imposed them as special conditions in 2012.  And the AAG has imposed an "American-made" requirement for body armor purchases, which Congress has not chosen to codify.  Try as they might, Plaintiffs cannot account for the AAG's past adoption of these special conditions advancing particular federal law enforcement interests, none of which has ever been questioned by Congress or challenged as *ultra vires* by a grant recipient, including Plaintiffs.

   **2.**     Even if § 10102(a)(6) did not by itself authorize the FY 2018 conditions—which it does—Congress also authorized the AAG for OJP to "maintain liaison with . . . State governments in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), to dictate the "form" of Byrne JAG applications, *id.* § 10153(a), and to require compliance with all "applicable Federal laws," *id.* § 10153(a)(5)(D).  These authorities amply support the public-disclosure condition and the requirement for Byrne JAG applicants to provide information about certain of their laws and policies.

The public-disclosure condition enables federal, state, and local law enforcement officials to work together effectively and safely, such that they readily fall within the AAG's authority to "maintain liaison." *Id.* § 10102(a)(2). Operational security—the confidentiality of law enforcement operations—is essential to such operations. Thus, for example, the federal Freedom of Information Act protects the confidentiality of operational law enforcement information. *See* 5 U.S.C. § 552(b)(7) (exempting "records or information compiled for law enforcement purposes" to the extent disclosure "could reasonably be expected to interfere with enforcement proceedings" or "disclose techniques and procedures for law enforcement investigations or prosecutions").

In arguing to the contrary, Plaintiffs assert that this authority encompasses only "bilateral conversations or meetings." Pltfs' Mem. at 7 (internal quotation marks omitted). But one who "maintains liaison" does more than engage in dialogue. A liaison is defined as "a close bond or connection" or "a person who establishes and maintains communication for mutual understanding and cooperation." *See Liaison*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998). Thus, the AAG is responsible for maintaining "a close bond or connection" between federal and state criminal justice authorities and for facilitating "mutual understanding and cooperation" among such authorities. In order to work together effectively and safely, the free flow of law enforcement information is essential. This clearly encompasses, at minimum, protecting the confidentiality of federal law enforcement information provided to state and local agencies and assessing the ability of such agencies to engage in law enforcement cooperation by gathering information about their laws and policies. *Cf. Eringer v. Principality of Monaco*, No. CV 10-1803 GAF (EX), 2011 WL 13134271, at *5 (C.D. Cal. Aug. 23, 2011), *aff'd*, 533 F. App'x 703 (9th Cir. 2013) (stating that plaintiff's contract for "maintaining liaison" between Principality and foreign intelligence agencies entailed "regularly shar[ing] sensitive intelligence information").

One important aspect of the "liaison" duty is to encourage "deconfliction" between federal and local law enforcement agencies. When agencies conduct law enforcement operations, they must "de-conflict" to protect officer safety and ensure that other agencies do not inadvertently jeopardize their operations. *See, e.g.*, Nationwide Officer Safety Event Deconfliction, National Criminal Intelligence Resource Center, https://www.ncirc.gov/Deconfliction/ (last visited Apr. 7, 2019); Best Practices in Event Deconfliction, Commission on Accreditation for Law Enforcement Agencies, https://www.calea.org/sites/default/files/EventDeconfliction_PoliceFoundation.pdf

 (last visited Apr. 7, 2019). When agencies operate in isolation, no agency has the complete picture, and the implications for public safety can be dire. Obviously, information-sharing diminishes if agencies fear that recalcitrant jurisdictions will publicly release information shared through these channels for purposes of subverting the law. Thus, when federal authorities liaise with State and local authorities, it is wholly reasonable for federal authorities to insist on the protection of sensitive law enforcement information which, if publicly released, could endanger federal law enforcement and personnel. Dfts. Mem. at 4.

### B. The FY 18 Conditions Do Not Violate the Separation of Powers.

Because the challenged conditions are authorized by statute, Plaintiffs' argument that they violate the separation of powers, Pltfs' Mem. at 20, lacks merit. Plaintiffs do not dispute that Congress may, consistent with the separation of powers, properly delegate to the Executive Branch the authority to attach conditions on agency spending. Dfts' Mem. at 15-16. Because Congress has done so here, this challenge should be rejected.

### C. The FY 18 Conditions Do Not Violate 34 U.S.C. § 10228(a).

Contrary to Plaintiffs' argument, Pltfs' Mem. at 17-20, 34 U.S.C. § 10228(a) does not prohibit the FY 2018 conditions. Section 10228(a) prohibits the federal government from "exercis[ing] any direction, supervision or control over any police force or any other criminal justice agency" of any

state or locality.  34 U.S.C. § 10228(a).  The point of this statute is to ensure that the federal government does not nationalize state and local police forces.  As the Fourth Circuit has explained, "[t]he dominant concern of Congress apparently was to guard against any tendency towards federalization of local police and law enforcement agencies." *Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971).

The FY 2018 conditions are far afield from this concern and from the language of the statute. A requirement that grantees refrain from publicly disclosing sensitive federal law enforcement information and abide by other reasonable requirements—as a condition of participating in a *wholly voluntary* federal program—does not amount to the Department of Justice exercising "direction, supervision, or control" over state and local law enforcement.  After all, the Supreme Court has recognized that Congress may offer funds conditioned on compliance with specified conditions to "induce States to adopt policies that the Federal Government itself could not impose." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012).  At all times, Plaintiffs are free to forego Byrne JAG program funds if any particular condition proves undesirable or unpalatable.[3]  This statute, however, does not entitle them to dictate the terms on which they may help themselves to federal funds, ignoring lawfully imposed conditions in the process.

And notwithstanding Plaintiffs' assertion that they have supplied a "detailed articulation of Section 10228(a)'s meaning," Plaintiffs again make no real effort to reconcile their expansive interpretation of Section 10228(a)—which treats as wholly irrelevant the voluntary nature of the Byrne JAG program—with their acceptance of numerous other Byrne JAG conditions. New York City's

---

[3] Plaintiffs characterize the Department's argument as asserting that "'requiring modest cooperation' is not 'exercising "direction, supervision, or control,"'" and criticize the Government for purportedly not explaining "how being 'required' to 'cooperate' is any different from being directed or controlled." Pltfs.' Mem. at 19.  In fact, the Government explained that "requiring modest cooperation with federal law enforcement *in exchange for federal law enforcement funds* does not constitute exercising 'direction, supervision, or control.'"  Dfts.' Mem. at 18 (emphasis added).

Byrne JAG award for FY 2016, which the City accepted without challenge, imposed more than fifty "special conditions." Dfts. Mem. at 20. The City agreed, for example, to refrain from certain specific actions related to human trafficking, including any "[a]cts that directly support or advance trafficking in persons"; to comply with DOJ regulations on civil rights and non-discrimination, including regulations prohibiting specific forms of discrimination on the basis of religion; to refrain from requiring employees to sign any "internal confidentiality agreement or statement that prohibits or otherwise restricts, or purports to prohibit or restrict, the reporting (in accordance with law) of waste, fraud, or abuse"; and to complete law enforcement training provided by OJP's Bureau of Justice Assistance. *Id.* But Plaintiffs have never alleged that these and many other conditions constitute "direction, supervision, and control" over grantees—indeed, they have *agreed* to them—and make no meaningful effort to reconcile that agreement with their challenge to the conditions at issue.

## III. The Additional Conditions Are Consistent with the APA.

In relation to its claim under the APA, Plaintiffs fail to meaningfully explain how the challenged grant requirement can be "arbitrary and capricious" under the APA if it is statutorily authorized and comports with the Spending Clause, as shown above. Indeed, virtually all of Plaintiffs' arbitrary-and-capricious arguments amount to claims that the conditions are inconsistent with the Byrne JAG statute. If these claims are rejected—which they should be—there is no basis for deeming the conditions arbitrary and capricious.

In any event, the FY 2018 conditions readily satisfy this "highly deferential" standard, *see Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010), especially in light of the actual disclosure of an impending federal law enforcement operation by an elected official in California. *See* Admin. Record at AR01038-39. It is "entirely rational" for OJP to deny federal law enforcement funding to a jurisdiction that publicly discloses sensitive federal law enforcement information in an attempt to shield an alien or fugitive from detection or that refuses to provide

information about its laws or policies on communicating with certain federal law enforcement authorities. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009).

In response, Plaintiffs argue that the advanced disclosures of federal law enforcement operations by the mayor of Oakland are insignificant and insufficient to justify a special condition. Pltfs.' Mem. at 23. They incorrectly minimize the serious risks that law enforcement officers could face when an operation is revealed to targets. Moreover, nothing in the APA requires evidence of a large problem of unauthorized disclosures to establish the reasonableness of conditioning federal law enforcement funds on protecting federal law enforcement information. Plaintiffs also fault Defendants for failing to offer any reason for the new conditions, but this is false for the reasons explained in Defendants' previous brief. *See* Dfts.' Mem. at 24-26.

## IV. The Challenged Conditions are Consistent with the Spending Clause.

Under the Spending Clause, conditions on federal spending must bear "some relationship" to the purpose of the spending, *New York v. United States*, 505 U.S. 144, 167 (1992), and the conditions must be stated so as to enable the recipients "to exercise their choice knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). These are not demanding requirements and, notwithstanding Plaintiffs' arguments, they are easily met here.

### A. The FY 2018 Conditions Are Related to the Purposes of the Byrne JAG Program.

The Supreme Court has held that the Constitution requires only "*some* relationship" between spending conditions and the purposes of the program involved, *New York v. United States*, 505 U.S. 144, 167 (1992) (emphasis added), and this "low-threshold" inquiry is "a far cry from imposing an exacting standard," *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002). Indeed, the Supreme Court has *never* "overturned Spending Clause legislation on relatedness grounds." *Barbour v. Wash. Metro.*

*Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004). As Defendants previously explained, this "some relationship" test is easily met here. Dfts' Mem. at 21-22.

Plaintiffs' responses ignore the highly permissive standard for relatedness under the Spending Clause. Plaintiffs also discount the multiple ways in which criminal law is intertwined with immigration law. Among other things, the term "criminal alien" appears multiple times in the Immigration and Nationality Act ("INA"), and "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes." 8 U.S.C. §§ 1226(c), 1228(a), 1231(a)(6), 1378; *Duvall v. Atty. Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006). The requirements challenged here ensure, among other things, that any "program or activity" funded by the Byrne JAG Program does not publicly disclose any sensitive federal law enforcement information in an attempt to harbor or shield from detection either a "fugitive from justice" under the federal criminal laws or an alien who "has come to, entered, or remains in the United States" in violation of federal immigration law – thus also serving the purposes of the program.

Urging otherwise, Plaintiffs' response focuses almost entirely on the purportedly local nature of criminal law enforcement and the proposition that immigration enforcement is civil in nature. Pltfs.' Mem. at 25. But these observations are plainly insufficient to demonstrate that there is *no* relationship between the challenged requirements and the purposes of the Byrne JAG program. Indeed, the term "criminal justice" is defined broadly under the Byrne JAG statute. *See* 34 U.S.C. § 10251(a)(1). There, Congress defined it to mean more than simply prosecuting individuals for violations of criminal law. Rather, it includes "activities pertaining to crime prevention, control, or reduction" in addition to the mere "enforcement of the criminal law." *Id.* Here, ensuring that grantees do not publicly disclose sensitive federal law enforcement information to shield dangerous individuals from detection obviously fits within this broad definition. More broadly, once removed, a criminal alien has no opportunity to re-offend, which controls, prevents, and reduces crime.

This is particularly true given high recidivism rates, indicating that it is likely that a criminal alien not removed will again engage in criminal activity. *See* Marial Alper, Mathew R. Durose, & Joshua Markman, *2018 Update on Prisoner Recidivism: A 9-Year Follow-UP Period (2005-2014)*, Bureau of Justice Statistics (May 23, 2018), https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6266. Moreover, ensuring that immigration enforcement efforts are not in conflict with the activities of local criminal law enforcement is an essential component of proper management of dual law enforcement entities. *Cf. California v. Sessions*, 284 F. Supp. 3d 1015, 1033 (N.D. Cal. 2018) (noting that "criminal law impacts the INA in a variety of ways" and that "the relationship the government needs to add conditions to the receipt of grants does not need to be close"). Thus, preventing the disclosure of federal law enforcement information that is shared to ensure the safety and avoid conflicts between the operations of two authorized law enforcement agencies is necessarily related to the criminal-justice purposes of the Byrne JAG Program. The challenged conditions fall squarely within the statutory definition of "criminal justice," even if immigration enforcement itself is considered to be civil in nature.

Moreover, the "federal law enforcement information" to be protected by the public-disclosure condition encompasses any "law enforcement sensitive information communicated or made available, by the federal government, to a State or local government entity," States Case, Dkt. No. 133, Ex. 53, Special Condition ¶ 44 (New York State's FY 2018 Byrne JAG award), not just information regarding the enforcement of immigration law. Additionally, the fact that the public-disclosure condition forecloses grantees from disclosing federal law enforcement information to conceal either unlawfully present aliens or fugitives from criminal justice further shows the requirement's relationship to the purposes of the Byrne JAG Program. This condition seeks to prevent federal grantees from using federal law enforcement information to defeat federal law enforcement objectives, whether the targets of that enforcement are violating federal immigration law *or* federal criminal law.

Plaintiffs also argue that, rather than furthering the criminal justice purposes of the Byrne JAG program, the additional requirements "do violence to it," by purportedly restricting local policies that "help New York City combat crime and keep its residents safe." Pltfs.' Mem. at 25. New York City's argument that it is in fact furthering efforts to "combat crime and keep its residents safe" by *publicly disclosing* sensitive federal enforcement information—in order to harbor or shield from detection fugitives from justice and aliens who remain in the United States in violation of federal immigration law—is difficult to fathom. In any event, Plaintiffs' policy disagreement is beside the point. Because the challenged conditions have "some relationship"—indeed, ample relationship—to the purposes of the Byrne JAG program, this requirement is satisfied.

## B. The Requirements are Unambiguous.

The challenged requirements also satisfy the governing standards on clarity under the Spending Clause. On this point too, Plaintiffs largely ignore the governing legal standards. To avoid blindsiding State grantees, if the Federal Government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted). Although the Federal Government must clearly state *the existence* of a condition, the courts hold that "the *exact nature* of [grant] conditions may be largely indeterminate, provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted) (emphasis added). "Once Congress clearly signals its intent to attach . . . conditions . . . it need not specifically identify and proscribe in advance every conceivable state action that would be improper." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004). Indeed, courts have found the notice requirement satisfied even where a particular condition "provide[s] a pliable standard," *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th

Cir. 2009), or a "standard [that] is perhaps unpredictable because it has resulted in different determinations in different courts." *Mayweathers*, 314 F.3d at 1067.

In arguing that the challenged requirements are impermissibly ambiguous, Plaintiffs complain that the Rules of Construction purportedly provide insufficient guidance on what constitutes an "indirect" attempt to "conceal" an undocumented person. Pltfs' Mem. at 26. Plaintiffs also fault the FY 2018 certification requirement for "fail[ing] to specify what types of laws, rules, policies or practices 'impede the exercise by federal officers of authority' relating to certain immigration-related statutes." Pltfs' Mem. at 26. But the FY 2018 Byrne JAG solicitation identifies the specific statutes at issue and merely requires applicants to certify through their chief legal officer and chief executive that the jurisdiction has no laws or policies that impede the Federal Government's exercise of its authority under the specific cited statutes. In both instances, Plaintiffs appear to require the Department of Justice to "specifically identify and proscribe in advance every conceivable . . . action that would be improper," which the Spending Clause does not require. *See Benning*, 391 F.3d at 1306. The challenged requirements are set forth at some length, with definitions and Rules of Construction as needed, which more than satisfies the Spending Clause's standards of clarity. State Case, Dkt. No. 133.

Plaintiffs also argue that the challenged requirements are unconstitutionally ambiguous because they allegedly cover indeterminate types of sensitive law enforcement information. Pltfs.' Mem. at 26; *see also id.* at 27 n.38 (attempting to distinguish cases approving even indeterminate standards by contending that the additional requirements "impose novel standards for which there is no statutory guidance"). But the purported uncertainty cited by Plaintiffs is either not ambiguous at all or is too particular to constitute a constitutional violation. As is clearly understood by Plaintiffs, the point of this requirement is to prevent state and local authorities from disclosing in advance news of federal law enforcement operations. This is clearly illustrated by the disclosure by the Mayor of Oakland, California, on Twitter and Facebook, of a planned operation. Further, the Rules of

Construction clearly define "federal law enforcement information" as "law enforcement sensitive information communicated or made available, by the federal government, to a State or local government entity." *See* States Case, ECF No. 133-1 at 20.

In any event, Plaintiffs can always ask OJP for clarification on these questions. The question under the ambiguity element of the Spending Clause is whether applicants can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207. To the extent an applicant is uncertain about the meaning of a grant requirement, it can seek clarification from the federal agency, which would presumably be bound by any explanation it provides regarding the "consequences" of the requirement, allowing the applicant to act "knowingly." It is also consistent with the liaison role specifically assigned by Congress.

## V. If the Court Grants an Injunction, It Should Be Limited to the Current Parties.

As Defendants previously noted, Plaintiffs' amended complaint is unclear as to whether it seeks relief as to non-parties, but their initial memorandum seeks an injunction that is limited to them and their political subdivisions. *See* Dfts.' Mem. at 26. Plaintiffs lack standing to seek such an injunction on behalf of any non-parties in this case (other than their political subdivisions), *id.*, and Plaintiffs' latest brief confirms that they do not seek broader injunctive relief here, Pltfs' Mem. at 28.

## CONCLUSION

Accordingly, the Court should dismiss with prejudice Plaintiffs' challenges to the FY 2018 public-disclosure condition, the information collection condition, and the certification requirement.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. TYLER
Assistant Director

 /s/ Daniel D. Mauler
DANIEL D. MAULER
Virginia State Bar No. 73190
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20530
(202) 616-0773
(202) 616-8470 (fax)
dan.mauler@usdoj.gov

*Counsel for Defendants*